ANN RAVEL (62139)
aravel@mcmanislaw.com
McMANIS FAULKNER
a Professional Corporation
50 West San Fernando Street, 10th Floor
San Jose, California 95113
Telephone:     (408) 279-8700
Facsimile:     (408) 279-3244

GLEN E. SUMMERS (176402)
glen.summers@bartlitbeck.com
KARMA M. GIULIANELLI (184175)
karma.giulianelli@bartlitbeck.com
ALISON G. WHEELER (180748)
alison.wheeler@bartlitbeck.com
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, Colorado  80202
Telephone:     (303) 592-3100
Facsimile:     (303) 592-3140

*Attorneys for Plaintiffs,*
*Joseph Taylor, Edward Mlakar, Mick*
*Cleary, and Eugene Alvis*

GEORGE A. ZELCS (*pro hac vice*
application forthcoming)
gzelcs@koreintillery.com
ROBERT E. LITAN (*pro hac vice*
application forthcoming)
rlitan@koreintillery.com
RYAN Z. CORTAZAR (*pro hac vice*
application forthcoming)
rcortazar@koreintillery.com
KOREIN TILLERY LLC
205 North Michigan Avenue
Suite 1950
Chicago, Illinois 60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751

MICHAEL E. KLENOV (277028)
mklenov@koreintillery.com
CAROL O'KEEFE (*pro hac vice*
application forthcoming)
cokeefe@koreintillery.com
KOREIN TILLERY LLC
505 North Seventh Street
Suite 3600
St. Louis, Missouri 63101-1625
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| JOSEPH TAYLOR, EDWARD MLAKAR, MICK CLEARY, and EUGENE ALVIS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>GOOGLE LLC,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

1
CLASS ACTION COMPLAINT

### INTRODUCTION

1.      Defendant Google LLC ("Google") has a dirty little secret. It designed the Android operating system to collect vast amounts of information about users, which Google uses to generate billions in profit annually by selling targeted digital advertisements. There are privacy implications for an operating system specifically designed to surveil mobile device users in order to refine Google's targeted advertising business. But in the course of mobile surveillance, there is also an unlawful taking of Android users' property—namely, their cellular data. Google effectively forces these users to subsidize its surveillance by secretly programming Android devices to constantly transmit user information to Google in real time, thus appropriating the valuable cellular data users have purchased. Google does this, in large measure, for its own financial benefit, and without informing users or seeking their consent.

2.      This case involves the application of long-standing common law principles to seek redress for Google's secret appropriation of Android users' cellular data allowances. Pursuing claims for conversion and quantum meruit, Plaintiffs seek to represent a nationwide class of consumers (excluding California residents) who own Android mobile devices that secretly use their costly cellular data plans to enable Google's surveillance activities.

3.      Much of this information-gathering by Google takes place without any action at all by Android device owners. While Plaintiffs' Android devices are in their purses and pockets, and even while sitting seemingly idle on Plaintiffs' nightstands as they sleep, Google's Android operating system secretly appropriates cellular data paid for by Plaintiffs to perform "passive" information transfers which are not initiated by any action of the user and are performed without their knowledge. The transmission of this data to and from Google is not time-sensitive and could be delayed until Plaintiffs are in Wi-Fi range to avoid consuming Plaintiffs' cellular data allowances. However, Google deliberately designed and coded its Android operating system and Google applications to indiscriminately take advantage of Plaintiffs' data allowances and passively transfer information at all hours of the day—even after Plaintiffs move Google apps to the background, close the programs completely, or disable location-sharing.

4.      Plaintiffs had no say in Google's continual misappropriation of their cellular data allowances and remain largely powerless to stop it. Google designed its Android operating system and apps to prevent users from changing the settings to disable these transfers completely or to restrict them to Wi-Fi networks. Because of Google's deliberate design decisions, these passive information transfers using cellular data allowances purchased by Plaintiffs are mandatory and unavoidable burdens shouldered by Android device users for Google's financial benefit.

5.      Plaintiffs at no time consented to these transfers, and were given no warning or option to disable them. Google has crafted its various terms of service and policies in ways that purport to create binding contracts with the users of its technologies. But Plaintiffs and other consumers purchased their Android devices with little choice but to accept Google's terms and policies, which are contracts of adhesion. Even if Google's policies and terms of service are valid contracts, they do not alert users that Android devices will needlessly consume their cellular data allowances. While Google informs the users of certain transfers of personal information when they are actively engaged with their devices, its extensive "privacy" policies are silent on mandatory, passive information transfers and the means by which they occur.

6.      These information transfers are not mere annoyances—they interfere with Plaintiffs' property interests, depriving them of data for which they, not Google, paid. Each month, mobile device users pay their mobile carriers for cellular data allowances that enable them to transmit and receive information on the carriers' cellular data networks. Whether Plaintiffs pay for a specific number of gigabytes or unlimited access subject to speed restrictions above a certain data usage threshold, the contracts between Plaintiffs and their mobile carriers create for Plaintiffs concrete property interests in their purchased data allowances. When it initiates passive transfers of information utilizing Plaintiffs' cellular allowances, Google wrongfully interferes with Plaintiffs' property and commits the longstanding tort of conversion.

7.      In addition to misappropriating Plaintiffs' property, the passive transfers confer a valuable benefit to Google at Plaintiffs' expense. Google sends and receives information without bearing the cost of transferring that information between consumers and Google. Indeed, the

information transmitted through this practice supports the company's product development and lucrative targeted advertising business. In the absence of contractual provisions disclosing and permitting Google's appropriation of Plaintiffs' property, Google must compensate Plaintiffs for the fair market value of the data allowances Google has misappropriated, as well as the value of the personal information which Google has thereby acquired.

## PARTIES

8. Plaintiff Joseph Taylor, who is a resident and domiciliary of Illinois, bought an Android mobile device that he uses with a monthly unlimited cellular data plan purchased from carrier Metro by T-Mobile. Plaintiff Taylor was injured in fact and has been deprived of his property as a result of Google's unlawful conversion of his cellular data.

9. Plaintiff Edward Mlakar, who is a resident and domiciliary of Illinois, bought an Android mobile device that he uses with a monthly unlimited cellular data plan purchased from carrier Sprint Solutions, Inc. Plaintiff Mlakar was injured in fact and has been deprived of his property as a result of Google's unlawful conversion of his cellular data.

10. Plaintiff Mick Cleary, who is a resident and domiciliary of Wisconsin, bought an Android mobile device that he uses with a monthly unlimited cellular data plan purchased from carrier Verizon. Plaintiff Cleary was injured in fact and has been deprived of his property as a result of Google's unlawful conversion of his cellular data.

11. Plaintiff Eugene Alvis, who is a resident and domiciliary of Iowa, bought Android mobile devices that he has used with a monthly limited cellular data plan purchased from carrier Verizon and a monthly unlimited cellular data plan from U.S. Cellular. Plaintiff Alvis was injured in fact and has been deprived of his property as a result of Google's unlawful conversion of his cellular data.

12. Defendant Google LLC is a Delaware limited liability company with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043. Google created the Android operating system and continues to control all aspects of Android's programming and operation.

# JURISDICTION

13.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d), because (1) this action is a "class action," which contains class allegations and expressly seeks certification of a proposed class of individuals; (2) the Class defined below consists of more than one hundred proposed class members; (3) the citizenship of at least one class member is different from Google's citizenship;[1] and (4) the aggregate amount in controversy of the claims of Plaintiffs and the putative Class exceeds $5,000,000, exclusive of interest and costs.

14.     This Court has personal jurisdiction over Google because it maintains its headquarters in California and in this District, and the illegal conduct alleged herein was conceived and implemented in whole or in part within California and this District.

15.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c).

16.     Google's terms of service provide that all claims arising out of or relating to Google's products and services will be litigated in federal or state courts in Santa Clara County, California, USA, and that Google consents to personal jurisdiction in those courts.

## I.     GOOGLE'S ANDROID SYSTEM IS UBIQUITOUS

17.     Google owns and programs the most popular mobile platform in the world, the Android operating system. Android works on a variety of mobile devices, including smartphones and tablets.

---

[1] Because jurisdiction is based on the Class Action Fairness Act, 28 U.S.C. § 1332(d), even though Google LLC is a limited liability company, it is a citizen of the states "where it has its principal place of business and…under whose laws it is organized." 28 U.S.C. § 1332(d)(10). In other words, while in traditional non-class diversity cases the citizenship of a limited liability company would be determined by the citizenship of its members, that principle does not apply to this case. *See, e.g., Erie Ins. Exch. V. Erie Indemn. Co*., 722 F.3d 154, 161 n.7 (3d Cir. 2013) (explaining that the Class Action Fairness Act "evinces an intent that suits by unincorporated associations be treated like suits by corporations in that the citizenship of the association for diversity purposes is determined by the entity's principal place of business and not by the citizenship of its members").

1   18.    The Android operating system includes an interface that provides the principal

2   means by which users interact with their devices. The interface allows consumers to access and to

3   use applications and widgets on the devices.

4   19.    In addition to the Android operating system, Plaintiffs' devices come with various

5   Google applications and widgets pre-installed, including the Google search application, Chrome

6   browser, Gmail email application, Google Maps, and YouTube.

7   20.    Android has been available on mobile devices since 2008 and has been the most

8   dominant mobile operating system since 2011.[2] It currently has about a 54.4 percent share of the

9   U.S. smartphone market.[3]

10   21.    All or virtually all mobile carriers offer cellular data plans that allow Android

11   devices to connect to their cellular networks in order to send and receive internet communications.

12   These mobile carriers sell mobile devices directly to consumers. Among the mobile carriers that

13   sell Android devices for connection to their cellular networks are Verizon, AT&T, Sprint, T-

14   Mobile, and U.S. Cellular.

15   22.    Many of the most popular mobile-device manufacturers sell devices with Android

16   preinstalled as the operating system and often with a suite of Google's mobile apps preinstalled.

17   These manufacturers include Samsung, Motorola, LG, Kyocera, Sonim, Huawei, ZTE, and HTC.

18

19   **II.   PLAINTIFFS HAVE A PROPERTY INTEREST IN THEIR CELLULAR**

20   **DATA PLANS**

21   23.    Plaintiffs purchased mobile devices preloaded with Google's Android operating

22   system and suite of mobile apps and widgets.

23

24

25   [2] Charles Arthur, *The History of Smartphones: Timeline*, GUARDIAN (Jan. 24, 2012),
https://www.theguardian.com/technology/2012/jan/24/smartphones-timeline.

26   [3] *Subscriber Share Held by Smartphone Operating Systems in the United States: 2012 to 2018*,
STATISTA, https://www.statista.com/statistics/266572/market-share-held-by-smartphone-
27   platforms-in-the-united-states/.

28

24.     To use their mobile devices, Plaintiffs contracted with mobile carriers. As part of these contracts, plaintiffs purchased cellular data plans that provided them with data allowances. These plans allow plaintiffs to access the carriers' cellular data networks, thereby providing users with the ability to send and receive information over the internet without a Wi-Fi connection. In this way, cellular data plans provide the essential capability that allows a mobile device to be truly mobile.

25.     Though cellular data networks provide a critical resource for mobile devices, they are not necessary for the mobile device to send and receive information through the internet. When users do not wish to use their cellular networks or when they are unable to use them, mobile devices can also transfer and receive information over the internet through Wi-Fi connections. Indeed, many cost-conscious users maximize their time on Wi-Fi whenever possible and use their cellular networks only when Wi-Fi connections are unavailable in order to "save" the cellular data allowances available under their monthly carrier plans.

26.     Cellular data plans vary by carrier, but they function in essentially the same way. The users pay the carrier a certain price each month for cellular data allowances, which provide the users with the right to send and receive information on their devices through the carrier's cellular network. Some cellular data plans provide users with an unlimited cellular data allowance, while others provide users with a fixed allowance, which grants them the right to send and receive a maximum amount of data (e.g., 10 gigabytes) each month. When users have a fixed cellular data allowance and exceed it, they are typically charged an overage fee. When users have a so-called "unlimited" plan, they are still typically subject to quotas on their usage and will have their cellular connection speeds throttled if they exceed such quotas. When throttled to reduced speeds, a number of functionalities can be lost entirely (such as video streaming), and the overall performance of the device can be significantly impaired.

27.     The purchase of data plans from mobile carriers creates a property interest for Plaintiffs in their cellular data allowances. Each quantum of the data allowance has a fair market value determined by market forces. By contracting for the purchase of their cellular data

CLASS ACTION COMPLAINT

allowances, Plaintiffs obtain access to send and receive information on the carriers' networks in accordance with the terms of the contract. This access includes the right to exclude other persons and entities from using Plaintiffs' cellular data allowances. Plaintiffs have the right to determine precisely how to use their data allowances and to grant others access to those allowances through their mobile device activity.

28.     For example, Android users may explicitly grant others access to their cellular data allowances by creating a mobile "hotspot," in which the mobile device shares its cellular network connection with other nearby devices so that those devices can access the internet once they are given the hotspot's password. Similarly, "tethering" (either through a USB cable or a Bluetooth connection) allows users to connect their mobile device with a computer to share the device's cellular network connection and grant the computer access to their cellular data allowances. Users can also sell unused data allowances. *See, e.g.*, https://www.simplify.network/ (mobile app enabling Android users to sell their excess data allowances via hotspot).

III.    **MOBILE DEVICE USERS ONLY CONSENT TO GOOGLE'S USE OF THEIR CELLULAR DATA ALLOWANCES WHEN THEY ACTIVELY USE GOOGLE'S PRODUCTS**

29.     Under certain circumstances, mobile device users consent to the use of their cellular data allowances. For example, when users actively engage with applications that require internet access while connected only by their cellular plan, they instruct the applications to use some of their cellular data allowance, thus authorizing such use. For example, when a user is in an area without Wi-Fi, opens a browser, and types in a web address, the user consents to use her cellular data allowance to send information to the website's server and to allow the website to send information over the mobile carrier's cellular network to the device. Similarly, when that user opens a video app and requests to view a video, she consents to allow the app to send a video to her device over her mobile carrier's cellular network and for that usage to count toward her allowance.

8

CLASS ACTION COMPLAINT

30.     These active transfers of information that are initiated by the user engaging an application are not at issue in this lawsuit. Plaintiffs do not contest Google's right to use Plaintiffs' cellular data allowances pursuant to their consent when Plaintiffs are actively using Google's various products on their mobile devices.

31.     Plaintiffs instead challenge Google's misappropriation of their cellular data allowances, without Plaintiffs' consent, based on "passive transfers," meaning information transfers that occur in the background or which do not result from Plaintiffs' direct engagement with Google products on their devices. These passive transfers, described in more detail below, occur in a variety of ways – including when Google applications are open (though not in active use) and operating in the background, and even when a user has closed out all Google applications on her device and the device is stationary and seemingly dormant. In none of the Google policies discussed below does Google notify users that its operating system, applications, and widgets cause users' mobile devices to indiscriminately consume Plaintiffs' cellular data allowances, even when users are not using an app or widget on their devices.

## IV.    GOOGLE'S MISAPPROPRIATION OF PLAINTIFFS' CELLULAR DATA ALLOWANCES

32.     Google designed and implemented its Android operating system and apps to extract and transmit large volumes of information between Plaintiffs' cellular devices and Google using Plaintiffs' cellular data allowances. Google's misappropriation of Plaintiffs' cellular data allowances through passive transfers occurs in the background, does not result from Plaintiffs' direct engagement with Google's apps and properties on their devices, and happens without Plaintiffs' consent.

33.     These passive transfers occur in a variety of ways. First, such transfers occur when mobile devices are in a completely idle state, meaning they are stationary, untouched, and with all apps closed. To confirm this, an analysis commissioned by Plaintiffs' counsel tested a new Samsung Galaxy S7 mobile device with the standard default settings accepted and standard pre-

9

loaded set of apps, which was connected to a brand-new Google account and was not connected to Wi-Fi. The analysis found that when the device was left in an idle state, the device sent and received 8.88 MB/day of data, with 94% of those communications occurring between Google and the device. In all, the device transferred information to and from Google approximately 389 times in 24 hours, for an average of more than 16 times per hour. The frequency of passive information transfers in this experiment was striking given the source: a stationary and untouched Android device, with all apps closed.

34.     Many of those communications were comprised of LOG files, which are automatically-produced files that contain a record of certain background information such as the networks that are available, apps that are open, and metrics about the operating system. LOG files are typically not time-sensitive, and transmission of them could easily be delayed until Wi-Fi is available. Google could also program Android to allow users to enable passive transfers only when they are on Wi-Fi connections, but it has chosen not to do so. Instead, Google has chosen to simply take advantage of Plaintiffs' cellular data allowances so that it can get information from Plaintiffs at all hours of the day, no matter where they are or what they are doing.

35.     Second, a higher volume of passive transfers occurs when mobile devices are stationary and untouched, but with one or more apps open and unused. Vanderbilt University Professor Douglas C. Schmidt performed a study of Google's data collection efforts in 2018. (*See* Ex. 1, Douglas C. Schmidt, *Google Data Collection* (Aug. 15, 2018). He found that both Android and Chrome transmit information to Google "even in the absence of *any* user interaction." (*Id*. at p. 3 (emphasis in original).) Professor Schmidt conducted an experiment with an Android device that was outwardly dormant and stationary but with Chrome open and in the background, and he found passive transfers[4] to Google occurred approximately *900 times in 24 hours* (*id*. at 14), for an average of *38 times per hour*.

---

[4] Professor Schmidt consistently defined "passive" information transfers as "information exchanged in the background without any obvious notification to the user," in contrast to "active" transfers, which he defined as "information directly exchanged between the user and a

CLASS ACTION COMPLAINT

36.     In comparison, a stationary and untouched iPhone device with the Safari browser open in the background communicated virtually no information to Google, and its information transfers to Apple amounted to only about 1/10th of the information transferred to Google from the Android device. (*Id*. at pp. 3, 14.)



(Ex. 1 at p. 14, Figure 6, Traffic data sent from idle Android and iPhone mobiles.)

37.     The Android device passively transferred 4.4 MB of data each day, or around 130MB each month, to Google servers, while the iPhone device transferred around 1/6th that volume of data to Google servers. (*Id*. at 14.)

38.     The contrast between the number of requests made to the two devices, as well as the volume of data transferred from the devices, confirms that Google's products play critical roles in passive information transfers to Google—and that the vast majority or all of these transfers are unnecessary.

Google product." (*Id*. at 7.)

39.     Third, even more passive transfers occur once users begin moving around with their Android devices, or interacting with them by visiting web pages, or using apps, despite also eschewing the use of any preloaded Google apps such as Google Search, YouTube, Gmail, or Google Maps. (*Id.* at pp. 3, 23.) This increased activity was driven by Google's publishing and advertising products including Google Analytics, DoubleClick (now Google Ad Manager), and AdWords (now Google Ads). (*Id.* at 3, 15) Passive information transfers represented 46% of requests to Google servers from the device in the Schmidt experiment. (*Id.* at pp. 3–4.)

40.     An iPhone device (again, without the Android operating system or Google's applications) in comparable active use communicated with Apple far less frequently than Android devices communicated with Google's servers. (*Id.* at 24.) (The two devices did have a comparable number of contacts with Google's advertising domains, as was expected in light of the similar usage on both devices of third party websites and apps which provide information to Google. (*Id.*)) The iPhone device also transferred a small fraction of information to Apple's servers, compared to the information transferred to Google from the Android device, as shown below: (*Id.*)



CLASS ACTION COMPLAINT

(Ex. 1 at p. 24, Figure 12, Information requests from mobile devices during a day of typical use.)

41.     With active use, the Android device passively transferred to Google servers 11.6 MB of data each day, or around 350MB each month, while the iPhone device transferred around half that amount to Google servers. (*Id*. at 24.)

42.     Google's publishing and advertising products drive passive data transfers from Android devices to Google in a variety of ways.  For example, Android devices transmit "tokens" that identify devices and users (and provide other information) with each connection to Google's servers. Google uses this information to determine which users it communicates with on which specific devices and to serve targeted ads. (*Id*. at 16–23.) These tokens are frequently sent alongside requests to send ads to the device.

43.     Google's publishing and advertising products also drive passive data transfers from Google to Android devices.  For example, Google tracks and predicts user behavior to pre-load targeted ads containing text, audio, games or other interactives, and even video onto Android devices.  Users often never view these pre-loaded ads, even though their cellular data was already consumed to download the ads from Google.  And because these pre-loads can count as ad impressions, Google is paid for transmitting the ads.

44.     Google instigates these transfers of information by designing and implementing its Android operating system and apps to mandate that transfer, regardless of whether a user has access to a Wi-Fi connection or instead has only her cellular data allowance to transmit information to and from her device.

## V.     MOBILE DEVICE USERS DO NOT CONSENT TO GOOGLE'S USE OF THEIR CELLULAR DATA ALLOWANCES WHEN THEY ARE NOT USING GOOGLE'S PRODUCTS

45.     Users of Android must accept standardized form contracts to use the company's various policies ("Google Agreements"). But none of those agreements discloses that Google

appropriates Plaintiffs' cellular data allowances to transmit information when Plaintiffs are not actively using Google's products. Instead, they notify Plaintiffs that they may incur charges to third parties (the wireless carriers) when they *use* Google's products.

46.     The Google Agreements include four general policies relevant to this suit: the Terms of Service; the Privacy Policy; the Managed Google Play Agreement; and the Google Play Terms of Service.[5] Google's master policy is its Terms of Service. The Terms of Service themselves incorporate by reference the company's Privacy Policy. In addition, according to the Managed Google Play Agreement, use of the Android operating system is governed by the Google Play Terms of Service. Nothing in these policies suggests that Google uses Plaintiffs' data allowances to transmit information when Plaintiffs are not actively engaged with Google's products.

47.     Specifically, Google's Privacy Policy states, "We collect information about the apps, browsers, and devices you use to access Google services... We collect this information when a Google service on your device contacts our servers—for example, when you install an app from the Play Store or when a service checks for automatic updates. If you're using an Android device with Google apps, your device periodically contacts Google servers to provide information about your device and connection to our services."[6]

48.     The Google Play Terms of Service is the only policy that even mentions cellular data usage. It applies to the company's Google Play online store, where users can download software applications for their mobile devices. The policy has a disclaimer targeted specifically at Google Play's usage of cellular data allowances. The disclaimer, however, applies only to active usage in connection with the use of Google Play and apps available through Google Play. The Play terms provide: "You are responsible for any access or data fees incurred from third parties (such

---

[5] These policies are posted online at: https://policies.google.com/terms?hl=en-US (Terms of Service); https://policies.google.com/privacy (Google Privacy Policy); https://www.android.com/enterprise/terms/ (Managed Google Play Agreement); https://play.google.com/about/play-terms/index.html (Google Play Terms of Service).

[6] Google Privacy Policy, https://policies.google.com/privacy.

as your Internet provider or mobile carrier) in connection with *your use and viewing* of Content and Google Play"[7] (emphasis added). The disclaimer is silent on Google's misappropriation of cellular data allowances when users are not "using and viewing" Google's products.

49.    The Google Agreements also include Google policies that apply specifically to individual mobile apps. None of those policies disclose Google's passive data usage. For example, the Google Maps terms provide that "[c]ontent you upload, submit, store, send, or receive through Google Maps/Google Earth is subject to Google's Terms of Service."[8] The policy is silent about how that information is sent and does not provide Google with the authority to use Plaintiffs' cellular data allowances for passive information transfers.

50.    The same is true of the Google Chrome browser policy. Despite the policy's specificity, it still does not obtain users' consent to Google accessing users' cellular data allowances for passive information transfers. Instead, the Google Chrome policy merely discloses that Chrome unilaterally transmits various types of information to Google. For example, the policy states that Chrome "periodically sends information to Google to check for updates, get connectivity status, validate the current time, and estimate the number of active users." It further states that "information that Chrome stores [locally on your device] won't be sent to Google unless you choose to store that data in your Google Account." The policy also provides that "[s]ites and Android apps can also ask the browser to preload the pages you might visit next" when using Chrome and that "[p]reloading requests from Android apps are controlled by the same setting as Chrome-initiated predictions." Moreover, "on mobile devices, Chrome automatically shares your location with your default search engine if the Chrome app has permission to access your location and you haven't blocked geolocation for the associated website." Finally, the policy states that "usage statistics and crash reports are sent to Google to help us improve our products."[9] But again,

---

[7] Google Play Terms of Service, https://play.google.com/about/play-terms/index.html.

[8] Google Maps/Google Earth Additional Terms of Service, https://www.google.com/help/terms_maps/.

[9] Google Chrome Privacy Notice, https://www.google.com/chrome/privacy/.

no language in the policy discloses that Google accesses users' cellular data allowances to initiate passive information transfers.

## VI.  GOOGLE HAS CONCEALED ITS MISAPPROPRIATION OF PLAINTIFFS' CELLULAR DATA

51.  Upon information and belief, Google's misappropriation of cellular data began with the very first sale of the Android operating system. And from that time on, Google has actively and fraudulently concealed its misappropriation of Plaintiffs' cellular data.

52.  Instead of notifying Plaintiffs and obtaining their consent to its usage of their cellular data, Google has misled Plaintiffs by informing them that they are responsible for access or data fees incurred from third parties (such as the mobile carriers) "in connection with *your use and viewing* of Content and Google Play"[10] (emphasis added). This provision misrepresents the true nature of Google's cellular data consumption because this purported disclosure suppresses the material fact that access or data fees may be incurred *even when users are neither using nor viewing Content or Google Play.*

53.  Google's fraudulent concealment tolls the statute of limitations—Plaintiffs are entitled to recover from Google the value of their misappropriated data from the beginning of Google's scheme to use Plaintiffs' data without their consent or even knowledge.

## CLASS ALLEGATIONS

54.  Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23(a), and 23(b)(1), 23(b)(2), 23(b)(3), and/or 23(c)(4) on behalf of the following proposed class:

> All natural persons in the United States (excluding citizens of the State of California) who have used mobile devices running the

---

[10] Google Play Terms of Service, https://play.google.com/about/play-terms/index.html.

1   Android operating system to access the internet through cellular data

2   plans provided by mobile carriers.[11]

3       55.   The Class excludes (a) Defendant, its officers, directors, management, employees,

4   subsidiaries, and affiliates; and (b) any judges or justices involved in this action and any members

5   of their immediate families or their staff.

6       56.   <u>Numerosity</u>. Plaintiffs do not currently know the exact number of persons in the

7   Class, but they number in the millions and are geographically dispersed throughout the United

8   States. Joinder of all Class members before this Court would be impracticable. The names, contact

9   information, and other unique identifiers of the members of the Class are readily obtainable from

10  Google, which requires users to log in to their Google accounts to download apps from the Google

11  Play store and sets up profiles for users of Android phones who do not have Google accounts. This

12  information about class members is also obtainable from nonparty mobile carriers, which maintain

13  lists of customers who have mobile devices with Android technology.

14      57.   <u>Typicality</u>. Plaintiffs' claims are typical of and fairly encompass the claims of the

15  Class members. Plaintiffs are members of the Class. Plaintiffs have used Android devices to access

16  the internet using their cellular data plans during the Class Period, including the past three years.

17  The members of the Class are similarly harmed by Google's conversion of their cellular data.

18      58.   <u>Adequacy</u>. Plaintiffs and their counsel will fairly, adequately, and vigorously

19  protect the interests of the members of the Class. There are no material conflicts between the claims

20  of Plaintiffs and the members of the Class making class certification inappropriate. Counsel for

21  the Class will vigorously assert Plaintiffs' claims and those of the members of the Class. Plaintiffs

22  are represented by Counsel who are competent and experienced in the prosecution of consumer

23  class action litigation.

24

25

26  _____

[11] Plaintiffs reserve the right to modify this class definition before moving for class certification,
27  whether based on information gleaned in discovery, or otherwise.

28

59.    <u>Superiority</u>. A class action is superior to all other available means for the fair and efficient adjudication of the claims of the members of the Class. The damages suffered by some individual members of the Class may be relatively small compared to the burden and expense of individual prosecution of the complex and extensive litigation required to recover from Google. It would be virtually impossible or impractical for most, if not all, Class members to redress the wrongs done to them on an individual basis. Furthermore, individual litigation would be unmanageable for the Court system as it would result in thousands or millions of individual lawsuits creating the risk of inconsistent or contradictory judgments and increasing the delay and expense to all parties and the court system. In contrast, a class action would present far fewer management difficulties. Class action treatment provides the benefits of a single adjudication, economies of scale, and supervision by a single court.

60.    <u>Existence and Predominance of Common Questions of Law and Fact</u>. Numerous questions of law and/or fact are common to Plaintiffs and all members of the Class. These common questions derive common answers for all Class members that impact the resolution of the claims on grounds equally applicable to all Class members. The common questions of law and fact for the Class include, but are not limited to:

    a.    Whether Google misappropriates the cellular data of Android mobile-device users to conduct passive information transfers, which occur in the background and do not result from Plaintiffs' direct engagement with their mobile devices or applications;

    b.    Whether the cellular data allowances that Plaintiffs purchase are property interests recognized by California law, which governs Plaintiffs' claims under the choice-of-law provision contained in the terms and conditions governing Plaintiffs' use of the Android operating system;

    c.    Whether Plaintiffs consent to allow Google limited access to their cellular data property through contractual terms in Google's policies;

CLASS ACTION COMPLAINT

d.     Whether Google's passive transmission of information through Plaintiffs' cellular data plans exceeded the scope of any limited consent to allow Google access to the cellular data;

e.     Whether Plaintiffs are entitled to recover damages for Google's conversion of their cellular data under California law;

f.     Whether the passive information transfers provided Google with a valuable benefit at Plaintiffs' expense;

g.     The value of data converted by Google and the benefit conferred on Google at Plaintiffs' expense;

h.     The amount of damages due to individual class members, which is readily ascertainable through economic analysis of the fair market value of cellular data based on market transactions; and

i.     Whether Google fraudulently concealed its scheme to misappropriate Plaintiffs' contracted for and purchased cellular data.

61.     Certification is also appropriate under Fed. R. Civ. P. 23(b)(1) and/or (b)(2) because:

a.     The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Google.

b.     The prosecution of separate actions by individual Class members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

c.     Google has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the entire Class.

CLASS ACTION COMPLAINT

1

**COUNTS AND REQUESTED RELIEF**

2

**COUNT ONE: CONVERSION**

3
62.     Plaintiffs re-allege and incorporate by reference each of the allegations set forth
4
above.

5
63.     Plaintiffs have property interests in the cellular data allowances that they purchase
6
from their mobile carriers.

7
64.     Plaintiffs at no time consented to Google appropriating their cellular data
8
allowances to transfer information between Plaintiffs' Android devices and Google when Plaintiffs
9
were not actively using their mobile devices.

10
65.     Google wrongfully disposed of Plaintiffs' property by causing information to be
11
transferred between Plaintiffs' Android devices and Google using Plaintiffs' cellular data
12
allowances without Plaintiffs' consent. Google initiated these passive transfers when Plaintiffs
13
were not directly engaged with Google products on their devices.

14
66.     As a result of Defendants' conversion, Plaintiffs have suffered injury and damages
15
in an amount to be proven at trial.

16

17

**COUNT TWO: QUANTUM MERUIT**

18
67.     Plaintiffs re-allege and incorporate by reference each of the allegations set forth
19
above.

20
68.     Google used valuable cellular data allowances that Plaintiffs have purchased in
21
order to send information between Plaintiffs' devices and Google.

22
69.     Google has used Plaintiffs' cellular data allowances to collect and transmit
23
information through passive transfers to develop and support its advertising business and other
24
ventures.

25
70.     The cellular data allowances usurped through the passive transfers conferred on
26
Google a valuable benefit to its business.

27

28

**CLASS ACTION COMPLAINT**

71.     The use of Plaintiffs' cellular data allowances was at the expense of Plaintiffs, who paid for the cellular data allowances that Google used to send and receive information between its servers and Plaintiffs' Android devices through passive transfers.

72.     Plaintiffs did not consent to these passive transfers using Plaintiffs' cellular data allowances. No contract between Plaintiffs and Google authorized information transfers that benefited Google.

73.     Plaintiffs suffered injury and damages when their cellular data allowances were used to transfer to Google information that benefited Google.

74.     Plaintiffs are entitled to recover the reasonable value of the cellular data allowances usurped by Google to transfer information that benefited Google.

75.     Plaintiffs are also entitled to recover the reasonable value of Plaintiffs' personal information which Google collects and then exploits in its targeted advertising business and other ventures.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for judgment against Google as follows:

76.     Determining that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23 and directing that reasonable notice of this action be provided to the Class pursuant to Rule 23(c)(2).

77.     That the Court adjudge and decree that Google has converted Plaintiffs' property in the form of their cellular data.

78.     That the Court award Plaintiffs and the Class:

    A.     The fair market value of the cellular data converted by Google;

    B.     The reasonable value of the cellular data used by Google to extract and deliver information that benefited Google;

    C.     Pre- and post-judgment interest on their damages;

21

CLASS ACTION COMPLAINT

1       D.      Injunctive relief directing Google to stop using cellular data purchased by

2              consumers without their consent;

3       E.      The costs of this action and reasonable attorneys' fees; and

4       F.      Such other and further relief as the Court deems just and proper.

5

6                              **DEMAND FOR A JURY TRIAL**

7       In accordance with Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial by

8  jury on all issues so triable.

9

10

11

12

13       Dated:  November 12, 2020      Respectfully submitted,

14

15

16                              /s/ *Michael E. Klenov*

17                              Michael E. Klenov (277028)
                                KOREIN TILLERY LLC

18                              505 North Seventh Street
                              Suite 3600

19                              St. Louis, Missouri 63101-1625
                              Telephone: (314) 241-4844

20                              Facsimile: (314) 241-3525

21                              Ann Ravel
                              McMANIS FAULKNER

22                              a Professional Corporation
                              50 West San Fernando Street, 10th Floor

23                              San Jose, California 95113
                              Telephone:   (408) 279-8700

24                              Facsimile:   (408) 279-3244

25

26

27

28                                22

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Glen E. Summers (176402)
Karma M. Giulianelli (184175)
Alison G. Wheeler (180748)
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, Colorado 80202
Telephone:     (303) 592-3100
Facsimile:      (303) 592-3140

George A. Zelcs (*pro hac vice* application forthcoming)
Robert E. Litan (*pro hac vice* application forthcoming)
Ryan Z. Cortazar ((*pro hac vice* application forthcoming)
KOREIN TILLERY LLC
205 North Michigan Avenue
Suite 1950
Chicago, Illinois 60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751

Carol O'Keefe (*pro hac vice* application forthcoming)
KOREIN TILLERY LLC
505 North Seventh Street
Suite 3600
St. Louis, Missouri 63101-1625
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

*Attorneys for Plaintiffs*
*Joseph Taylor, Edward Mlakar, Mick Cleary, and Eugene Alvis*

CLASS ACTION COMPLAINT