COOLEY LLP
WHITTY SOMVICHIAN (194463)
(wsomvichian@cooley.com)
MAX A. BERNSTEIN (305722)
(mbernstein@cooley.com)
KELSEY R. SPECTOR (321488)
(kspector@cooley.com)
101 California Street, 5th Floor
San Francisco, California 94111-5800
Telephone: +1 415 693 2000
Facsimile: +1 415 693 2222

Attorneys for Defendant
GOOGLE LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

JOSEPH TAYLOR, EDWARD MLAKAR, MICK CLEARY, and EUGENE ALVIS, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

GOOGLE LLC,

Defendant.

Case No. 5:20-cv-07956-VKD

**GOOGLE LLC'S REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

Date: April 20, 2021
Time: 10:00 a.m.
Judge: Hon. Virginia K. DeMarchi

## TABLE OF CONTENTS

**Page**


I. INTRODUCTION ..... 1
II. ARGUMENT ..... 2
A. Plaintiffs Lack Article III Standing. ..... 2
B. Plaintiffs Have Not Stated a Claim for Conversion. ..... 5
1. Plaintiffs fail to identify cognizable property. ..... 5
a. Plaintiffs' contractual rights to receive cellular service are not property. ..... 5
b. Plaintiffs' analogies to other forms of property fail. ..... 7
2. Plaintiffs allege no substantial interference with their data allowances. ..... 8
3. Plaintiffs have not established damages. ..... 10
4. Plaintiffs consented to the alleged data transfers. ..... 12
C. Plaintiffs' Common Count for Quantum Meruit Fails. ..... 14
III. CONCLUSION ..... 15

**Cases**

*Aixtron, Inc. v. Veeco Instruments Inc.*, 52 Cal. App. 5th 360 (2020) .......... 2

*Bolanos v. Super. Ct.*, 169 Cal. App. 4th 744 (2008) .......... 2

*Crocker-Anglo Nat'l Bank v. Kuchman*, 224 Cal. App. 2d 490 (1964) .......... 14

*Daniel v. Nat'l Park Serv.*, 891 F.3d 762 (9th Cir. 2018) .......... 3

*Davis v. Fed. Election Comm'n*, 554 U.S. 724 (2008) .......... 4

*DIRECTV, Inc. v. Pahnke*, 140 S. Ct. 1615 (2005) .......... 7

*E.J. Franks Constr., Inc. v. Sahota*, 226 Cal. App. 4th 1123 (2014) .......... 15

*English & Sons, Inc. v. Straw Hat Restaurants, Inc.*, 176 F. Supp. 3d 904 (N.D. Cal. 2016) .......... 11

*In re Facebook Inc. Internet Tracking*, 956 F.3d 589 (9th Cir. 2020) .......... 2, 3, 5

*Fremont Indem. Co. v. Fremont Gen. Corp.*, 148 Cal. App. 4th 97 (2007) .......... 10

*G.S. Rasmussen & Assocs., Inc. v. Kalitta Flying Serv., Inc.*, 958 F.2d 896 (9th Cir. 1992) .......... 7, 9

*Hedging Concepts, Inc. v. First Alliance Mortgage Co.*, 41 Cal. App. 4th 1410 (1996) .......... 15

*Ironshore Specialty Ins. Co. v. 23andMe, Inc.*, No. 14-cv-03286-BLF, 2016 WL 3951660 (N.D. Cal. July 22, 2016) .......... 2

*Jordan v. Talbot*, 55 Cal. 2d 597 (1961) .......... 8, 9

*Lueter v. State of California*, 94 Cal. App. 4th 1285 (2002) .......... 10, 11, 12

*McBridge v. Boughton*, 123 Cal. App. 4th 379 (2004) .......... 14, 15

*Monster Energy Co. v. Vital Pharms., Inc.*, No. EDCV 18-1882 JGB (SHKx), 2019 WL 2619666 (C.D. Cal. May 20, 2019) .......... 6

*Moore v. Regents of the Univ. of Cal.*, 51 Cal. 3d 120 (1990) .......... 8

*Newbury Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392 (9th Cir. 1996).......... 15

*Opperman v. Path*, 84 F. Supp. 3d 962 (N.D. Cal. 2015) .......... 3, 4

*Pierce v. Ducey*, 965 F.3d 1085 (9th Cir. 2020).......... 3

*Prouty v. Gores Tech. Grp.*, 121 Cal. App. 4th 1225 (2004) .......... 13

*Shein v. Canon U.S.A., Inc.*, No. CV 08-07323 CAS (Ex), 2009 WL 1774287 (C.D. Cal. June 22, 2009).......... 9

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) .......... 2, 3

*Supply Pro Sorbents, LLC v. RingCentral, Inc.*, No. 16-cv-02113-JSW, 2017 WL 4685705 (N.D. Cal. July 17, 2017).......... 10

*Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615 (2020) .......... 2, 3, 4

*Welco Elecs., Inc. v. Mora*, 223 Cal. App. 4th 202 (2014) .......... 7, 9

*In re Yahoo Mail Litigation*, 7 F. Supp. 3d 1016 (N.D. Cal. 2014) .......... 14

*Yunker v. Pandora Media, Inc.*, No. 11-cv-03113 JSW, 2013 WL 1282980 (N.D. Cal. Mar. 26, 2013) .......... 4

**Statutes**

Cal. Civ. Code
§ 1638.......... 13
§ 3333.......... 10
§ 3336.......... 4, 10, 11, 12
§ 3337.......... 12

## I. INTRODUCTION

Plaintiffs' Opposition ("Opp.") tries to obscure the defects of the Complaint through sensationalized rhetoric, likening Google to a "thief" and making other dramatic accusations. But what this case really involves are simply the data transmissions to and from mobile devices that enable consumers to use their devices in a normal and secure way. The fact that such data transmissions can occur over *cellular* networks should come as no surprise to users of *cellular* phones. While a full discussion of the security enhancements and other benefits these data transmissions enable is beyond the scope of this motion, it is notable that Plaintiffs all apparently continue to use their Android devices despite their allegations. (Compl. ¶¶ 8-11.) For all its hyperbole, Plaintiffs' Opposition offers no valid justification for the many defects of the Complaint, which should be dismissed as a matter of law.

First, Plaintiffs turn Article III standing doctrine on its head in an attempt to justify their inability to allege any concrete injury. Specifically, Plaintiffs urge this Court to adopt a novel rule that merely alleging a violation of a common law interest suffices to confer standing, without more. That is not the law, and Plaintiffs cannot escape the need to allege a concrete injury.

Second, Plaintiffs still have not pointed to any personal property that could be the subject of conversion. The Opposition claims Plaintiffs' cellular contracts give them ownership over "bytes of cellular data." But this contradicts the allegations of the Complaint, which concedes these contracts create only a right to a *service*—the transmission of information over a cellular network up to a designated "data allowance." (Compl. ¶ 24.) This contractual right to receive cellular services is not a recognized form of property, and Plaintiffs offer no meaningful rebuttal to the case law rejecting similar efforts to shoehorn contractual claims into the conversion doctrine.

Third, Plaintiffs try to obscure their failure to plead the required elements of substantial interference and resulting damages by raising various straw man arguments and constructing novel principles inconsistent with prevailing law. Contrary to Plaintiffs' assertions, merely declaring that a conversion occurred does not suffice to show a substantial interference with property. Nor are Plaintiffs entitled to a presumption of resulting damages.

Fourth, Plaintiffs cannot avoid the consent they gave Google regarding the data transfers

they now challenge. Plaintiffs assert the Google Terms and Policies they agreed to apply only to data transfers that occur when a user is "actively" using an Android device and the device is connected to Wi-Fi. But the Terms and Policies contain no such limitations and for good reason, as any such limitations would inhibit the normal functioning of mobile devices.

Finally, Plaintiffs cannot maintain a common count for quantum meruit separate and apart from their conversion claim. And even if Plaintiffs could have a standalone quantum meruit claim, they failed to allege facts satisfying the elements of any such claim.

For all these reasons, Google's Motion should be granted in its entirety.[1]

## II. ARGUMENT

### A. Plaintiffs Lack Article III Standing.

Because Plaintiffs cannot allege any concrete injury, they urge the Court to find that they have Article III standing simply because they have brought a conversion claim and seek recovery under a quantum meruit theory, relying on *In re Facebook Inc. Internet Tracking*, 956 F.3d 589 (9th Cir. 2020). (*See* Opp. at 13-14.) As Plaintiffs would have it, *Facebook Internet Tracking* establishes a sweeping rule that any alleged violation of a common law interest establishes standing, even with no concrete injury. (*See* Opp. at 13-14.) That interpretation contradicts longstanding precedent, misreads the Ninth Circuit's decision, and should be rejected.

The Supreme Court has made clear that Article III requires a plaintiff to demonstrate an "injury in fact," *i.e.*, that they "suffered an invasion of a legally protected interest that is ***concrete and particularized*** and ***actual or imminent, not conjectural or hypothetical***." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547-48 (2016) (emphasis added and internal quotations omitted). Thus, not all invasions of a "legally protected interest" can constitute an "injury in fact." The Supreme Court recently reaffirmed that principle in *Thole v. U.S. Bank N.A.* where participants in a retirement plan brought an ERISA claim against the plan's administrators. 140 S. Ct. 1615, 1618

[1] Plaintiffs request that this Court take judicial notice of the state court's decision in *Csupo v. Google*. (*See* ECF No. 39-2 at 2-3.) But courts regularly apply Rule 8.1115(a) to find that unpublished decisions from a California Superior Court are not even *citable*. *See Ironshore Specialty Ins. Co. v. 23andMe, Inc.*, No. 14-cv-03286-BLF, 2016 WL 3951660, at *4 (N.D. Cal. July 22, 2016); *see also Aixtron, Inc. v. Veeco Instruments Inc.*, 52 Cal. App. 5th 360, 399 (2020). In any event, it is well settled that "a written trial court ruling has no precedential value." *Bolanos v. Super. Ct.*, 169 Cal. App. 4th 744, 761 (2008).

(2020). The plaintiffs argued defendants violated their duties of loyalty and prudence by mismanaging the plan. *Id.* at 1619. The Court found plaintiffs lacked standing because they "received all of their monthly benefit payments" and "ha[d] not sustained any monetary injury" notwithstanding defendants' alleged violations. *Id.* at 1618-19. In other words, the alleged violations of legal interests protected by the duties of loyalty and prudence did not establish standing because there was no resulting injury. *Id.* at 1619; *see also Pierce v. Ducey*, 965 F.3d 1085, 1089 (9th Cir. 2020) (finding no Article III standing and explaining that a "concrete" injury "must actually exist" and "an abstract, theoretical concern will not do") (citation and quotation omitted). Plaintiffs' interpretation of *Facebook Internet Tracking* ignores this recent precedent and should be rejected for that reason alone.

But even further, Plaintiffs misread *Facebook Internet Tracking* itself. While that case held that "state law ***can*** create interests that ***support*** standing in federal courts," it did not announce a blanket rule that ***any*** theoretical violation of a common law interest ***suffices*** to confer standing. 956 F.3d at 599. Indeed, such a principle would run afoul of countless decisions that look to whether a plaintiff asserting common-law claims suffered a concrete injury apart from the alleged violation of their common-law interest. *See, e.g.*, *Daniel v. Nat'l Park Serv.*, 891 F.3d 762, 767 (9th Cir. 2018) ("[A] plaintiff may not rely on bare legal conclusions to assert injury-in-fact, or engage in an ingenious academic exercise in the conceivable to explain how defendants' actions caused his injury.") (internal quotations omitted); *Opperman v. Path*, 84 F. Supp. 3d 962, 990 (N.D. Cal. 2015) (concluding plaintiffs were not entitled to a presumption of injury based on allegations of conversion and dismissing claim for lack of standing). Plaintiffs' suggestion that *Facebook Internet Tracking* silently abrogated this longstanding precedent, *see* Opp. at 13, n.2, and enshrined a rule that any abstract invasion of a common law interest confers standing, Opp. at 12-14, is meritless.

Without such a rule, Plaintiffs have no standing to pursue their conversion claim. Plaintiffs argue it suffices to allege that Google "invaded" a "concrete property interest in the bytes they purchased." (Opp. at 12-13.) But simply proclaiming that Plaintiffs have a "concrete property interest" does not demonstrate that Plaintiffs suffered a concrete ***injury***. Without allegations that

Google's conduct impacted Plaintiffs' use of their cellular data plans or forced them to pay overage charges or led to some other concrete injury—allegations Plaintiffs appear intent on avoiding—their conversion claim fails for lack of Article III standing. *See Thole*, 140 S. Ct. at 1618-19; *Opperman*, 84 F. Supp. 3d at 990 (plaintiffs were not entitled to a presumption of injury-in-fact based on allegations of conversion); *see also Yunker v. Pandora Media, Inc.*, No. 11-cv-03113 JSW, 2013 WL 1282980, at *5 (N.D. Cal. Mar. 26, 2013) (concluding plaintiff did not have standing based on alleged abstract interference with his interest in his device's memory space where he did not allege associated impact on his use and enjoyment of device).[2]

Further, Plaintiffs' alleged interest in "disgorging Google's unjust enrichment" cannot support their conversion claim. (Opp. at 13-14.) By Plaintiffs' admission, they do not seek "disgorgement" as a remedy for their conversion claim—in fact, according to them, that is what distinguishes their conversion and quantum meruit claims. (*Id*. at 27-28 (arguing their quantum meruit claim "seeks to recover the value of the benefit Google derived from these passive transfers that occurred at Plaintiff's expense" and "contrasts with the conversion claim, which focuses on Plaintiffs' property interest and the market value of cellular data")); *cf. also* Cal. Civ. Code § 3336 (setting forth presumptive remedies for conversion without identifying disgorgement). Because "a plaintiff must demonstrate standing for each claim he seeks to press," any alleged interest in recovering unjust enrichment cannot create standing for Plaintiffs' separate conversion claim. *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008).

Finally, Plaintiffs' alleged interest in "disgorging Google's unjust enrichment" cannot create standing for any claim because the Complaint does not seek this remedy, notwithstanding Plaintiffs' characterization in their Opposition. While *Facebook Internet Tracking* concluded an

[2] Plaintiffs' attempts at distinguishing these cases, *see* Opp. at 13, n.2, fall flat. First, Plaintiffs try to distinguish *Opperman* by arguing that there, the defendant did not "take[] the only copy of [the information at issue] and deprive plaintiffs of its use." (*Id.* (citing *Opperman*, 87 F. Supp. at 1032).) But Plaintiffs also do not allege anything of the sort in this case, as they do not contend that Google's alleged use of the cellular data plans prevented them from enjoying those plans. Second, Plaintiffs argue that *Yunker* dismissed the trespass and conversion claims for failure to state a claim. (*Id.* (citing *Yunker*, 2013 WL 1282980, at *15-17).) While that is true, that case ***also*** rejected the argument that abstract interference with a property interest is sufficient to confer standing. *Yunker*, 2013 WL 1282980, at *5 (concluding allegations of diminished memory space were insufficient to confer standing where plaintiff did not allege associated performance problems).

interest in disgorging unjustly earned profits supports standing in some circumstances, the plaintiffs there specifically alleged the nature of the profits at issue and their entitlement to them. *See* 956 F.3d at 600-01. In contrast, Plaintiffs here do not seek disgorgement of profits as a remedy on any claim and refer only to recovering the "value" of the property with which Google allegedly interfered. (*See* Compl. ¶¶ 74-75, 78.)

**B. Plaintiffs Have Not Stated a Claim for Conversion.**

**1. Plaintiffs fail to identify cognizable property.**

**a. Plaintiffs' contractual rights to receive cellular service are not property.**

To create the impression that this case involves property, Plaintiffs repeatedly claim that their cellular data plans give them ownership of "bytes of cellular data." (*See, e.g.*, Opp. at 14 (stating in heading that "purchased bytes of cellular data are property").) But that assertion mischaracterizes the contractual rights at issue by conflating distinct concepts: (1) the ***means*** of transmitting information between mobile devices and remote servers via a cellular network, (2) the ***amount*** of information that is transmitted, which can be measured in bytes; and (3) the ***underlying information*** itself that is transmitted (*e.g.*, text messages, security updates, or other data files).[3]

Here, Plaintiffs' conversion claim is not based on alleged ownership in the information their devices exchange with Google—*e.g.*, the crash reports, software patches, and other data files exchanged via "passive" transfers. Nor do Plaintiffs own "bytes" themselves, as they sometimes seem to claim. (*See, e.g.*, Opp. at 19 ("The property that Google converts are the individual bytes that Google uses to execute passive transfers.").) A byte is just a unit of measurement, and you can no more own a "byte" than you can an hour or an inch.

Rather, Plaintiffs' claim is premised on alleged "property interests in the cellular data *allowances* that they purchase from their mobile carriers." (Compl. ¶ 63 (emphasis added).) So when Plaintiffs say they own "bytes of cellular data," what they really mean is that they have a contractual right—the right to transmit information over a cellular network up to a certain

[3] *See* Encyclopedia Britannica, Byte, ("[T]he basic unit of information in computer storage and processing. A byte consists of 8 adjacent binary digits (bits), each of which consists of a 0 or 1.") (available at: https://www.britannica.com/technology/byte).

allowance—that is *measured in* "bytes of cellular data." Plaintiffs acknowledge as much in other parts of their Opposition and in the Complaint. (*See* Opp. at 10 ("Plaintiffs were granted the right to send and receive digitized information over [a] carriers' cellular network."); Compl. ¶ 24 (alleging that Plaintiffs' plans allow them "to access the carriers' cellular data networks, thereby providing users with the ability to send and receive information over the internet without a Wi-Fi connection.").) These sort of contractual rights are not any recognized form of *property*, even if the rights are exclusive[4] and measurable, because they are a right to use a *service*. (*See* Mot. at 10-11 (citing cases explaining that such a contractual right to receive a service cannot be converted).) Plaintiffs attempt to argue these cases do not stand for that proposition (Opp. at 19-20), but the cases are unambiguous. *See*, *e.g.*, *Monster Energy Co. v. Vital Pharms., Inc.*, No. EDCV 18-1882 JGB (SHKx), 2019 WL 2619666, at *13 (C.D. Cal. May 20, 2019) (reaching "the common sense conclusion which is also supported by ample precedent: that the benefits of contractual rights are not personal property capable of conversion").

To deflect from this problem, the Opposition baldly asserts that Plaintiffs have a "possessory interest in cellular data that exists independent of the contracts." (Opp. at 9.) But Plaintiffs' reference to "cellular data" again conflates concepts. While it is true that the underlying data that is transmitted might exist independently of the contracts, as discussed above, this case is not about that information. The only interest Plaintiffs have, by their own characterization, is in their "cellular data *allowances*." (Compl. ¶ 63 (emphasis added).) These allowances would cease to exist if Plaintiffs cancel their cellular plans because they exist solely by virtue of these contracts.

That the "bytes of cellular data" Plaintiffs reference are just a measure of a service, and not property on their own, is highlighted by Plaintiffs' unlimited plans. Plaintiffs offer no coherent explanation for how they could own, possess, or control infinite bytes or how such a property interest could be precisely defined and delineated. And if Plaintiffs cannot own the infinite bytes

[4] Plaintiffs do not allege exclusive control even of this contractual right to service, as they do not allege that they alone have the right to draw from their data allowances. (Mot. at 12-13 (noting the ubiquity of family and corporate data plans).) The Opposition dodges this issue by saying that the capacity to share property is consistent with ownership. (Opp. at 18.) But the issue here is not whether Plaintiffs chose to share their allowances with others—instead, Plaintiffs may never have had exclusive control at all, as a family or corporate plan allows all users to draw from the same data allowance.

they are entitled to under their unlimited plans, their theory of property collapses, as all that remains is an unrestricted contractual right to a service.[5]

Plaintiffs' analogy to a requirements contract for an apple seller only exposes this incoherence further. (Opp. at 16.) In that example, the apples exist independent of the contract and the fact that the contract allows the seller to take possession of an indefinite number does not detract from the fundamental nature of apples, which can be possessed and controlled as property. Here, the purported property interest consists *solely* of the contractual right to use a service and, in the context of an unlimited plan, to do so without restriction. This contractual arrangement does not give rights to any underlying property that Plaintiffs can possess like an apple, has no precisely defined boundaries, and lacks the necessary hallmarks of property. (*See* Mot. at 11-12.)

**b. Plaintiffs' analogies to other forms of property fail.**

Plaintiffs' analogies to other forms of property also fail. To start, Plaintiffs make much of the fact that California courts have recognized certain "intangible" property in the conversion context. But these interests fundamentally differ from the bytes at issue here. (Opp. at 15.) Take for example the alleged theft of television programming: In *DIRECTV, Inc. v. Pahnke*, the plaintiff alleged that the programming itself—intellectual property that existed independent of the contract that governed its distribution—was converted, leading to quantifiable harm. 405 F. Supp. 2d 1182, 1189 (E.D. Cal. 2005). The regulatory approval for an airplane design in *G.S. Rasmussen & Assocs., Inc. v. Kalitta Flying Serv., Inc.*, is similar: There, the FAA granted the plaintiff a license to implement a certain airplane design, a kind of quasi-intellectual property that could be further licensed to third-parties. 958 F.2d 896, 906 (9th Cir. 1992). The Ninth Circuit found this transferrable design approval was property, but nowhere held that a contractual right to receive a service, what is at issue here, would be. *Id.* The credit card information in *Welco Elecs., Inc. v. Mora* is more of the same. 223 Cal. App. 4th 202, 211 (2014). The theft of credit card information in that case had the same effect as the direct theft of money, which has long been recognized as a

[5] Plaintiffs assert that "[n]o one is suggesting that purchasers of 'unlimited' data plans have a right to an infinite amount of cellular data." (Opp. at 16.) But then what are Plaintiffs suggesting? If Plaintiffs are not claiming a property interest in their data allowances—which are unlimited—then it is unclear what the alleged property is.

form of convertible property. Plaintiffs muster no case finding that a contractual right to a service is property that can be converted—instead, the case law holds just the opposite. (Mot. at 10-11.)

Plaintiffs' attempt to analogize to utilities like gas and water also fails. Plaintiffs say that when information is transmitted to or from their devices, "users consume discrete bytes of cellular data" similar to the way people consume gas, water, and other utilities. (Opp. at 20.) But that relies on the same mischaracterizations discussed above. Again, "cellular data" is the *means* by which underlying information is transmitted, and "bytes of cellular data" are just a *measure* of how much of that service is used. Unlike in the utility context, Plaintiffs here did not pay for some underlying commodity like gas or water that they could receive and consume; they paid for the right to utilize their carriers' cellular networks up to certain contractually defined "allowances." (Compl. ¶ 63.) And unlike the diversion of gas or water, which deprives the intended recipient of the use of those commodities and can result in increased utility charges, the allegations here do not involve any such impact and do not support extending the notion of "property" in the entirely novel way that Plaintiffs propose.

All of these analogies only drive home the point: Cellular data plans are contracts that allow users to access a service, but they do not assign interests in independently existing property. And the instruction of California courts has been clear: This kind of expansion of conversion into other domains should be checked, not endorsed. (*See* Mot. at 9-10, 19.)

**2. Plaintiffs allege no substantial interference with their data allowances.**

Plaintiffs do not dispute that conversion requires "actual interference with [a party's] ownership or right of possession," *Moore v. Regents of the Univ. of Cal.*, 51 Cal. 3d 120, 136 (1990), which must be "substantial" and cannot be based on mere "use" or "intermeddling" with property, *Jordan v. Talbot*, 55 Cal. 2d 597, 610 (1961). (*See* Opp. at 21.) Nor do Plaintiffs contend that Google in any way interfered with their ability to use their cellular data plans. (*See* Mot. at 14.) Because they have no answer to these dispositive points, Plaintiffs resort to sensationalized rhetoric, accusing Google of seeking a "license to steal," among other dramatic claims. These efforts to obscure the defects of their conversion theory all fail.

First, Plaintiffs argue they need not allege that Google took "*all* of Plaintiffs' data." (Opp.

at 21 (emphasis in original).) But that is not what Google argues. Google does not quarrel with the notion that a conversion claim can potentially lie where a defendant takes property from "a divisible pool of resources" without taking "all" of the available property. (*Id.*) But the purported "property" here is not a portion of some "pool" of "bytes" but rather Plaintiffs' contractual right to transmit data over a cellular network. Plaintiffs' claim fails—not because they must allege Google used up "all" of their data allowances—but because they do not allege ***any*** interference at all with their ability to use their data plans, even as a result of the partial use of their data allowances.

Second, Plaintiffs claim Google is improperly insisting on allegations of "consequential harms . . . in addition to the direct harm of being deprived of property they purchased." (Opp. at 21.) But again, "the property they purchased" (if it is property at all) were rights to send and receive data over a cellular network, so the question is whether Google substantially interfered with those rights. Again, Plaintiffs allege no interference with this right, let alone any substantial interference.

Third, Plaintiffs argue the Complaint "squarely meets [the] requirement" of substantial interference by alleging a "conversion of a definite, measurable number of bytes." (Opp. at 21.) But that argument begs the question of what constitutes the alleged interference. Plaintiffs carefully avoid specifying as much because, at bottom, they are alleging only that Google used a portion of their data allowances, without pointing to how that interfered with their ability to use the allowances themselves, which is insufficient to demonstrate substantial interference. *See Jordan*, 55 Cal. 2d at 610 (mere "use" or "intermeddling" are not sufficient to sustain a conversion claim).

Fourth, Plaintiffs' cited cases do not support any finding of substantial interference and instead reinforce, by contrast, the defects of the Complaint. (Opp. at 21-22.) In those cases, the plaintiffs alleged defendants dispossessed them of their property or otherwise deprived them of the rights inherent to property ownership, like the ability to license the use of their property. *See G.S. Rasmussen*, 958 F.2d at 906 (plaintiff offered to license its FAA permit to the defendant for $95,000 but defendant photocopied and used it without permission); *Welco Elecs.*, 223 Cal. App. 4th at 211 (defendant "misappropriated plaintiff's credit card and used it" to "obtain[] the money from the credit card company," causing plaintiff to "bec[ome] indebted to the credit card company"); *Shein v. Canon U.S.A., Inc.*, No. CV 08-07323 CAS (Ex), 2009 WL 1774287, at *13 (C.D. Cal. June 22,

2009) (defendant prevented plaintiff from using remaining ink in cartridges plaintiff had purchased). Here, by contrast, Plaintiffs do not allege Google prevented them from exercising *any* of their contractual rights under their cellular data plans in any way.[6]

**3. Plaintiffs have not established damages.**

Plaintiffs do not dispute (nor could they) the black letter law that conversion requires not only substantial interference with a property interest, but "resulting damages." *Fremont Indem. Co. v. Fremont Gen. Corp.*, 148 Cal. App. 4th 97, 119 (2007). Instead, Plaintiffs try to sidestep this requirement by claiming they need only allege that the passive data transfers at issue used some portion of their cellular data allowance, at which point damages are presumed under Civil Code Section 3336. (Opp. at 21-24.) That is not and cannot be the law.

Contrary to Plaintiffs' arguments, Section 3336 does not entitle Plaintiffs to a "presumption of detriment." (Opp. at 22-23.) Importantly, Section 3336 must be read in conjunction with Section 3333, which establishes a measure of damages for most tort cases: "For the breach of an obligation not arising from contract, the ***measure of damages, except where otherwise expressly provided by this Code***, is the amount which will compensate ***for all the detriment proximately caused*** thereby, whether it could have been anticipated or not." Cal. Civ. Code § 3333 (emphasis added). As contemplated by Section 3333, Section 3336 provides for an alternative measure of damages for conversion claims that is based on the value of the converted property. But Section 3336 does not purport to create a presumption that any plaintiff who alleges interference with a property interest is entitled to damages; it merely clarifies the "measure of damages" available to a plaintiff who can show some proximately caused "detriment."

*Lueter v. State of California*, 94 Cal. App. 4th 1285 (2002), on which Plaintiffs rely, (Opp. at 23), confirms this reading of Section 3336. In that case, the court considered a conversion claim

[6] Plaintiffs suggest that *Supply Pro Sorbents, LLC v. RingCentral, Inc.*, No. 16-cv-02113-JSW, 2017 WL 4685705, at *1 (N.D. Cal. July 17, 2017), would apply only if Plaintiffs alleged Google converted their Android devices. (Opp. at 12, n.11.) But Plaintiffs cannot have their cake and eat it too. By Plaintiffs own logic, intangible property is covered by California conversion law. (*See* Opp. at 14.) And Plaintiffs offer no reason to believe that established principles regarding substantial interference would not apply here to their purported interest in their data plans, if such plans are property. *See Supply Pro Sorbents*, 2017 WL 4685705, at *5 ("[T]here may be minor and unimportant dispossessions which do not seriously interfere with the other's right of control, and so do not amount to a conversion.").

and reaffirmed that "[a]ctions for the taking and damaging of private property are in the field of tortious action, and hence are subject to the rule that ***proof of damage is an essential part of the plaintiff's case***." *Id.* at 1302 (emphasis added). As the *Lueter* court further explained, to demonstrate the damages element of conversion, the plaintiff must show both: (1) "***proximately caused injury***," *i.e.*, "the fact of harm suffered by the plaintiff due to the defendant's conduct," to a reasonable certainty; and (2) the "***measure of damages***," *i.e.*, "the monetary sum that the plaintiff may be awarded as compensation for the injury," to a "degree of certainty that the circumstances of the case permit." *Id.* at 1303 (emphasis added).

Similarly, the court in *English & Sons, Inc. v. Straw Hat Restaurants, Inc.* rejected an argument that Section 3336 creates a presumption of damages. 176 F. Supp. 3d 904 at 924 (N.D. Cal. 2016). Relying on *Lueter*, the *English & Sons* court concluded the conversion doctrine imposes a "requirement of actual proof" of damages. *Id.* The court thus rejected the movant's summary judgment motion because it had failed to present evidence of damages.[7] *Id.* As both *Lueter* and *English & Sons* show, Plaintiffs' contention that Section 3336 permits courts to "presume" damages is wrong.

Plaintiffs' remaining arguments fare no better. First, Plaintiffs assert that Google has not cited a case where a court dismissed a conversion claim for failure to allege damages, but they ignore the many cases cited by Google holding that damages are a necessary element of a conversion claim. (*See* Mot. at 15 & 16 n.2.) For example, Plaintiffs do not even acknowledge *English & Sons*, 176 F. Supp. 3d at 904. (*See* Mot. at 16 n.2.)

Second, Plaintiffs complain that Google is insisting on allegations of "consequential damages [a]s a prerequisite to any recovery." (Opp. at 23.) But that argument is a straw man. Google is not contending that "consequential" damages must always be shown to state a conversion claim. Rather, Google is arguing that Plaintiffs must show ***some*** form of damages contemplated by Section 3336 and that damages cannot simply be presumed as a matter of law without erasing

[7] *English & Sons* was in a different procedural posture but the premise underlying the decision is equally applicable here—"actual damages" are an essential component of any conversion claim, and a failure to demonstrate damages defeats that claim. *English & Sons*, 176 F. Supp. 3d at 924.

damages as an element of the claim.[8] Because Plaintiffs have failed to allege any damages, and do not even pretend to do so, their claim must be dismissed.[9]

**4. Plaintiffs consented to the alleged data transfers.**

With regard to consent, the Opposition is most notable for what it does not say. At no point do Plaintiffs identify any type of "passive" data transmission that is not covered by Google's Terms and Policies, which go to great lengths to explain the ways that Android devices can share data with Google. (*See* Mot. at 4-5, 16-19; Spector Decl. (ECF 33) Exs. A-D.) Instead of challenging whether Google could exchange data with their devices, Plaintiffs challenge only *when* Google could do so.

First, Plaintiffs invent the arbitrary rule that the only time an Android device can communicate with a Google server is when the user is actively interacting with the device. (Opp. at 24-26.) But this rule has no basis in the relevant contract language. Take the following provisions from the Google Privacy Policy as an example:

> The information we collect includes unique identifiers, browser type and settings, device type and settings, operating system, mobile network information including carrier name and phone number, and application version number. We also collect information about the interaction of your apps, browsers, and devices with our services, including IP address, crash reports, system activity, and the date, time, and referrer URL of your request.
>
> ***We collect this information when a Google service on your device contacts our servers*** — for example, when you install an app from the Play Store or when a service checks for ***automatic*** updates. If you're using an Android device with Google apps, ***your device periodically*** contacts Google servers to provide information about your device and connection to our services. This information includes things like your device type, carrier name, crash reports, and which apps you've installed.

[8] When attacking this straw man, Plaintiffs rely on *Lueter* for the proposition that parties need not prove consequential damages and can recover "the market value of their converted property, even when the property [is] essentially worthless." (Opp. at 23.) But the plaintiff in *Lueter* demonstrated an injury entitling them to recover the fair market value of their property because the defendant threw away the plaintiff's property. *See* 94 Cal. App. 4th at 72. Here, Plaintiffs do not allege they were deprived of even the *de minimis* value at issue in *Lueter.*

[9] Plaintiffs also spill much ink developing an argument that damages for conversion can be awarded even where the challenged behavior benefited the plaintiff. (Opp. at 23-24.) Those cases all rely on Section 3337 and thus the notion that the benefit was given "without [the plaintiff's] consent." *See* Cal. Civ. Code § 3337. For the reasons given below, Plaintiffs ***did*** consent to the use of their cellular data plans, *see* Section II.B.4 *infra*, and these cases are thus inapposite.

(Spector Decl., Ex. B at 3 (emphasis added).) This detailed disclosure makes clear that Android devices regularly send a wide range of information to Google servers, including highly technical information generated on an automated basis that has nothing to do with a user's active use of a device. Only a lawyer with an agenda would read this language as imposing a requirement that the user be "actively" interacting with the device at the time of any data transfer.

This "active use" concept is not only nowhere to be found in the Google Terms and Policies, imposing it would lead to absurdities. *See* Cal. Civ. Code § 1638 (instructing against interpretations of contracts that would lead to the "absurd"). To start, this reading of the Google Terms and Policies would mean a Google server could never send data to an Android device unless it already knew the device was in "active use." But this would create a Catch-22: Google would have no way of knowing whether the device was in active use unless data was sent to the server to let it know. Moreover, no longer could Google alert a user that she received an email, push an urgent software patch, or automatically update an app. And any communication a device needs to make with a Google server would have to be rushed into the window when the user is "actively using" the device, even if this was an inefficient use of device resources or otherwise against the user's interests.

The Opposition attempts to defend Plaintiffs' interpretation by arguing the language quoted above falls under a heading with the term "use" of Google services and therefore only refers to data transfers that take place during "active use" of the device (notably, Plaintiffs add the "active," which appears nowhere in any of the relevant documents). This is a tortured reading of even the heading, but regardless, the title of a contract section cannot alter the meaning of a specific provision. *See Prouty v. Gores Tech. Grp.*, 121 Cal. App. 4th 1225, 1235 (2004) (specific provisions control over general provisions).[10]

Second, Plaintiffs argue that even if they consented to "passive" data transfers, Google was required to transmit such data only over Wi-Fi networks, and could not do so over cellular networks. But again, the Google Terms and Policies contain no such requirement, and the Opposition does

---

[10] The Opposition attempts to inject this invented "active use" concept into various other provisions that likewise do not support it. (*Compare* Mot. at 19 *with* Opp. at 24-26.)

not even bother to argue otherwise. For example, the Google Terms and Policies explain that "your device periodically contacts Google servers to provide information about your device," with no limitation on the type of network (Wi-Fi or cellular) that can be used to do so. (Spector Decl., Ex. B at 3.) Plaintiffs ask the Court to read into this provision a new term, as if the language read: "***if your device is connected to WiFi***, your device periodically contacts Google servers to provide information about your device." (*See* Opp. at 25-26.) The Opposition offers no basis, in the contract language itself or from other authority, to do so.[11]

Regardless, these competing contract interpretations, and arguments about how Google ought to have exercised its contractual authorization to communicate with Android devices, are the domain of contract law, *not* conversion. (*See* Mot. at 18-19.) To call this "theft" stretches the tort of conversion beyond recognition.[12]

### C. Plaintiffs' Common Count for Quantum Meruit Fails.

Plaintiffs' contention that their common count for quantum meruit can proceed separate and apart from their conversion claim, (*see* Opp. at 28), is wrong. Plaintiffs rely on *Crocker-Anglo Nat'l Bank v. Kuchman*, but that case and its progeny say only that "[a] plaintiff may rely on a different theory of recovery in the common count *as long as* that theory [of recovery] *is fully supported in the specific facts pleaded in the other counts*." 224 Cal. App. 2d 490, 497 (1964) (emphasis added). As explained in Google's Motion, because Plaintiff's common count is based on the same factual predicate as the conversion claim, Plaintiff's common count of quantum meruit must fall with their conversion claim. (Mot. at 19.) *See also McBridge v. Boughton*, 123 Cal. App.

---

[11] Plaintiffs misunderstand Google's invocation of *In re Yahoo Mail Litigation*, 7 F. Supp. 3d 1016 (N.D. Cal. 2014). Because Plaintiffs agreed to the data transfers, they necessarily agreed to the use of the network the device was then connected to—there could be no transfer otherwise. Plaintiffs argue that Google could have waited until the device was connected to WiFi. As an initial matter, for many users, that may be a long time or never at all. But regardless, this exposes Plaintiffs' argument for what it is: A new contract term that, far from conforming to the language of the agreement, would introduce new requirements found nowhere in the contractual language.

[12] Plaintiffs seek judicial notice of various webpages describing Google Chrome Books and the Google Pixelbook. (*See* ECF Nos. 39-2, 39-1.) Plaintiffs appear to concede these pages do not constitute part of their agreements with Google, and instead argue these pages show that not every update termed "automatic" by Google will take place over a cellular network. (Opp. at 26.) Google has never contended otherwise, so these documents have no bearing here. Similarly, Plaintiffs seek judicial notice of Alphabet Inc.'s 10k filing, but this document also has no nexus with the claims at issue. The Court should decline to take judicial notice of these irrelevant materials.

4th 379, 394 (2004) ("A common count is not a specific cause of action, however; rather, it is a simplified form of pleading normally used to aver the existence of various forms of monetary indebtedness.").

Even if quantum meruit were a standalone claim, Plaintiffs do not allege the necessary elements. To recover under quantum meruit, a plaintiff "must show the circumstances were such that the services were rendered under some understanding or expectation of both parties that compensation therefor was to be made." *E.J. Franks Constr., Inc. v. Sahota*, 226 Cal. App. 4th 1123, 1127 (2014). Here, Plaintiffs make no effort to allege that "both parties" (they and Google) shared an "understanding or expectation" that Plaintiffs would be compensated for data transmissions used to service their Android devices. (*See* Compl. ¶¶ 67-75.)

Further, Plaintiffs acknowledge that written agreements govern their use of Android devices. (*See* Compl. ¶ 45.) Because those contracts address data transfers between Google servers and Plaintiffs' devices, any independent quantum meruit theory fails as a matter of law. *See, e.g.*, *Newbury Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1405 (9th Cir. 1996) (concluding party could not proceed on quantum meruit theory where "express contract existed . . . which covered the subject matter of th[e] suit"); *Hedging Concepts, Inc. v. First Alliance Mortgage Co.*, 41 Cal. App. 4th 1410, 1419 (1996) (similar).

## III. CONCLUSION

For all these reasons, Plaintiffs' Complaint should be dismissed in its entirety.

Dated: March 15, 2021

COOLEY LLP

By: /s/ Whitty Somvichian
Whitty Somvichian

Attorneys for Defendant
GOOGLE LLP

246515887