ANN RAVEL (62139)
 aravel@mcmanislaw.com
McMANIS FAULKNER
a Professional Corporation
50 West San Fernando Street, 10th Floor
San Jose, California 95113
Telephone:    (408) 279-8700
Facsimile:    (408) 279-3244

GLEN E. SUMMERS (176402)
 glen.summers@bartlitbeck.com
KARMA M. GIULIANELLI (184175)
 karma.giulanelli@bartlitbeck.com
ALISON G. WHEELER (180748)
 alison.wheeler@bartlitbeck.com
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, Colorado  80202
Telephone:    (303) 592-3100
Facsimile:    (303) 592-3140

GEORGE A. ZELCS
MARC A. WALLENSTEIN
ROBERT E. LITAN
RYAN Z. CORTAZAR
KOREIN TILLERY LLC
205 North Michigan Avenue
Suite 1950
Chicago, Illinois 60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751

MICHAEL E. KLENOV (277028)
CAROL O'KEEFE
KOREIN TILLERY LLC
505 North Seventh Street
Suite 3600
St. Louis, Missouri 63101-1625
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

*Attorneys for Plaintiffs,*
*Joseph Taylor, Edward Mlakar, Mick*
*Cleary, Eugene Alvis, and Jennifer Nelson*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| JOSEPH TAYLOR, EDWARD MLAKAR, MICK CLEARY, EUGENE ALVIS, and JENNIFER NELSON individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>GOOGLE LLC,<br><br>Defendant. | Case No.:  5:20-CV-07956-VKD<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

1

FIRST AMENDED CLASS ACTION COMPLAINT, Case No. 5:20-CV-07956-VKD

**INTRODUCTION**

1.      Defendant Google LLC ("Google") designed the Android operating system to collect vast amounts of information about its users, which Google uses to generate billions of dollars in profit annually by selling targeted digital advertisements and improving products like Google Maps. There are privacy implications for an operating system specifically designed to surveil mobile device users in order to refine Google's targeted advertising business. But there is also an unlawful free-riding problem because Google collects this information by consuming the cellular data that its Android users purchase from their cellular providers every month. Google effectively forces these users to subsidize its surveillance by secretly programming Android devices to constantly transmit user information to Google in real time, thus appropriating the valuable cellular data users have purchased. Google does this, in large measure, for its own financial benefit, and without informing users or seeking their consent.

2.      This case involves the application of long-standing common law principles to seek redress for Google's secret appropriation of Android users' cellular data. Pursuing separate claims under both quantum meruit and conversion, Plaintiffs seek to represent a nationwide class of consumers (excluding California residents) who own Android mobile devices that secretly use their costly cellular data to enable Google's surveillance activities.

3.      Consumers pay mobile carriers for cellular data, and they consume that data through their mobile devices. Cellular data is property subject to conversion.  But even if cellular data were a service rather than property, Google's misappropriation of that service gives rise to a quantum meruit claim—a claim that does not depend on cellular data being property.

4.      Cellular data is property subject to conversion because, just like electricity or water, cellular data is capable of exclusive possession. Just like electricity or water passing through a meter attached to a home, every singly byte of cellular data transmitted by a wireless device is metered by the carrier. Just like the use of electricity or water, the amount of data transmitted by a wireless device has ramifications for the consumer, who can be charged for the additional use or suffer restrictions on further use.  And just as electricity and water are provided by utilities, it

2

FIRST AMENDED CLASS ACTION COMPLAINT, Case No. 5:20-CV-07956-VKD

makes no difference that cellular data is transmitted by a wireless carrier.  Just like electricity delivered through a wire into a home is property, and just as the water passing through a pipe into a home is property, so too is the cellular data transported over a wireless carrier's network to and from a user's cellular device.

5.      Even if cellular data is not property subject to conversion, and is instead a contractual right of access to a service, it is still a valuable right that Google has misappropriated, and the misappropriation of a service is precisely the sort of wrong that quantum meruit is meant to redress.  ***The quantum meruit claim pleaded in this Amended Complaint is not a common count derivative of the conversion claim.***  It is a separate cause of action, with a separate theory of recovery that the consumer class has a right to pursue regardless of whether cellular data is or is not property.  The quantum meruit claim does not rise and fall with the conversion claim—quite the opposite.  Either cellular data is property subject to conversion, or it is a contractual right of access to a service subject to quantum meruit. It may even be both—but it must at least be one or the other.

6.      Much of the information-gathering by Google takes place without any action at all by Android device owners. While Plaintiffs' Android devices are in their purses and pockets, and even while sitting seemingly idle on Plaintiffs' nightstands as they sleep, Google's Android operating system secretly appropriates cellular data paid for by Plaintiffs to perform "passive" information transfers which are not initiated by any action of the user and are performed without their knowledge. The transmission of this data to and from Google is not time-sensitive and could be delayed until Plaintiffs are on a Wi-Fi network, to avoid consuming Plaintiffs' cellular data. However, Google deliberately designed and coded its Android operating system and Google applications to indiscriminately consume Plaintiffs' cellular data and passively transfer information at all hours of the day—even after Plaintiffs move Google apps to the background, close the programs completely, or disable location-sharing.

7.      Plaintiffs had no say in Google's continual misappropriation of their cellular data and remain largely powerless to stop it. Google designed its Android operating system and apps

3

to prevent users from changing the settings to disable these transfers completely or to restrict them to Wi-Fi networks. Because of Google's deliberate design decisions, these passive information transfers using cellular data purchased by Plaintiffs are mandatory and unavoidable burdens shouldered by Android device users for Google's financial benefit.

8.     Plaintiffs at no time consented to these transfers, and were given no warning or option to disable them. Google has crafted its various terms of service and policies in ways that purport to create binding contracts with the users of its technologies. But Plaintiffs and other consumers purchased their Android devices with little choice but to accept Google's terms and policies, which are contracts of adhesion. Even if Google's policies and terms of service are valid contracts, they do not alert users that Android devices will needlessly consume their cellular data. While Google informs the users of certain transfers of personal information when they are actively engaged with their devices, its extensive "privacy" policies are silent on mandatory, passive information transfers and the means by which they occur.

9.     These information transfers are not mere annoyances—they interfere with Plaintiffs' property interests, depriving them of data for which they, not Google, paid. Each month, mobile device users pay their mobile carriers for cellular data that enable them to transmit and receive information on the carriers' cellular data networks. Whether Plaintiffs pay for a specific number of gigabytes, pay a fixed price per GB, or pay for unlimited access subject to speed restrictions above a certain data usage threshold, the contracts between Plaintiffs and their mobile carriers create for Plaintiffs concrete property interests in their purchased cellular data. When it initiates passive transfers of information utilizing Plaintiffs' cellular allowances, Google wrongfully interferes with Plaintiffs' exclusive possession of this property and commits the longstanding tort of conversion.

10.     If cellular data is viewed as a contractual right of access to a service instead of property, then Google has unjustly enriched itself by misappropriating Plaintiffs' right to transmit cellular data over their carriers' networks for its own purposes, without the knowledge or consent of the users whose right of access Google is coopting.  If that misappropriation does not state a

claim for conversion, it must state a claim for quantum meruit.  That is because the passive transfers of cellular data confer a valuable benefit to Google at Plaintiffs' expense. Google sends and receives information without bearing the cost of transferring that information between consumers and Google. Indeed, the information transmitted through this practice supports the company's product development and lucrative targeted advertising business. In the absence of contractual provisions disclosing and permitting Google to utilize Plaintiffs' cellular data, Google must compensate Plaintiffs for that use.

11.    This case is not about privacy. In this Amended Complaint, Plaintiffs do not challenge Google's underlying practice of harvesting personal information about users from their interactions with mobile devices or apps. Rather, Plaintiffs challenge Google's practice of effectively making mobile device users *pay* for the *transfer* of that information from their mobile devices to Google. As used by the carriers, and as used in this Amended Complaint, the term "cellular data" does not describe the underlying personal information that Google secretly causes Android mobile devices to transmit to it; rather, "cellular data" describes the transmission of such information over cellular networks charged against consumers' cellular data plans. To avoid confusion, this Amended Complaint typically refers to cellular data as "data" and the underlying information transferred via the cellular network as "information."

**PARTIES**

12.    Plaintiff Joseph Taylor, who is a resident and domiciliary of Illinois, bought an Android mobile device that he uses with a monthly unlimited cellular data plan purchased from carrier Metro by T-Mobile. Plaintiff Taylor was injured in fact and has been deprived of his property as a result of Google's unlawful conversion of his cellular data.

13.    Plaintiff Edward Mlakar, who is a resident and domiciliary of Illinois, bought an Android mobile device that he uses with a monthly unlimited cellular data plan purchased from carrier Sprint Solutions, Inc. Plaintiff Mlakar was injured in fact and has been deprived of his property as a result of Google's unlawful conversion of his cellular data.

14.     Plaintiff Mick Cleary, who is a resident and domiciliary of Wisconsin, bought an Android mobile device that he uses with a monthly unlimited cellular data plan purchased from carrier Verizon. Plaintiff Cleary was injured in fact and has been deprived of his property as a result of Google's unlawful conversion of his cellular data.

15.     Plaintiff Eugene Alvis, who is a resident and domiciliary of Iowa, bought Android mobile devices that he has used with a monthly limited cellular data plan purchased from carrier Verizon from 2013 through approximately November 2019 and a monthly unlimited cellular data plan from U.S. Cellular from approximately November 2019 through the present. Plaintiff Alvis changed his Verizon monthly data limit from time to time, and at various times it was 4GB, 6GB, 8GB, 12GB, or 25GB, depending on the plan that he chose.  Plaintiff Alvis was also briefly on an unlimited Verizon data plan from July to October 2019.  Plaintiff Alvis was injured in fact and has been deprived of his property as a result of Google's unlawful conversion of his cellular data.

16.     Plaintiff Jennifer Nelson, who is a resident and domiciliary of Wisconsin, bought an Android mobile device that she uses with a monthly pay-per-GB data plan purchased from carrier Spectrum Mobile.  She pays a fixed price for up to 1GB of data per month, and whenever she exceeds 1GB of data usage (which she does from time to time), she pays an additional charge for each additional 1GB of data.  Plaintiff Nelson was injured in fact and has been deprived of her property as a result of Google's unlawful conversion of her cellular data.

17.     Defendant Google LLC is a Delaware limited liability company with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043. Google created the Android operating system and continues to control all aspects of Android's programming and operation.

## JURISDICTION

18.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d), because (1) this action is a "class action," which contains class allegations and expressly seeks certification of a proposed class of individuals; (2) the Class defined below consists of more than one hundred proposed class members; (3) the citizenship of at least one class member is different from Google's

6

citizenship;[1] and (4) the aggregate amount in controversy of the claims of Plaintiffs and the putative Class exceeds $5,000,000, exclusive of interest and costs.

19.     This Court has personal jurisdiction over Google because it maintains its headquarters in California and in this District, and the illegal conduct alleged herein was conceived and implemented in whole or in part within California and this District.

20.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c).

21.     Google's terms of service provide that all claims arising out of or relating to Google's products and services will be litigated in federal or state courts in Santa Clara County, California, USA, and that Google consents to personal jurisdiction in those courts.

## I.     GOOGLE'S ANDROID SYSTEM IS UBIQUITOUS

22.     Google owns and programs the most popular mobile platform in the world: the Android operating system. Android works on a variety of mobile devices, including smartphones and tablets.

23.     The Android operating system includes an interface that provides the principal means by which users interact with their devices. The interface allows consumers to access and to use applications and widgets on the devices.

24.     In addition to the Android operating system, Plaintiffs' devices come with various Google applications and widgets pre-installed, including the Google search application, Chrome browser, Gmail email application, Google Maps, and YouTube.

---

[1] Because jurisdiction is based on the Class Action Fairness Act, 28 U.S.C. § 1332(d), even though Google LLC is a limited liability company, it is a citizen of the states "where it has its principal place of business and…under whose laws it is organized." 28 U.S.C. § 1332(d)(10). In other words, while in traditional non-class diversity cases the citizenship of a limited liability company would be determined by the citizenship of its members, that principle does not apply to this case. *See, e.g., Erie Ins. Exch. V. Erie Indemn. Co*., 722 F.3d 154, 161 n.7 (3d Cir. 2013) (explaining that the Class Action Fairness Act "evinces an intent that suits by unincorporated associations be treated like suits by corporations in that the citizenship of the association for diversity purposes is determined by the entity's principal place of business and not by the citizenship of its members").

FIRST AMENDED CLASS ACTION COMPLAINT, Case No. 5:20-CV-07956-VKD

25.    Android has been available on mobile devices since 2008 and has been the most dominant mobile operating system since 2011.[2] It currently has about a 54.4 percent share of the U.S. smartphone market.[3]

26.    All or virtually all mobile carriers sell cellular data to customers via cellular data plans that allow Android devices to connect to their cellular networks in order to send and receive internet communications. These mobile carriers sell mobile devices directly to consumers. Among the mobile carriers that sell Android devices for connection to their cellular networks are Verizon, AT&T, Sprint, T-Mobile, and U.S. Cellular.

27.    Many of the most popular mobile-device manufacturers sell devices with Android preinstalled as the operating system and often with a suite of Google's mobile apps preinstalled. These manufacturers include Samsung, Motorola, LG, Kyocera, Sonim, Huawei, ZTE, and HTC.

## II.    PLAINTIFFS HAVE A PROPERTY INTEREST IN THEIR CELLULAR DATA

28.    Plaintiffs purchased mobile devices preloaded with Google's Android operating system and suite of mobile apps and widgets.

29.    To use their mobile devices, Plaintiffs contracted with mobile carriers. As part of these contracts, Plaintiffs purchase cellular data from their mobile carriers through cellular data plans that allow Plaintiffs to access the carriers' cellular data networks, thereby providing users with the ability to send and receive information over the internet without a Wi-Fi connection.

30.    Though cellular data networks provide a critical resource for mobile devices, they are not necessary for the mobile device to send and receive information through the internet. When users do not wish to use their cellular networks or when they are unable to use them, mobile devices can also transfer and receive information over the internet through Wi-Fi connections. Indeed,

---

[2] Charles Arthur, *The History of Smartphones: Timeline*, GUARDIAN (Jan. 24, 2012), https://www.theguardian.com/technology/2012/jan/24/smartphones-timeline.

[3] *Subscriber Share Held by Smartphone Operating Systems in the United States: 2012 to 2018*, STATISTA, https://www.statista.com/statistics/266572/market-share-held-by-smartphone-platforms-in-the-united-states/.

8
FIRST AMENDED CLASS ACTION COMPLAINT, Case No. 5:20-CV-07956-VKD

many cost-conscious users maximize their time on Wi-Fi whenever possible and use their cellular networks only when Wi-Fi connections are unavailable in order to "save" the cellular data available under their monthly carrier plans.

31.    Cellular data plans vary by carrier, but they function in essentially the same way. The users pay the carrier a certain price each month, and in exchange, they purchase cellular data, which they can use to send and receive information on their devices through the carrier's cellular network. Some users purchase limited data plans, meaning a fixed amount of cellular data for a fixed price, *e.g.*, 8GB per month.   Users with limited data plans are typically charged an overage fee if they use more data than they have purchased in a given month, *e.g.*, if they exceed the 8GB limit.  Other users buy cellular data incrementally, on a pay-per-GB basis, meaning that they pay a fixed amount for 1GB of data, and if they use more than 1GB of data that month, they pay another fixed amount for a second GB of data.  Users with such "pay-per-GB" plans pay a fixed charge (though not labeled an "overage") for each additional GB of data that they use each month.  Still other users have unlimited plans, essentially requirements contracts, which appear to offer unlimited data usage, but in reality are still nearly always subject to quotas on their usage and will have their cellular connection speeds throttled if they exceed such quotas. For example, a typical "unlimited" data plan actually has a data cap of, *e.g.*, 20GB per month.  If the user exceeds that data cap, the user is "throttled," which means the speed at which he or she can access the cellular network is greatly reduced.  When throttled to reduced speeds, a number of functionalities are typically lost entirely (such as video streaming), and the overall performance of the device is significantly impaired.  Users who are throttled typically notice a network slowdown or an inability to use their device, but often do not realize that they have been throttled, and instead attribute the slowdown or lack of access to general network issues.

32.    Some users do not have data plans at all—instead, they purchase prepaid SIM cards (or prepaid cellular phones) that have a particular allocation of data associated with the SIM card (or phone) at the time of purchase, *e.g.*, 25GB.  When the user purchases that SIM card (or phone),what they are buying is the advertised amount cellular data, *e.g.* 25GB.  Once that data is

9

used up, it is gone.  Sometimes the user has the opportunity to purchase additional data at that point, but the original cellular data that the user purchased has been used up.

33.    The purchase of data plans from mobile carriers creates a property interest for Plaintiffs in their cellular data. Each megabyte or gigabyte of the cellular data has a fair market value, determined by market forces. By contracting for the purchase of their cellular data, Plaintiffs obtain access to send and receive information on the carriers' networks in the amounts provided by the terms of the contract. This access includes the right to exclude other persons and entities from using Plaintiffs' cellular data. Plaintiffs have the right to determine precisely how to use their cellular data and to grant others access to those allowances through their mobile device activity.

34.    For example, Android users may explicitly grant others access to their cellular data by creating a mobile "hotspot," in which the mobile device shares its cellular network connection with other nearby devices so that those devices can access the internet once they are given the hotspot's password. Similarly, "tethering" (either through a USB cable, Wi-Fi sharing or a Bluetooth connection) allows users to connect their mobile device with a computer to share the device's cellular network connection and grant the computer access to their cellular data. Users can also sell unused cellular data. *See, e.g.*, https://www.simplify.network/ (mobile app enabling Android users to sell their excess data via hotspot).

### III.    MOBILE DEVICE USERS ONLY CONSENT TO GOOGLE'S USE OF THEIR CELLULAR DATA WHEN THEY ACTIVELY USE GOOGLE'S PRODUCTS

35.    Under certain circumstances, mobile device users consent to the use of their cellular data. For example, when users actively engage with applications that require internet access while connected only to their cellular network, they instruct the applications to use some of their cellular data, thus authorizing such use. For example, when a user is in an area without Wi-Fi, opens a browser, and types in a web address, the user consents to use her cellular data to send information to the website's server and to allow the website to send information over the mobile carrier's cellular network to the device. Similarly, when that user opens a video app and requests to view a

video, she consents to allow the app to send a video to her device over her mobile carrier's cellular network and for that usage to count toward her allowance.

36.    These active transfers of information that are initiated by the user engaging an application are not at issue in this lawsuit. Plaintiffs do not contest Google's right to use Plaintiffs' cellular data pursuant to their consent when Plaintiffs are actively using Google's various products on their mobile devices.

37.    Plaintiffs instead challenge Google's misappropriation of their cellular data, without Plaintiffs' consent, based on "passive transfers," meaning information transfers that occur in the background or that do not result from Plaintiffs' direct engagement with Google products on their devices. These passive transfers, described in more detail below, occur in a variety of ways—including when Google applications are open (though not in active use) and operating in the background, and even when a user has closed out all Google applications on her device and the device is stationary and seemingly dormant. In none of the Google policies discussed below does Google notify users that its operating system, applications, and widgets cause users' mobile devices to indiscriminately consume Plaintiffs' cellular data, even when users are not using an app or widget on their devices.

**IV.    GOOGLE'S MISAPPROPRIATION OF PLAINTIFFS' CELLULAR DATA**

38.    Google designed and implemented its Android operating system and apps to extract and transmit large volumes of information between Plaintiffs' cellular devices and Google using Plaintiffs' cellular data. Google's misappropriation of Plaintiffs' cellular data through passive transfers occurs in the background, does not result from Plaintiffs' direct engagement with Google's apps and properties on their devices, and happens without Plaintiffs' consent.

39.    These passive transfers occur in a variety of ways. First, such transfers occur when mobile devices are in a completely idle state, meaning they are stationary, untouched, and with all apps closed. To confirm this, an analysis commissioned by Plaintiffs' counsel tested a new Samsung Galaxy S7 mobile device with the standard default settings accepted and standard pre-loaded set of apps, which was connected to a brand-new Google account and was not connected

11

FIRST AMENDED CLASS ACTION COMPLAINT, Case No. 5:20-CV-07956-VKD

to Wi-Fi. The analysis found that when the device was left in an idle state, the device sent and received 8.88 MB per day of data, with 94% of those communications occurring between Google and the device. In all, the device transferred information to and from Google approximately 389 times in 24 hours, for an average of more than 16 times per hour. The frequency of passive information transfers in this experiment was striking given the source: a stationary and untouched Android device, with all apps closed.

40.    Many of those communications were comprised of LOG files, which are automatically-produced files that contain a record of certain background information such as the networks that are available, apps that are open, and metrics about the operating system. LOG files are typically not time-sensitive, and transmission of them could easily be delayed until Wi-Fi is available. Google could also program Android to allow users to enable passive transfers only when they are on Wi-Fi connections, but it has chosen not to do so. Instead, Google has chosen to simply take advantage of Plaintiffs' cellular data so that it can get information from Plaintiffs at all hours of the day, no matter where they are or what they are doing.

41.    Second, a higher volume of passive transfers occurs when mobile devices are stationary and untouched, but with one or more apps open and unused. Vanderbilt University Professor Douglas C. Schmidt performed a study of Google's data collection efforts in 2018. *See* Ex. 1, Douglas C. Schmidt, *Google Data Collection* (Aug. 15, 2018). He found that both Android and Chrome transmit information to Google "even in the absence of *any* user interaction." *Id*. at 3 (emphasis in original). Professor Schmidt conducted an experiment with an Android device that was outwardly dormant and stationary but with Chrome open and in the background, and he found passive transfers[4] to Google occurred approximately *900 times in 24 hours*, *id*. at 14, for an average of *38 times per hour*.

---

[4] Professor Schmidt consistently defined "passive" information transfers as "information exchanged in the background without any obvious notification to the user," in contrast to "active" transfers, which he defined as "information directly exchanged between the user and a Google product." (*Id*. at 7.)

FIRST AMENDED CLASS ACTION COMPLAINT, Case No. 5:20-CV-07956-VKD

42.     In comparison, a stationary and untouched iPhone device with the Safari browser open in the background communicated virtually no information to Google, and its information transfers to Apple amounted to only about 1/10th of the information transferred to Google from the Android device. *Id*. at 3, 14.



(Ex. 1 at p. 14, Figure 6, Traffic data sent from idle Android and iPhone mobiles.)

43.     The Android device passively transferred 4.4 MB of data each day, or around 130MB each month, to Google servers, while the iPhone device transferred around 1/6th that volume of data to Google servers. *Id*. at 14.

44.     The contrast between the number of requests made to the two devices, as well as the volume of data transferred from the devices, confirms that Google's products play critical roles in passive information transfers to Google—and that the vast majority or all of these transfers are unnecessary.

45.     Third, even more passive transfers occur once users begin moving around with their Android devices, or interacting with them by visiting web pages, or using apps, despite also

13

eschewing the use of any preloaded Google apps such as Google Search, YouTube, Gmail, or Google Maps. *Id*. at 3, 23. This increased activity was driven by Google's publishing and advertising products including Google Analytics, DoubleClick (now Google Ad Manager), and AdWords (now Google Ads). *Id*. at 3, 15. Passive information transfers represented 46% of requests to Google servers from the device in the Schmidt experiment. *Id*. at 3–4.

46.    An iPhone device (again, without the Android operating system or Google's applications) in comparable active use communicated with Apple far less frequently than Android devices communicated with Google's servers. *Id*. at 24. (The two devices did have a comparable number of contacts with Google's advertising domains, as was expected in light of the similar usage on both devices of third party websites and apps which provide information to Google. *Id*.) The iPhone device also transferred a small fraction of information to Apple's servers, compared to the information transferred to Google from the Android device, as shown below. *Id*.



Ex. 1 at p. 24, Figure 12, Information requests from mobile devices during a day of typical use.

47.    With active use, the Android device passively transferred to Google servers 11.6 MB of data each day, or around 350MB each month, while the iPhone device transferred around half that amount to Google servers. *Id*. at 24.

48.    Google's publishing and advertising products drive passive information transfers from Android devices to Google in a variety of ways.  For example, Android devices transmit "tokens" that identify devices and users (and provide other information) with each connection to Google's servers. Google uses this information to determine which users it communicates with on which specific devices and to serve targeted ads. *Id*. at 16–23. These tokens are frequently sent alongside requests to send ads to the device.

49.    Google's publishing and advertising products also drive passive information transfers from Google to Android devices.  For example, Google tracks and predicts user behavior to pre-load targeted ads containing text, audio, games or other interactives, and even video onto Android devices.  Users often never view these pre-loaded ads, even though their cellular data was already consumed to download the ads from Google.  And because these pre-loads can count as ad impressions, Google is paid for transmitting the ads.

50.    Google instigates these transfers of information by designing and implementing its Android operating system and apps to mandate that transfer, regardless of whether a user has access to a Wi-Fi connection or instead has only her cellular data to transmit information to and from her device.

51.    In one of many examples, Google designed Android so that it frequently collects the user's location at times when the user is not actively using the phone, including whenever the user is walking around or driving in a car.  This location information is transmitted to Google, often over a cellular network, even though it could just as easily have been transferred over a Wi-Fi network at a later time.

52.    Whenever a user uses a third-party application that requests the user's location, such as a weather application, Google gratuitously collects an additional copy (and sometimes multiple copies) of that location information for itself and sends it to Google's servers, often over

15

a cellular network, expending the user's cellular data, even though the information could just as easily have been sent over a Wi-Fi network.  To be clear, this gratuitous transfer to Google consumes a quantum of the user's cellular data on top of and in addition to the quantum of cellular data used by the third-party application.  This type of information transfer has nothing to do with the functioning of the third-party application—the user could have successfully used the application without it.  And the user never consented to these additional, gratuitous transfers of location information. Google uses that location information, which it collects by utilizing users' cellular data, for its own benefit, including to improve products like Google Maps, traffic, and advertising.  In other instances, Google directly monetizes location information by selling it to automotive manufacturers, ride-hailing companies, and through Google's advertising products. Google could just as easily collect the data needed to power or improve its products over Wi-Fi networks, which are both cheaper than cellular and ubiquitous.

## V.    MOBILE DEVICE USERS DO NOT CONSENT TO GOOGLE'S USE OF THEIR CELLULAR DATA WHEN THEY ARE NOT USING GOOGLE'S PRODUCTS

53.    Users of Android must accept standardized form contracts to use the company's various policies ("Google Agreements"). But none of those agreements discloses that Google appropriates Plaintiffs' cellular data to transmit information when Plaintiffs are not actively using Google's products. Instead, they notify Plaintiffs that they may incur charges to third parties (the wireless carriers) when they *use* Google's products.

54.    The Google Agreements include four general policies relevant to this suit: the Terms of Service; the Privacy Policy; the Managed Google Play Agreement; and the Google Play Terms of Service.[5] Google's master policy is its Terms of Service. The Terms of Service themselves incorporate by reference the company's Privacy Policy. In addition, according to the

---

[5] These policies are posted online at: https://policies.google.com/terms?hl=en-US  (Terms of Service); https://policies.google.com/privacy  (Google Privacy Policy); https://www.android.com/enterprise/terms/ (Managed Google Play Agreement); https://play.google.com/about/play-terms/index.html (Google Play Terms of Service).

16

FIRST AMENDED CLASS ACTION COMPLAINT, Case No. 5:20-CV-07956-VKD

Managed Google Play Agreement, use of the Android operating system is governed by the Google Play Terms of Service. Nothing in these policies suggests that Google uses Plaintiffs' data to transmit information when Plaintiffs are not actively engaged with Google's products.

55.     Specifically, Google's Privacy Policy states, "We collect information about the apps, browsers, and devices you use to access Google services… We collect this information when a Google service on your device contacts our servers—for example, when you install an app from the Play Store or when a service checks for automatic updates. If you're using an Android device with Google apps, your device periodically contacts Google servers to provide information about your device and connection to our services."[6]

56.     The Google Play Terms of Service is the only policy that even mentions cellular data usage. It applies to the company's Google Play online store, where users can download software applications for their mobile devices. The policy has a disclaimer targeted specifically at Google Play's usage of cellular data. The disclaimer, however, applies only to active usage in connection with the use of Google Play and apps available through Google Play. The Play terms provide: "You are responsible for any access or data fees incurred from third parties (such as your Internet provider or mobile carrier) in connection with *your use and viewing* of Content and Google Play"[7] (emphasis added). The disclaimer is silent on Google's misappropriation of cellular data when users are not "using and viewing" Google's products.

57.     The Google Agreements also include Google policies that apply specifically to individual mobile apps. None of those policies disclose Google's passive data usage. For example, the Google Maps terms provide that "[c]ontent you upload, submit, store, send, or receive through Google Maps/Google Earth is subject to Google's Terms of Service."[8] The policy is silent about

---

[6] Google Privacy Policy, https://policies.google.com/privacy.

[7] Google Play Terms of Service, https://play.google.com/about/play-terms/index.html.

[8] Google Maps/Google Earth Additional Terms of Service, https://www.google.com/help/terms_maps/.

FIRST AMENDED CLASS ACTION COMPLAINT, Case No. 5:20-CV-07956-VKD

how that information is sent and does not provide Google with the authority to use Plaintiffs' cellular data for passive information transfers.

58.    The same is true of the Google Chrome browser policy. Despite the policy's specificity, it still does not obtain users' consent to Google accessing users' cellular data for passive information transfers. Instead, the Google Chrome policy merely discloses that Chrome unilaterally transmits various types of information to Google. For example, the policy states that Chrome "periodically sends information to Google to check for updates, get connectivity status, validate the current time, and estimate the number of active users." It further states that "information that Chrome stores [locally on your device] won't be sent to Google unless you choose to store that data in your Google Account." The policy also provides that "[s]ites and Android apps can also ask the browser to preload the pages you might visit next" when using Chrome and that "[p]reloading requests from Android apps are controlled by the same setting as Chrome-initiated predictions." Moreover, "on mobile devices, Chrome automatically shares your location with your default search engine if the Chrome app has permission to access your location and you haven't blocked geolocation for the associated website." Finally, the policy states that "usage statistics and crash reports are sent to Google to help us improve our products."[9] But again, no language in the policy discloses that Google accesses users' cellular data to initiate passive information transfers.

## VI.    GOOGLE HAS CONCEALED ITS MISAPPROPRIATION OF PLAINTIFFS' CELLULAR DATA

59.    Upon information and belief, Google's misappropriation of cellular data began with the very first sale of the Android operating system. And from that time on, Google has actively and fraudulently concealed its misappropriation of Plaintiffs' cellular data.

60.    Instead of notifying Plaintiffs and obtaining their consent to its usage of their cellular data, Google has misled Plaintiffs by informing them that they are responsible for access

---

[9] Google Chrome Privacy Notice, https://www.google.com/chrome/privacy/.

or data fees incurred from third parties (such as the mobile carriers) "in connection with *your use and viewing* of Content and Google Play"[10] (emphasis added). This provision misrepresents the true nature of Google's cellular data consumption because this purported disclosure suppresses the material fact that access or data fees may be incurred *even when users are neither using nor viewing Content or Google Play.*

61.    Google has also misled users through its location history settings. While Google allowed users to turn off the "location history" and "web and app activity" settings to prevent Google from tracking users' locations, disabling these settings did not prevent Google from collecting this information passively. This practice remained hidden from users until an August 13, 2018 report from the Associated Press.[11]

62.    Google's fraudulent concealment tolls the statute of limitations—Plaintiffs are entitled to recover from Google the value of their misappropriated data from the beginning of Google's scheme to use Plaintiffs' data without their consent or even knowledge.

## VII.    USERS EXCLUSIVELY POSSESS AND CONTROL THEIR CELLULAR DATA

63.    California law defines property as anything that is subject to ownership, and recognizes that there may be ownership of all inanimate things which are capable of appropriation or of manual delivery, or of exclusive possession and control. Electricity is considered property under California law, and cellular data is analogous to electricity.

64.    Cellular data, like electricity, is metered and attributed to a particular user.  Like a pipeline that serves as a conduit for the gas or oil moving through it, and the electric grid through which electricity is transmitted, the cellular network is a conduit for cellular data, which consists

[10] Google Play Terms of Service, https://play.google.com/about/play-terms/index.html.

[11] Google Records Your Location Even When You Tell It Not To, The Guardian (Aug. 13, 2018) *available at* https://www.theguardian.com/technology/2018/aug/13/google-location-tracking-android-iphone-mobile (last visited December 10, 2021).

of measured units—existing in the physical world—that are transferred over the network.  That makes each unit of cellular data unique and capable of exclusive possession and control.

65.    Plaintiffs possess and control their cellular data.  When a mobile device connects to the cellular network, it must be properly authenticated before any transfer actually takes place.  The authentication process uses unique information stored on the SIM card, in tandem with a unique identifier assigned to each physical cellular device called an International Mobile Equipment Identity (IMEI) number, and other associated identifiers, to authenticate the user.  Through this authentication process, the carrier uses unique identifiers to track and tally all consumption of cellular data as information is transmitted to or from a mobile device, so that all cellular data consumption can be attributed to (and charged to) a particular user.

66.    These unique identifiers allow carriers to precisely meter the amount of cellular data that each wireless device has consumed.  Much as an electrical utility uses an electricity meter to measures every kilowatt-hour of electricity consumed by a customer, a cellular carrier uses SIM cards, IMEI numbers, and related identifiers to measure every unit of cellular data as it is consumed by a particular wireless device.

67.    Consumers reasonably expect that others will not be able to hijack their valuable cellular data.  Just as consumers expect that others will not tap into their electrical, gas or water lines, consumers also reasonably expect that third parties will not misappropriate their cellular data.

68.    Consider, again, electricity.  After electricity is generated at a power plant, it moves over power lines through a meter and into a customer's home, where the customer uses the electricity to power myriad devices, systems, and appliances.  Once the electricity passes through the meter, it is associated with the customer, and the customer owns it.  If a neighbor taps into the customer's power line without the customer's knowledge or consent, and uses electricity that has already passed through that customer's meter, then the neighbor has converted the customer's electricity.  It is irrelevant that the customer may not have experienced any interruption in electrical

service, or any less ability to power the customer's home, because the meter shows that the customer has consumed the electricity, when in reality it was the neighbor who consumed it.

69.    In cellular networks, carriers meter the cellular data consumed by every single transmission to or from a wireless device. Cellular data used to transmit information from the device to Google's servers is metered by the carrier using the identifying information stored in the SIM card and on the device itself, which allows the carrier to associate that particular consumption of cellular data with a particular user, rendering it possessed by that user. The cellular provider measures that cellular data consumption in bytes. Because those bytes of cellular data are identifiable, uniquely attributable, owned by that user, and controllable by that user, they are capable of exclusive possession and control. When Google hijacks a consumer's cellular data in order to transmit information from the user's device to Google's servers, that cellular data is metered (allocated to the user) and treated by the carrier as data that the customer has consumed. It is irrelevant that the user may not have experienced any interruption in cellular data service, or any less ability to utilize the user's mobile device, because the meter shows that the user has consumed the cellular data, when in reality it was Google who consumed it.

70.    When a customer consumes electricity, gas, or water from a utility network, the customer deprives other customers of the ability to consume that exact same electricity, gas, or water. Even though *access* to the utility network may be unlimited and non-exclusive, *consumption* of the commodity provided by the utility network is exclusive. That is why the commodities provided by public utilities—electricity, gas, and water—are property, rather than merely access to a service. Similarly, when a customer consumes cellular data, the information the customer deprives others of the ability to consume that exact same cellular data. Even though all customers have non-exclusive access to the cellular network, the consumption of cellular data, through the transmission of the underlying information over the network, is exclusive. If the customer sends a particular piece of information over a cellular network, that information occupies its portion of network capacity for the length of time that it takes to move the information from one part of the cellular network to another. Otherwise, cellular networks would be limitless, which

21

is not the case.  Cellular networks have finite capacity, and transmitting information over cellular networks occupies that network capacity exclusively, such that other information cannot occupy that same network capacity.

71.    Moreover, because consumption of cellular data in order to transfer information over the network requires the expenditure of energy, that possession and control is exclusive.  One user's use and attribution of cellular data prevents another user (or Google) from using that same cellular data.

72.    Networks operated by cellular carriers utilize electricity to transmit information from mobile devices to servers, computers or other networks elsewhere on the internet.  Each byte of cellular data transmitted over a cellular network is unique.  This is because the energy used to transmit a quantum of information over a cellular network is unique.  Once a network consumes the energy needed to move a particular byte from an Android phone to Google's servers, the same energy cannot be consumed for transmission of a different byte.  Like all commercial products, cellular data (and its corresponding value) internalizes all of the costs incurred in its production including the energy expended in the transmission, network maintenance, and overhead. In this way, cellular carriers are like electrical utilities who internalize in the price of a kilowatt-hour the energy expended, grid maintenance, and overhead.

73.    The type of cellular plan offered by the carrier does not change the nature of the thing sold, it merely changes the pricing.  Originally, cellular data was commonly sold by the gigabyte, and consumers were charged a fee when they consumed excess amounts. As cellular data capacity and usage has increased, the industry has largely moved towards providing consumers with requirements contracts, *i.e.* unlimited plans where the consumer pays a fee to consume as much cellular data as desired over a discrete time period. However, the terms of the transaction of sale do not dictate whether or not the product sold is property. The sale of limited or unlimited data is a matter of business discretion.  The sale of a prepaid SIM card or prepaid cellphone, too, is a matter of business discretion.  A power company may choose to sell energy to an industrial customer through a requirements contract rather than a fixed amount of kilowatt-hours over a given

FIRST AMENDED CLASS ACTION COMPLAINT, Case No. 5:20-CV-07956-VKD

period of time for a fixed price, but that does not change the underlying nature of the electricity as capable of exclusive possession and control, should an evil neighbor siphon off the customer's electricity. The same is true here, where customers' requirements contracts for unlimited cellular data from their carriers do not change the essential nature of the purchased product, which is capable of exclusive possession and control because it represents a unique quantum of energy that, once used, is gone.

74. Users who purchase cellular data through limited or pay-per-GB data plans possess the same property interest in their cellular data as users who have unlimited data plans, but the fact that they have bought and paid for a particular amount of data for a particular price makes their property interest easier to discern. A user who purchases 8GB of data per month for a fixed price owns that 8GB of data, and the value of each incremental unit of data is reflected by the price paid divided by the quantity purchased. When Google uses part of that 8GB through the passive information transfers described above, Google has stolen that amount of cellular data from the user, and prevented the user from using that amount of cellular data. The value of the stolen data is simply a function of the unit price of the data times the amount of data that Google stole.

75. A user on a pay-per-GB data plan has even more clearly purchased each GB of cellular data, because such a user pays a fixed charge for each additional GB of data used each month. When Google converts some of that user's cellular data through passive information transfers about which the user is unaware and to which the user has not consented, Google is quite literally taking dollars out of the user's pocket, because each additional GB of data costs an additional fixed amount of money.

76. A user, who purchases a prepaid SIM card or prepaid cellphone that has a fixed amount of data associated with it, *e.g.*, 25GB, has paid a fixed price for a particular amount of data. When Google uses some of that 25GB of cellular data for its own purposes, without the user's knowledge or consent, Google has stolen that amount of cellular data from the user, and owes the user the value of the stolen data.

## VIII.  PASSIVE TRANSFERS OF CELLULAR DATA CONFER A VALUABLE BENEFIT ON GOOGLE

77.    If users' cellular data is not recognized as a convertible property interest under California law, then it must be a service that is subject to a quantum meruit claim for misappropriation.  A contractual right to a service has value that, if unlawfully appropriated, supports a claim for quantum meruit, regardless of the viability or non-viability of a parallel conversion claim.  In California, the measure of damages in quantum meruit is the market value of the services.  Cellular data is either property that is subject to a conversion claim, or it is a contractual right of access to a service that is subject to a quantum merit claim.

78.    Plaintiffs bought and paid for the right to access their cellular providers' cellular networks.  The three Plaintiffs on unlimited data plans bought a requirements contract—the right to all the cellular data that they require in a given month.  The two Plaintiffs on limited or pay-per-GB data plans bought the right to use a particular amount of cellular data each month for a particular price.  Either way, Google has unlawfully appropriated those contractual rights by utilizing Plaintiffs' right of access to their carriers cellular networks for Google's own purposes, without Plaintiffs' knowledge or consent.

79.    When Google executes passive information transfers as described above, it commandeers the users' phones, forcing their carriers to log cellular data usage as if it has been consumed by the users themselves, even though it has not.  When these transfers occur over cellular networks, Plaintiffs unwittingly perform a valuable service for Google, because they ultimately foot the bill for these transfers of information to and from Google.

80.    Users with unlimited cellular data plans may not pay an additional cost, but the amount of data used by Google is falsely attributed to the user, rather than to Google.  Users with limited or pay-per-GB plans necessarily lose the ability to exercise their right to access the cellular network by the exact amount of data that Google has used for its own purposes.  For example, a user with an 8GB limited data plan expects to be able to use 8GB worth of data each month in exchange for the monthly fee they pay to their cellular carrier.  But because Google causes passive

24

transfers of cellular data, and those passive transfers count towards the 8GB limit, the user has less data available to use for his or her own purposes that month.  That confers a benefit to Google.  If that benefit is viewed as a contractual right to a service rather than property, then Google has unjustly enriched itself at the user's expense and owes the user the market value of the service that it misappropriated.  That is the essence of quantum meruit: damages for unpaid services determined by the market rate.

81.     The case of a pay-per-GB user is even more clear.  Consider a user, like Plaintiff Nelson, who purchases 1GB of data each month for a fixed rate.  In her case, that rate is currently $14 per month.  Google's passive information transfers—about which she is unaware and to which she has not consented—eat up some portion of that 1GB of data each month.  In months where her data usage exceeds 1GB, in part because of Google's passive information transfers, her plan charges her an additional $14 for an additional 1GB of data, for a total of 2GB of data in exchange for $28.  In months where her data usage exceeds 2GB, her plan charges her an additional $14 for an additional 1GB of data, for a total of 3GB of data in exchange for $42.  If Google stole all or part of one of those GB of data from her, Google owes her $14 (or whatever part of $14 corresponds to the amount of data Google stole).

82.     By commandeering users' right to utilize their cellular carriers' cellular networks as they see fit, Google avoids any cost for accessing these cellular networks. Instead, Google feeds on the users' accounts.  This avoidance of transfer costs is a direct benefit to Google.  As aggregated across its millions of Android users, Google has forced Plaintiffs to give it a free ride on wireless networks using Plaintiffs' accounts.  Without this free ride, Google would have to bargain with the users to pay its fair share.  And part of the costs internalized in the price of cellular data sold to customers is the volume and/or traffic of information on the cellular networks. Even if users do not pay an overage fee, Google's passive transfers are costs that are internalized by the carrier and ultimately passed on to customers.

83.     Google ultimately exploits users' information for its own direct and significant benefit.  Google takes the information that it receives through the passive information transfers

25

described above and uses it to improve the quality of its products, such as Google Maps, and to improve the quality of targeted advertising services that it sells to online advertisers and publishers, and from which it reaps immense profits.  Consistent with the Court's order dismissing the prior version of this Complaint, Plaintiffs no longer seek recovery of the value of the underlying information to Google.  But Plaintiffs do seek recovery of the market value of their cellular data, which if viewed as a right of access to a service, is their entitlement to use  cellular networks, which they purchased from cellular carriers, and which Google has misappropriated for itself. Plaintiffs seek recovery of the market value of the amount of cellular data that Google used without users' knowledge or consent.

## CLASS ALLEGATIONS

84.     Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23(a), and 23(b)(1), 23(b)(2), 23(b)(3), and/or 23(c)(4) on behalf of the following proposed class:

> All natural persons in the United States (excluding citizens of the State of California) who have used mobile devices running the Android operating system to access the internet through cellular data networks operated by mobile carriers.[12]

85.     The Class excludes (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; and (b) any judges or justices involved in this action and any members of their immediate families or their staff.

86.     Numerosity. Plaintiffs do not currently know the exact number of persons in the Class, but they number in the millions and are geographically dispersed throughout the United States. Joinder of all Class members before this Court would be impracticable. The names, contact information, and other unique identifiers of the members of the Class are readily obtainable from

---

[12] Plaintiffs reserve the right to modify this class definition before moving for class certification, whether based on information gleaned in discovery, or otherwise.

26

FIRST AMENDED CLASS ACTION COMPLAINT, Case No. 5:20-CV-07956-VKD

Google, which requires users to log in to their Google accounts to download apps from the Google Play store and sets up profiles for users of Android phones who do not have Google accounts. This information about class members is also obtainable from nonparty mobile carriers, which maintain lists of customers who have mobile devices with Android technology.

87.    <u>Typicality</u>. Plaintiffs' claims are typical of and fairly encompass the claims of the Class members. Plaintiffs are members of the Class. Plaintiffs have used Android devices to access the internet using their carriers' cellular networks during the Class Period, including the past three years. The members of the Class are similarly harmed by Google's conversion of their cellular data and / or unjust enrichment of itself through misappropriating their right to access their carriers' cellular networks.

88.    <u>Adequacy</u>. Plaintiffs and their counsel will fairly, adequately, and vigorously protect the interests of the members of the Class. There are no material conflicts between the claims of Plaintiffs and the members of the Class making class certification inappropriate. Counsel for the Class will vigorously assert Plaintiffs' claims and those of the members of the Class. Plaintiffs are represented by Counsel who are competent and experienced in the prosecution of consumer class action litigation.

89.    <u>Superiority</u>. A class action is superior to all other available means for the fair and efficient adjudication of the claims of the members of the Class. The damages suffered by some individual members of the Class may be relatively small compared to the burden and expense of individual prosecution of the complex and extensive litigation required to recover from Google. It would be virtually impossible or impractical for most, if not all, Class members to redress the wrongs done to them on an individual basis. Furthermore, individual litigation would be unmanageable for the Court system as it would result in thousands or millions of individual lawsuits creating the risk of inconsistent or contradictory judgments and increasing the delay and expense to all parties and the court system. In contrast, a class action would present far fewer management difficulties. Class action treatment provides the benefits of a single adjudication, economies of scale, and supervision by a single court.

90.    Existence and Predominance of Common Questions of Law and Fact. Numerous questions of law and/or fact are common to Plaintiffs and all members of the Class. These common questions derive common answers for all Class members that impact the resolution of the claims on grounds equally applicable to all Class members. The common questions of law and fact for the Class include, but are not limited to:

a.    Whether Google misappropriates the cellular data of Android mobile-device users to conduct passive information transfers, which occur in the background and do not result from Plaintiffs' direct engagement with their mobile devices or applications;

b.    Whether the cellular data that Plaintiffs purchase are property interests recognized by California conversion law, which governs Plaintiffs' conversion claim under the choice-of-law provision contained in the terms and conditions governing Plaintiffs' use of the Android operating system;

c.    Whether the cellular data that Plaintiffs purchase is a contractual right to use the cellular networks owned and operated by Plaintiffs' cellular carriers recognized by California quantum meruit law, which governs Plaintiffs' quantum meruit claim under the choice-of-law provision contained in the terms and conditions governing Plaintiffs' use of the Android operating system;

d.    Whether Plaintiffs consent to allow Google limited use of their cellular data through contractual terms in Google's policies;

e.    Whether Google's passive transmission of information and use of Plaintiffs' cellular data exceeded the scope of any limited consent to allow Google access to the cellular data;

f.    Whether Plaintiffs are entitled to recover damages for Google's conversion of their cellular data under California law;

g.    Whether Plaintiffs are entitled to recover damages through quantum meruit for Google's unjust enrichment through misappropriation of their right to access their carriers' cellular networks under California law;

28

h.      Whether the passive information transfers provided Google with a valuable benefit at Plaintiffs' expense;

i.      The value of data converted by Google and the benefit conferred on Google at Plaintiffs' expense;

j.      The amount of damages due to individual class members, which is readily ascertainable through economic analysis of the fair market value of cellular data based on market transactions; and

k.      Whether Google fraudulently concealed its scheme to misappropriate Plaintiffs' contracted for and purchased cellular data.

91.     Certification is also appropriate under Fed. R. Civ. P. 23(b)(1) and/or (b)(2) because:

a.      The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Google.

b.      The prosecution of separate actions by individual Class members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

c.      Google has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the entire Class.

**COUNTS AND REQUESTED RELIEF**

**COUNT ONE: QUANTUM MERUIT**

92.     Plaintiffs re-allege and incorporate by reference each of the allegations set forth above.

93.     Google used valuable cellular data services that Plaintiffs purchased in order to send information between Plaintiffs' devices and Google.

29

FIRST AMENDED CLASS ACTION COMPLAINT, Case No. 5:20-CV-07956-VKD

94.     Google has used Plaintiffs' cellular data to collect and transmit information through passive transfers to develop and support its advertising business and other ventures.

95.     The cellular data services usurped through the passive transfers conferred on Google a valuable benefit to its business.

96.     The use of Plaintiffs' cellular data was at the expense of Plaintiffs, who paid for the cellular data that Google used to send and receive information between its servers and Plaintiffs' Android devices through passive transfers.

97.     Plaintiffs did not consent to these passive transfers using Plaintiffs' cellular data. No contract between Plaintiffs and Google authorized information transfers that benefited Google.

98.     Plaintiffs suffered injury and damages when their cellular data were used to transfer to Google information that benefited Google.

99.     Plaintiffs are entitled to recover the reasonable value of the cellular data usurped by Google to transfer information that benefited Google.

## COUNT TWO: CONVERSION

100.    Plaintiffs re-allege and incorporate by reference each of the allegations set forth above.

101.    Plaintiffs have property interests in the cellular data that they purchase from their mobile carriers.

102.    Plaintiffs at no time consented to Google appropriating their cellular data to transfer information between Plaintiffs' Android devices and Google when Plaintiffs were not actively using their mobile devices.

103.    Google wrongfully disposed of Plaintiffs' property by causing information to be transferred between Plaintiffs' Android devices and Google using Plaintiffs' cellular data without Plaintiffs' consent. Google initiated these passive transfers when Plaintiffs were not directly engaged with Google products on their devices.

104.    As a result of Google's conversion, Plaintiffs have suffered injury and damages in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for judgment against Google as follows:

105.    Determining that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23 and directing that reasonable notice of this action be provided to the Class pursuant to Rule 23(c)(2).

106.    That the Court adjudge and decree that Google has converted Plaintiffs' property in the form of their cellular data.

107.    That the Court award Plaintiffs and the Class:

A.    The fair market value of the cellular data converted by Google;

B.    The reasonable value of the cellular data misappropriated and used by Google for its own benefit;

C.    Pre- and post-judgment interest on their damages;

D.    Injunctive relief directing Google to stop using cellular data purchased by consumers without their consent;

E.    The costs of this action and reasonable attorneys' fees; and

F.    Such other and further relief as the Court deems just and proper.

///

///

///

///

///

///

///

///

///

///

FIRST AMENDED CLASS ACTION COMPLAINT, Case No. 5:20-CV-07956-VKD

## **DEMAND FOR A JURY TRIAL**

In accordance with Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial by jury on all issues so triable.


Dated: December 13, 2021                    Respectfully submitted,



/s/ *Ann Ravel*
Ann Ravel
McMANIS FAULKNER
a Professional Corporation
50 West San Fernando Street, 10th Floor
San Jose, California 95113
Telephone:    (408) 279-8700
Facsimile:    (408) 279-3244

Glen E. Summers (176402)
Karma M. Giulianelli (184175)
Alison G. Wheeler (180748)
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, Colorado 80202
Telephone:    (303) 592-3100
Facsimile:    (303) 592-3140

George A. Zelcs (*pro hac vice*))
Marc A. Wallenstein (*pro hac vice*)
Robert E. Litan (*pro hac vice*)
Ryan Z. Cortazar (*pro hac vice*)
KOREIN TILLERY LLC
205 North Michigan Avenue
Suite 1950
Chicago, Illinois 60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751

32
FIRST AMENDED CLASS ACTION COMPLAINT, Case No. 5:20-CV-07956-VKD

Michael Klenov
Carol O'Keefe (*pro hac vice*)
KOREIN TILLERY LLC
505 North Seventh Street
Suite 3600
St. Louis, Missouri 63101-1625
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

*Attorneys for Plaintiffs*
Joseph Taylor, Edward Mlakar, Mick Cleary,
Eugene Alvis, and Jennifer Nelson