1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3          Before The Honorable Virginia K. DeMarchi, Judge

4

5   TAYLOR, et al.,                  )  No. C 20-07956-VKD
                                     )
6        Plaintiffs,                 )
                                     )
7   vs.                              )
                                     )
8   GOOGLE, LLC,                     )
                                     )
9        Defendant.                  )
    _____ )
10
                                     San Jose, California
11                                   Tuesday, March 29, 2022

12

13    TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
               RECORDING 10:00 - 11:20 = 80 MINUTES

14

15  APPEARANCES:

    For Plaintiffs:
16                                   Korein Tillery, LLC
                                     205 North Michigan Avenue
17                                   Suite 1950
                                     Chicago, Illinois 60601
18                          BY:  MARC A. WALLENSTEIN, ESQ.

19  For Defendant:
                                     Cooley, LLP
20                                   3 Embarcadero Center
                                     20th Floor
21                                   San Francisco, California
                                      94111
22                          BY:  WHITTY SOMVICHIAN, ESQ.

23  Transcribed by:                  Echo Reporting, Inc.
                                     Contracted Court Reporter/
24                                   Transcriber
                                     echoreporting@yahoo.com
25

                                                                    2

1  <u>Tuesday, March 29, 2022</u>                        <u>10:00 a.m.</u>

2                      P-R-O-C-E-E-D-I-N-G-S

3                          --oOo--

4           THE CLERK:  20CV7956, Taylor, et al. versus

5  Google, LLC, on for motion to dismiss.

6           Counsel, please state your appearances beginning

7  with the Plaintiffs.

8           MR. WALLENSTEIN (via Zoom):  Good morning, your

9  Honor.  Marc Wallenstein for the Plaintiffs.

10          THE COURT:  Good morning.

11          MR. SOMVICHIAN (via Zoom):  Good morning, your

12  Honor.  Whitty Somvichian with Cooley, representing Google

13  today.

14          THE COURT:  Okay.  Good morning.

15     So, we are here on Google's motion to dismiss the first

16  amended complaint.  Thank you again for your very excellent

17  briefing, both sides.  It's very helpful.

18     I feel that I may be at risk of asking you some of the

19  same questions we talked about a few months ago, but I did

20  want to address a couple of points, and that -- let me start

21  with Google since it is Google's motion.

22     We now have the formulation cellular data instead of

23  cellular data allowance, and I -- I take Google's point that

24  from Google's perspective, really nothing much has changed.

25  Cellular data and cellular data allowance are essentially

3

1  the same.

2      The parties' arguments this time around, as before,

3  analogizing the -- the -- the thing at issue here, cellular

4  data to electricity and the provision of electricity and how

5  do we think about electricity in terms of conversion are

6  useful and continue to be somewhat challenging I think to

7  address, but I wanted to pose to Google a question about

8  possibly a different analogy, and that is I have been

9  thinking about cellular data and cellular data allowance,

10 those concepts, in the context of phone service, so,

11 telecommunications and, in particular, the version of

12 telephone service that is the plain old telephone system,

13 meaning there's a subscriber who pays for telephone service

14 and you get it via a wire, so, not digital, not any of the

15 newfangled anything, but plain old telephone service.

16     So, if someone -- you have a subscriber with telephone

17 service and someone uses that subscriber's telephone line to

18 make a call and the subscriber is charged for that call, is

19 that conversion?  And if not, why not?

20     And I'm sorry for springing that analogy on you right

21 out of the box, but it struck me as possibly a more closely

22 connected circumstance.

23         MR. SOMVICHIAN:  Yes.  So, your Honor, that would

24 not be conversion for the same reasons that the claims here

25 don't support a conversion claim because in that analogy,

4

1 the -- the dispute still involves a contractual right to a

2 service.  The -- the -- the individual's rights in that

3 service are defined by a contract.  They don't exist

4 independently of the contract.  They may be burdened -- you

5 know, they -- let's say their charges go up because

6 somebody's been tapping their phone line or just coming in,

7 you know, and using their -- their phone.  There may be a

8 claim, some other type of claim, but not a conversion claim

9 that depends on a cognizable form of personal property.  And

10 in that circumstance and in our circumstance you get to the

11 same result because what you're dealing with is a

12 contractual right to a service which you've correctly found

13 before does not support a conversion claim under California

14 law.

15         THE COURT:  And if we were instead talking about

16 water, which is easier than electricity or telephone

17 service, and someone was diverting water from my water

18 supply system from the city to their own property, would

19 that not be conversion of the water?

20         MR. SOMVICHIAN:  That could potentially -- that --

21 that presents a much different situation because the water

22 exists as property, as a tangible thing, item that can --

23 separately from the contractual rights to it.  So, you can

24 have a situation, certainly, where there's existing property

25 and there's a contractual right to that property in varying

5

1  amounts and in different -- subject to various terms, and

2  that -- and that's really the distinction here.  It's --

3  it's the fact that the only thing that the Plaintiffs are

4  asserting an interference with is their contractual right.

5  There's not a separate underlying property as in the water

6  example.

7          THE COURT:  So -- so, here's -- here's where I

8  think there's some difficulty, which is I'm pretty sure that

9  at least two appellate courts in California Terrace and the

10 in the San Joaquin cases, one in 1905 and one in 1929, did

11 find that electricity is personal property.  That was --

12 those were in the context of breach of contract cases, not

13 conversion cases, but very specifically did say they are

14 personal property.

15     Now, perhaps in the context of conversion, some other

16 California court would reconsider that.  But -- but if we

17 assume for the moment that electricity, like water, is

18 personal property, then we're kind of back to the same

19 discussion that we had before, which is you can't simply

20 say, Well, electricity is not personal property or -- you

21 know, as distinct from water, which is personal property.

22          Do you see what I'm saying?  Or the telephone

23 service -- I mean, I guess the -- the compelling -- for me,

24 the compelling distinction was the one that Google made last

25 time, which was if we're going to talk about analogy, the

6

1 proper analogy in the context of electricity is that you

2 have wires that are the means for delivering the

3 electricity, and they -- and that's distinct from

4 electricity itself.

5     And to compare that to what's at issue here in this

6 case, the means of delivery, information or data files are

7 the radio signals or whatever, the cellular data in the form

8 of radio signals measured in bytes, and the actual thing

9 that's analogous to the electricity are the data files or

10 information that are actually sent to the consumer.

11     So, distinguishing the means and measurement of

12 transmission of whatever it is from the actual thing that is

13 transmitted, that made some sense to me.  But -- but I still

14 find myself troubled by -- it doesn't really -- it's not a

15 perfect analogy.  And, so, I'm just -- I find myself

16 rethinking this again, and I appreciate your discussion

17 about the telecommunications analogy, but it's somewhat

18 dissatisfying to say, Well, it doesn't exist but for the

19 contract.  It doesn't seem to really work.  Electricity does

20 exist, like water.  So, it's not simply a creation of

21 contract.

22         MR. SOMVICHIAN:  Well, your Honor, I think one

23 question also is what -- what is new in the complaint.

24         THE COURT:  Yeah, that's a good point.  I

25 understand, but I could have been wrong.  That's the thing.

7

1 I could have been wrong last time, and, so, I'm prepared to

2 accept the fact that I could have been wrong.  And, so, I

3 appreciate nothing's new in the complaint.  I -- you know, I

4 take that point, there's not much that's new.  But I am

5 continuing to -- to wonder about the -- the analogy.

6        So, I'm sorry to have cut you off.

7              MR. SOMVICHIAN:  And, to that point, your Honor,

8 there's nothing new that changes the conclusion that you

9 reached with respect to the specific element of a property

10 interest, the exclusivity requirement that it not only be

11 something that could be precisely defined but something that

12 somebody can actually own and possess to the exclusion of

13 others in a -- in a way that's exclusive.  And, again, there

14 is nothing in the facts here that would support that

15 element.  Nothing has changed.  We're still talking about

16 the means of transmission, that the bytes of data, they've

17 switched from cellular data allowance, because that's

18 clearly a creature of contract, to saying, Well, it's just

19 the cellular data itself.  But that's what they argued

20 before, your Honor, that they were focused on the bytes of

21 data.  And you're right that that is the means of

22 transmission.  That's not something that any Plaintiff owns

23 or possesses to the exclusion of others.  It's just the way

24 that they access the service that they have a right to

25 access via their contractual terms.  So, that is the same.

8

1   That is no different than before and leads to the same

2   conclusion that because you don't -- you can't dispossess

3   somebody from a particular byte of data, you don't own any

4   particular byte of data, you just get to access a network to

5   -- to receive a service, and that's not a property interest.

6           THE COURT:  It does seem to me that -- and I'm --

7   I think this -- what I'm about to say favors Google's

8   position rather than -- than the Plaintiffs' position, but

9   it seems to me that a particular cell phone user doesn't

10  actually possess, exclusively or otherwise, any -- any

11  increment of data, whether you conceive of it as a right or,

12  you know, a quantum of energy that carries data -- carries

13  the data file.  But you don't actually possess that until

14  you've actually sent or received a transmission.

15      So -- so, the concept of owning something before you've

16  sent or received anything, even if I, you know, am most

17  generous to the Plaintiffs' conception of this, doesn't seem

18  helpful to the Plaintiff, because in the absence of doing

19  that, there is nothing that they own or possess exclusively.

20      So, I mean, I think this is consistent with Google's

21  theory, and I will be asking MR. Wallenstein about it as

22  well.  But I wonder what your -- your reaction to that way

23  of thinking is.  Is that a correct way of thinking about it,

24  that if there is some possession, it doesn't happen  until

25  there's actually a transmission or reception with that

9

1   particular cellular telephone?

2           MR. SOMVICHIAN:  Yes.  The -- the property

3   interest that they're trying to assert as such, to your

4   point, your Honor, it seems very awkward to say that that

5   only springs into existence at the moment of the data

6   transfer itself.  And that kind of underscores why the --

7   the theory doesn't fit within the normal framework of -- of

8   personal property, even extended to these types of

9   intangible forms of -- of property.

10          And, again, that moment of transmission when their data

11  file gets transmitted or they receive a security update from

12  Google or some -- or some other lying -- other underlying

13  data file is -- is transmitted, the -- the means of

14  transmission, again, only -- they -- they access that

15  network at that moment and use those particular bytes of

16  cellular data to transmit that data in that moment, and

17  there's nothing that exists prior to that.  And there's no

18  sense in which you could say I -- I -- I own this increment

19  of the network that I might use at some future point.  And I

20  think you're right that that underscores the analogy to

21  other forms of intangible property just doesn't fit here

22  because what they're really doing is just exercising their

23  contractual rights to access the service at a particular

24  moment in time.

25          THE COURT:  Okay.  Yeah.  All right.  So -- so,

10

1 let me -- let me turn to the question of quantum meruit,

2 which is now formulated by the Plaintiffs in a different

3 way.  They say, Okay.  Well, it's not like our conversion

4 claim because to the extent our conversion claim relies on

5 property, our quantum meruit claim relies on rights created

6 by contract.

7       So, I would -- I would like to -- I mean, I would like

8 to let you argue whatever you would like to argue on the

9 common count issue, but I -- I feel that there is some merit

10 to the argument as formulated now, that you can have a

11 quantum meruit claim even when it seeks the same recovery,

12 as long as you're not advocating a double recovery, you're

13 not obtaining a double recovery, you can have a different

14 legal theory for seeking a recovery that's based on quantum

15 meruit, whether it's a common count or not, that is distinct

16 from the conversion claim.

17       So, if I find there's no conversion claim that could be

18 pled here, I'm not persuaded that that necessarily means the

19 quantum meruit claim as currently formulated has to fail

20 because last time around, the quantum meruit claim was

21 really formulated as -- based on exactly the same premises,

22 legal and factual, as the conversion claim.  And, so, I --

23 it was not very problematic for the Court to say, Well, you

24 can't possibly do that.

25       So -- so, I think there are -- there are problems,

11

 1  which I will explore with Mr. Wallenstein, about the

 2  elements of the quantum meruit claim and whether that's

 3  satisfied, but I'd like to -- to make sure I'm not, you

 4  know, misunderstanding the arguments that Google has made

 5  about how as a common count you can't have it.  That doesn't

 6  seem to be supported by the case law.

 7          MR. SOMVICHIAN:  Your Honor, so, there's no

 8  dispute that quantum meruit, because of the historical

 9  development of the law, is a common count.  There's no

10  controversy around the rule that you applied before that a

11  common count, when pled in a way that relies on the same

12  facts and seeks the same recovery as an independent claim,

13  has to rise and fall with -- with that other cause of

14  action.  That's established law in the McBride, McAfee,

15  other cases.

16      So, I don't think it's correct that, when pled as -- in

17  a way that the Plaintiffs have -- and they're the master of

18  their complaint, your Honor.  They could have -- they could

19  have shown you that it -- it derives from a different set of

20  facts or they could have pursued a different calculation of

21  recovery, but they didn't do those things.  The complaint

22  still relies on the same facts with respect to all of the --

23  with respect to both the conversion claim and quantum merit.

24  All of the --

25          THE COURT:  So -- so, I'm sorry to interrupt, but

1   let's say that they had, after my first order, decided that
2   they weren't going to pursue the conversion claim at all and
3   they dropped it and I had only a complaint that said we're
4   entitled to recovery in quantum meruit.  I don't see how you
5   could possibly make the argument that you're making now.
6   Right?  So, if I dismiss the conversion claim because it
7   can't be sustained under the law of conversion and they
8   can't meet the elements, then how could that possibly be a
9   just result to say, "And you can't have the quantum meruit
10  claim either because it's like the conversion claim which
11  I'm dismissing," when they are specifically now saying it's
12  a different legal theory?  It's not simply you can't
13  actually meet the merits of a claim based on personal
14  property; so here's a common count based on personal
15  property.  That's -- I'm not sure that's wise.
16          MR. SOMVICHIAN:  Let me just touch on that
17  briefly, your Honor.
18          THE COURT:  Okay.  Good.
19          MR. SOMVICHIAN:  Even -- even if you conceive of
20  the -- even in your situation where we just -- we just
21  evaluate the quantum meruit claim as if it were standalone,
22  let's say they had just pled that, it still fails; and we
23  can come back to that.  I'd like to come back to that.
24  But --
25          THE COURT:  Okay.

13

1          MR. SOMVICHIAN:  -- with respect to the issue of

2  whether they rise or fall together, it -- it does depend,

3  your Honor, on whether they have p led a situation in which

4  their quantum meruit theory relies on the same facts and

5  seeks the same recovery.

6          So, you could -- you could have a situation where,

7  okay, we have a breach of contract claim and a quantum

8  meruit claim, and those don't have to rise and fall

9  together.  Why?  Because they seek different recoveries by

10  -- by definition.  A breach of contract claim seeks contract

11  damages, expectations damages, benefit of the bargain that

12  could include lost profits, et cetera.

13          The quantum meruit claim in that situation is a proper

14  alternative claim that could stand on its own because, even

15  if -- even let's say it relies on all of the same fact,

16  because it seeks a different recovery, the law says you

17  don't get to try to enforce the contract in full and get

18  everything that you might have gotten from the contract.

19  But we're going to step in; and if the breach of contract

20  claim fails because of some formality or requirement under

21  contract law, we're not going to allow a plaintiff to be

22  harmed if they've performed services expecting compensation

23  and you get to at least get the value of the services you've

24  provided.  That's a different remedy, and that's why in that

25  situation you can have a claim like breach of contract and a

14

1  quantum meruit theory that stand separately and don't have

2  to rise or fall together.

3      That's not how they pled it here, your Honor.

4          THE COURT:  Right, and but --

5          MR. SOMVICHIAN:  They pled --

6          THE COURT:  But it does seem to me that if you

7  were -- it's -- maybe coincidence is not the right word, but

8  you could have two different causes of action that had, you

9  know, theoretically different theories of recovery but end

10 up with the same measure of damages.

11     So, in other words, you could have a breach of contract

12 claim that is identical in terms of the measure of damages

13 alleged under that contract with a quantum meruit theory of

14 recovery.

15     So, even though you might be able to get and could

16 argue the framework is different for contract damages versus

17 quantum meruit unjust enrichment kind of damages, they could

18 be the same; and perhaps it's coincidence.

19     So, here, if what you're suggesting is that, Well, the

20 theory of recovery, the measure of damages is the same,

21 which is what's the value of this data that was used, right,

22 these -- however we're going to formulate it, the cellular

23 data that was used without permission, it just so happens

24 that the -- at present, in the pleadings stage, the

25 Plaintiffs are relying on the same measure of damages?

1          MR. SOMVICHIAN:  Yeah.  Well --

2          THE COURT:  It would have to be that way.

3          MR. SOMVICHIAN:  But that -- that's not how they

4   pled the claim, your Honor.  It's not -- it's not a

5   circumstance where they've pled two theories that have two

6   different measures of recovery and they just happen to

7   converge given the particular facts of the case.

8      They've pled two claims specifically to get the same

9   remedy, the value of the cellular data allowance.  But I --

10  I don't want to dwell on this.  I think --

11          THE COURT:  Okay.  No, I understand.  I understand

12  your point.  That's helpful.

13          MR. SOMVICHIAN:  We do think your prior order was

14  correct, that quantum meruit is a common count.  The rule

15  that you applied before is well established and still

16  applies.  But, even if you, your Honor, were to find that,

17  okay, I want to -- I want to consider the quantum meruit

18  claim as a -- as a standalone without regard to what happens

19  with conversion, the claim still fails because the basic

20  premise of quantum -- quantum meruit is an expectation of

21  compensation.  That's why the law steps in to protect a

22  plaintiff, so that in the situation that we were talking

23  about before where a plaintiff may not be able to enforce a

24  contract in full but because they detrimentally relied --

25  they performed services based on an expectation of

16

1  compensation and they've expended the time, effort,

2  resources, money to provide the service, the law steps in to

3  provide that protection so that you can get at least the

4  value of the services that you provided.

5      The premise of all of that is the expectation of a

6  compensation.  That's reflected in all of the case law that

7  describes the elements of quantum meruit in a standalone

8  sense, and that's what is not pled here.

9         THE COURT:  Yeah.  I -- I find that a pretty

10 persuasive argument I have to say, that even if I were to

11 say, Okay, quantum meruit can exist as an independent claim

12 from the conversion claim, the elements aren't there.  I've

13 looked at the case law that you all cited on that, and I saw

14 the reply.  I'm going to give Mr. Wallenstein an opportunity

15 to respond to the reply on that point, but I can find that t

16 hat's -- at this point I find that a pretty persuasive

17 argument.  So, I have mostly questions for the Plaintiff on

18 that point.

19     Before I turn to the Plaintiff, is there anything else

20 that you'd like to highlight for me or argue on Google's

21 behalf?

22         MR. SOMVICHIAN:  Just very quickly, your Honor,

23 and just to build on the point on -- on quantum meruit,

24 again, the -- the reason we're running into all of these

25 difficulties of -- of how to conceive of it and whether the

17

1  elements fit is because it -- it -- the circumstances here

2  just don't fit within the framework at all of quantum

3  meruit.  We talked about the elements before and the

4  expectation of compensation.

5      In the typical circumstance, you have a -- you have a

6  plaintiff who performed services and they're out some amount

7  of time or effort or resources.  The Plaintiffs did nothing

8  here.  They didn't provide the service that their -- their

9  network carriers did.  They weren't harmed in some sense

10 where the -- the law needs to step in in an equitable sense

11 to restore them to some prior position because they

12 detrimentally relied.

13     And, so, we -- we focused on one element of -- of the

14 common count in terms of the expectation.  But, really, when

15 you think about it as a whole, you know, the circumstances

16 here really don't fit any of the typical factors and

17 circumstances of a quantum meruit claim.  So, I just want to

18 underscore that.

19         THE COURT:  Okay.  Okay.  That's -- that's

20 helpful, and I will give you an opportunity to respond after

21 I've asked Mr. Wallenstein --

22         MR. SOMVICHIAN:  Thank you.

23         THE COURT:  -- some questions.  Thank you.

24     All right.  Mr. Wallenstein, let me start with kind of

25 -- the conversion claim and -- and the -- the question of

18

1   what exactly is cellular data.

2       So, I looked very carefully at the first amended

3   complaint, and paragraph 11 I interpret as the Plaintiffs'

4   effort to define for me what they mean by cellular data.

5   So, paragraph 11 includes the statement that cellular data

6   describes the transmission of information over a cellular

7   network charged against consumers' cellular data plans, and

8   it's also said in paragraph 11 that cellular data does not

9   refer to the actual data files or information that's

10  transmitted.

11      The difficulty I have with that is that it's not really

12  a definition to say cellular data describes because it seems

13  to me like cellular data is being used in the first amended

14  complaint as very similar, if not identical to, the phrase

15  "cellular data allowance" in the original complaint.  And it

16  can mean or does mean both the means of transmission of this

17  information over the cellular network and the measurement of

18  that use of the cellular network, which just sort of brings

19  us back to where we were -- where I was in -- in the

20  decision I made on the -- the initial complaint.

21      So, if that's the case, it does seem to me that your

22  analogy to -- or the Plaintiffs' analogy to electricity or

23  water or other utilities doesn't really work.  So, I'd like

24  for you to really drill down on what is cellular data as

25  used in the first amended complaint.

1        MR. WALLENSTEIN:  Thank you, your Honor.  And we

2   appreciate the opportunity to replead the complaint and to

3   defend it again today.

4       You mentioned the -- the analogy that Google provided

5   you last time around that you found very compelling,

6   distinguishing between the means of transmission, the

7   measure of the information and the underlying information

8   transmission.  I found that very helpful too, but it's

9   missing two things, and it's missing two things that we have

10  pled that are new allegations in this complaint.

11      What's different in this complain is set forth in

12  paragraphs 70 to 74, mostly in 72 and 73.  What's alleged

13  there is that the energy that's expended when transmitting

14  information over the cellular network, it's expended

15  forever.  It uses up electricity.  And just like electricity

16  can be capable of exclusive possession and control, because

17  electricity is expended, the cellular data that's moved is

18  capable of exclusive possession and control.  So, that is

19  one additional fact and one additional -- you'd have to add

20  that as a fourth thing to the three things that -- that

21  Google identified between the means, the measure, and the

22  underlying information.  There's also the energy required to

23  transmit the information.

24      In addition to that, we introduced the concept of the

25  finiteness of the network.  The same cellular data cannot

20

1  occupy the same space in the network at the same time.
2  So --
3          THE COURT:  I don't see how that -- that is
4  helpful to me, though.  I mean, I -- I appreciate that
5  there's only limited -- there's limited bandwidth in terms
6  of whatever frequency this is being transmitted on, and
7  there's a possibility that, you know, it -- and I also get
8  the concept technically -- at least I think I do -- that
9  once someone sends or transmits to a particular user's cell
10 phone, it's kind of like a channel, right.  So, it's a
11 channel to that cell phone, and that data occupies some --
12 so that data file or information occupies some measure of
13 cellular data, whether it's a portion of a signal or however
14 it's incremented.
15     So, I -- so, I understand that, but -- but here's what
16 I'm still having difficulty with.  I'm sorry to bring you
17 back to paragraph 11, not your paragraph 70 --
18          MR. WALLENSTEIN:  Sure.  Sure.
19          THE COURT:  -- but how does -- what is cellular
20 data in the formulation that you provided me, which is to
21 say that it describes the transmission of information?  It's
22 not particularly helpful to say, Well, energy is consumed
23 when that happens, because what the -- the cellular service
24 provider is incrementing against a user's account is not the
25 energy expended.  It's the measurement of data that is

21

1  transmitted or sent or received to the phone.

2          MR. WALLENSTEIN:  Well --

3          THE COURT:  So, how -- how is that helpful to, you

4  know, point out to me that it consumes energy?

5          MR. WALLENSTEIN:  Well, one of the things

6  actually, your Honor, I submit that actually is bundled into

7  the price that users pay when they are buying cellular data

8  is the energy that's expended when data is transmitted, as

9  well as the cost of maintaining the network, maintaining the

10  length of pipe that you have, the amount of bandwidth.  All

11  of those things, like any product, get rolled up into the

12  price of the product.

13      So, your question, what is cellular data, well, it's

14  what you buy when you pay your $29.99 every month.  And what

15  that is is a -- a requirements contract if you're on an

16  unlimited plan and a particular increment of data if you're

17  not, and some people do have prepaid cards where they're

18  buying 25 gigs of data or they -- they're paying $14.99 for

19  every incremental gigabyte in addition.  They are buying the

20  -- the data that they will use over the course of that

21  month.

22      Once -- I -- I acknowledge that it has to be metered to

23  know which data it is.  But, just like the analogy your

24  Honor used to apples in -- and the prior round of briefing

25  and the prior oral argument, a farmer --

1          THE COURT:  I'm known for analogies.

2          MR. WALLENSTEIN:  A farmer can purchase a

3   requirements contract for all the apples the farmer can

4   consume.  I would submit the farmer owned -- if a farmer can

5   consume a thousand apples that month, the farmer owns a

6   thousand applies.  We don't know which apples they are

7   because the apple manufacturer has a million apples.  They

8   don't become the particular apples until they're actually

9   put in the truck and delivered to the farmer.  But he stills

10  owns a thousand apples if that's what he can consume.  And,

11  by the way, if he bought a thousand apples specifically, not

12  a requirements contract but a number, then he definitely

13  owns a thousand apples.  That's what he paid for.

14         THE COURT:  Right.  But -- but your description of

15  either the unlimited plan or the more limited plan, you

16  know, the fixed price amount or the cart, is entirely

17  consistent with a description of cellular data or cellular

18  data allowance as a contractual right to a service, access

19  to a network, which is exactly how I described it before.

20      So, it -- here -- here's the -- here's the difficulty

21  that I am struggling with still or again, which is it does

22  seem that there is a question of what do the Plaintiffs own

23  or exclusively possess in this contract.  And one thing that

24  can be said is that they have a contractual right to use a

25  particular or unlimited quantum access to the network, and

23

1  it will be measured in these bytes of data.  But it does

2  appear to be completely defined by the contract.  And it's

3  -- it's difficult for me to understand what you exactly mean

4  in the context of a conversion claim to say, as you do at I

5  think it's paragraph 65, the Plaintiffs possess and control

6  their cellular data.  Like, what does that mean?  Cellular

7  data is not any plaintiff's cellular data until they use it

8  in this context.  There's not a thing.  It's a right to use

9  it.  But, until you actually use it to send or receive --

10 you meaning Plaintiff -- there doesn't seem to be any notion

11 of exclusive possession or control.  It's just out there in

12 the network.

13          MR. WALLENSTEIN:  Your Honor, I -- I hear what

14 you're grappling with, but the answer is electricity.

15 That's equally true of electricity.  When I have my contract

16 with my utility company for all the requirements, a

17 requirements contract for all the electricity that I can

18 use, I don't own any particular electrons.  They're all just

19 out there in the network.  But once they enter my home and

20 pass through the meter, the become my electrons.  Those

21 specific electrons are mine.

22          THE COURT:  Right.  So, but then there's no

23 conversion of anything until someone uses your electrons, to

24 put it that way.

25          MR. WALLENSTEIN:  Correct.

24

1          THE COURT:  But they're not yours.  So, here, if I

2    take my analogy to the plain old telephone network, Mr.

3    Somvichian says, Well, if somebody's using your telephone

4    service, tapping into your phone line, they are not

5    converting anything.  They are interfering with your

6    contractual rights.

7          Why not the same here?  It's not necessarily a foregone

8    conclusion that your electricity thesis works.  I have been

9    using it as a useful analogy, but I think that your 1905 and

10   1929 California Appellate Court decisions are not, you know,

11   totally compelling, for the reasons that the Court was not

12   considering this issue in the context of a conversion claim

13   but more in the context of contractual rights.  You did use

14   the word "personal property" I grant you.

15         So -- so, anyway, that -- that's the -- let me -- let

16   me formulate it a slightly different way, and then I'll let

17   you actually have -- get a word in edgewise here, which is

18   it seems like if the problem is focusing on the exclusive

19   possession or control or ownership, there is no such thing

20   happening by a Plaintiff with respect to what you are

21   calling cellular data if I think of it as a physical

22   phenomenon, a bite of something.  There -- there's nothing

23   that is owned that is separate and apart from the use per

24   contract to send and receive information.

25         MR. WALLENSTEIN:  I acknowledge that, your Honor.

25

1  You don't own it until you use it.  And I submit that's the

2  same as electricity.  Your Honor may disagree.  We

3  understand that your Honor disagreed from your last

4  decision, and -- and that's why we repled the complaint the

5  way we did.

6       Your question about phone service is, I think, very

7  apt.  I'd direct you to the Precision Pay case which

8  specifically deals with phone service and shows that phone

9  service is susceptible to a quantum meruit claim.  So,

10 Precision Pay is a case that's kind of cursorily responded

11 to by Google.  They -- they kind of selectively quote one of

12 the sentences in the case to make it seem like it says

13 something it doesn't really say.

14      What Precision Pay involved is a pay phone owner.  And

15 the pay phone owner got paid two ways.  One way was a coin

16 getting put in the phone.  He gets a piece of the coin.  The

17 other way was interexchange businesses like Quest pay a

18 share of the fees that their customers pay them.  So, you

19 call -- you pick up the phone, you dial a number, you use

20 that interexchange company to connect your call, and you're

21 a customer of that interexchange company.  Well, if you use

22 a particular pay phone, the interexchange company has a deal

23 usually with the pay phone operator to pay them a fee for

24 the use of the phone.

25      In this case, Quest got around that.  So, Quest users

26

 1 would dial an 800 number.  So, there'd be no charge to the

 2 pay phone owner.  It's called a dial-around system.

 3          THE COURT:  Um-hmm.

 4          MR. WALLENSTEIN:  And Quest -- Quest customers

 5 paid Quest.  Quest used its dial-around system to connect

 6 the customers' phone calls.  But the pay phone owner didn't

 7 -- didn't get anything.  And that case shows that there is a

 8 quantum meruit claim when no one --

 9          THE COURT:  But not a conversion claim.

10          MR. WALLENSTEIN:  But not a conversion claim.

11 That case shows that there is a quantum meruit claim when

12 there's no -- I realize I'm pivoting, but your --

13          THE COURT:  Yes.

14          MR. WALLENSTEIN:  -- analogy is -- your analogy is

15 so apt I couldn't resist.

16          THE COURT:  Okay.

17          MR. WALLENSTEIN:  And, as you see, when we replead

18 the complaint, we understand your skepticism about the

19 conversion claim, and what we are squarely going for is the

20 -- if you view it as a service, we think quantum meruit

21 aptly states a claim.

22      So, what Precision Pay says is that when you -- even

23 though there's not an expectation of payment, there's still

24 a quantum meruit claim.  And Google would have you believe

25 that Precision Pay says there has to be an affirmative

27

1  expectation of payment.  But that's not what the case says.

2  The case says all that has to be the case is that the

3  Plaintiff didn't intend whatever the subject of the quantum

4  meruit is, the pay phone calls, to be gratuitous.  And

5  there's a huge difference between an affirmative obligation

6  on the Plaintiff to prove that there's an expectation of

7  compensation on the one hand and the -- proving the absence

8  of an intent of gratuitousness.

9      So, all the case law quotes this one sentence that says

10  there's an expectation of payment but the expectation is

11  only that the service wasn't intended to be gratuitous.  And

12  a lot of it is taken out of context.  And I'll let your

13  Honor read the cases and see what is and isn't dicta, and

14  the parties have lots of dispute in the briefing about what

15  cases say and whether it's relevant to the holding.

16      I would urge you to be -- to look into that and be

17  careful about that.  But, basically, what Precision Pay says

18  is that the only requirement is that the services rendered

19  must not have been intended to be gratuitous, and there's

20  not any requirement there must be an affirmative expectation

21  of compensation.  And that's with respect to pay phone

22  service specifically.

23      It also says that the claim applies especially where

24  the Defendant acquires the benefit with knowledge -- with

25  knowledge of the circumstances establishing the unjust

1  enrichment.  So, based -- just like the pay phone owners had
2  no idea that Quest was causing pay phone users to free ride
3  off of the pay phone owner's pay phones here, Plaintiff in
4  this case had no idea that Google was free riding on their
5  cellular data.  The case is on all fours with our case.  It
6  resolves any Article 3 standing issues that it may have.
7  And it's important because it's the only case where nobody,
8  not the Defendant, not a third party, had any expectation of
9  payment for the services at issue because Quest had no
10 relationship with the pay phone operator whatsoever, yet
11 there was still a quantum meruit claim.

12         THE COURT:  Okay.  So, I -- I am interested in the
13 quantum meruit claim.  But, just before we leave the
14 converging claim, I did have one other question, because
15 I --

16         MR. WALLENSTEIN:  Sure.

17         THE COURT:  -- noticed that you added a Plaintiff
18 who has a fixed-price plan or a -- you know, for a certain
19 number of gigabytes and then they have to pay more if they
20 exceed that.  But what I didn't see and the opposition
21 didn't really respond on this point is an allegation that
22 any of the Plaintiffs, including that new one, actually
23 suffered an injury because of that arrangement.
24     So, in other words, did any Plaintiff have to pay more
25 for data or suffer some degradation in service because of

29

1  the -- I'm going to call it free riding, the free riding

2  that you allege Google did on the data plan that that

3  subscriber had?

4         MR. WALLENSTEIN:  It's a great question, your

5  Honor.  And the answer is we didn't allege it because you

6  don't know.  So, when Plaintiff Nelson is her -- Jennifer

7  Nelson is her name.  When Plaintiff Nelson uses her cellular

8  phone, she doesn't know what's causing her to exceed the

9  one-gigabyte threshold, just like someone on a unlimited

10 plan doesn't know that they've been throttled.  You don't --

11 if you -- this is an important point, and it's related to

12 the point you made if you'd just -- if you'd let me -- if

13 you'd let me make it, your Honor, even though it's not

14 squarely responsive.

15      All -- this is something that I know your Honor

16 understands, but I don't know if you fully grasped the

17 import last time around.   Unlimited plans are not

18 unlimited.  They are 20-gigabyte or 25-gigabyte plans.  Once

19 you hit that cap, which is in the fine print, your

20 connection slows down.  On some services you can't use

21 video.  On others you can.  Your service is degraded.  That

22 makes each increment of that 20 gigabytes that you've

23 purchased precious to you.  And when Google uses any

24 increment of it, it is using -- it is converting your

25 valuable property.

1          THE COURT:  But that -- that actually doesn't make

2   -- like, if I -- if I say I have a not infinite but so big

3   quantum of, you know, available access to the network, 25

4   gigabytes -- I don't know if that's it, but whatever it is,

5   I'm like never going to get there if I'm a normal

6   subscriber.  Then there really isn't an injury is the -- is

7   the Defendant's point.  You -- I would expect that any

8   plaintiff would know if it suffered a degradation in

9   service.  You could tell if your video got throttled.  You

10  could tell if you couldn't actually use video on a

11  particular service.  There would be -- you would experience

12  an injury.  Otherwise, what's the point of filing a lawsuit.

13         On the question of do you know if you've exceeded the

14  threshold, if you're someone like Ms. Nelson, because of

15  whatever Google is doing with data transfer, you might not

16  know which actual transmission or reception of information

17  put you over the -- the hump, but you would know based on

18  your information about how much on average is being used by

19  Google independent -- allegedly independent of active use.

20  And you could say in this month or whatever it is, we

21  exceeded the -- she exceeded the threshold by this increment

22  which, look, it matches what we have itemized as the level

23  -- I mean, you gave me all kinds of information about how

24  much Google is taxing the use of -- of the service.

25         So, you ought to be able to at least say, well, you

1  know, but for that, she would have been within her

2  threshold, and I don't see those allegations.

3          MR. WALLENSTEIN:  Your Honor, respectfully, I

4  disagree with that as a matter of fact.

5          THE COURT:  And why is -- why is that?

6          MR. WALLENSTEIN:  So, the complaint alleges that

7  Plaintiffs don't know when they're being throttled.  That is

8  an allegation in the complaint, and it is actually true.

9  The --

10          THE COURT:  Then why does it matter?

11          MR. WALLENSTEIN:  -- providers -- the providers --

12  because, so, take for -- take a wage and hour case.  If an

13  employer doesn't keep records of time sheets, that doesn't

14  mean you can't recover against them, in the -- in the same

15  way --

16          THE COURT:  But you know if you've worked -- as an

17  employee, you know if you've worked for hours for which you

18  haven't been paid.  That's how much cases are litigated.  So

19  you should be able to say -- I'm sorry that I find this just

20  kind of remarkable, but you should be able to say as a user,

21  I was trying to watch this video, and it kept, you know,

22  stalling, and I couldn't get it and, you know, my service

23  was degraded.

24          MR. WALLENSTEIN:  Our allegation --

25          THE COURT:  If nothing happens, why do you have an

32

1 injury?

2          MR. WALLENSTEIN:  But, so, a typical user may

3 experience a degradation in service not because of

4 throttling, at any point in the month.  Sometimes you have

5 bad service.  The allegation in the complaint is that users

6 -- and this is true for me personally.  I don't know whether

7 I've been throttled or whether I just have bad service in a

8 given month, if it's at the end of the month and I've had a

9 -- you know, maybe a little more usage than normal.

10          THE COURT:  Okay.

11          MR. WALLENSTEIN:  We've alleged in the complaint

12 that the users don't actually know, and they don't.  You

13 just use your phone.  You don't get a notice.  You could --

14 you could get a notice from Google that you're being

15 throttled, but they don't tell you that.  So, users don't

16 know when they've been throttled and when they haven't.

17      And, to your point about the quantum of data that's

18 used, so Plaintiff Nelson buys by the gigabyte.  Our

19 allegation I believe in the complaint is that the log file

20 piece of the case at least is about eight megabytes a day.

21 So, why we think that's very significant and it's a very

22 important injury, relative to the total usage of a user in

23 -- over the course of a month, it's pretty small.  So, it's

24 actually impossible to let you know whether that increment

25 is what put you over the top or didn't.  If your use in a

33

1 particular month was eight megabytes more than a gigabyte,

2 well -- well, those eight megabytes might have been from

3 watching a video.  If your usage was nearly two gigabytes,

4 there could be eight megabytes in there that mattered.  You

5 just -- you don't know because it's all one pot.  It's not

6 divided up.

7         THE COURT:  Right.  I guess what I was thinking of

8 -- and possibly this is not the right way to think about it

9 -- is a sort of but-for theory.  So, but for Google's

10 activities, you wouldn't have to pay for the extra gigabyte.

11         MR. WALLENSTEIN:  And in -- we submit in some

12 cases that's true, but we don't know which ones they are.

13         THE COURT:  Okay.

14         MR. WALLENSTEIN:  And it's because of the way

15 Google does it.  If they told us that you were throttled,

16 we'd know.

17         THE COURT:  Okay.  So, let's get to quantum

18 meruit.

19         MR. WALLENSTEIN:  Yes, your Honor.  Thank you.

20         THE COURT:  Well, I do -- I -- I take your point

21 about Precision Pay, but it seems to me that the Ninth

22 Circuit case we should be looking at is In Re De Laurentiis

23 (phonetic).

24         MR. WALLENSTEIN:  And Precision Pay quotes and

25 interprets In Re Delaurentiis.

34

1        THE COURT:  Yes.  And, with all due respect to

2   Judge Chen, I mean, you know, I'm not sure that he modifies

3   anything from -- or intended to modify anything from In Re

4   De Laurentiis.  It -- it does seem to make clear -- the

5   Ninth Circuit does seem to make clear that expectation of

6   payment from someone is a necessary element of a claim for

7   quantum meruit.  But I think that -- that really,

8   conceptually, quantum meruit is intended to encompass a

9   situation where both parties believed that one was doing

10  something for the benefit of the other, both parties to the

11  litigation in the absence of a contract -- or at least an

12  enforceable contract, and -- and here, what I struggle with

13  is the idea that the Plaintiffs are performing a service.  I

14  mean, I'm sensitive to Google's observation that this

15  doesn't really seem to fit a quantum meruit theory.  It --

16  if anyone's providing a service, it's the -- it is the

17  cellular service company.  They're the ones providing the

18  service, literally providing the service.  And your argument

19  is, Well, the Plaintiff shouldn't have to pay for that.  But

20  it doesn't seem to fit a quantum meruit theory.

21        MR. WALLENSTEIN:  Well, your Honor, to that point

22  -- and I will respond on In Re De Laurentiis.  But on that

23  point, I'd direct you to Wonderful Citrus.  So, in Wonderful

24  Citrus, the person providing the service is a contract

25  laborer.  And Wonderful Citrus bought their labor.  So, just

35

1  like the Plaintiffs buy cellular data from cellular carriers

2  and they now have the claim if their cellular data is

3  coopted the way Google has, when Jordan coopted the labor of

4  the laborers and didn't have to pay Wonderful Citrus for the

5  labor that he -- laborers that he had laboring on his own

6  farm, by -- by Wonderful Citrus purchasing the labor from

7  the contract workers, it's their right to enforce.

8       Another analogy might be, you know, if I buy a gift

9  certificate to get a haircut and someone else goes and uses

10 it, it's not the hairdresser who has a cause of action

11 against them.  He got paid for the -- for the gift

12 certificate.  It's me.

13             THE COURT:  But the -- okay.  But the expectation

14 of -- somebody expects to be paid by somebody is the -- is

15 the notion.  Whether it's the actual Defendant or not, there

16 is an expectation of payment.  So, you know, certainly, in

17 the -- in the case that you all like to fight about about

18 whether, you know, whether it was DEG or CTI or NBC, you

19 know, NBC expected to be paid by somebody on behalf of DEG,

20 like that kind of a situation.  So, it's not literally -- it

21 doesn't necessarily literally have to be the Defendant in

22 the case is the one from whom payment was expected.  But

23 there has to have been an expectation of payment for

24 services rendered for the benefit of.  That's the -- that's

25 the notion.

1      And, so -- so, here that -- when I make the

2  observation, that doesn't seem to fit.  It doesn't seem that

3  anybody had an expectation of being paid for whatever Google

4  was doing.  The -- more particularly, the Plaintiffs didn't

5  have an expectation of being paid.  Now, you say, Well, they

6  didn't know they were being harmed.  But that's not quite

7  the same thing as there was a benefit given for which the

8  Plaintiffs expected to, you know, receive compensation.

9          MR. WALLENSTEIN:  So, your Honor, Google's theory

10  taken to its logical conclusion that there must always be an

11  affirmative proof of expectation of payment, means that you

12  could never have a quantum meruit claim where something's

13  stolen or where there's fraud, and that's not the --

14          THE COURT:  Well, there are different theories of

15  recovery.  So, this is where I -- I really come down to the

16  -- to a question for you that I -- that bothered me last

17  time around, which is the Plaintiffs seem to suggest and, in

18  fact, actually say at this point in the opposition, that if

19  this passive data transfer doesn't constitute conversion, it

20  has to be quantum meruit, suggesting that those are the only

21  two possible theories of recovery.  And, while that might

22  have some, like, rhetorical impact, I'm not sure I agree,

23  and I'm not sure that it dictates any kind of result.  So,

24  kind of in line with the argument you were just making, I'm

25  -- I'm not sure that it means that the Plaintiffs are left

37

1  wholly without remedy.  And, I mean, there are distinct --

2  there are different legal theories that one could invoke.

3  You have chosen conversion or quantum meruit, but I'm not

4  convinced that that's your only option and that I must find

5  that there's a quantum meruit theory if I find there is not

6  a conversion theory.

7          MR. WALLENSTEIN:  Your Honor, we -- we chose the

8  theories that we chose because we didn't think we could

9  recover on other theories.

10         THE COURT:  I see.

11         MR. WALLENSTEIN:  That -- we may be wrong about

12  that, and your Honor may be right, and that's not a reason

13  to change the elements of quantum meruit.

14         THE COURT:  Right.

15         MR. WALLENSTEIN:  That's not what I'm saying.

16         THE COURT:  Exactly.  Okay.

17         MR. WALLENSTEIN:  I'm just -- I'm just suggesting

18  that with new technology, which this is, the reason why this

19  particular fact pattern may not have arisen before is

20  because it's a relatively new technology, and it's a new

21  development, and it's difficult to analogize to things that

22  have happened in the past.

23      Normally, everybody knows what's going on, and there's

24  a -- you know, a service that's human labor or something

25  like that.  And, you know, maybe you didn't have a contract

38

1 with a price term, but you figure out what it's generally

2 worth.

3       Technology is very different than where we were back

4 when these rules were first set.

5       So, let me talk about De Laurentiis because, you know,

6 you opened with that; and everyone thinks -- everyone

7 understands that it's the -- the Ninth Circuit case at issue

8 here.

9             THE COURT:  Okay.

10            MR. WALLENSTEIN:  So, De Laurentiis does not say

11 that there must be an expectation of payment from someone.

12 It says that there is no expectation of payment requirement

13 from the Defendant.  That there may have happened to be an

14 expectation of payment from the intermediary company, the

15 third party in De Laurentiis, does not mean that such an

16 expectation was required as a matter of law.

17       Regardless, even if you disagree with that, the only

18 expectation that's required is set forth in the next

19 sentence of the decision, that compensation must be expected

20 only in the sense that the service rendered must not have

21 been intended to be gratuitous.  That's a very important

22 sentence.

23       The Defendants, like I said, are trying to conflate two

24 things, an affirmative expectation of payment on the one

25 hand, which only makes sense if you actually know about the

39

1   -- the problem, unlike in this case, and an absence of

2   gratuitousness on the other.

3       The former is not an element of quantum meruit, we

4   submit, for all the reasons in our brief.  The latter, the

5   absence of gratuitousness, is at best an affirmative

6   defense.  And we'll talk about that in a moment, but even if

7   the latter -- the non-gratuitousness, is an element, which

8   it is absolutely not the four corners of the complaint make

9   clear that Plaintiffs did not intend to gratuitously allow

10  Defendants to utilize their cellular data.

11      THE COURT:  What service did the Plaintiffs

12  provide?  The Plaintiffs do have to provide a service for

13  which they are expecting compensation.  What is the service

14  that Plaintiffs provided?

15      MR. WALLENSTEIN:  The service is Google coopting

16  -- so, if cellular data is the right of access to the

17  network, right -- that's the premise of the quantum meruit

18  claim -- Google is coopting that right of access, and that

19  states a claim for quantum meruit.

20      THE COURT:  But Plaintiffs did not provide a

21  service.  So, if I'm focusing, again, on the language that

22  you're highlighting for me in De Laurentiis, what service

23  did Plaintiffs provide for which they are entitled to a

24  benefit?

25  I don't see a service that the Plaintiffs are providing.

40

1          MR. WALLENSTEIN:  The services rendered are the
2  cellular data.  The right of access --
3          THE COURT:  It's not theirs to provide.  It's not
4  theirs to provide.  That's the --
5          MR. WALLENSTEIN:  But they --
6          THE COURT:  that's the problem that I have.
7          MR. WALLENSTEIN:  But they purchase it, your
8  Honor.  By purchasing it, it becomes their right to enforce.
9  The cellular company's already been paid for the data.  It's
10 not going to sue Google.  It's already been paid for all the
11 cellular data that's used.
12         THE COURT:  Right.
13         MR. WALLENSTEIN:  The Plaintiffs purchased that
14 cellular data from the carriers, just like Wonderful Citrus
15 purchased the labor from the contractors, and it becomes the
16 Plaintiffs' right to enforce.
17         THE COURT:  Okay.
18         MR. WALLENSTEIN:  If you -- if you put the onus on
19 the provider, then Google will simply free ride.  There'll
20 be no one left to enforce.
21     Now, Google says that subsequent Ninth Circuit --
22 excuse me -- subsequent -- let me make one additional point
23 on De Laurentiis.
24         THE COURT:  Sure.
25         MR. WALLENSTEIN:  The law presumes that services

41

1  are gratuitousness -- excuse me -- gratuitous only under

2  very specific circumstances, like if you are cohabitating,

3  if you are married, if you are close relatives.  That's the

4  <u>Maglica</u>, the <u>Maglica</u> case, as well as <u>McBride</u>.

5      Google drops that aspect of the argument completely.

6  The relationship between the Plaintiffs and Google is

7  nowhere -- nothing like relatives or cohabitants.  You don't

8  presume gratuitousness, and you can't intend something to be

9  gratuitous if you don't even know it's happening.

10      The allegations in the complaint clearly plead the

11  Plaintiffs had no idea Google was doing this.  Why didn't

12  they know?  Because Google didn't tell anyone.  They didn't

13  write in their disclosures, "By the way, whenever you walk

14  around and your phone's in your pocket, whenever you get in

15  a car, we are going to send 300 log files that don't -- that

16  don't affect the functioning of your phone, and we're going

17  to do it over cellular data even though we could do it over

18  WIFI.  And, by the way, those cellular transmissions,

19  they're going to be credited to you against your account,

20  and if you have a fixed data plan, you're going to have paid

21  money for them.  If you have an unlimited data plan, you're

22  going to have less data available before you get throttled."

23      Google didn't tell anyone that.  And if --

24          THE COURT:  Well, I know you all dispute that.

25  But, taking your allegations of the complaint, I understand

42

1   that's the theory -- that's the theory that you're

2   advocated.  So, why isn't it a breach of contract?

3            MR. WALLENSTEIN:  Because the contract -- why

4   isn't it a breach of contract?

5            THE COURT:  Yeah.  So --

6            MR. WALLENSTEIN:  Well --

7            THE COURT:  So, when you're telling me all these

8   things and there's this whole consent dispute that's based

9   on the terms of service, why isn't what you just told me

10  just a straight up breach of contract claim between the

11  Plaintiffs and Google?

12           MR. WALLENSTEIN:  Because the Plaintiffs didn't

13  contract with Google for cellular data.

14           THE COURT:  No.  They contracted --

15           MR. WALLENSTEIN:  They contracted with the

16  carriers.

17           THE COURT:  -- with Google or the -- the only

18  incidental beneficial uses -- there is something about, you

19  know, data transmission in there.  You all dispute about

20  what that  encompasses, but it seems t me that if what you

21  say is -- what you said just now is true, then the

22  Plaintiffs have a breach of contract claim against Google

23  for violating those terms of service.

24           MR. WALLENSTEIN:  So, the same reason it states a

25  quantum meruit claim and not a breach of contract claim, you

43

1 can't have both.  When there's a valid contract, you don't

2 have quantum meruit.  That's the law.  And the reason for

3 that is when the parties' understanding regarding a

4 particular topic, regarding compensation, is reduced to

5 writing, the writing controls.

6     The whole point of the consent argument is that the

7 contract does not address the issue at hand.  The contract

8 between the Plaintiffs and Google does not address how much

9 Google's supposed to pay if it's using Plaintiffs' cellular

10 data.  If it -- it doesn't even disclose that Google is

11 using their cellular data under the circumstances alleged

12 here.  If it did that cleanly and squarely, maybe it would

13 be a breach of contract claim.  But, because it doesn't do

14 that, there isn't a breach of contract claim; and, in our

15 view, the only other option if it is a service is quantum

16 meruit and not some other cause of action.

17     THE COURT:  And I did -- I know I did interrupt

18 you.  So, I'm sorry to have derailed your argument.

19     MR. WALLENSTEIN:  No.

20     THE COURT:  But please continue on the --

21     MR. WALLENSTEIN:  Oral argument is your time, your

22 Honor.  I want to answer the questions you have.

23     So, they cite Huskinson --

24     THE COURT:  Yes.

25     MR. WALLENSTEIN:  -- a Supreme Court of California

1  case that they point out occurs after De Laurentiis.

2  Huskinson involved two law firms that agreed to share fees,

3  and there was no expectation of payment that was at issue.

4  Everyone agreed that the client and the law firms understood

5  the law firms would be compensated for the services they

6  provided.  The issue was just the law firms didn't show

7  their fee sharing agreement to the -- they didn't get

8  written sign-off from the client.  So, it was legally

9  unenforceable, and the main law firm didn't pay the other

10 law firm and got sued.

11      So, because there was no expectation of payment issue,

12 the statement that Google quotes from Huskinson is dicta.

13 It has nothing to do with whether that's an element or not

14 because whether it's an element or not -- because whether it

15 existed or not wasn't at issue.

16      Huskinson does not overrule De Laurentiis.  It doesn't

17 even cite De Laurentiis.  It has absolutely nothing to do

18 with it.

19      The other case that Google cites is Chavez v. Hayward,

20 which is a District Court case that interprets De Laurentiis

21 differently than we do.  And, just like they have, you know,

22 a District Court that goes their way, we've got -- we've got

23 one that goes our way.  And I, you know, trust your Honor to

24 read them and you'll make your own decision about which one

25 is correct.  But I would draw your attention to the fact

1 that in <u>Chavez</u> the case was dismissed because there really

2 wasn't any benefit.  This is the case involving a batterer.

3          THE COURT:  Okay.

4          MR. WALLENSTEIN:  And the police were called

5 and --

6          THE COURT:  (Indiscernible).

7          MR. WALLENSTEIN:  -- they arrest -- they arrested

8 him and they arrested him, and his arm got hurt, and they

9 sued the batterer for the value of the emergency response

10 and the police response.  And they said, Well, he hasn't

11 benefitted from this, and we're dismissing it.

12     That didn't really have anything to do with an

13 expectation of payment.  There is a footnote that talks

14 about and interprets De Laurentiis the way we disagree with,

15 that we think is wrong.  That's dicta.  The holding is no

16 benefit equals no quantum meruit.  It doesn't have anything

17 to do with an expectation of payment.

18     We've already talked about <u>Wonderful Citrus</u> and -- and

19 <u>Precision Pay</u>, and I'd just draw your attention to the

20 <u>Miller</u> case.

21          THE COURT:  Yes.

22          MR. WALLENSTEIN:  The Defense argues that <u>Miller</u>

23 is an outlier.  I think what they mean by that is they

24 disagree with how it was decided.  It's not an outlier.

25 It's from 2008.  That's after <u>Huskinson</u>, which is from 2004.

1  <u>Miller</u> has not been overruled.  <u>Miller</u> relies on an old 1960

2  case for a longstanding principle that the Defense bears the

3  burden of proving that the services were gratuitously

4  rendered unless the parties are near relatives.

5          THE COURT:  Okay.

6          MR. WALLENSTEIN:  That --

7          THE COURT:  Let me just pause you there.  I've

8  read <u>Miller</u>.  I've read <u>Sowash</u>, and I -- I don't think that

9  you have the better argument on this one.  It -- the -- the

10 circumstances of the recitation of the law in <u>Miller</u>, which

11 includes a reference to <u>Huskinson</u> as well, and the

12 understanding or expectation of both parties that

13 compensation, therefore, was to be made.  So, <u>Miller</u> does

14 include that element.

15     When there's a discussion of, on the other hand, a

16 defense that the work was performed under a special contract

17 as an affirmative and goes on to say likewise, unless, the

18 parties are near relatives, the recipient of the services

19 has a burden to prove that the defense of services were

20 rendered gratuitously or without obligation, citing <u>Sowash</u>.

21     The way I read <u>Miller</u> combined with <u>Sowash</u> is that in

22 the situation where there is this kind of personal service

23 provided that there is a presumption, as <u>Sowash</u> says, that

24 unless you're a near relative, you're not doing that just

25 for your own fund.  I mean, <u>Sowash</u> is an extraordinary case

1 of some inebriated person whose friend took them in and

2 provided for them and took care of them and then in the end,

3 that person was saying, Hey, I need -- I didn't do this for

4 free.  I need to be compensated.  And the Court said, Yeah,

5 I'm going to presume that you should -- there was an

6 expectation you should be compensated because you're not a

7 near relative.

8      I mean, to me that, I think, is a very thin read to

9 say, well, therefore, there's a presumption -- or there's an

10 affirmative defense that you have to establish a gratuity

11 and that's on the burden of the Defendant.  I mean, I don't

12 think so.

13      So, I think there -- what I take away from the

14 arguments that -- and the cases that the parties have cited

15 to me is that it's -- you know, it's maybe two sides of the

16 same coin, not gratuitous and I expect to be paid.  It's

17 kind -- they're two sides of the same coin.  And there is

18 some statement -- and I'm not sure which case it comes up

19 in.  Maybe it was <u>Sowash</u>.  I can't remember now -- where the

20 -- the court remarks that to avoid some problem, you ought

21 to plead that it's not gratuitous.  You ought to have facts

22 that suggest that it's not gratuitous in the actual

23 Plaintiffs' complaint.  So, I'm not sure how that shakes

24 out.

25      But, in any event, my concern is the question I have

48

1  been trying to -- to pose is that I'm not sure that there

2  are any services being provided by the Plaintiffs.  So, I

3  will go back and look at your -- your arguments based on

4  <u>Precision Pay</u> and also <u>Jordan v. Wonderful Citrus</u>, but I

5  think that the -- it doesn't -- again, it doesn't really fit

6  the quantum meruit theory to say that the Plaintiffs

7  provided services.

8           MR. WALLENSTEIN:  But the Plaintiffs acquired the

9  -- the services from -- I've made this argument several

10  times.

11          THE COURT:  Yeah, yes.

12          MR. WALLENSTEIN:  You know my argument, your

13  Honor.

14          THE COURT:  I got your -- I got your argument.  I

15  will give it -- I will absolutely give it some

16  consideration, thorough consideration.

17          MR. WALLENSTEIN:  Thank you, your Honor.

18          THE COURT:  I guarantee you I will.  So, I -- and

19  I appreciate that, and I appreciate that, you know, the --

20  the opposition said what it said and then I had the reply

21  with the pile of, you know, responsive cases, and I

22  appreciate your rebuttal here.

23          MR. WALLENSTEIN:  And, you know, that reminds me,

24  your Honor, regarding some of the cases cited in the reply,

25  which you kind of referred to -- you alluded to earlier --

1  so these are the cases at the very end that aren't cited

2  until the reply.  The four cases that the Defense claims

3  dismiss quantum meruit for failing to plead an expectation

4  of compensation don't involve any concealment or theft.

5  Everything happens out in the open, and that's -- I can go

6  case by case if -- you know, I'm happy to talk about them

7  case by case if you have particular questions, but that

8  fundamentally distinguishes all of them.

9      If Defendants are right and -- we submit there really

10  is a huge difference between proving the absence of

11  something, the absence of gratuitousness and affirmatively

12  approving an expectation of payment.  Those are two

13  completely different things.  You can't intend something to

14  be gratuitous if you don't know it's happening.  That's what

15  distinguishes all of those cases.  In all of those cases,

16  everyone knew what was happening.  It was a -- often a

17  personal service provided in the open, and if Google's

18  theory is right, then there could never be a claim to

19  address the wrong in this case in our review.  I respect

20  your Honor's point that there's only two causes of action

21  pled here rather than others.  We don't believe there are

22  other viable causes of action.  And, because this is a new

23  area with, you know, a very sophisticated Defendant in this

24  particular area operating kind of on its home turf, cases

25  like this one will send signals to technology companies

50

1  about what they can and can't do.  And I'm not saying you

2  should decide the case for policy reasons.  I'm really not.

3          THE COURT:  Okay.

4          MR. WALLENSTEIN:  But it does -- it does make it

5  incumbent upon all of us, Google, the Plaintiffs, and the

6  Court, to make sure that we don't interpret the causes of

7  action in an inappropriately stringent way because this is a

8  -- in our view a serious wrong that will not be righted

9  unless one of these two causes of action applies.  And, in

10  our view, either it is a -- either it's a property right and

11  you get Article 3 standing because you've stolen property,

12  like, I get that there's -- it's really complicated.  But,

13  at the end of the day, if you believe it's a property right,

14  that's where you get standing from and that's where you got

15  the injury.

16     If you don't believe it's a property right, which we

17  completely understand and we kind of repled our complaint --

18  I didn't expect to be talking about conversion as much as we

19  have today.  I'm heartened that you're still thinking about

20  it, your Honor.  I fear that by not talking about it as much

21  as I have, maybe I've tanked it, but --

22          THE COURT:  No, no, don't -- don't.

23          MR. WALLENSTEIN:  But the reason we led with

24  quantum meruit and the reason we briefed it the way we did

25  is because if it's not personal -- if it's not property, the

51

only other thing it can be is the right of access to a

service, and that's what quantum meruit is intended to

address.

          And, very briefly, regarding the common count

issue, I think your Honor's decided it already; but I just

wanted to note that both Farrington (phonetic) and McBride,

both of them in my -- on my reading, involved specific

counts for quantum meruit.  So -- so, one of them doesn't

involve any reference to common counts at all.  The other

one, it does involve references to common counts, but the

common counts is for money it hadn't received, and it

appears to me that there is a specific count for quantum

meruit.

     So, if you look at those cases, I think that that

answers the question whether quantum meruit is necessarily a

common count.  It's not always.  It does not have to be.  It

depends on how factually fleshed out and legally fleshed out

the theory is.

     I'd also briefly note that quantum meruit is the same

thing as quasi-contract.  There's a part in Google's brief

where they suggest that quasi-contract seeking restitution

for unjust enrichment is a separate cause of action from

quantum meruit, that they are two different things.  And I

admit that there is at least one case that does have two

counts with those names.  But, when the Court addresses

52

1  those two counts, it combines them together.  It says

2  they're --

3          THE COURT:  Yes.

4          MR. WALLENSTEIN:  -- the same thing.

5          THE COURT:  Yeah, I -- I don't -- I don't think we

6  need to belabor that -- that issue, but thank you for

7  pointing that out.  Okay.

8          MR. WALLENSTEIN:  Fair enough.  Is there any other

9  issue your Honor would like me to address within quantum

10 meruit or conversion?

11         THE COURT:  No.  I think you've -- I've asked you

12 all my questions.  If there's anything further that you need

13 to add to your argument, let me know.  Otherwise, I'll

14 return to Mr. Somvichian for a brief response if he wants

15 one.

16         MR. WALLENSTEIN:  Yeah, I'd just say the -- I'd

17 close with Google could have told everyone that this is what

18 it was doing.  And if it had done that 10 years ago, that

19 it's having everyone send their location at all times

20 completely unnecessarily, taking copies of your location

21 data whenever you check the weather so the weather -- the

22 weather app gets a copy and then Google gets its own copy

23 with its own separate transmission so that it could build

24 out Google Maps and make Google Maps, you know, much better,

25 if it had told everyone that 10 years ago, there would have

53

1  been uproar and outrage, and compensation would have been

2  extracted for that.  But it didn't tell everyone.  The

3  clauses are ambiguous.  It hid that information until

4  recently.  And if -- if that -- if not telling people that

5  you are doing that doesn't state a claim for conversion, it

6  must state a claim for quantum meruit.

7            THE COURT:  Okay.  Thank you very much.

8            MR. WALLENSTEIN:  Thank you, your Honor.

9            THE COURT:  Mr. Somvichian, anything that you need

10 to respond to?

11           MR. SOMVICHIAN:  I would like to, your Honor.

12 I'll try to be brief.

13           THE COURT:  Okay.

14           MR. SOMVICHIAN:  Four -- four quick points.  On

15 the conversion claim and the property arguments, we've heard

16 all this before, your Honor.  Mr. Wallenstein talked about

17 the quantum of energy being consumed and then you never get

18 it back and the bytes of data are -- are unique and also

19 consumed so that they're not attributable to more than one

20 device.  We've heard all of that before, and I'll just give

21 you a quick citation.

22      In their opposition to the prior motion to dismiss --

23 that's Docket Entry Number 39 at page 18 -- these arguments

24 are elsewhere, but here's one instance where they've raised

25 these arguments before.  So, at the very bottom of the page,

54

1 they argue:

2              "Plaintiffs' individual bytes of

3         cellular data are used once and

4         exclusively by their devices.  They

5         cannot be copied and multiplied."

6    That sounds a lot like what we're debating again now

7 and what Mr. Wallenstein tried to raise about quantums of

8 energy being used once or bytes of data only being used a

9 single time or -- or attributed to a -- a given user.  Those

10 arguments failed before, and they fail for the same reason

11 now, your Honor, which is all of this conflates the means of

12 transmission with what they're trying to construe as the

13 property.  And we're still struggling with that because when

14 they say cellular data -- they used to say cellular data

15 allowances, and now they pivot to cellular data -- what

16 they're still talking about is the means of transmission.

17 That's the means by which they are able to send and receive

18 the only thing that they actually own, which is the data

19 files at issue.

20    So, again, I won't belabor the point.

21       THE COURT:  Okay.

22       MR. SOMVICHIAN:  We've heard all this before, and

23 the claim fails for the -- the same reasons.

24    On the quantum meruit claim and what is the right

25 standard and what's the right case, on the Huskinson case,

55

1  your Honor, that is the California Supreme Court.  I'll just

2  quote it very briefly.  Page 458 of that decision:

3                "To recover in quantum meruit, a

4           party must show that circumstances were

5           such that the services were rendered

6           under some understanding or expectation

7           of both parties that compensation,

8           therefore, was to be made."

9      So, Mr. Wallenstein says that's just dicta.  That's a

10  very clear statement of the requirements of quantum meruit

11  by the California Supreme Court that postdates the other

12  decisions we've been talking about.  I don't --

13              THE COURT:  What -- what about Mr. Wallenstein's

14  point, which you perhaps are going to get to, that if you

15  don't know, you know, you can't -- you can't meet that

16  standard; and, yet, it would be unreasonable to -- and I'm

17  paraphrasing Mr. Wallenstein's argument -- it would be

18  unreasonable for someone in Google's position to expect they

19  could just do this for free, even if unbeknownst to the

20  Plaintiffs this was going on?

21              MR. SOMVICHIAN:  Well, again, your Honor, that

22  goes to the assumption, which is wrong, that this has to fit

23  into on of these frameworks.  It's either a conversion or,

24  if it's not, it has to be quantum meruit.  That's not --

25  that's not right.  They -- they could have framed their

1 complaint however they wanted.  And whether it was because

2 of the remedy that they wanted to seek or whether they

3 thought these particular causes of action were more amenable

4 to class certification or whatever other strategic reason

5 they chose to limit the claims to what they did, they did do

6 that; and they limited their complaint to two different

7 theories, neither one of which fits the facts that we have

8 here.  And the fact that we're grappling with all of these

9 different elements and whether they fit really reinforces

10 that we're -- we really got -- have a square peg round hole

11 situation.  And just because it doesn't fit the two is not a

12 reason to change any of the elements that have to be

13 applied.  And this idea that if -- if you don't do that, if

14 you don't jam it into one or the other, there's going to be

15 this great injustice, that's a result of the way that they

16 pled their complaint, your Honor.

17       And, but the last point, when you asked about the --

18 the named Plaintiffs and their allegations with respect to

19 whether they were harmed in any way, they weren't.  Their

20 allegation doesn't say they were.  And, just to -- just to

21 reinforce this, that is a separate and independent basis to

22 dismiss both of these claims.  Even if, your Honor, you

23 found that there's a personal property interest at issue in

24 the cellular data and clear that hurdle, even though the

25 complaint, we submit, is no different than before, the fact

1    that the named Plaintiffs haven't alleged any interference

2    with their ability to use their cellular data allowances is

3    another separate and independent basis to dismiss their

4    conversion claim.  It's also a basis to dismiss the -- t he

5    quantum meruit claim because the entire premise of quantum

6    meruit is that  there has been some detrimental reliance and

7    a need to compensate the Plaintiffs for some amount that

8    they've incurred to provide the service or for some

9    detriment that they've suffered in expectation of

10   compensation.  And, again, there are no allegations to

11   support that here.  So, that -- that failure would be an

12   independent basis even if you got past property interests

13   ons the conversion side and expectation on the quantum

14   meruit side.

15           THE COURT:  Okay.  Thank you very much.

16       Let me -- let me thank both parties for very helpful

17   arguments this time as last time.  I have followup to the

18   question I asked at the end of last time's hearing, which is

19   what is going on in the State Court and is that anything

20   that might be useful for me to know?  I -- I don't recall,

21   Mr. Somvichian, are you representing Google in --

22           MR. SOMVICHIAN:  Yes.  Yes, your Honor.  And Mr.

23   Wallenstein --

24           THE COURT:  Also --

25           MR. SOMVICHIAN:  -- also for the Plaintiffs in the

58

1 Chupo (phonetic) case.  We've been meeting and conferring at

2 least weekly, if not more often than that, on various

3 discovery issues, but there's no material update.

4            THE COURT:  Nothing's happened?

5            MR. SOMVICHIAN:  No.

6            THE COURT:  The case is still proceeding through

7 discovery and --

8            MR. SOMVICHIAN:  Yes.

9            THE COURT:  Okay.  All right.

10            MR. WALLENSTEIN:  Your Honor, I --

11            THE COURT:  Yeah, Mr. Wallenstein?

12            MR. WALLENSTEIN:  I speak to Mr. Somvichian more

13 than some members of my family.

14            THE COURT:  Well, I'm glad you hopefully both get

15 along.  That's important.

16            MR. WALLENSTEIN:  That's why we're repleading the

17 complaint, your Honor.  We're having so much fun together in

18 the State Court.  We would just love to continue that here.

19            THE COURT:  I see.  Okay.  All right.  Well, thank

20 you very much for the update on that.  I do appreciate it.

21 I will issue a written decision, and then we'll figure out

22 what to do from there.  Okay.

23            MR. WALLENSTEIN:  Thank you, your Honor.

24            THE COURT:  All right.  Thank you.

25            MR. SOMVICHIAN:  Thank you, your Honor.

1          THE COURT:  This matter is concluded.

2     (Proceedings adjourned at 11:20 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

60

<u>CERTIFICATE OF TRANSCRIBER</u>

     I certify that the foregoing is a true and correct
transcript, to the best of my ability, of the above pages of
the official electronic sound recording provided to me by
the U.S. District Court, Northern District of California, of
the proceedings taken on the date and time previously stated
in the above matter.

     I further certify that I am neither counsel for,
related to, nor employed by any of the parties to the action
in which this hearing was taken; and, further, that I am not
financially nor otherwise interested in the outcome of the
action.

                    Echo Reporting, Inc., Transcriber

                        Tuesday, April 5, 2022