COOLEY LLP
WHITTY SOMVICHIAN (194463)
(wsomvichian@cooley.com)
MAX A. BERNSTEIN (305722)
(mbernstein@cooley.com)
ANUPAM DHILLON (324746)
(adhillon@cooley.com)
CAROLINE A. LEBEL (340067)
(clebel@cooley.com)
3 Embarcadero Center, 20th floor
San Francisco, California 94111-4004
Telephone:    (415) 693 2000
Facsimile:    (415) 693 2222

Attorneys for Defendant
GOOGLE LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JOSEPH TAYLOR, EDWARD MLAKAR, MICK CLEARY, and EUGENE ALVIS, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> GOOGLE LLC, <br><br> Defendant. | Case No. 5:20-cv-07956-VKD <br><br> **GOOGLE LLC'S MOTION TO EXCLUDE EXPERT OPINIONS RE DAMAGES** <br><br> Date:    July 1, 2025 <br> Time:    10:00 a.m. <br> Judge:   Hon. Virginia K. DeMarchi |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ........................................................................... 1

STATEMENT OF ISSUES TO BE DECIDED ............................................................... 1

STATEMENT OF RELIEF SOUGHT ........................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITY ...................................................... 2

I.     INTRODUCTION ................................................................................................. 2

II.    BACKGROUND ................................................................................................... 3

III.   LEGAL STANDARD ........................................................................................... 7

IV.   ARGUMENT ........................................................................................................ 8

     A.     Dr. Entner Is Unqualified to Opine on Economic Damages. ................................... 8

     B.     Dr. Entner's Average Price Per Megabyte Analysis Does Not Reliably Measure Classwide Damages For Multiple Reasons. .................................. 9

         1.     Dr. Entner's "average price" calculation ignores massive variation in what individuals actually pay for their cellular data services. ............... 9

         2.     Dr. Entner incorrectly measures the average price of all cellular data when the alleged property at issue is limited to the marginal units of cellular data consumed by the Challenged Transfers. ................... 11

         3.     The "average price" measure inflates damages by including amounts users pay for bundled services. .................................................. 13

         4.     The "average price" calculations are further unreliable because they rely on undisclosed verbal discussions with unidentified individuals. .......................................................................................... 14

     C.     Plaintiffs' New Theories Result in Absurd Results and Unjustified Windfalls. ....................................................................................................... 16

         1.     Plaintiffs' experts point the finger at each other and neither actually opines that the new damages theories are reliable measures of damages. ........................................................................................... 17

         2.     Plaintiffs' new theories are based on a misunderstanding of fair market value that conflicts with the law and basic economic principles. ...................................................................................... 19

         3.     Even taken at face value, the new damages theories cannot be applied as a reliable measure of classwide damages. ........................... 21

V.     CONCLUSION ................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Avila v. Willits Env't Remediation Tr.*,
633 F.3d 828 (9th Cir. 2011)........................................................................................ 8

*Cabrera v. Cordis Corp.*,
134 F.3d 1418 (9th Cir. 1998)..................................................................................... 16

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
2017 WL 10434367 (N.D. Cal. Jan. 23, 2017) ........................................................... 19

*Csupo v. Google LLC*,
No. 19CV352557 (Cal. Super. Ct. Mar. 7, 2025) .................................................. 3, 4, 5

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ............................................................................................ *passim*

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*,
618 F.3d 1025 (9th Cir. 2010)..................................................................................... 18

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)............................................................................................. 14, 17

*Goodell v. Soledad Unified Sch. Dist.*,
2021 WL 2533564 (N.D. Cal. June 21, 2021) ........................................................ 7, 19

*Grodzitsky v. Am. Honda Motor Co.*,
957 F.3d 979 (9th Cir. 2020)........................................................................................ 8

*Gutierrez v. Wells Fargo & Co.*,
2010 WL 1233810 (N.D. Cal. Mar. 26, 2010) ............................................................ 11

*Kimberlin v. Comm'r*,
128 T.C. 163 (2007)...................................................................................................... 9

*Klein v. Meta Platforms, Inc.*,
2025 WL 489871 (N.D. Cal. Feb. 13, 2025) ............................................................... 17

*La Canada Ventures, Inc. v. MDalgorithms, Inc.*,
2024 WL 3643082 (N.D. Cal. Aug. 2, 2024)............................................................... 14

*Leakas v. Monterey Bay Mil. Hous., LLC*,
2024 WL 495938 (N.D. Cal. Feb. 8, 2024) ................................................................... 7

*Payan v. Los Angeles Cmty. Coll. Dist.*,
2019 WL 8163479 (C.D. Cal. June 13, 2019) ............................................................. 16

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-ii-

**GOOGLE'S MOTION TO EXCLUDE EXPERT
OPINIONS RE DAMAGES
CASE NO. 5:20-CV-07956-VKD**

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Primiano v. Cook*,
  598 F.3d 558 (9th Cir. 2010), *as amended* (Apr. 27, 2010)....................................................8

*Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*,
  752 F.3d 807 (9th Cir. 2014)....................................................................................................8

*Sali v. Corona Reg'l Med. Ctr.*,
  909 F.3d 996 (9th Cir. 2018)....................................................................................................8

*San Francisco Baykeeper v. City of Sunnyvale*,
  627 F. Supp. 3d 1085 (N.D. Cal. 2022) ................................................................................19

*Sentius Int'l, LLC v. Microsoft Corp.*,
  2015 WL 451950 (N.D. Cal. Jan. 27, 2015) .........................................................................11

*Simpson Strong-Tie Co. Inc. v. MiTek Inc.*,
  2023 WL 137478 (N.D. Cal. Jan. 9, 2023) .............................................................................7

*Surgical Instrument Serv. Co., Inc. v. Intuitive Surgical, Inc.*,
  2024 WL 1975456 (N.D. Cal. Mar. 31, 2024) .......................................................................8

*ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*,
  648 F. App'x 609 (9th Cir. 2016)...........................................................................................17

*In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products
  Liability Litigation*,
  2020 WL 13228418 (N.D. Cal. Feb. 21, 2020) .....................................................................20

*Werdebaugh v. Blue Diamond Growers*,
  2014 WL 2191901 (N.D. Cal. May 23, 2014) .......................................................................21

**Statutes**

Cal. Civ. Code 3336.......................................................................................................................11

**Other Authorities**

Civil Local Rule 7 ............................................................................................................................1

Fed. R. Civ. P. 26(a)(2)(B)(ii).......................................................................................................15

Fed. R. Evid.
  702 ...........................................................................................................................1, 7, 16, 18
  703 ..........................................................................................................................................14

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-iii-

GOOGLE'S MOTION TO EXCLUDE EXPERT
OPINIONS RE DAMAGES
CASE NO. 5:20-CV-07956-VKD

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Judicial Council of California Civil Jury Instructions (CACI) No.
   1923 ...................................................................................................................... 20
   2102 ........................................................................................... 12, 19, 20, 21

**Google's Motion to Exclude Expert
Opinions re Damages
Case No. 5:20-cv-07956-VKD**

# NOTICE OF MOTION AND MOTION

## TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD

**PLEASE TAKE NOTICE THAT** on July 1, 2025, or as soon thereafter as this Motion may be heard in the above-titled Court, before the Honorable Virginia K. DeMarchi of the United States District Court, Northern District of California at the San Jose Courthouse, Courtroom 2 – 5th Floor, 280 South 1st Street, San Jose, CA 95113, Defendant Google LLC ("Google") will and hereby does move the Court to exclude the opinions of Plaintiffs' experts Dr. Roger Entner and Dr. Jeffery Stec relating to damages issues. Google's Motion is made pursuant to Federal Rule of Evidence 702, Civil Local Rule 7, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ("*Daubert*"). Google's Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Max Bernstein and the exhibits attached thereto, all matters of which the Court may take judicial notice, all pleadings and papers on file in this action, and other written or oral argument that Google may present to the Court.

## STATEMENT OF ISSUES TO BE DECIDED

Whether Dr. Entner's and Dr. Stec's opinions, including those offered in support of Plaintiffs' proposed classwide damages calculations, are admissible under Federal Rule of Evidence 702 and the standards and requirements articulated in *Daubert*.

## STATEMENT OF RELIEF SOUGHT

Google requests that the Court exclude all opinions offered by Dr. Entner and Dr. Stec in support of Plaintiffs' proposed classwide damages calculations, including all opinions and assertions regarding purported measures of fair market value of cellular data and all calculations of conversion damages based thereon.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

GOOGLE'S MOTION TO EXCLUDE EXPERT
OPINIONS RE DAMAGES
CASE NO. 5:20-CV-07956-VKD

# MEMORANDUM OF POINTS AND AUTHORITY

## I.    INTRODUCTION

The opinions of Plaintiffs' experts Dr. Roger Entner and Dr. Jeffrey Stec on damages issues should be excluded as unreliable and inadmissible for multiple reasons. First, Dr. Entner calculates what he calls the "average price" of cellular data based on industry metrics on total revenues and total cellular data consumption; Dr. Stec then uses that "average price" to calculate damages for all proposed class members, regardless of what they actually paid for cellular data services under their individual data plans. While this oversimplified theory provides a seemingly uniform damages model for the proposed class, it masks a host of problems that render the method unreliable, including (1) the massive variation in the pricing of mobile data plans, which Plaintiffs' experts simply assume away by applying a single "average price" to measure damages, (2) a fundamental disconnect in that the "average price" is derived from *all* cellular data usage for all purposes, whereas the alleged converted "property" in dispute is limited to the small incremental amount of cellular data consumed by the Challenged Transfers[1], and (3) the fact that consumers pay for non-cellular data services bundled as part of their data plans (perks like cloud storage and streaming services), which inflates damages, yet is entirely unaccounted for by Plaintiffs' experts. Compounding these issues, Dr. Entner admitted his "average price" calculations rely on inputs from undisclosed individuals who provided unspecified information to him years ago—sources whose reliability is now impossible to assess. These unverifiable inputs are critical to Dr. Entner's calculation and further render his "average price" analysis unreliable and inadmissible.

Additionally, Plaintiffs' experts propose two additional damages theories based on the terms of certain specific data plans, in seeming contradiction to their focus on a uniform "average price." These theories are also inadmissible because they lead to absurd outcomes and generate massive windfalls. As just one example, Dr. Entner opines that the fair market value of cellular data can be measured by the overage penalties (*i.e.*, the fees for exceeding a specified cap on data usage) under three data plans from the mid-2010s (before unlimited plans became the norm); Dr. Stec then

---

[1] "Challenged Transfers" refers to the specific types of data transfers between Android devices and Google servers that Plaintiffs claim wrongfully consume cellular data, as identified in the expert report of Chris Thompson.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

GOOGLE'S MOTION TO EXCLUDE EXPERT
OPINIONS RE DAMAGES
CASE NO. 5:20-CV-07956-VKD

applies that $15 per gigabyte ("GB") penalty to calculate damages for the *entire proposed class*, including individuals who were not on those plans, never paid any overage penalties, and always had unlimited data plans in which they paid effective prices that were a fraction of $15/GB. These sorts of absurd results provide ample ground for the Court to strike Plaintiffs' additional damages theories. But the problems run deeper here because **neither Dr. Entner nor Dr. Stec actually purports to opine that classwide damages can be measured in these incoherent ways**. Instead, Dr. Entner says he was *instructed by counsel* to include the new measures in his report, which he does only in perfunctory fashion without explaining how they could reliably measure damages for the entire proposed class. Dr. Stec then uses the inputs to quantify damages, but again with no supporting analysis of any kind and deferring entirely to Dr. Entner. What is lost in this fumbled exchange between Dr. Entner and Dr. Stec is any expert who actually attempts to justify the resulting damages calculations, which massively inflate Google's exposure and confer unjustified windfalls to large swaths of the proposed class.

Allowing Plaintiffs to present any of these unfounded damages calculations and conflicting theories to the jury would be highly prejudicial, and the Court should exclude all of them as unreliable and inadmissible.

## II. BACKGROUND

Dr. Entner describes himself as a "telecom analyst." (Ex. 22[2] ("2023 Entner Rep.") ¶ 1.) Dr. Entner issued an initial expert report on January 9, 2023 and a supplemental report on October 15, 2024 in the *Csupo v Google* matter.[3] (*See* Ex. 23 ("2024 Entner Rep.").) Both are adopted and incorporated as his expert report in this matter. Dr. Entner is not an economist and confirmed in deposition that he is not offering expert opinions on damages, as discussed further below. (Ex. 25 ("2023 Entner Depo. Tr.") at 17:9-21.)

Dr. Jeffery Stec is an economist who holds a Ph.D. in economics and is the managing director of Berkeley Research Group. (Ex. 3 ("2024 Stec Rep.") ¶¶ 5, 8.) Dr. Stec has served as an

---

[2] All "Ex." references are to the exhibits attached to the Declaration of Max Bernstein.
[3] These reports were initially submitted in the parallel California state court action, *Csupo v. Google LLC*, No. 19CV352557 (Cal. Super. Ct. Mar. 7, 2025). They are adopted in full in this action. (*See* Ex. 24.)

Cooley LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

**GOOGLE'S MOTION TO EXCLUDE EXPERT
OPINIONS RE DAMAGES
CASE NO. 5:20-CV-07956-VKD**

expert witness in numerous cases, including on economic damages. (*Id.* ¶ 6.) Here, however, Dr. Stec played a limited role as he simply preformed arithmetic calculations to quantify supposed classwide damages. Dr. Stec was not asked to opine on the appropriate measure of fair market value or any other inputs to his damages calculations, relying instead on Dr. Entner. (*See* Ex. 15 ("2024 Stec Depo. Tr.") at 206:14-19 ("I wasn't asked to come up with fair market value estimates here. Nor was I asked to look into his estimates themselves and how he put those together. This was something that [Entner is] the expert on and that he did.").

**Plaintiffs' First Damages Methodology**: When Plaintiffs first moved for class certification in *Csupo*, Dr. Entner estimated the "average price" of cellular data by dividing total mobile industry revenue by the total amount of cellular data consumed in the United States, as reflected in data from the Cellular Telecommunications Industry Association ("CTIA").[4] (2023 Entner Rep. ¶ 75.) Plaintiffs used this "average price" as the single measure of "fair market value" of cellular data for all Android users, avoiding the need to grapple with the pricing and terms of individual plans. (*Id.* ¶¶ 19, 88.) Dr. Entner uses two different approaches for the numerators in his equation, depending on the applicable year. For years up to and including 2013, when CTIA reported more granular revenue information, Mr. Entner used a direct measure of cellular data revenue (he calls this the "disaggregated" approach). (*Id.* ¶¶ 21, 77-78.) For years after 2013, when CTIA combined revenue numbers for cellular data and voice services, Dr. Entner estimated cellular data revenue by applying certain assumptions (he calls this the "bundled" approach). (*Id.* ¶ 78.) As further discussed below, these assumptions are not disclosed in Dr. Entner's expert reports, but his depositions revealed they are entirely unfounded. Dr. Entner then takes a blended average of the two approaches to arrive at the "average price" of cellular data, which ranges from $7.60 in 2016 to $2.11 in 2023.[5] (2023 Entner Rep. ¶ 78; 2024 Entner Rep. ¶ 79.)

Plaintiffs' damages expert, Dr. Stec, then took these "average prices" and multiplied them by the estimated volume of cellular data allegedly consumed by the Challenged Transfers to arrive at what he labels "class-wide damages" of approximately ***$9.01 billion*** for the time period back to

---

[4] Dr. Entner calculates an "average price" for each year from 2006 to 2023.

[5] Dr. Entner's 2023 Report states that the number for 2016 is $7.59. The 2024 Report shows $7.61.

Cooley LLP
Attorneys at Law
San Francisco

4

Google's Motion to Exclude Expert
Opinions re Damages
Case No. 5:20-cv-07956-VKD

2010.[6] (2024 Stec Rep. ¶ 97, Table 41.) In performing these calculations, Dr. Stec relied solely on Dr. Entner and assumed that the "average price" numbers appropriately measure fair market value, without offering an independent expert opinion on this critical issue.  (*See* 2024 Stec Depo. Tr. at 37:3-39:19, 121:18-21, 203:16-19, 204:24-205:2, 206:14-19 ("I wasn't asked to come up with fair market value estimates here. Nor was I asked to look into his estimates themselves and how he put those together. This was something that [Entner is] the expert on and that he did."), 207:16-20 ("I wasn't asked to look into the fair market value, like I said.  I rely on Dr. Entner to do that.  And the appropriateness of the estimates that he comes up with are based on his analyses and opinions."), 213:23-214:1.)

**Google Fi theory**: In addition to the "average price" calculation, Dr. Entner's 2024 report refers to two additional measures of fair market value, which he added to his report "at the instruction of counsel." (2024 Entner Rep. ¶ 8.)

As background for the first new measure, Google has offered mobile data plans for Android devices, known as Google Fi, since 2018.[7] (*See* Ex. 26 ("Eichmann Decl.") ¶ 6.) Google Fi consists of different plans with different pricing structures. Under the Google Fi "Flexible" plan, users pay a set monthly amount for calls and texts and $10 per gigabyte for cellular data usage up to a specified data level—for example, the data level for a single user on the Flexible plan today is 6 GB. Any data usage above that level is ***not*** charged at $10/GB but is ***free***. In effect, the Flexible plan becomes an unlimited plan in the months when someone exceeds the data level. In the single user plan example, for instance, payments would be capped at $60 whether someone used six or ten (or more) GB in a month.[8] The $10/GB pricing thus applies to only a ***portion*** of someone's data usage under the Flexible plan.

Google also offers other Google Fi plans that provide unlimited cellular data for a set

---

[6] The certified class period in *Csupo* goes back only to 2016. Plaintiffs and Dr. Stec, however, are seeking damages going back to 2010.

[7] A predecessor to Google Fi, known as "Project Fi" was publicly available beginning in 2015 for certain Nexus and Pixel devices only. (Eichmann Decl. ¶¶ 4-5.)

[8] Under the Flexible Plan, when a user not only exceeds the 6GB data level but also exceeds 15GB of usage, their data speed is "throttled," or slowed down, until the following billing cycle. (*See* Eichmann Decl. ¶ 8.)

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5

GOOGLE'S MOTION TO EXCLUDE EXPERT
OPINIONS RE DAMAGES
CASE NO. 5:20-CV-07956-VKD

1    monthly amount; these are currently known as the Simply Unlimited and Unlimited Plus plans. The

2    $10/GB pricing that applies to part of the Flexible plan does not apply to these unlimited Google

3    Fi plans. (Eichmann Decl. ¶¶ 7-10.) Notably, Dr. Entner does not acknowledge these unlimited

4    Google Fi plans in his reports.

5    Focusing only on the Google Fi Flexible plan, Dr. Entner states that the $10/GB pricing

6    "may be used as an input in a damages calculation in this case" but provides no basis for that

7    conclusory assertion. (2024 Entner Rep. ¶ 33.) He offers no explanation, for example, as to how

8    the $10/GB term from the Flexible plan could appropriately measure fair market value for users

9    who never paid that amount because they were on a Google Fi unlimited plan or another carriers'

10    unlimited plan, or how a pricing term from the Flexible plan could have any relevance at all for

11    calculating damages in time periods when it did not yet exist.

12    Despite those glaring omissions in Dr. Entner's report, Dr. Stec takes the $10/GB price from

13    the Flexible plan at face value to calculate damages for *all* class members on *all* data plans for the

14    *entire time period* from 2010 to 2023. This results in total aggregate damages as high as ***$11.575***

15    ***billion*** (for the time period back to 2010). (2024 Stec Rep. ¶ 98, Table 42.)

16    **Overage penalty theory**: Plaintiffs' second new damages theory (the "overage penalty"

17    theory) is based on overage penalties that applied under certain data plans that Verizon, AT&T,

18    and T-Mobile offered starting in the mid-2010s. Specifically, Dr. Entner notes in his supplemental

19    report that these plans capped cellular data usage to a specified amount and imposed a penalty of

20    $15/GB (or sometimes more) for users who exceeded the cap. (2024 Entner Rep. ¶¶ 37-40.) Based

21    on those historical plan terms, Dr. Entner states: "I find that $15 per GB is a reasonable measure of

22    the highest price that a willing buyer would pay a willing seller for cellular data, since it is based

23    on the actual amount that buyers do pay for more gigabytes in the real world." (*Id*. ¶ 40 (emphasis

24    omitted).) Dr. Entner's report provides no other context for how the $15/GB overage penalty relates

25    to calculating damages in this case. He offers no insight, for example, on how the $15/GB penalty

26    could have any bearing on damages for users who were never on these old data plans and never

27    agreed to pay $15/GB as the "actual amount . . . for more gigabytes" for their data usage. (*Id*.)

28    In his deposition, Dr. Entner confirmed he has no estimate for how many users might still

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6

**GOOGLE'S MOTION TO EXCLUDE EXPERT
OPINIONS RE DAMAGES
CASE NO. 5:20-CV-07956-VKD**

1    be on these legacy data plans with overage penalties. (Ex. 27 ("2024 Entner Depo. Tr.") at 167:17-

2    169:8.) Regarding T-Mobile in particular, Dr. Entner acknowledged there are currently ***no*** active

3    users on a T-Mobile plan with overage penalties because T-Mobile stopped charging overages in

4    2014, over a decade ago. (*Id.* at 176:3-177:6; *see also* 2024 Entner Rep. ¶ 39.)

5         Despite Dr. Entner's admissions, Dr. Stec calculates damages by applying the $15/GB

6    penalty to *all* class members on *all* data plans for the *entire* period from 2010 to 2023. This results

7    in total aggregate damages as high as ***$17.363 billion*** for the overages penalty theory. (2024 Stec

8    Rep. ¶ 99, Table 43.)

9    **III.    LEGAL STANDARD**

10        Rule 702 of the Federal Rules of Evidence provides that a witness "who is qualified as an

11   expert by knowledge, skill, experience, training, or education may testify in the form of an opinion

12   or otherwise," if the proponent of the testimony "demonstrates that it is more likely than not" that:

13   (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to

14   understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts

15   or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's

16   opinion reflects a reliable application of the principles and methods to the facts of the case.

17   Reliability analysis "entails a preliminary assessment of whether the reasoning or methodology

18   underlying the testimony is scientifically valid and of whether that reasoning or methodology

19   properly can be applied to the facts in issue." *Leakas v. Monterey Bay Mil. Hous., LLC*, 2024 WL

20   495938, at *2 (N.D. Cal. Feb. 8, 2024) (DeMarchi, J.) (citing *Daubert*, 509 U.S. at 592-93).

21        "Rule 702 imposes a 'basic gatekeeping obligation' on district courts to 'ensure that any

22   and all scientific testimony'—including testimony based on 'technical[ ] or other specialized

23   knowledge'—'is not only relevant, but reliable.'" *Simpson Strong-Tie Co. Inc. v. MiTek Inc.*, 2023

24   WL 137478, at *2 (N.D. Cal. Jan. 9, 2023) (DeMarchi, J.) (quotation omitted). The proponent of

25   expert testimony has the burden of proving admissibility. *Goodell v. Soledad Unified Sch. Dist.*,

26   2021 WL 2533564, at *5 (N.D. Cal. June 21, 2021) (DeMarchi, J.) (citation omitted); *see also* Fed.

27   R. Evid. 702 advisory committee's note to 2000 amendment.

28        District courts should apply *Daubert* and Rule 702 standards at the class certification stage.

*See, e.g., Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 984 (9th Cir. 2020). However, at this stage, there is no jury to gatekeep and the judge is the sole arbiter, so "admissibility must not be dispositive." *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1006 (9th Cir. 2018). "Instead, an inquiry into the evidence's ultimate admissibility should go to the weight that evidence is given at the class certification stage." *Id.*

**IV.    ARGUMENT**

**A.    Dr. Entner Is Unqualified to Opine on Economic Damages.**

Under *Daubert*, in order for an expert opinion to be reliable, it must be grounded in "knowledge and experience of the relevant discipline." *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 813 (9th Cir. 2014); *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010), *as amended* (Apr. 27, 2010). Thus, "courts routinely exclude expert testimony where the expert's opinion is not within the scope of his expertise." *Surgical Instrument Serv. Co., Inc. v. Intuitive Surgical, Inc.*, 2024 WL 1975456, at *1 (N.D. Cal. Mar. 31, 2024); *Avila v. Willits Env't Remediation Tr.*, 633 F.3d 828, 839 (9th Cir. 2011) (affirming exclusion where expert did not have the "special training or knowledge" to reliably form some of his opinions).

Here, Dr. Entner is a telecom analyst; he is ***not*** an economist and does not purport to be one. (2023 Entner Rep. ¶¶ 1-17.) He has never been qualified as an expert on economic damages. (2023 Entner Depo. Tr. at 17:9-18:2.) When asked in his 2023 deposition whether he is qualified to offer opinions on damages issues in this case, he declined to directly answer and responded that he had not been asked to do so. (*Id*. at 18:3-19:8.) As Dr. Entner explained his limited assignment, he was asked to calculate the average "price per megabyte of cellular data" from industry sources, but not that these calculations could be used to measure damages in this case. (*Id*. at 17:9-18:2.) In his 2024 deposition, Mr. Entner reiterated: "As I stated before, I'm not an expert on damages or provide here testimony about damages." (2024 Entner Depo. Tr. at 96:18-21.)

While Dr. Entner's industry experience allows him to explain how the telecom industry tracks overall metrics on revenues and cellular data usage, he is unqualified to opine on whether the "average price" calculations derived from these metrics are an appropriate measure of fair market value from an economic or other perspective. Plaintiffs thus cannot offer Dr. Entner's

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

**GOOGLE'S MOTION TO EXCLUDE EXPERT
OPINIONS RE DAMAGES
CASE NO. 5:20-CV-07956-VKD**

reports to support their theory of classwide damages measured as the fair market value of cellular data consumed by the Challenged Transfers. *See, e.g.*, *Kimberlin v. Comm'r*, 128 T.C. 163, 171 (2007) (rejecting fair market value opinion of unqualified expert that was not an economist).

**B.    Dr. Entner's Average Price Per Megabyte Analysis Does Not Reliably Measure Classwide Damages for Multiple Reasons.**

Even if the Court were to look past Dr. Entner's lack of qualifications on economic damages, the substance of his report confirms his "average price" calculations are not a reliable measure of fair market value that can be applied to all proposed class members. As Dr. Entner described it, his "average price" calculation is a "simple equation: total revenue from wireless data, divided by total data consumption." (*See, e.g.*, 2023 Entner Rep. ¶¶ 19, 75, 79.) He does not cite any economic principle or other authority that suggests this "simple equation" is a valid measure of fair market value that can be applied to all consumers under all mobile data plans. (*See* Ex. 28 ("2025 Ghose Rep.") ¶¶ 52, 56.) And it is not, for multiple reasons.

**1.    Dr. Entner's "average price" calculation ignores massive variation in what individuals actually pay for their cellular data services.**

As Dr. Entner recognizes, "[m]obile service providers have hundreds, in some cases thousands, of active rate plans and permutations of these rate plans." (2023 Entner Rep. ¶ 63.) The prices consumers pay under these data plans span an immense spectrum. Looking at just Dr. Entner's 2024 report, he refers to (1) an "average price" of $2.11/GB for 2023[9], (2) "fixed wireless" plans currently priced at $50/month for unlimited data, with average usage of 450/GB per month[10], which corresponds to $0.11/GB per month, and (3) the Google Fi Flexible plan that charges $10/GB for certain levels of usage.[11] Those examples are just the tip of the iceberg in an industry that offers a host of different data plans that provide access to different cellular data networks with different bundles of services. (*See* 2025 Ghose Rep., Exs. B-1, B-2, B-3 (summarizing various data plans offered from 2017 to 2024).)

---

[9] (2024 Entner Rep., Figure 1-B.)

[10] The Entner 2024 Report refers to T-Mobile fixed wireless plans offered at https://www.t-mobile.com/home-internet/plans. The information at that URL includes a plan priced at $50/month for unlimited data. Dr. Entner further states that "the average T-Mobile customer used 450GB/month." (2024 Entner Rep. ¶ 28.)

[11] (2024 Entner Rep. ¶¶ 31-34.)

Cooley LLP
Attorneys at Law
San Francisco

9

Google's Motion to Exclude Expert
Opinions re Damages
Case No. 5:20-cv-07956-VKD

Even taking a single plan, the "average price" that someone pays for cellular data—based on Dr. Entner's "simple equation" of the dollar amount paid over the amount of cellular data consumed—will differ depending on the specific amount of data used in a given month. For example, the "average price" for someone whose plan offers 8 gigabytes of data in a month for $40 would be $5.00/GB—if they use exactly 8 gigabytes. (2025 Ghose Rep. ¶ 85.) But the same person with the exact same plan who uses 4 gigabytes of data the following month would have an effective "average price" of $10.00 per gigabyte. (*Id.*)

By taking Dr. Entner's "average price" calculations and applying them as a uniform measure of damages for everyone in the proposed class, Plaintiffs intentionally obscure this immense variation in what consumers actually pay under their particular data plans. That methodology would be the equivalent of determining the fair market value of a 2023 Toyota Corolla by looking at the average price of *all* models of *all* cars including the most expensive luxury models, which would be plainly wrong. Unsurprisingly, Dr. Entner offers no valid rationale for applying this approach to mobile data plans, beyond his conclusory assertion that cellular data allowances are "homogenous," "fungible" and a "commodity." (*See* 2024 Entner Rep. ¶ 12.) Dr. Entner is unqualified to offer expert opinions on those economic principles, however, as noted above. And even setting aside his lack of qualifications, the evidence shows unequivocally that mobile data plans are ***not*** priced in a "homogenous" way. (*See* 2025 Ghose Rep. Exs. B-1, B-2, B-3.) Indeed, Dr. Entner acknowledged that mobile carriers compete on not only price but service quality and bundled services like mobile hotspot and streaming television services. (*See, e.g.*, 2023 Entner Depo. Tr. at 88:2-89:2; 2024 Entner Rep. ¶¶ 25-26; *see also* 2025 Ghose Rep. ¶ 108-113.)

As for Dr. Stec, he simply takes Dr. Entner's "average price" calculations at face value to calculate classwide damages, without offering any expert opinion that doing so is appropriate from an economic or any other measure.  Indeed, Dr. Stec expressly disavowed offering any opinion of whether Dr. Entner's "average price" calculations can appropriately measure the fair market value of cellular data under different data plans. (2024 Stec Depo. Tr. at 37:3-39:19 ("Q. With respect to fair market value, are you offering any independent opinions about fair market value in this case, or are you relying on what Dr. Entner conveyed to you? A. I'm relying on what Dr. Entner

Cooley LLP
Attorneys at Law
San Francisco

10

Google's Motion to Exclude Expert
Opinions re Damages
Case No. 5:20-cv-07956-VKD

conveyed."), 121:18-21, 203:16-19, 204:24-205:2, 206:14-19, 207:16-20, 213:23-214:1.)

In sum, Plaintiffs' use of Dr. Entner's industry-wide "average price" as a purported classwide measure of damages is intentionally designed to obscure the fact that individuals pay vastly different "average prices" for cellular data services, and Dr. Entner offers no valid expert basis to support applying his calculations in this way. *Sentius Int'l, LLC v. Microsoft Corp.*, 2015 WL 451950, at *6 (N.D. Cal. Jan. 27, 2015) (excluding scientific opinion where expert "d[id] not address" the question that needed to be answered to establish damages); *Gutierrez v. Wells Fargo & Co.*, 2010 WL 1233810, at *8 (N.D. Cal. Mar. 26, 2010) (excluding expert's damages methodology where it had "no discernable (and hence, reliable) relation to the facts or theories" in the case).

### 2. Dr. Entner incorrectly measures the average price of all cellular data when the alleged property at issue is limited to the marginal units of cellular data consumed by the Challenged Transfers.

Dr. Entner's "average price" calculation should also be excluded because it measures *the wrong thing* by not addressing the alleged converted property in this case. The appropriate remedy for conversion must focus, of course, on the fair market value of the alleged converted property, not some other property. *See* Cal. Civ. Code 3336 (stating that conversion damages are presumed to be "[t]he value of the property at the time of the conversion"). Dr. Entner acknowledges as much. (2024 Entner Rep. ¶ 7 (citing Cal. Civ. Code 3336).) Here, the alleged converted "property" is limited to the incremental or marginal amount of cellular data consumed by the Challenged Transfers—not all of the cellular data Android users consume and specifically excluding any data used in connection with individuals' active use of their devices. *See* First Am. Compl. ¶¶ 35-37 (explaining that the case only addresses "passive" data transfers and "active transfers … are not at issue in this lawsuit.")

Dr. Entner's "average price" calculation, however, does not even attempt to calculate the value of these marginal units of cellular data, which are the only alleged property at issue in this case. Instead, he calculates the "average price" of *all* cellular data usage, including cellular data that Android users consume to download apps, watch videos, stream music, and all other types of active use that are beyond the scope of this case, by Plaintiffs' own characterization. (*See* 2023

Entner 2023 Rep. ¶ 75 (confirming that the "average price" calculation uses a denominator that includes **all** cellular data usage).) This disconnect alone renders Dr. Entner's method an unreliable measure of fair market value in this case.

This is not just a theoretical problem but one that inherently inflates damages in an unreliable way. Take for example someone on the T-Mobile plan described above who pays $85/month for unlimited data, and assume that 1) they expect to use 15.5 GB of cellular data for their own active use[12], and 2) the Challenged Transfers consume an additional .0138 GB of data[13] unbeknownst to them. The question for determining conversion damages in this example would be: what is the "highest price that a willing buyer would have paid to a willing seller" for the .0138 GB of marginal cellular data consumed by the Challenged Transfers? *See* CACI No. 2102 (setting forth definition of "fair market value" for conversion damages). For this user, who has already chosen to pay $85/month for **unlimited** data, the answer could well be zero. And the same applies for all Android users on unlimited plans, who comprise the great majority of the proposed class. (*See* 2023 Entner Rep. ¶ 54 (noting that unlimited plans comprised 90% of all plans as of 2019 and noting an upward trend).) Applying Dr. Entner's "average price" calculation to measure damages in these circumstances would thus result in an improper windfall—one that neither of Plaintiffs' experts attempts to justify.

Further, as a matter of basic economic principles, the "average price" calculated from *all units* of a good or service will generally exceed the price for *additional, marginal units* of the same good/service, and so Dr. Entner's "average price" calculation will necessarily overstate damages. Google's expert Dr. Aninyda Ghose explains these principles in detail, including multiple examples of data plans in which the price per GB decreases as the amount of cellular data under the plan increases as well as a rigorous regression model that quantifies the estimated difference in value between "average price" and the price for marginal units of cellular data (over a 93% difference).

---

[12] Per Dr. Entner, this is the average amount of cellular data usage in 2023. (2024 Entner Rep. ¶ 75, Figure 10-A.)

[13] Based on the sample of data analyzed by both sides' experts in this case, the average amount of cellular data consumed by the Challenged Transfers in a day is 0.46 MB. (*See* Ex. 13, 3/10/2025 Jeffay Rep. ¶ 189.) Extrapolated to a 30-day month and converted to GB, the number is .0138 GB per month.

Cooley LLP
Attorneys at Law
San Francisco

12

Google's Motion to Exclude Expert
Opinions re Damages
Case No. 5:20-cv-07956-VKD

(2025 Ghose Report ¶¶ 66-79, 141-154.) These findings are not only grounded in established economic principles, but also comport with common understanding of how goods and services are priced. Indeed, Dr. Stec acknowledged that the price of a good generally declines as consumers consume more of it. (*See* 2024 Stec Tr. at 260:7-261:1.) Using Dr. Entner's "average price" calculation to measure damages for the marginal units of data consumed by the Challenged Transfers runs directly counter to this principle, yet Plaintiffs' experts do not grapple with this issue at all.

> **3.    The "average price" measure inflates damages by including amounts users pay for bundled services.**

As explained above, Dr. Entner calculates the "average price" of cellular data under his "bundled" approach by reference to the "total service revenue" figures published by CTIA. (2023 Entner Rep. ¶ 75.) But, according to CTIA, this revenue number is not limited to revenue for cellular data services but includes all "prepaid and postpaid service charges, excluding revenues from the sale, lease, or rental of equipment, as well as taxes or mandate-related fees (*e.g.*, 911 or Universal Service fees)." (Ex. 29 at p. 39.) In other words, CTIA's revenue numbers include *all* "service charges," including revenues unrelated to cellular data, and exclude *only* charges related to equipment or taxes and mandated fees. CTIA is thus explicit that its revenue numbers *include* payments for non-cellular data services. (*Id.*)

Despite knowing this, Mr. Entner made no effort to determine what non-cellular data revenues are included in CTIA's revenue numbers or to try to account for them in some way. Notably, Mr. Entner recognizes that cellular carriers often bundle services distinct from cellular data services as part of their mobile data plans, such as streaming subscriptions (Disney+, ESPN+, etc.), cloud storage, hot spot allowances, etc. (*See, e.g.*, 2023 Entner Depo. Tr. at 88:2-89:2; 2025 Ghose Rep. ¶¶ 102-103.) Yet Dr. Entner admitted in his 2023 deposition that he did not investigate whether revenues associated with these services are included in CTIA's revenue figures. (*See, e.g.*, 2023 Entner Depo. Tr. at 40:5-11 ("Q: As part of your work in this case, Mr. Entner, did you investigate what other specific categories of revenues roll up into 'Total Service Revenues' beyond what we can read here in this list. A: No."); *id.* at 98:14-99:13 (similar).

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

13

GOOGLE'S MOTION TO EXCLUDE EXPERT
OPINIONS RE DAMAGES
CASE NO. 5:20-CV-07956-VKD

Because the revenue numbers Dr. Entner used are not tied directly to cellular data services alone but are also associated with additional bundled services, the resulting calculations of "average price" are necessarily inflated. Dr. Entner tries to diminish the impact of bundled services by describing them as mere "sweeteners … to get people to buy cellular data plans" and saying they are not reported "as a separate line item" of revenue. (2024 Entner Rep. ¶ 25.) But that is precisely the problem. Because bundled services like streaming services "get people to buy cellular data plans," a material portion of what consumers are paying for are the "sweeteners," not just the cellular data service aspect of a data plan alone. And because these bundled services are not reported as a "separate line item," there is no way to isolate the amount consumers pay for their cellular data service. Dr. Entner's "bundled" approach therefore relies on revenue numbers that are inflated in an amount he cannot quantify and do *not* reflect revenues associated solely with cellular data services. (2025 Ghose Rep. ¶ 103.)

### 4.    The "average price" calculations are further unreliable because they rely on undisclosed verbal discussions with unidentified individuals.

In general, an expert may offer an opinion based on information furnished by others only if the information is of a type reasonably relied upon by professionals in the relevant field. *Daubert*, 509 U.S. at 595; Fed. R. Evid. 703. An expert therefore cannot rely on undisclosed sources that make it impossible to effectively cross-examine the expert or test his or her results. *See La Canada Ventures, Inc. v. MDalgorithms, Inc.*, 2024 WL 3643082, at *9 (N.D. Cal. Aug. 2, 2024) (striking expert's opinion about a "reasonably expected return" on a marketing investment where the expert could not substantiate the assumption with any source); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (courts should not "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). Dr. Entner's "average price" calculations must be excluded under these standards because critical assumptions of his calculations are based on conversations that Dr. Entner only dimly recalls, with unidentified individuals who purportedly conveyed information he can no longer specify.

For example, one aspect of Dr. Entner's "average price" calculation under the "bundled approach" is a blanket assumption that revenue from cellular data services in a given year grows

Cooley LLP
ATTORNEYS AT LAW
SAN FRANCISCO

14

GOOGLE'S MOTION TO EXCLUDE EXPERT
OPINIONS RE DAMAGES
CASE NO. 5:20-cv-07956-VKD

by half the amount it grew in the previous year. (2025 Ghose Rep. ¶ 85; 2023 Entner Depo. Tr. at 152:10-154:9, 156:9-158:23.) But there is no basis for this assumption anywhere in Dr. Entner's report, which is itself grounds to strike Dr. Entner's calculations. Fed. R. Civ. P. 26(a)(2)(B)(ii) (requiring an expert's report to contain "the facts or data considered by the witness in forming" their opinions). At his 2023 deposition, all Dr. Entner could offer to support this critical assumption were vague references to undisclosed "guidance" he got from "conversations" over a decade ago in 2012 and 2013, with industry participants whose names he could not remember. (*See* 2023 Entner Depo. Tr. at 152:10-154:9, 156:9-158:23.)

As another example, Dr. Entner's calculation of "average price" utilizes as another important input an assumption of the amount of data the average consumer uses to send messages (*e.g.*, those sent in apps like iMessenger and WhatsApp) and subtracts that amount from the total amount of cellular data consumed (the denominator in Dr. Entner's "simple equation"). (2023 Entner Rep. ¶ 77.) In his 2024 deposition, Dr. Entner admitted he did not derive these amounts from any actual data but rather from his recollection of conversations he had with unknown individuals years ago. (2024 Entner Depo. Tr. at 75:8-22 (Q. "Okay. How did you come up with those estimates?" A. " . . . I use, then, those data points - - some of them are public, some are due to conversations - - to create these estimates.").) Again, Dr. Entner could not identify whom he spoke to, what they said, or provide any other foundation besides his *ipse dixit*. (*Id.* at 75:8-77:2.)

It gets worse. In Dr. Entner's 2024 deposition, it became clear these issues are even more widespread because he cannot recall the extent to which other parts of his report are based on these unknown conversations. (2024 Entner Depo. Tr. at 75:8-77:2 (Q. "What parts [of Entner's estimates of data usage] are based on conversations?" "A. I can't pinpoint the exact cell and number that is pinpointed from conversations." . . . Q. "You can't tell me as you sit here today right now which cells are based on conversations or not, because . . . you can't recall . . . back to 2014 or earlier; is that fair?" A. "That's fair.").) Dr. Entner's admissions thus confirm not only that critical parts of his "average price" calculations are based on unknown, untestable, and unreliable sources, but that there could well be more such problems woven into his results.

These opinions must be excluded because the reliability of Dr. Entner's sources cannot be

1    assessed in any meaningful way. For example, there is no way to know if the information Dr. Entner

2    used from his conversations had any scientific or empirical support or whether it was mere

3    speculation. And these issues cannot be cabined to specific aspects of Dr. Entner's calculations

4    because he cannot even say to what extent his calculations were based on this inherently unreliable

5    information. Thus, it is impossible for the Court and the parties to assess the reliability of ***any*** aspect

6    of Dr. Entner's "average price" calculations, and the Court should exclude them from evidence

7    given the inherent prejudice that would otherwise result to Google. *See Daubert*, 509 U.S. at 590

8    (expert opinion cannot be based on "subjective belief [and] unsupported speculation."); *Payan v.*

9    *Los Angeles Cmty. Coll. Dist.*, 2019 WL 8163479, at *3 (C.D. Cal. June 13, 2019) (quoting *Cabrera*

10   *v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998)) ("An opinion based on such unsubstantiated

11   and undocumented information is the antithesis of the scientifically reliable expert opinion

12   admissible under *Daubert* and Rule 702.").

13   **C.    Plaintiffs' New Theories Result in Absurd Results and Unjustified Windfalls.**

14          Plaintiffs' additional damages theories based on the Google Fi Flexible plan and data

15   overage penalties, as described above, also suffer from fatal defects and should be excluded from

16   evidence. Indeed, these additional theories of classwide damages are absurd on their face—they are

17   the equivalent of saying the fair market value of all models or all cars from all manufacturers can

18   be measured by the price of one or a small handful of cars priced far above the average, like a Tesla

19   Cybertruck. Below are just some examples of the inexplicable outcomes of the additional theories:

20   - Under the Google Fi theory, an individual who signed up for the Google Fi Unlimited Plus plan would still have damages measured by the Flexible plan's $10/GB term—even though they actually pay only $1.30/GB for up to 50 GB of high speed data and have an unlimited data allowance overall. (See 2025 Ghose Rep. ¶ 136.) And this same windfall applies to all other individuals on other unlimited plans, who comprise the great majority of the class by Plaintiffs' own account. (See 2023 Entner Rep. ¶ 54 (estimating that 90% of consumers were on unlimited plans as of 2019); *see also* 2025 Ghose Rep. ¶ 50 (estimating that between 80-97% of class members had unlimited data plans).)

25   - Under the Google Fi theory, Dr. Stec applies the $10/GB term to calculate damages for time periods when Google Fi did not even exist. For example, Dr. Stec applies the $10/GB term as damages for all class members in 2010-2014, when no version of Google Fi existed, and in 2015-2017, when Project Fi (the predecessor to Google Fi) was only available to users of Nexus and Pixel devices.

28   - Under the overage penalty theory, a class member who switched from a T-Mobile

Cooley LLP
Attorneys at Law
San Francisco

16

Google's Motion to Exclude Expert
Opinions re Damages
Case No. 5:20-cv-07956-VKD

plan with a $15/GB overage penalty in 2014 (the last year T-Mobile had such plans) to a plan with unlimited data would still have damages measured at $15/GB even though they were last subject to overage penalties over a decade ago. (2024 Entner Rep. ¶ 39.) And this same result would apply even for individuals who were never on any plan with overage penalties.

- In both the Google Fi and overage penalty theories, Dr. Stec uses the $10/GB and $15/GB valuations (respectively) as fixed amounts to calculate damages throughout the 15-year span from 2010 to the present with no adjustments of any kind—even though Dr. Entner opines that the average price of cellular data declined dramatically over this span from $77.62 in 2010 to $2.11 in 2023. (2024 Entner Rep. ¶ 79, Figure 1-A.) Indeed, CTIA—the industry group Dr. Entner relies on for his "average price" calculations—recently observed that mobile data costs have decreased by 97% over the last decade. (2025 Ghose Rep. ¶ 132.)

The Court need look no further than the results above to see that these damages theories are unreliable and untenable on their face. *See Gen. Elec. Co.*, 522 U.S. at 146 (expert opinion must be excluded where there is "simply too great an analytical gap between the data and the opinion proffered"); *ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*, 648 F. App'x 609, 614 (9th Cir. 2016) (holding that the trial court properly excluded expert opinion based on a "wholly subjective methodology"); *Klein v. Meta Platforms, Inc.*, 2025 WL 489871, at *5 (N.D. Cal. Feb. 13, 2025) (excluding economist's opinions and denying class certification where economic principles were not applied to the facts of the case).

### 1. Plaintiffs' experts point the finger at each other and neither actually opines that the new damages theories are reliable measures of damages.

Worse, Plaintiffs' experts actually *disclaim* offering any expert opinion that classwide damages can be measured in these absurd ways. Indeed, Dr. Entner acknowledged he is not serving as an expert on economic damages at all. (2024 Entner Depo. Tr. at 135:3-7; *id.* at 238:16-23 ("Mr. Stec is the damages expert, not me."), 96:18-20 ("As I stated before, I'm not an expert on damages or provide here testimony about damages.").) Consistent with that disclaimer, Dr. Entner's report simply notes basic facts about Google Fi and overage penalties, and states in perfunctory terms that they are "different measures for pricing" that could be "reliable alternative inputs for a damages calculation." (2024 Entner Rep. ¶ 8.) Beyond that conclusory assertion, Dr. Entner offers no context on *how* these "measures for pricing" can be used as reliable inputs for classwide damages.[14]

---

[14] Because Dr. Entner does little more than read and refer to publicly available materials about Google Fi and overage penalties his conclusory opinion does not assist the jury, because the jury is

Cooley LLP
Attorneys at Law
San Francisco

17

GOOGLE'S MOTION TO EXCLUDE EXPERT
OPINIONS RE DAMAGES
CASE NO. 5:20-CV-07956-VKD

For example, Dr. Entner's report notably does not explain (1) how the $10/GB term from the Google Fi Flexible plan could reliably measure damages for individuals who never signed up for that plan and were on unlimited plans in which they effectively paid far less for data, (2) how $15/GB overage penalties under certain legacy plans could be a "reliable alternative input[]" for measuring damages for individuals who were never on those plans and never agreed to pay an overage penalty in any amount, let alone $15/GB, or (3) why these "measures of pricing" could be applied as a constant, unchanging measure of damages for the 15-year span for which Dr. Stec calculates damages. Nor did Dr. Entner provide any direct guidance outside of his report to Dr. Stec on these or any other issues relating to how Google Fi and overage penalties should factor into Dr. Stec's damages calculations. (*See* 2024 Entner Depo. Tr. at 238:16-18 ("I'm not in communication with Dr. Stec. I'm not giving him instructions.").)

Given Dr. Entner's failure to address these key issues, the Court might assume they were addressed by Dr. Stec, a highly experienced expert who is well qualified to opine on damages issues. But Dr. Stec's expert report contains zero analysis of the Google Fi and overage penalty theories, and he ***disavows*** offering any expert opinion that these new damages theories are reliable measures of classwide damages, deflecting entirely to Dr. Entner. Indeed, Dr. Stec confirmed in deposition that he is not offering any expert opinion (1) that $10/GB or $15/GB are reliable measures of fair market value,[15] (2) that it is appropriate to use the pricing terms from one specific plan to measure fair market value of other plans,[16] (3) that it is appropriate to apply Google Fi pricing terms to measure damages for individuals under different plan types,[17] (4) that the $10/GB term of Google Fi Flexible plan has any relevance to determining fair market value of data under

---

well equipped on its own "to determine intelligently and to the best possible degree" what these terms mean. *See Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1040–41 (9th Cir. 2010); Fed. R. Evid. 702 advisory committee's note.

[15] (2024 Stec Depo. Tr. at 206:14-19 ("I wasn't asked to come up with fair market value estimates here . . . Nor was I asked to look into his estimates themselves and how he put those together. This was something that he's the expert on and that he did."), 207:16-20 ("So I wasn't asked to look into fair market value, like I said. I rely on Dr. Entner to do that.").)

[16] *Id.* at 207:11-20.

[17] *Id.* at 203:8-19.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18

GOOGLE'S MOTION TO EXCLUDE EXPERT
OPINIONS RE DAMAGES
CASE NO. 5:20-CV-07956-VKD

1    unlimited plans,[18] (5) that overage penalties are relevant to calculating classwide damages,

2    including for individuals on unlimited plans,[19] or (6) that the $10/GB and $15/GB amounts can be

3    applied as a constant measure of damages with no adjustment over time.[20]

4         Rather than addressing those fundamental issues in his report, Dr. Stec simply takes the

5    $10/GB and $15/GB amounts from Dr. Entner at face value to calculate damages for all class

6    members under all mobile data plans for the entire period from 2010 to 2023, with no explanation

7    for how that result could possibly make sense from an economic (or any other) perspective. The

8    result is a massive increase in purported damages that ***neither Dr. Stec nor Dr. Entner actually***

9    ***opines is a valid measure of classwide damages***. Indeed, both experts actively avoid taking any

10   ownership or accountability for the new damages theories by deflecting to the other, which is itself

11   telling. Under these circumstances, the Court should strike both Dr. Entner's undeveloped

12   observations about Google Fi and overage penalties as well as Dr. Stec's damages calculations that

13   rely entirely on those observations. *See San Francisco Baykeeper v. City of Sunnyvale*, 627 F. Supp.

14   3d 1085, 1100 (N.D. Cal. 2022) (excluding expert's opinions where they were based on the

15   unreliable opinions of another expert); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2017 WL

16   10434367, at *2 (N.D. Cal. Jan. 23, 2017) ("Where an expert bases her opinion on – or simply

17   repeats – the unreliable opinion of another expert, a district court may properly exclude the first

18   expert's testimony."); *Goodell*, 2021 WL 2533564, at *6 (N.D. Cal. June 21, 2021) ("[A]n expert

19   can appropriately rely on the opinions of others if other evidence supports [her] opinion and the

20   record demonstrates that the expert conducted an independent evaluation of that evidence.")

21        **2.    Plaintiffs' new theories are based on a misunderstanding of fair market**
            **value that conflicts with the law and basic economic principles.**
22

23        While Dr. Entner's report does not explain how the $10/GB and $15/GB measures could be

24   used as reliable measures of classwide damages, his deposition testimony confirmed his conclusory

25   assertions (as incomplete as they are) are grounded in a hyper-literal interpretation of California

26   law that is untenable. Specifically, Dr. Entner's report attempts to apply Judicial Council of

27   _____
     [18] *Id.* at 204:17-205:2.
28   [19] *Id.* at 214:15-21, 219:10-221:3.
     [20] *Id.* at 228:4-19, 233:7-25, 236:20-237:2.

California Civil Jury Instructions (CACI) 2102, which provides that conversion damages are based on the converted property's "fair market value," which in turn is defined as the "highest price that a willing buyer would have paid to a willing seller" for the property. *See* CACI No. 2102.

This standard of fair market value does not depend, of course, on the subjective views of particular individuals who may be outliers in how they value particular property. For example, in *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, 2020 WL 13228418, at *2 (N.D. Cal. Feb. 21, 2020), the court considered an analogous jury instruction (CACI No. 1923) that also defines "fair market value" as the "highest price that a willing buyer would have paid . . . to a willing seller" and explained: "[t]he instruction speaks in terms of a *generic buyer*, paying the price determined by *the market as a whole*." *Id*. (emphasis added). Further, "fair market value" is "not how much a *particular individual* would have paid," because it is intended to be an objective measure. *Id*. at *1 (emphasis added). (*See also* 2025 Ghose Rep. ¶¶ 104-113 (explaining that Dr. Entner's notion of fair market value concept misunderstands basic economic principles by focusing only the "willing buyer" and ignoring the "willing seller" component, which leads to a prevailing market price for a good).)

Dr. Entner, however, applies an extreme interpretation of CACI 2102 in which fair market value can be determined by the "highest price" that even a single person might be "willing to pay." For example, Dr. Entner claimed that his $10/GB and $15/GB measures are "conservative" (even though they massively increase damages as compared to his "average price" calculation) because some historical plans had even higher pricing, as high as $40/GB or more. (2024 Entner Depo. Tr. at 244:8-22.) When asked if he believes the fair market value of cellular data can be "based on a plan like $40 per gigabyte because some small number of people paid that amount many years ago," he confirmed "[y]es." (*Id*. at 245:9-15). And when pressed on why historical overage penalties could be a relevant measure of "the fair market value of cellular today in 2024" for "people on unlimited plans," Dr. Entner answered that any price is relevant to determining fair market value so long as there is "[a]t least one" person willing to pay it. (*Id*. at 247:3-14; *see also id*. at 248:25-249:3 (Q. "So in your view, the application of that jury instruction [CACI 2102] can be based on a single person willing to pay some amount?"; A. "That is my impression.").)

Cooley LLP
Attorneys at Law
San Francisco

20

Google's Motion to Exclude Expert
Opinions re Damages
Case No. 5:20-cv-07956-VKD

This testimony confirms the additional damages theories are premised on a mistaken and incoherent application of CACI 2102, which provides additional ground for the Court to reject the new damages theories. *See Werdebaugh v. Blue Diamond Growers*, 2014 WL 2191901, at *22 (N.D. Cal. May 23, 2014) (excluding expert opinions at class certification on damages where the model proffered was "not the proper measure of damages").[21]

### 3. Even taken at face value, the new damages theories cannot be applied as a reliable measure of classwide damages.

Plaintiffs' new damages theories should be excluded for all the reasons above, but even accepting them at face value, they cannot be applied as reliable ***classwide*** measures by Dr. Entner's own admission. As Dr. Entner applies it, the "highest price a willing buyer would have paid" concept of CACI 2102 does not generate a single fair market value that could be used to broadly measure classwide damages. Rather, it generates a virtually limitless array of *different* fair market values for cellular data *even under a single data plan for a single user*. For example, Dr. Entner testified that the Google Fi Flexible plan's $10/GB term measures the "highest price" *only* for individuals who are on that particular plan and do *not exceed their initial data allotment*. (2024 Entner Depo. Tr. at 104:19-105:3; 105:18-106:16 (Q. "So your opinion relates to individuals who sign up for a plan like this and stay under the data cap level, correct?" A. "Yeah. Yes.").) The Google Fi theory therefore does *not* apply to individuals who are on different plans, and even for those on the Flexible plan, it would not apply to individuals whose use *exceeds* the data cap in a given month. (*See id*. at 105:18-106:10.) For Google Fi unlimited plans that do not have the $10/GB term, Dr. Entner further acknowledged that the "highest amount that a willing buyer would be willing to pay" for data under those plans will vary "depending on the usage." (*Id.* at 114:10-115:1.)

As for the overage penalty theory, Dr. Entner similarly testified that this measure also is not fixed but varies depending on a user's individual circumstances. (*Id.* at 145:14-147:18.) Specifically, Dr. Entner conceded that, for users on such plans who did *not* exceed their data caps

---

[21] In fact, Dr. Stec acknowledges that the fair market value of a given good or service should generally be a *single* price (2024 Stec Depo. Tr. at 221:12-24), not multiple prices based on the subjective views of individuals.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

21

GOOGLE'S MOTION TO EXCLUDE EXPERT
OPINIONS RE DAMAGES
CASE NO. 5:20-CV-07956-VKD

and did *not* pay a $15 per gigabyte overage penalty, the "highest price" those users are "willing to pay" would be different (lower) than the $15 per gigabyte amount, and the specific amount would depend on the particular terms of their plan. (*Id.* at 147:19-151:25.) As Dr. Entner ultimately conceded, determining the "amount that somebody's willing to pay depends on the plan terms and their amount of data usage." (*Id.* at 151:21-25.) These admissions alone gut Plaintiffs' attempt to apply the Google Fi theory as a reliable classwide measure of damages for all class members.

## V.    CONCLUSION

For the foregoing reasons, the Court should strike (1) Dr. Entner's "average price" calculations and all classwide damages estimates that Dr. Stec derives based on those calculations, and (2) all of Dr. Entner's and Dr. Stec's opinions regarding the new Google Fi and overage penalty damages theories, including all of Dr. Stec's quantifications of purported classwide damages under these theories.

Dated: March 11, 2025                         COOLEY LLP


                                              By: */s/ Whitty Somvichian*
                                                  Whitty Somvichian

                                              Attorneys for Defendant
                                              GOOGLE LLC