# EXHIBIT A

Filed
May 27, 2025
Clerk of the Court
Superior Court of CA
County of Santa Clara
19CV352557
By: MJacobo

**UNREDACTED ORDER**

SUPERIOR COURT, STATE OF CALIFORNIA

COUNTY OF SANTA CLARA

ORDER ON SUBMITTED MATTER

| | |
|---|---|
| ATILLA CSUPO, et al., individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>GOOGLE LLC,<br><br>    Defendant. | Case No.: 19CV352557<br><br>ORDER:<br><br>(1) DENYING PLAINTIFFS' MOTION TO EXCLUDE DEFENDANT'S EXPERT TESTIMONY;<br><br>(2) DENYING DEFENDANT'S MOTION TO EXCLUDE EXPERT OPINIONS REGARDING DAMAGES:<br><br>(3) DENYING DEFENDANT'S MOTION TO EXCLUDE ANALYSIS OF NETWORK USAGE DATA; AND<br><br>(4) DEFERRING PLAINTIFFS' MOTION O EXCLUDE SURPRISE WITNESSES<br><br>Dept. 7 |

  This unredacted order is filed under seal. However, the Court intends to file the unredacted order on June 2, 2025 unless the parties, no later than 5:00 p.m. on May 30, 2024, submit by email to Department7@scscourt.org a joint proposed redacted version, or separate versions for the Court to consider.

ORDER DENYING PLAINTIFFS' MOTION TO EXCLUDE DEFENDANT'S EXPERT
TESTIMONY ET AL.

1

This is a putative class action for conversion and quantum meruit, brought by plaintiffs Attila Csupo, Andrew Burke, and Kerry Hecht (collectively, "Plaintiffs"), individually and on behalf of others similarly situated, alleging that defendant Alphabet, Inc.'s ("Google") Android operating system and mobile phone applications passively transfer data using class members' cellular data allowances without their consent.

Before the Court is (1) Plaintiffs' motion to exclude Google's expert testimony; (2) Google's motion to exclude expert opinions regarding damages; (3) Google's motion to exclude analysis of network usage data; and (4) Plaintiffs' motion to exclude surprise witnesses, which are all opposed.

For reasons stated below, Plaintiffs' motion to exclude Google's expert testimony is DENIED; Google's motion to exclude Plaintiffs' expert opinions regarding damages is DENIED; Google's motion to exclude Plaintiffs' expert witnesses' analysis of usage data is DENIED; and Plaintiffs' motion to exclude Google's witnesses is DEFERRED.

## I.      BACKGROUND

The operative fourth amended complaint ("4AC") alleges Google used cellular data allowances purchased by Plaintiffs for its own benefit.  (4AC, ¶¶ 1, 23.)  To use their mobile devices, Google Android phones, Plaintiffs contracted with mobile carriers and purchased cellular data plans that provided them with data allowances.  (4AC, ¶ 24.)  According to the allegations, the purchase of these data plans creates a property interest for Plaintiffs in their cellular data allowances.  (4AC, ¶ 27.)

While Plaintiffs' Android devices were not in use, Google's Android technology was appropriating cellular data paid for by Plaintiffs without their knowledge or consent.  (4AC, ¶¶ 2, 4, 39.) These "'passive'" information transfers[1] occur because Google programmed its Android

---

[1] Plaintiffs' define these "passive transfers" as "information transfers that occur in the background and which do not result from Plaintiffs' direct engagement with Google products on their device.  (4AC, ¶ 31.)

operating system and Google applications to cause mobile devices to exchange large amounts of information with Google, which Google then uses to further its own corporate interests, including targeted digital advertising.  (*Ibid.*)  This data transfer was taking place at all hours of the day, even after Plaintiff's had closed Google apps.  (*Ibid.*)  Further, Google has designed its products to prevent users from changing the settings to disable these transfers completely or to restrict them to WiFi networks.  (4AC, ¶ 3.)

Google has crafted its terms of service and policies in ways that create binding contracts with users of its technologies but none of Google's terms or policies alert users that Android devices will consume their cellular data allowances in order to exchange information that is not required to provide the user with full functionality of the mobile device.  (4AC, ¶¶ 4, 33-36.)

By transferring user's data, Google is wrongfully interfering with Plaintiffs' property, including their cellular data allowances.  (4AC, ¶ 5.)  In addition to misappropriating Plaintiffs' property, the data transfers confer a valuable benefit to Google because it sends and receives information without bearing the cost of transferring that information between consumers and Google which supports Google's product development and targeted advertising business.  (4AC, ¶ 7.)

On February 1, 2022, Plaintiffs filed their 4AC, asserting two counts for: (1) conversion; and (2) quantum meruit.  Thereafter, Google filed a motion for summary judgment or summary adjudication, motion to decertify class, and a motion to seal.  Plaintiffs opposed the motion. Plaintiffs filed a motion to add classwide transfer, which was also opposed by Google.  On May 2, 2025, the Court issued its order denying summary judgment as to the first cause of action for conversion; granting it as to the second cause of action for quantum meruit; granting the motion to seal, in part and denying in part.  On May 12, 2025, the Court issued its order denying Google's motion to decertify; and granting Plaintiffs' motion to add classwide transfers.

The Court addresses each of the parties' motions below.

ORDER DENYING PLAINTIFFS' MOTION TO EXCLUDE DEFENDANT'S EXPERT TESTIMONY ET AL.

3

## II.    PLAINTIFFS' MOTION TO EXCLUDE GOOGLE'S EXPERT TESTIMONY

Plaintiffs move to exclude the testimony of Dr. Anindya Ghose ("Dr. Ghose") and Dr. Kevin Jeffay ("Dr. Jeffay") with regard to standards of harm.

### A.  Legal Standard

"Under California law, trial courts have a substantial 'gatekeeping' responsibility." (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 769 (*Sargon*).) "[U]nder Evidence Code sections 801, subdivision (b), and 802, the trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative. Other provisions of law, including decisional law, may also provide reasons for excluding expert opinion testimony." (*Id.* at pp. 771-772.) Critically, a court "must also be *cautious* in excluding expert testimony. The trial court's gatekeeping role does not involve choosing between competing expert opinions …. The gatekeeper's focus must be solely on principles and methodology, *not* on the *conclusions* they generate." (*Ibid.*) As *Sargon* further explained:

The trial court's preliminary determination whether the expert opinion is founded on sound logic *is not a decision on its persuasiveness*. The court must not weigh an opinion's probative value or substitute its own opinion for the expert's opinion. Rather, the court must simply determine whether the matter relied on can provide *a reasonable basis for the opinion* or whether that opinion is based on *a leap of logic or conjecture. The court does not resolve scientific controversies*. Rather, it conducts a 'circumscribed inquiry' to 'determine whether, as a matter of logic, the studies and other information cited by experts adequately support the conclusion that the expert's general theory or technique is valid. The 'goal of trial court gatekeeping is simply to exclude '*clearly* invalid and unreliable' expert opinion. In short, the

ORDER DENYING PLAINTIFFS' MOTION TO EXCLUDE DEFENDANT'S EXPERT TESTIMONY ET AL.

4

gatekeeper's role 'is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom *the same level of intellectual rigor that characterizes the practice of an expert in the relevant field*.

(*Sargon*, 55 Cal.4th at 772 [emphasis added].)

With the foregoing in mind, the Court turns to Plaintiffs' motion.

**B. Discussion**

Plaintiffs contend Google's experts improperly offer opinions about the law and apply the wrong legal standard.

**1. Dr. Ghose[2]**

Plaintiffs argue Dr. Ghose acknowledges the standard of law for damages but makes legal and policy arguments that the controlling legal standard for damages in the jury instructions is incorrect, improper, and irrelevant. (Motion, p. 6:25-28; p. 7:1-19.) They further argue that Dr. Ghose offers several opinions that contradict settled California law with regard to damages for conversions and applies opinions as to what an "economically appropriate" measure for damages should be rather than applying well-established law. (Motion, p. 7:23-27.) In opposition, Google argues that Dr. Ghose rebuts Plaintiffs' damages claims, he opines that Dr. Entner calculated the FMV of the wrong alleged property, and Plaintiffs seek to strike the portions which provide additional context for his opinion. (Google's Opposition ("Opp."), p. 3:14-23.) Google further argues that Dr. Ghose calculated the FMV of marginal units because Dr. Roger Entner only calculated an "average price" for all cellular data—thus, his calculation was meant to address the gap in Dr. Entner's analysis. (Opp., p. 5:1-3.)

Dr. Ghose's Report contains his opinions from an economic perspective, rather than offering legal conclusions. (See Dr. Ghose Rpt., ¶¶ 27-31, 47-50.) Additionally, he offers

---

[2] Dr. Ghose is the Chair Professor of Business and New York University's School of Business and his academic research focuses on the economic consequences of the internet and mobile technologies on industries, firms, and markets. (Dr. Ghose Report, ¶¶ 1-2.)

ORDER DENYING PLAINTIFFS' MOTION TO EXCLUDE DEFENDANT'S EXPERT TESTIMONY ET AL.

5

rebuttals to Dr. Entner's opinions.  (See Dr. Ghose Rpt., ¶¶ 37-39.)  Dr. Ghose also provides

calculations regarding the marginal data used, which he purports was not addressed by Dr.

Entner.  (See Dr. Ghose Rpt., ¶¶ 42-46.)  Moreover, the Court's review of Dr. Ghose's Report

shows that he does not opine on the jury instructions themselves, but on *Dr. Entner's*

*interpretation* of the jury instructions.  (See Dr. Ghose Rpt., ¶¶ 98-102.)[3]  Lastly, paragraphs

122-138 pertain to Dr. Ghose rebuttal to Dr. Entner's proposed methodology.  (See Dr. Ghose

Rpt., ¶¶ 122-138.)  Therefore, the Court finds that Dr. Ghose does not improperly offer opinions

of law or regarding the jury instructions.  Thus, Plaintiffs' motion to exclude Dr. Ghose's expert

testimony is DENIED.

### 2.  Dr. Jeffay[4]

Plaintiffs argue Dr. Jeffay offers legal opinions which invade the province of this Court

to instruct the jury, and the province of the jury to apply such instructions to the facts.  (Motion,

p. 10:13-15.)  They further argue that he opines "there is no sense in which a user with an

unlimited cellular data plan is injured by software on their phone using their plan to send

network transfers," which constitutes an improper legal opinion."  (Motion, p. 10:18-20.)

Google argues that Dr. Jeffay provides technical expert opinions regarding Plaintiffs' theory of

harm.  (Opp., 14:7-8.)  Paragraph 42 pertains Dr. Jeffay's disagreement with Plaintiffs' expert's

reports and explicitly responds as a "matter of computer science."  (See Dr. Jeffay Rpt., ¶ 42.)

Dr. Jeffay's conclusion that there is no injury is grounded in his opinion that the transfers are

industry-standard practices and his disagreement with Plaintiffs' experts' conclusions.  (See Dr.

---

[3] Dr. Ghose specifically states, "I am no legal scholar and am not offer a legal opinion about the California jury instruction, but *from an economic perspective,* Dr. Entner's interpretations of Fair Market Value makes no sense and are invalid in the context of economic damages for several reasons."  (Dr. Ghose Rpt., ¶ 99 [emphasis added].)

[4] Dr. Jeffay is a professor of Computer Science at the University of North Carolina, Chapel Hill and he has nearly 40 years of experience in the research and development of networked computing systems.  (Dr. Jeffay Report, ¶¶ 3, 5.)

Jeffay Rpt., ¶¶ 20, 26, 39-43.)  Therefore, it does not appear to the Court that Dr. Jeffay improperly offers legal opinions.  Thus, Plaintiffs' motion to exclude Dr. Jeffay's expert testimony is DENIED.

Accordingly, Plaintiffs' motion to exclude Google's expert testimony is DENIED.

## III.    GOOGLE'S MOTION TO EXCLUDE EXPERT OPINIONS REGARDING DAMAGES

Google argues Plaintiffs' experts Dr. Entner and Dr. Jeffrey Stec ("Dr. Stec") on damages issues should be excluded as unreliable and inadmissible.

### A.  Discussion

As background, Google states when Plaintiffs first moved for class certification, Dr. Entner calculated the "average price" of cellular data using aggregate data covering all consumers and all mobile data plans, which Plaintiffs used as the measure of "fair market value" ("FMV") of cellular data for the entire class.  (Motion, p. 5:8-12.)  On the other hand, Google Fi consists of different plans with different pricing structures and Google contends Dr. Entner states the $10/GB pricing "may be used as an input in a damages calculation in this case" without explanation.  (Motion, p. 6:1-15.)  Plaintiffs also assert an overage penalty theory, which is based on overage penalties that applied under certain data plans that Verizon, AT&T, and T-Mobile offered starting in the mid-2010s.  (Motion, p. 6:25-7:1.)

Google argues that despite the reports by Dr. Entner and Dr. Stec, there is no expert opinion that justifies the resulting damage calculations, which massively inflates Google's exposure and confers unjustified windfalls to large swaths of the proposed class.  (Motion, p. 4:21-23.)  Google further argues Plaintiffs' new theories would bring absurd results and unjustified windfalls.  (Motion, p. 8:5.)  It provides the following examples of purportedly inexplicable outcomes:

- Under the Google Fi theory, an individual who chose not to pay for the flexible plan and instead signed up for the unlimited plan would still have damages measured by the Flexible $10/GB term, even if they paid much less and this applies to individuals on other unlimited plans, which is much of the class. (Motion, p. 8:13-17);

- Under the overage penalty theory, a class member who switched from a T-Mobile plan with a $15/GB overage penalty in 2014 (the last year T-Mobile has such plans) to an unlimited plan would still have damages measured at $15/GB even though they were last subject to overage penalties over a decade ago. (Motion, p. 8:21-23);

- In both of the aforementioned theories, Dr. Stec used $15/GB and $10/GB as fixed amounts to calculate damages through the 15-year span from 2010 to the present without adjustments of any kind, despite Dr. Entner's opinion that the average price of cellular data dramatically declined. (Motion, p. 8:24-28.)

Based on the foregoing, Google argues that the results do not make sense from a legal or economic sense, on their face. In opposition, Plaintiffs argue their alternative inputs are valid measures of the fair market value of cellular data in California. (Plaintiffs' Opposition ("Opp."), p. 14:16-18.) Plaintiffs rely on Civil Code section 3336, which provides, "the detriment caused by the wrongful conversion of personal property is presumed to be: First—the value of the property at the time of the conversion, with the interest from that time, or, an amount sufficient to indemnify the party injured for the loss which is the natural, reasonable and proximate result of the wrongful act complained of and which a proper degree of prudence on his part would not have averted; and Second—a fair compensation for the time and money properly expended in pursuit of the property." (Civ. Code, § 3336.) Thus, both theories are calculated pursuant to CACI No. 2102, which defines FMV as "the highest price that a willing buyer would have paid to a willing seller, assuming" that "there is no pressure on either one to buy or sell" and that "the buyer and seller knew all the uses and purposes for which the [property] is reasonably capable of

being used." (CACI No. 2102.)  Therefore, it appears there is a reasonable basis for the calculations.

Next, Google argues that Dr. Entner does not offer any context as to how the damages can be established on a classwide basis.  (Motion, p. 9:18-19.)  Moreover, Dr. Stec does not offer any expert opinion as to the new damage theories and simply accepts the values from Dr. Entner without addressing how the results could make sense from an economic perspective.  (Motion, p. 10:5-19.)  In opposition, Plaintiffs direct the Court to its order regarding the parties' expert exclusion motions, filed on October 26, 2023, which the Court denied the motions to exclude certain expert opinions.  With regard to the relationship between Dr. Entner and Dr. Stec, the Court found Dr. Entner qualified to offer his opinion regarding the fair market value of cellular data during and leading up to the proposed class period and stating, "[h]e is not purporting to calculate damages—that is Dr. Stec's job.  All Dr. Entner is doing is providing inputs for Dr. Stec's work.  As for those 'inputs,' whether the average price or the marginal price is the correct measure of fair market value is *a quintessential merits question*.  Google has not shown that Dr. Entner's choice to use average price was so far out of bounds or something so foreign to the industry that exclusion of his opinion is justified." (October 26, 2023 Order, p. 8:6-15 [emphasis added].)  However, the Court notes that Plaintiffs' new damages theories were not before it at that time.

With regard to Dr. Stec, the Court stated "an expert can rely upon information from other experts if the opposing party can investigate that information adequately and such information is typically relied in that expert's field.  That is true here: Google was able to cross-examine Dr. Schmidt and Dr. Entner, and economists preparing damages estimates often rely upon work of other experts.  Therefore, the Court sees no problem with Dr. Stec relying on these other experts' work.  (*Id*. at p. 8:21-25.)  Here, it appears Google had the opportunity to cross-examine Dr. Entner and Dr. Stec.

ORDER DENYING PLAINTIFFS' MOTION TO EXCLUDE DEFENDANT'S EXPERT TESTIMONY ET AL.

9

Plaintiffs also argue that whatever the jury determines is the reasonable and objective price can then be applied classwide to all Plaintiffs as damages for conversion. (Opp., p. 15:23-24.) In light of the discussion at the hearing on this topic, the Court agrees with Plaintiffs.

Lastly, Google argues that Dr. Entner's calculations of the "average price" of cellular data should be excluded on the ground that they are unreliable because they rely on undisclosed verbal discussions with unidentified individuals. (Motion, p. 13:26-28.) Google contends that Dr. Entner can't recall where he derived amounts for his calculations for the amount of data an average consumer uses to send iMessenger and Whatsapp messages. (Motion, p. 14:19-24.) Plaintiffs argue this is not a sufficient basis to exclude his calculation because those figures were not used in Dr. Entner's expert opinions in this case and the Court agrees.

Google further contends he could not recall the complete extent to which other parts of his report were based on the unknown conversations. (Motion, p. 15:5-13.) In opposition, Plaintiffs argue Dr. Enter's inability to recall the conversations more than a decade later does not render his opinions admissible, but rather, it goes to the weight of his opinions, not their admissibility. (Opp., p. 9:12-20.) Moreover, they argue that counsel for Google went "row by row through Dr. Entner's calculation spreadsheets and asked him to identify any rows that were 'not solely based on hard numbers reported by the CTIA or some other third party' [citing Ex. H, Dr. Entner II Tr. P. 81:3-10] Dr. Entner responded that *only one row* was based on verbal conversations, a row called 'effective price per message,' which refers to text messages (not iMessenger or Whatsapp messages): '**The only one that is not reported** would be the effective price per message, and that would be Row 11'… He reiterated that '**[a]ll the other data** is sourced directly or through a calculation of directly sourced data." (Opp., p. 10:8-15 [emphasis original].) As a result, the Court cannot conclude that Dr. Entner's calculations of the "average price" of cellular data is unreliable. Thus, the motion cannot be granted as to Dr. Entner's calculation of "average price."

Based on the foregoing, Google's motion to exclude Plaintiffs' expert opinions regarding damages is DENIED.

## IV. GOOGLE'S MOTION TO EXCLUDE PLAINTIFFS' EXPERTS UNRELIABLE ANALYSIS OF NETWORK USAGE DATA

Google moves to exclude Plaintiffs' experts Chris Thompson ("Mr. Thompson") and Dr. Stec analysis regarding data network usage.

### A. Background

Plaintiff's original technical expert was Dr. Douglas Schmidt ("Dr. Schmidt") who proposed a method for analyzing the network usage data to determine the behavior of a typical Android device, which Plaintiffs argued could be multiplied by the number of Android devices owned by class members to arrive at classwide network usage estimates. (Motion, p. 6:8-14.) The Court allowed that method and granted class certification. (Motion, p. 6:22-23.) Plaintiffs then offered Mr. Thompson's approach which threw out Dr. Thompson's analysis and provides that: (1) every single one of the tens of thousands of devices in both the Netstats and Westworld sampled had (2) sent every kind of Challenged Transfers (3) every day of the multi-year sample periods (4) over a cellular network. (Motion, p. 7: 5-10.) Google contends Mr. Thompson tried to walk back the assumption at his second deposition. (Motion, p. 8:4-6.) It further contends that Mr. Thompson served "updates" to his report that redesigned the proposed approach and Dr. Stec provided corresponding changes to his damages estimates. (Motion, p. 8:11-13.)

### B. Discussion

Google argues that Mr. Thompson and Dr. Stec use unreliable methods to analyze network usage data produced in discovery, which inflates the alleged damages far beyond what the empirical data supports. (Motion, p. 5: 2-4.)

1    1.  <u>Mr. Thompson</u>

2        Google argues Mr. Thompson has no relevant qualifications to serve as an expert because

3    he has no advanced degree or training, has not held any faculty position and has no significant

4    body of research—specifically, he does not have the qualifications to opine on complex issues of

5    network science and network traffic analysis.  (Motion, p. 10:1-4.)

6        For purposes of evaluating an expert's qualifications, expertise is "relative to the subject

7    and it is not subject to rigid classification according to formal education or certification.  Rather,

8    an expert's qualifications can be established in any number of different ways, including a

9    showing that the expert has the requisite knowledge of, or was familiar with, or was involved in,

10   a sufficient number of transactions involving the subject matter of the opinion.  In sum, with

11   respect to expert qualifications, 'the determinative issue in each case must be whether the

12   witness has sufficient skill or experience in the field so that his testimony would be likely to

13   assist the jury in the search for the truth, and no hard and fast rule can be laid down which would

14   be applicable in every circumstance."  (*Richard v. Union Pacific Railroad Co.* (2024) 105

15   Cal.App.5th 1263, 1277 (*Richard*).)  Once this threshold has been met, "questions regarding *the*

16   *degree* of an expert's knowledge go more to the weight of the evidence presented than to its

17   admissibility."  (*ABM Industries Overtime Cases* (2017) 19 Cal.App.5th 277, 294 [emphasis

18   original].)

19       Mr. Thompson states he has "led the creation of multiple data analytics systems and he

20   has extensive experience providing technology analysis, data analytics, and source code review

21   including in litigation.  I provided analyses with respect to numerous computer-enabled

22   technologies such as mobile baseband, network communications, mobile OS (including iOS and

23   Google Android), web technologies, digital advertising, computer security, distributed storage,

24   network storage and file systems, online and mobile gaming, geolocation services, source code

25   and data in connection with numerous litigation matters including matters relevant to business

record analysis and large-scale data productions.  [he] provided data analysis services in the areas of web traffic, mobile and web advertising, and big-data analytics."  (Expert Report of Chris Thompson ("Mr. Thompson Rpt."), ¶ 7.)[5]  He further states that he "is currently a partner at 233 Analytics, LLC. 233 Analytics provides technical analyses in technologically complex litigation and acquisition-related matters to firms and other entities.  My professional focus is analyzing and explaining the operation of computer systems, examining design and architecture of software-based systems, the source code that controls their behavior, as well as data they generate.  In my role at 233 Analytics, I also provide software development, project management, and technology leadership services to clients in a variety of industries including development of mobile applications, API integrations, backend services, data retention and processing, machine learning, computer vision, bioinformatics, medical research and ERP-type."  (Mr. Thompson Rpt., ¶ 9.)

Mr. Thompson provided further information as to his education, training, research, and experience in his CV, which he attached to his report, however, the copy submitted by Google does not include that portion.  Mr. Thompson submitted his CV along with Plaintiffs' opposition, however, because of Google's assertion that his CV was tailored to respond to its arguments in the moving papers—its unclear to the Court whether the CV before it at this time is the same as the CV attached to Mr. Thompson's expert report.  In his declaration, Mr. Thompson states for the past 15 years, companies have relied on his analysis; he has spent thousands of hours analyzing network protocols, cellular communications technology, and source code; and he has served as a consulting expert in 114 litigations.  (Declaration of Mr. Thompson, ¶¶ 2-3.)  Based on the foregoing, it appears that Mr. Thompson demonstrates the sufficient skill and experience in this field.  (See *Richard, supra,* 105 Cal.App.5th at p. 1277.)

---

[5] Mr. Thompson's report is attached to the declaration of Max Bernstein ("Berstein Decl."), Sealed Exh. 1.

ORDER DENYING PLAINTIFFS' MOTION TO EXCLUDE DEFENDANT'S EXPERT TESTIMONY ET AL.

13

Next Google argues that Mr. Thompson's analysis regarding overhead "correction" is unreliable because he based his instruction "to increase all damages calculations by 15.6% to account for 'network overhead,' on a single academic paper (the "Ahmadzadeh Paper") without further analysis. (Motion, p. 10:25-11:7.) Google further argues Mr. Thompson fundamentally misunderstood what the Ahmadzadeh Paper analyzed. (Motion, p. 11:22-23.) In opposition, Plaintiffs argue that Mr. Thompson relies on the same data relied on by Dr. Schmidt at the class certification stage. On October 26, 2023, the Court issued its order regarding the parties' motions to exclude experts and Plaintiffs' motion for class certification and the Court (Hon. Kulkarni) stated, "[a]fter reviewing Google's objection and Plaintiffs' responses, the Court finds that there is a logical path from Dr. Schmidt's methodology to his final opinions, and there is no 'analytical gap.' The Court also finds that the reliability of NetStats data is not so obviously lacking as to render Dr. Schmidt's use of that data fatal to his opinions; issues about the data are merits questions." (October 26, 2023 Order, p. 7:16-20.) Therefore, the Court cannot conclude that the figure used is completely hypothetical or unreliable. The parties dispute the contents of the Ahmadzadeh Paper and their experts dispute what they are measuring. However, this dispute does not provide a basis for exclusion of expert testimony. Moreover, it appears Mr. Thompson offers a valid theory. (See *Sargon, supra,* 55 Cal.4th at p. 772 ["the court does not resolve scientific controversies. Rather, it conducts a 'circumscribed inquiry' to 'determine whether, as a matter of logic, the studies and other information cited by experts adequately support the conclusion that the expert's general theory or technique is valid'"].)

Google argues Dr. Thompson's "log loss" "correction" is unreliable because he never explained how he determined that NetStats and Westworld logs failed at least 6% of the time. (Motion, p. 13:19-14:3.) It further argues that Mr. Thompson admitted that he has no way of knowing that the 6% figure applies to devices in the U.S. and he further admitted that it was lower in the U.S. (Motion, p. 14:9-13.) In opposition, Plaintiffs argue the 6% figure came from

ORDER DENYING PLAINTIFFS' MOTION TO EXCLUDE DEFENDANT'S EXPERT TESTIMONY ET AL.

14

Google's internal documents. (See Declaration of Karma M. Giulianelli ("Giulianeli Decl."), Exh. 6.) The Court's review confirms that the figure originates from Google's internal documents. Google further argues that Mr. Thompson makes the assumption that the figure was the same for the entire class period and Plaintiffs do not provide any evidence by Mr. Thompson to support such a conclusion. However, Plaintiffs argue that Google's expert, Dr. Jeffay, relies on a Google document which shows nearly the same log loss figure years earlier. (Opp., p. 15:24-28.) Therefore, it does not seem that Mr. Thompson's conclusion or use of the 6% is without a reasonable basis.

Google argues Mr. Thompson's "reported device" "correction" is unreliable because he assumed certain devices that reported no Challenged Transfers on a given day would have sent such traffic regardless. (Motion, p. 15:15-20.) Thus, Google contends, he has no foundation for his manipulation of the data to treat the devices as if they had sent this traffic despite reporting otherwise, which significantly increased damages. (Motion, p. 15:24-27.) In opposition, Plaintiffs argue Google produced network usage data from random samples it took from Android users from two sources: Westworld and Netstats. (Opp., p. 9:28-10:2.) Missing data is represented in the Westworld data set as "null," which signifies missing data, not zero and a device may have a "null" report for many reasons. (Opp., 10:4-7; 13-20.) Google only challenges Mr. Thompson's treatment of devices that sent information to Google but for which Google did not record the quantity of cellular or Wi-Fi usage. (Opp., p. 11:2-4.) While Google does not challenge Mr. Thompson's methodology regarding treating devices that sent information to Google as having average cellular or Wi-Fi usage that day, it does challenge his reliance on a CheckIn dataset called Android.info. (Opp., p. 11:15-20.) However, it appears Mr. Thompson uses the same methodology for those calculations. Moreover, Google's source code confirms that the field corresponds with the date of each CheckIn transfer. (Opp., p. 12:13.) Thus, it does not appear that Mr. Thompson's conclusion is based on unsupported assumptions.

Based on the foregoing, the Court cannot conclude that Mr. Thompson's expert opinion is "clearly invalid and unreliable." (See *Sargon, supra,* 55 Cal.4th at p. 772.) Thus, Google's motion to exclude Mr. Thompson's expert analysis is DENIED.

2. Dr. Stec

Google argues that Dr. Stec's analysis and downstream damages calculations are inadmissible because he did not follow Mr. Thompson's instructions, his sampling is not representative of the population he models, his "flat line" backwards extrapolation is unreliable.

While Google contends Dr. Stec did not use the files in the format Mr. Thompson instructed him to use, Mr. Thompson provide Dr. Stec with the data in his requested format. (Opp., p. 17:24-18:1.) Plaintiffs acknowledge there was a column missing in the original version but it was addressed in the format provided to Dr. Stec. Therefore, this does not render Dr. Stec's analysis inadmissible.

Dr. Stec provided updated calculation after Google's testimony explaining the source, extent, and precise date of the gaps. Thus, it was provided to compensate for those gaps.

Next, Google argues that Plaintiffs' experts do not address the fact that devices with the User and Diagnostic settings turned on behave differently than devices with the settings turned off. (Motion, p. 18:6-13.) It further argues that both sides' experts have recognized that the network usage trends are not the same across the categories of devices. (Motion, p. 18:14-20.) In opposition, Plaintiffs argue that Google attacks its own random samples. (Opp., p. 16:2-8.) They further argue that Plaintiffs rely largely on the same NetStats data as they did during the class certification stage. (Opp., p. 16:7-8.) Plaintiffs also argue that they relied on Google to produce the best available data and sample it properly. (Opp., 17: 18-20.) Moreover, Mr. Thompson opines that some users could not turn off transfers of Clearcut logs. Therefore, it does not appear that Plaintiffs' sample renders their experts' opinions unreliable.

3.  Margin of Error

Lastly, Google argues both opinions should be excluded because they fail to establish a confidence interval and a margin of error.  (Motion, p. 19:10-14.)  Google relies on *Maldonado v. Epsilon Plastics, Inc.* (2018) 22 Cal.App.5th 1308 (*Maldonado*), and *Duran v. U.S. Bank National Association* (2014) 59 Cal.4th 1 (*Duran*) for the proposition that expert statistical analysis is unreliable as a matter of law and must be excluded without a corresponding calculation of margin of error.  Having reviewed both *Maldonado* and *Duran*, however, the Court does not agree that these cases stand for such a broad rule. As such, the motion cannot be granted on this basis.

Based on the foregoing, Google's motion to exclude Plaintiffs' expert witnesses' analysis of usage data is DENIED.

## V.  PLAINTIFFS' MOTION TO EXCLUDE SURPRISE WITNESSES FROM TRIAL

Plaintiffs move for an order precluding Google from calling its employees Nandini Kappiah, Borbala Benko, and Eric Gustafson (collectively, the "Witnesses") from testifying at the trial set to begin on June 2, 2025.

### A.  Legal Standard

"A trial court's 'inherent power to curb abuses and promote fair process extends to the preclusion of evidence' at trial."  (*Peat, Marwick, Mitchell & Co. v. Superior Court* (1988) 200 Cal.App.3d 272, 288 (*Peat*).)  Accordingly, "trial courts regularly exercise their basic power to insure that all parties receive a fair trial by precluding evidence."  (*Ibid.*)

"Our Supreme Court has recognized that California courts have inherent powers, independent of statute, derived from two distinct sources: the court's equitable power derived from the historic power of equity courts and supervisory or administrative powers which all courts possess to enable them to carry out their duties…Trial courts regularly exercise their basic

power to insure that all parties receive a fair trial by precluding evidence." (*Continental Ins. Co. v. Superior Court* (1995) 32 Cal.App.4th 94, 107-108.)

### B. Discussion

Plaintiffs provide the following background: (1) Google has not produced any documents from any of the Witnesses; (2) it did not allow them to be deposed; (3) fact discover in this matter ended on April 19, 2024 and Google did not disclose any of the Witnesses as have relevant information or testimony before then; (4) it did not identify any of them in response to any interrogatory in this matter; (5) Ms. Benko and Dr. Gustafson were not included in any of the 65 organizational charts produced by Google; (6) the only involvement any of the Witnesses have had in this matter is their declarations in support of Google's class certification briefing, filed in February 2025; and (7) Google refuses to produce their documents or make them available for deposition. (Motion, p. 5:6-7:25.)

Based on the foregoing, Plaintiffs argue the Court should preclude the Witnesses from testifying because it would be fundamentally unfair. (Motion, p. 9:6.) They further contend that Google knew its conduct was wrong because it has challenged this same conduct in other matters. (Motion, p. 10:1-9.)

In opposition, Google argues that the Witnesses were identified to testify on the DroidGuard and GASS security system and the prejudice it would suffer from their exclusion is "hard to overstate" as "Plaintiffs seek hundreds of millions of dollars in connection with the network transfers these two systems causes, and Plaintiffs' experts make serial misrepresentations about [them] that Google's witnesses will show are false and intended to mislead the jury. Silencing these witnesses to allow Plaintiffs' misstatement to go unchecked would be manifestly unjust." (Google's Opposition ("Opp."), p. 3:6-11.) Google further argues that Plaintiffs never served any discovery requests (i.e., requests for documents, document custodians, interrogatories, or deposition notices) that Google failed to answer and that Plaintiffs'

ORDER DENYING PLAINTIFFS' MOTION TO EXCLUDE DEFENDANT'S EXPERT TESTIMONY ET AL.

18

decision to not explore DroidGuard and GASS was their own choice. (Opp., 3:12-25.) Google also argues on August 28, 2024, the parties entered into a written agreement to forego further depositions. (Opp., 7:5-12.) Google contends it did not learn that Plaintiffs would attempt to include DroidGuard and GASS until October 16, 2024 while reading Plaintiffs' expert reports. (Opp., 8:9-11.) The Witnesses became involved as a result of Plaintiffs' decision to include DroidGuard and GASS.

The Court is not persuaded by Google attempts to frame as solely an issue stemming from Plaintiffs' decisions regarding discovery. As Plaintiffs stated, Ms. Benko and Dr. Gustafson were not even included in the organizational charts that Google was ordered to produce, and the purported disclosures did not connect them to DroidGuard and GASS or otherwise establish that they would be the witnesses to address those systems. Moreover, despite Google's assertions that it will be prejudiced if the Witnesses are excluded from trial, it appears there are other individuals who can testify DroidGuard and GASS such as Google employee Sundeep Sancheti, who was disclosed as having factual knowledge about DroidGuard/GASS and he was produced as a custodian and already deposed. (Motion, p. 13:4; Reply, p. 7:10-14.) Google contends Plaintiffs knew Ms. Benko and Dr. Gustafson were relevant witnesses since February, but they did not request depositions until recently. However, Google repeatedly asserts that the parties had an agreement against further depositions. Therefore, it does not appear that an earlier requests from Plaintiffs would have made a difference. Moreover, it appears Plaintiffs saw the Witnesses on the April 17, 2025 witness list produced by Google and raised this issue then. (Declaration of Glen E. Summers, ¶¶ 4-6; Exhs. 3-5.)

Additionally, it does not appear that other sanctions such as monetary sanctions, issue sanctions, or terminating sanctions will sufficiently address this matter given the proximity to trial. Google contends compelling deposition of the Witnesses at this time would be unfair and

ORDER DENYING PLAINTIFFS' MOTION TO EXCLUDE DEFENDANT'S EXPERT TESTIMONY ET AL.

19

disadvantage it. However, it is the Court's job to ensure fairness in the litigation. (See *Peat, supra,* 200 Cal.App.3d at p. 288.)

Thus, if Google intends to call any of the Witnesses at trial during its case in chief, it must make them available for a two-hour deposition that must occur no later than June 6, 2025. If Google does not make them available for deposition within that timeframe, the Court intends to grant Plaintiffs' motion and exclude the Witnesses from offering testimony at trial. A final ruling on this motion is therefore DEFERRED.

**VI. CONCLUSION**

Based on the foregoing:

1. Plaintiffs' motion to exclude Google's expert testimony is DENIED;

2. Google's motion to exclude Plaintiffs' expert opinions regarding damages is DENIED;

3. Google's motion to exclude Plaintiffs' expert witnesses' analysis of usage data is DENIED; and

4. Plaintiffs' motion to exclude Google's Witnesses is DEFERRED.

DATED: May 27, 2025

_____
CHARLES F. ADAMS
Judge of the Superior Court

ORDER DENYING PLAINTIFFS' MOTION TO EXCLUDE DEFENDANT'S EXPERT TESTIMONY ET AL.

20