1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3   Before The Honorable Virginia K. DeMarchi, Magistrate Judge

4

5  TAYLOR, et al.,              )
                                )
6          Plaintiffs,          )
                                )
7  vs.                          )   Case No. C 20-07956-VKD
                                )
8  GOOGLE, LLC,                 )
                                )
9          Defendant.           )
   _____)

10

                            San Jose, California
11                          Tuesday, August 19, 2025

12

   TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
13        RECORDING 10:02 - 12:54 = 2 HOURS 52 MINUTES

14 APPEARANCES:

15 For Plaintiffs:
                            Bartlit Beck, LLP
16                          1801 Wewatta Street
                            Suite 1200
17                          Denver, Colorado 80202
                      BY:   KARMA M. GIULIANELLI, ESQ.
18                    BY:   GLEN E. SUMMERS, ESQ.

19                          Korein Tillery, LLC
                            205 North Michigan Avenue
20                          Suite 1950
                            Chicago, Illinois 60601
21                    BY:   MARC A. WALLENSTEIN, ESQ.

22

23

24

25         (APPEARANCES CONTINUED ON NEXT PAGE)

2

```
For Defendant:
                              Cooley, LLP
                              3 Embarcadero Center
                              20th Floor
                              San Francisco, California
                               94111
                         BY:  EMILY BORN, ESQ.
                         BY:  WHITTY SOMVICHIAN, ESQ.

Transcribed by:              Echo Reporting, Inc.
                             Contracted Court Reporter/
                             Transcriber
                             echoreporting@yahoo.com
```

3

1  Tuesday, August 19, 2025                          10:02 a.m.

2                    P-R-O-C-E-E-D-I-N-G-S

3                         --oOo--

4          THE CLERK:  Now calling Case 20-CV-07956-VKD,

5  Taylor, et al. versus Google, LLC.

6      Counsel, if you can please state your appearance,

7  beginning with the Plaintiff.

8          MS. GIULIANELLI:  Karma Giulianelli for the

9  Plaintiffs, from Bartlit Beck.

10         THE COURT:  Good morning.

11         MS. GIULIANELLI:  Good morning.

12         MR. SUMMERS:  And also Glen Summers from Bartlit

13 Beck.

14         MR. WALLENSTEIN:  And Marc Wallenstein from Korein

15 Tillery.

16         THE COURT:  Okay.  Good morning.

17         MR. SOMVICHIAN:  Good morning, your Honor.  Whitty

18 Somvichian with Cooley for Google today.

19         THE COURT:  Good morning.

20         MR. BORN:  And Emily Born, also with Cooley for

21 Google.

22         THE COURT:  Okay.  Good morning.

23     So, we have several matters on for hearing this

24 morning.  We have the Plaintiffs' motion for class

25 certification, the Plaintiffs' Daubert motion regarding the

4

1  Defendant's damages experts, Gos (phonetic)?  Am I saying

2  that correctly?

3          MR. SOMVICHIAN:  Gos.

4          THE COURT:  Gos.  And Jeffay (phonetic), yes?

5          MR. SOMVICHIAN:  Correct.

6          THE COURT:  All right.  And then we also have the

7  Defendant's Daubert motions regarding Plaintiffs' damages

8  experts Huntner (phonetic) and Steck (phonetic), and the

9  Defendant's Daubert motion regarding the Plaintiffs' experts

10 on network usage, purpose of transfers, and some other

11 things regarding Mr. Thompson, Doctor Steck, and Doctor

12 White.

13     And then there's all the things that you all have filed

14 recently, supplemental briefing requested, last-minute stuff

15 last night.  I'm not really going to belabor that.  We can

16 maybe talk about that at the end, but I'm not going to spend

17 a lot of time on those additional things at the moment.

18     I understand you have some plans about how you want to

19 argue I guess.  I have some -- five decks here.  I'm happy

20 to hear from you about how you would like to proceed.  Let

21 me invite the Plaintiffs' side first to address that

22 question.

23          MR. SUMMERS:  Your Honor, Glen Summers on behalf

24 of the Plaintiffs.  I would just say that the Plaintiffs

25 have two motions as -- as the Court has already mentioned, a

5

1 motion for class certification and a <u>Daubert</u> motion.  As

2 between the two, we would like to focus on the motion for

3 class certification today and use our time there.  Ms.

4 Giulianelli will be handling that, but I just wanted to make

5 that clear.  That's the one we think is priority for the

6 day.

7          THE COURT:  Okay.  And how did the Defendants

8 think you should proceed?

9          MR. SOMVICHIAN:  Your Honor, I agree we should

10 focus on the class certification issues.  The <u>Daubert</u> issues

11 are -- are also important.  We'll take our cues as to when

12 and -- and how you want to address those, but I agree the

13 class certification motion is probably the right place to

14 start.

15          THE COURT:  That was my sense as well, although it

16 seemed to me like there may be some <u>Daubert</u> issues that --

17          MR. SOMVICHIAN:  Yes.

18          THE COURT:  -- overlap with some of the questions

19 that are presented.  So, before we get that -- to that

20 issue, nobody asked for this hearing to be conducted under

21 seal.  I have not dug into your extremely large omnibus

22 motion to seal papers.

23     Are there massive disagreements about what should and

24 should not be sealed for purposes of the class cert briefing

25 and the <u>Daubert</u> briefing?

1          MR. SOMVICHIAN:  Your Honor, given who's in the

2     courtroom, I don't think that's a live concern.

3          THE COURT:  Well, this is a public hearing, and

4     there will be a public transcript.  I mean, you know the

5     procedures for once a transcript is made.

6        If there is something that should not be said out loud,

7     I'm going to rely on the parties to alert the Court to that

8     issue if you need to discuss something that everybody agrees

9     is sealed or subject to a sealing request, but, otherwise,

10    it's a public hearing is how I plan to proceed.  Okay.

11       Is that -- is that acceptable to the Plaintiffs' side?

12         MS. GIULIANELLI:  That is, and I was going to say

13    I do not intend for the class cert or the Daubert to say

14    anything that was not -- that -- that I think is

15    confidential and that was not already publicly available and

16    testified to in a trial that was just in the State Court

17    case.  So, there's nothing confidential that I am aware of

18    that I intend to say.

19         THE COURT:  Right.  And -- and it would be

20    principally Google's information.  So, Mr. Somvichian, I'll

21    count on you to raise your hand and alert the Court if

22    there's something that you think shouldn't be discussed.

23    Okay?

24         MR. SOMVICHIAN:  Yes, your Honor.  And -- and with

25    counsel's representation, I think -- I think we're on fairly

7

1  safe territory today.

2         THE COURT:  Okay.  Very good.

3         MR. SOMVICHIAN:  I would ask just procedurally, it

4  was my understanding with -- that there -- there could be a

5  request after the public --

6         THE COURT:  Yes.

7         MR. SOMVICHIAN:  -- transcript is made available

8  to -- before it is made public to request sealing in --

9         THE COURT:  Yes.  You --

10        MR. SOMVICHIAN:  -- that context.

11        THE COURT:  That is -- that is true.  That is,

12  under the rules, how we have it.  However, presumptively,

13  I'm conducting this sealing -- this hearing in public.

14  Anybody could walk in the door while we're talking, and you

15  would be saying things out loud in a public forum.  Okay.

16        MR. SOMVICHIAN:  Understood.

17        THE COURT:  So, that's how we proceed.

18     All right.  Let me start.  The first question that I

19  had for class certification -- now, I know you have prepared

20  materials.  I don't want to disrupt your presentation, but I

21  did want to highlight a concern I had, which is I was

22  surprised -- maybe I shouldn't be surprised, but given that

23  you've already been through a trial in a parallel

24  proceeding, there seems to be disagreement about what was

25  allegedly converted here.

8

1    So, initially, it was five categories of data transfer.

2 Then it was four categories of data transfer.  So, the

3 Plaintiffs are talking about in terms of categories of

4 transfer.  Google refers to specific data transfers that are

5 maybe within the categories.  I had a little bit of trouble

6 even mapping what goes within a Plaintiff category, you

7 know, what -- what goes with what.  And there are -- there's

8 a discussion about things within the larger categories that

9 are like not actionable because they don't fit what the

10 Plaintiffs' sort of definition is of a subject, you know,

11 converted data.

12    So, I was hoping that as a very fundamental point, the

13 Plaintiffs could explain to me what are the defining

14 features of the challenged transfers.  I think I have some

15 idea, but I'd like to hear from you.

16        MS. GIULIANELLI:  I can do that.

17        THE COURT:  Good.

18        MS. GIULIANELLI:  And, in fact, that was one of --

19 and let me do that immediately.  It was the first segment of

20 my argument --

21        THE COURT:  Okay.

22        MS. GIULIANELLI:  -- after an introduction.  I'd

23 like to go back to the introduction in a minute, but in

24 terms of the challenged transfers, your Honor -- and we have

25 on -- we've prepared a slide deck --

9

1          THE COURT:  Um-hmm.

2          MS. GIULIANELLI:  -- that is in front of your

3  Honor and the clerk has as well on Google.  Page three just

4  lists the categories.  And let me explain the defining

5  features of each of those categories.

6      As an initial matter, your Honor, we are no longer --

7  and we did not in the California case -- pursuing check-in

8  transfers.  So, they're not on here.  They're just a very

9  small category of -- of transfers.  And, so, we're not

10  pursuing those.  We're pursuing the ones listed on slide

11  three.

12          THE COURT:  Okay.  I'm looking at slide three, and

13  it says, How much cellular data Google converted.

14          MS. GIULIANELLI:  I think that your Honor may have

15  the Daubert deck.

16          THE COURT:  Oh, wrong one.  Okay.  No.

17          MS. GIULIANELLI:  There's a class certification

18  deck which I can hand up.

19          THE COURT:  I have two Daubert ones.  Okay.  I

20  don't have the class cert one I don't think.  Maybe my clerk

21  has two class cert ones.  I'll switch.  There we go.  Okay.

22  That seems more reasonable.

23      Okay.  So, yes, I think I'm on the page that you're

24  referring to.  Thank you.

25          MS. GIULIANELLI:  And, so, the categories of

10

1  transfers -- and I -- and I will get into a little detail

2  because it's complicated and it matters to your Honor's

3  question.

4      The first category is Clearcut logs, and Clearcut is a

5  system at Google for logging historical information about

6  everything basically that happened on the phone.  So,

7  whenever someone does something on the phone, these logs,

8  which are just historical information, are sent to Google on

9  a scheduler.  It's a defined schedule.  And it's built into

10 Google's android operating system called GmsCore, and none

11 of the logs need to be sent over cellular because they just

12 provide google with non-time-sensitive information about

13 things that have occurred in the past.

14      And, so, the first category of transfers are Clearcut

15 logs, and the defining characteristic of this and the reason

16 that these are converted is they are historical information

17 about things that happened on the phone that are unnecessary

18 for the usage of any -- of anything that the user is doing

19 in the moment on the phone to make any application work.

20 They do not need to be sent over cellular.  They don't need

21 to consume user's data, and it doesn't matter what

22 information is in the log, and this may be one of the things

23 that is confusing the Court with respect to Clearcut because

24 Google argues that there are all sorts of different logs.

25 There are 1300 logs in Clearcut, and it argues that some of

11

1  them are for this or some of them are for battery and some

2  of them are to record certain types of data and other types

3  of data.  What is in the logs does not matter.  So, there

4  will be no individualized issues.  And that's because all of

5  the logs are sent over cellular for historical information.

6  They're not time sensitive, and none of them are disclosed

7  to the user.

8           THE COURT:  So, can I pause you there?

9           MS. GIULIANELLI:  Yes.

10          THE COURT:  So, when we -- when I last heard from

11 you all on this case, the framing was passive data

12 transfers.  Is that the same thing as historical, doesn't

13 require the use of cellular data, you know, sort of in the

14 moment, can wait till there's a WiFi connection?  Is that

15 what that means?

16          MS. GIULIANELLI:  It basically is.  I think

17 passive is shorthand, and the way that the experts have

18 basically defined passive in the merits reports is that it

19 is passive.  In other words, it's not prompted by what the

20 user is doing in the moment or what the user is doing on the

21 phone.  So, it's not like the user is using an application

22 and immediately there needs to be a transfer sent in

23 connection with the use of the application.  So, passive is

24 defined --

25          THE COURT:  Okay.

1          MS. GIULIANELLI:  -- as -- is that.

2          THE COURT:  So, that's when -- so, passive and

3   sort of historical nonsensitive -- non-time-sensitive

4   information is kind of -- I should think of that as kind of

5   a single sort of feature, defining feature of this category.

6       And then you said unnecessary to the operation of the

7   phone.  So, there seems to be a lot of discussion of the

8   purpose of the transfer.

9       So, when you say "unnecessary", it sounds like it's a

10  little bit different than saying it's just not immediately

11  needed in the moment, and I want to understand what you mean

12  by unnecessary because I understand Google argues that some

13  data transfers are necessary to make sure the phone is safe,

14  secure, operational, gets updates, et cetera, et cetera.

15      So, when you say "unnecessary", what do the Plaintiffs

16  mean by that?

17          MS. GIULIANELLI:  So, the Plaintiffs mean that it

18  is unnecessary for Google to send this historical

19  information over cellular in order to make -- using cellular

20  data in order to make the transfers -- excuse me -- in order

21  to make the phone or the application work.

22      Now, Google says that certain transfers may be

23  Clearcut, but I think it talks -- and I'm getting to ad

24  attestation and experiments.  Google says these are

25  necessary for, as your Honor said, experiments or updating

13

1  or installing.  That is a dispute, and that is a dispute on

2  the merits about what these transfers are that will be

3  resolved on a class-wide basis.  And we are going to show

4  with common evidence that none of the transfers are about

5  security for the user.  None of them are about updating or

6  installing software.  And, so, Google's characterization of

7  the transfers is different from what we will -- is -- is a

8  dispute on the merits, and we will prove that with common

9  evidence.  But they are un -- all of the Clearcut, none of

10 the transfers are necessary for security, for the operation

11 of the phone in the moment to be sent over cellular.

12        THE COURT:  Why does that matter, though?  So,

13 here -- here's where I'm getting hung up.  So, if the

14 defining -- if the -- if the critical thing is you don't

15 need to use cellular, okay, you could say that about a lot

16 of things.  You could just wait for WiFi.  As long as it's

17 not time sensitive, just wait for WiFi, assuming that the

18 phone -- and maybe this is a good assumption.  Maybe it's

19 not a good assumption -- always will eventually connect to

20 WiFi.

21     So, when the observation is made that it's not only

22 passive and -- and not time sensitive, a log can be sent

23 whenever, but it's also unnecessary.  That seems like

24 something else.  It means like there's all this debate about

25 Google's using it for its own marketing purposes, its own

1  targeted advertising purposes, its own business development

2  purposes, like piggy backing unfairly as opposed to doing it

3  at a time when it wouldn't have to but, nevertheless, doing

4  things that are important for the phone, to make sure that

5  it's secure and gets updated and all of those things, but

6  you don't have to do it via cellular.  And I'm just -- I'm

7  trying to understand if there are two arguments or

8  everything is just under the umbrella of you don't need to

9  do it with cellular, therefore, it's a converted data byte.

10         MS. GIULIANELLI:  I think it's a great question,

11 and it goes to the issue of consent and whether the users

12 had all material information and the language in Google's

13 disclosures.

14     So, first of all, the fact that none of it has to be

15 sent over cellular is enough, and we will show that nothing

16 in Google's disclosures say that it needs to be sent over

17 cell -- the information will be sent over cellular, and

18 that's enough.  However, there if more, and this is where

19 the  unnecessary or the purpose or whether or not it's about

20 security comes in.  And the reason for that dispute, if you

21 will, is that Google has certain disclosures in its terms

22 and conditions and its privacy policy that use the word

23 "security", use the word "update".  Now, even those do not

24 say that things will be sent using cellular.  So, the fact

25 that it's not cellular is enough, to be clear --

1        THE COURT:  If I'm going to ask you --

2        MS. GIULIANELLI:  -- but --

3        THE COURT:  -- about Plaintiffs' theory of the

4   case --

5        MS. GIULIANELLI:  Yes.

6        THE COURT:  -- you would say, We don't think

7   there's consent for anything.  But if we got into the weeds

8   on that and we lost on that issue and there was some consent

9   based on a disclosure for some -- some subset of data sent

10  over the cellular network, we would say, Okay.  Fine, but

11  then there's the rest of it that was sent over the cellular

12  network for which there was no consent, because it doesn't

13  fall into the security of the et cetera bucket.

14      Is that fair?

15        MS. GIULIANELLI:  That's -- that's very close,

16  yes.  So, whatever google says is going to transfer in the

17  disclosures, it cannot exceed the scope of the consent.  So,

18  I think your Honor is -- is asking about the scope of the

19  consent.

20      So, if Google were to show -- which we dispute, and we

21  will show it using class-wide evidence, that some portion of

22  the transfer or one of the purposes is about security, we

23  will show that -- and we dispute that, by the way, with

24  classified evidence, but we will show that Google's

25  transfers go way beyond security, that they are unnecessary,

16

1  that they serve Google's own business purposes, its

2  advertising, and that they are unnecessarily using cellular

3  data for non-time-sensitive transfers.

4       And, so, in that situation, your Honor, we would show

5  that Google has exceeded the scope of any consent, and that

6  is not allowed.  So, the reason that we are talking about

7  the purpose, whether or not it's security or whether or not

8  it's updating, it goes -- it's both, that every disclosure

9  needs to have all material fact.  The disclosures, as the

10  cases say, the, you know, <u>Calhoon</u> (phonetic) case, the

11  <u>Frasco</u>, they have to -- actually, both implied and express

12  consent, and also implied explicitly notify the users of the

13  conduct.  That's the standard.

14       And when Google does not notify the users about the

15  purpose -- now, Google says in disclosures that it will make

16  transfers not over cellular but for security purposes.

17  That's why this is an issue.  Google is trying to shoehorn

18  these transfers into the language of its disclosures to

19  argue express consent.

20            THE COURT:  I'd rather not get into the consent

21  issue.

22            MS. GIULIANELLI:  Okay.  Yes.

23            THE COURT:  Because now what I'm trying to

24  understand is --

25            MS. GIULIANELLI:  But that's the reason.

1           THE COURT:  -- what -- it is, but I thank -- I

2    thank you for that explanation, but I am just trying to

3    figure out what the Plaintiffs' theory of the case -- and I

4    think some of this may matter a lot when we get into

5    quantification because then I can see how slicing and dicing

6    what was the purpose for the transfer might matter in terms

7    of how you count.  I don't know.  But -- but I'd rather just

8    understand at the -- the front end what the it is.

9           MS. GIULIANELLI:  Yes.

10           THE COURT:  What was the subject of the alleged

11    conversion.  Okay.  So, Clearcut logs.

12           MS. GIULIANELLI:  Yes.

13           THE COURT:  I think I've got that.

14           MS. GIULIANELLI:  So, for Clearcut logs, they are

15    the subject of the conversion is all historical logs sent

16    over the Clearcut system, which are -- do not need to be

17    sent over cellular, not time sensitive, sent on a scheduler.

18    And they are not for the security of the phone or what the

19    user is doing in the moment.

20       And, now, the next one is experiments.  Experiments is

21    a category of transfers where Google conducts secret testing

22    of software changes that Google makes on phones.  It runs

23    tens of thousands of experiments on phones every day.  So,

24    these experiments, the category of experiments -- and I

25    don't think that there's a dispute about how the categories

1  are transferred because Google tags them internally as

2  Clearcut tags.  So, it knows everything that's Clearcut, and

3  we can get into this with damages.

4     Experiments are tagged by Google in its data under what

5  it calls PH transfers, and these are signals that turn on or

6  off software if the phone has already downloaded and -- and

7  installed using cellular data.  And, so, basically, it's a

8  way for Google to experiment with like settings on the

9  phone.  If it moves something around on the interface or if

10 it has -- you know, if -- it experiments with all sorts of

11 different things.

12    Now, Google argues that experiments serve multiple

13 functions and that there are multiple types of experiments.

14 That's true, but it's irrelevant because, regardless of the

15 function, Plaintiffs will show with class-wide evidence that

16 they are still experiments, and they're not disclosed.

17        THE COURT:  So, would you say that anything that

18 has this PH tag in your experiments bucket is in the

19 category of what we're talking about, alleged converged data

20 bates, and we're not going to look under the hood about what

21 the experiment is or is not for?

22        MS. GIULIANELLI:  Correct.  For purposes of

23 showing conversion, we do not need to show what the

24 experiment is not for.  Now, it's -- it is -- the -- the

25 fact that Google -- how Google is experimenting on users is

19

1  relevant.  There are many different kinds of experiments.

2  There's AB testing.  There's experiments about software

3  that's not yet released.  All of this stuff fall under the

4  kinds of things that Google experiments on, and that's

5  relevant for the jury to know how it impacts advertising,

6  but it does not define whether or not it's conversion.

7          THE COURT:  We'll get to whether it's relevant for

8  the jury to know in a moment, but -- but in terms of the

9  Plaintiffs' theory of the case, it's anything that has a

10 Clearcut tag, anything that has a PG tag -- is it PH?

11         MS. GIULIANELLI:  Correct.

12         THE COURT:  Okay.  Anything that has a PH tag,

13 that's the entire category?

14         MS. GIULIANELLI:  Correct.

15         THE COURT:  Okay.  And then we move on to ad

16 attestation, and that's where it seemed to me that Google

17 was arguing there are sort of subcategories that were

18 meaningful for the analysis, and I'd like to hear -- I'm not

19 entirely sure I understand the Plaintiffs' view of that.

20         MS. GIULIANELLI:  Yes.  So -- so, we disagreed,

21 but there are different categories of ad attestation

22 transfers, but they are all -- the defining characteristic

23 of the entire set -- and I can speak to the categories -- is

24 that they are triggered -- it's a complex set of transfers

25 that are triggered basically by when an ad is called for.

20

So, every time a user clicks on an ad, it secretly triggers
a cascade of transfers that are all under the bucket of ad
attestation, without notifying the user, and they support
Google's advertising business because what these particular
transfers are -- and, again, they are delineated by tags
that we counted, specific tags, and these specific tags are
associated with basically verifying to Google so that it
could tell the advertiser that there's a real person
clicking on the ads.

So, basically, these are happening so that Google can
charge more money for each click.  And, again, they're not
for the user's security.  So --

THE COURT:  So, wait a minute.  I mean, I -- I'm
really kind of resisting having to get into the notion of
the sort of morality or not of what's going on, whether it's
-- I mean, lots of things our devices do, thank God, are
secret from the user because I wouldn't want to know every
time my computer is doing a particular operation.  So, I'm
not sure what -- when you're highlighting for me this
happens in secret and that happens in secret, I mean, for
obvious reasons, the way that the -- the device and the
applications are supported by advertising.  I think we all
know this now.  So, the fact that there is advertising on
the phone doesn't seem to me to be a critical feature of the
Plaintiffs' case.  So, I'm really just trying to tease out

21

1  what is the critical feature.  Is it that the ad attestation

2  operation that you're describing is something that is

3  necessary to have happened between Google and its ad

4  customer and the phone user could care, or could not care,

5  could only care in the indirect sense that if it -- there

6  weren't advertising on the platform, it would have to pay

7  more for services.  I mean, I'm not really sure what to make

8  of these observations here from, you know, the point of view

9  of what is the theory of conversion in this category.

10          MS. GIULIANELLI:  So, the theory of conversion --

11  and it's not a morality thing.  It really goes to consent

12  because the theory of conversion here is that there are

13  transfers that are triggered by Google's advertising

14  business that are specifically connected with Google

15  attesting that it's a real user that's using user cellular

16  data, and that is not disclosed, and that is the real issue.

17      What is disclosed in various disclosures, Google talks

18  about user security or transfers that may happen for user

19  security.  By the way, it still never says cellular.  So,

20  that's not enough of a disclosure.  But with respect to the

21  ad attestation transfers, the critical feature is that these

22  are transfers that, using Google's -- excuse me -- using

23  Plaintiffs' cellular data, that support Google's advertising

24  business because they attest to the advertiser that it's a

25  real human, and the reason it's conversion is because it is

22

1  using -- it's not about morality, and users know that Google

2  is an advertising platform, certainly.  But what users do

3  not know and what Google never discloses is that every time

4  an ad is clicked, their cellular data will be used in order

5  for Google to prove through this series of transfers to the

6  advertiser that it's a human clicking it, and that's what's

7  not disclosed, and that's why it's conversion.

8          THE COURT:  So -- okay.  That's -- this is a

9  useful juncture maybe for me to ask this other question

10 which has been puzzling me, which is that there's -- there

11 seem to be some categories of data transfer that I

12 understand Google to say people know this is happening

13 because this is the way phones work.  Okay.

14     Is this kind of thing the kind of thing that people

15 would assume is happening because this is the way phones --

16 android phones work, meaning, yes, Google will let an

17 advertiser know that you're a human and not a bot.  That's

18 the way advertising works.  It's an advertising platform.

19 Whether someone literally knows or doesn't know, I mean,

20 this is the way these things work.  How is -- how is this

21 sort of the kind of thing that would be something -- and I'm

22 not even sure this is the right framing, but this is

23 something that a -- you know, a -- a class member would be

24 like, That's my data.  You should not be using it for that

25 purpose.

1    You know, it's like the -- I'm -- I'm trying to figure

2  out like where do the Plaintiffs draw this line, and it may

3  not be anything like the sort of sentiment I just expressed.

4  It may be just completely -- I'm hoping it's completely

5  objective.  That's why I was asking what are the defining

6  features, but -- and I'm hoping it doesn't depend on consent

7  either, although some of these things may.  But does this

8  question make any sense to you?

9         MS. GIULIANELLI:  It -- it does make sense, and I

10  think that -- that your Honor is asking basically -- is

11  basically trying to figure out Google's argument and then

12  Plaintiffs' response.  And with respect to the issue of,

13  Wait a minute.  Don't people know that this is the way

14  things work, that depends on Google's characterization of

15  what these transfers are because Google says these transfers

16  are for security or they're to update phones.  Of course,

17  people know that there are security features on the phone

18  for the user or it's to update software.

19    But Plaintiffs are going to show with common class-wide

20  evidence that these transfers with expert technical

21  testimony are not about how Google characterizes them.  So,

22  a lot of this issue of, Wait a minute.  This is just how

23  phones work.  Users know this, that depends on Google's

24  characterization of what these transfers are, not what

25  Plaintiffs will show these transfers are with common class-

24

1  wide evidence.

2      Now, with respect to the issue -- your Honor used the

3  example of like advertising -- advertising.  Wait a minute.

4  Don't people just know that there's -- you know, that Google

5  will verify?  There is no objective evidence that an

6  objective reasonable user, which is the standard for implied

7  consent and express consent under the <u>Calhoon</u> Ninth Circuit

8  and also the <u>Frasco v. Flo</u> and <u>Meta Pixel</u>, the standard, as

9  your Honor said, is not up to -- is not subjective.  It's

10 the objective reasonable person, and there is not any

11 evidence that the reasonable person would understand because

12 it's not in Google's disclosures, and there's no other

13 evidence.  There's no survey evidence or anything that --

14 that these transfers -- that Google's going to be using

15 user's cellular data charged against a user's plan in order

16 to verify to advertisers that it's a real human.  That's

17 what people don't know, and that's what the common average

18 reasonable user does not -- does not know.

19         THE COURT:  And is this ad attestation bucket

20 limited to Google using the data transfer to -- to verify

21 that the user is a human and not a bot?  That's what -- from

22 Plaintiffs' perspective, that's what that bucket is about?

23         MS. GIULIANELLI:  Yes.  From Plaintiffs'

24 perspective, that bucket is all about transfers that are

25 being made by Google to show that there -- that there's a

25

1  real human.

2      So, for instance --

3          THE COURT:  And is there a tag in the data that

4  you can rely on to objectively distinguish those from other

5  things?

6          MS. GIULIANELLI:  Exactly.  I was just going to

7  say that.  For instance, there are very -- and -- and we can

8  get to this when we count damages.  Google actually tags

9  these transfers by category, and with respect to ad

10 attestation, there's like four different subcategories here.

11 There's GAS, which is about -- you know, it's a Google Ad

12 Services system.  And then there's DroidGuard.  These are

13 very specific tags that Google itself tags them to say all

14 of the transfers under DroidGuard are under this tag.  We

15 rely on those tags, and we don't need to and we do not say

16 only some sort of DroidGuard is this and some sort of

17 DroidGuard is some other purpose because everything under

18 the DroidGuard tag, which is the largest category under ad

19 attestation, is for the purpose of showing to an advertiser,

20 using the user cellular data charged against their plan,

21 which is the key, that it's a real person.

22     Now, Google says, Well, DroidGuard does other things.

23 It provides safety.  It provides, you know, stuff for

24 banking, and -- and it does other things too.

25     Now, DroidGuard supports a separate tag called

1    SafetyNet.  We do not count those categories in our damages.

2    SafetyNet is a separate tag, and it is not included.  So,

3    the DroidGuard transfers, when DroidGuard makes a transfer,

4    it is under the DroidGuard tag, and it is for ad

5    attestation.  DroidGuard supports other things like, you

6    know, maybe some banking applications or third parties that

7    want to verify something.  That does not prompt a challenged

8    transfer.

9              THE COURT:  Okay.

10             MS. GIULIANELLI:  So, we do not need to get into

11   that.  We do not count those.

12             THE COURT:  Okay.  All right.  So, that's the ad

13   attestation category.  What about the fourth category that

14   you have?

15             MS. GIULIANELLI:  The fourth category is actually

16   a very small amount of damages, and we're seeking to have

17   all these categories certified, and the fourth category is

18   location uploads.

19        Now, these are uploads that happen when the user is

20   moving like 200 meters and they are uploads of where routers

21   are and where like cellular towers are.  And, so, Google

22   uses these uploads to build its internal map, and it

23   refreshes the internal map like every seven days, sometimes

24   more.  But these uploads are not to tell the user where the

25   user is.  It is not Google Maps.  It is not for the user to

1  find themselves in the moment when the user's looking for

2  directions.  That's not what these are.  They're uploads

3  basically of like right now I don't know if there's some

4  router in here and I had an android, it would be -- and then

5  I moved, it would be pinging Google and saying, Oh, there's

6  a router in the courtroom so that Google knows where routers

7  are.

8          THE COURT:  So, when you say internal maps, it's

9  -- because there was some part of the -- the papers that

10  suggested it was -- and maybe this was the checking category

11  that's no longer here --

12          MS. GIULIANELLI:  Yeah.

13          THE COURT:  -- that Google's building profiles of

14  users, et cetera, et cetera.  Okay.  That's not what you're

15  talking about here.  It's not an internal map of where the

16  humans who have androids are going at any given time.  It's

17  for Google to understand what infrastructure surrounds users

18  who have the android phones?

19          MS. GIULIANELLI:  Correct.  It's for Google

20  basically to -- to build its mapping application.  So, it

21  wants to know where all the routers and WiFi towers are, and

22  that happens even when the phone is idle.  So, if it's on

23  your night stand or if it's in your purse and you're

24  walking, it will be constantly pinging Google when you move

25  like 200 meters to show it where things are.  And the

28

1  defining characteristic of this is that they are uploads and

2  they go to a very specific table.  It's like a tag again.

3  So, we know we can count these uploads because they are

4  measured in a table, and -- and it's unnecessary to use

5  users' cellular data.  Again, they're not time sensitive.

6  Google doesn't need thousands of uploads of where the router

7  is in this courtroom from people even when they're not using

8  the phone and it's idle to build its internal map.  It's

9  historical information.

10            THE COURT:  Okay.  So --

11            MS. GIULIANELLI:  And -- and basically this

12  happens when all apps are turned off.  The user's doing

13  nothing.  It's just they just happen, these uploads.

14            THE COURT:  Okay.  So, again, at risk of derailing

15  your whole presentation by asking my favorite --

16            MS. GIULIANELLI:  These are important.

17            THE COURT:  You've referred repeatedly to

18  Plaintiffs will show this by common evidence.  And, of

19  course, I've read Google's opposition papers, which say

20  different devices, different plans, you know, different

21  things happen at different times, and then I see the

22  representation that based on this sample of 9,000 users,

23  there are these various percentages of 96 percent of these

24  users had this category of data transfer, 99 percent, all

25  but one has this category.

1       So, I am trying to sort out how the parties can have

2  such vast disagreement on those issues, and I'm wondering

3  does the dispute about the commonality of the evidence and

4  the -- the extent to which everyone in this sample set or

5  almost everyone in the sample set experienced a particular

6  category of transfer.  Does that require me to investigate

7  the <u>Daubert</u> issues that are raised about, for example, Mr.

8  Thompson's work?  So --

9              MS. GIULIANELLI:  I can --

10             THE COURT:  Yeah.

11             MS. GIULIANELLI:  I can answer that.  No, I don't

12 think that this goes to the <u>Daubert</u> issues that are raised.

13 I think that the dispute comes from Google's

14 characterization of these transfers.  We -- as -- as I just

15 explained, these transfers all have certain defining

16 characteristics.  Like Clearcut logs are historical logging.

17 Experiments are PH flags.

18      Google says, Wait.  There are 1300 Clearcut logs, and

19 every one has a different information in it.  I think part

20 of the dispute comes from that.  We say that the information

21 in the logs doesn't matter because they're all converted.

22 None of the evidence is -- none of what is in the logs is

23 necessary to show that they're all converted, that they all

24 use cellular data that's unconsented to, undisclosed and --

25 and the improper taking of Plaintiffs' information.

1      So, I think part of the issue comes with Google's

2  characterization of what these transfers are versus the fact

3  that these are categories with common characteristics and

4  we're going to show that all of the categories, for

5  instance, all PH flags are undisclosed experiments.

6           THE COURT:  So, that may be, but I understand

7  Google to say those transfers don't happen on all devices

8  and for all users within the class, that there is not class-

9  wide evidence of that happening, and to put a fine point on

10  it, I understand Plaintiffs' thesis to be that these

11  transfers are mandatory and automatic, at least to some

12  extent.  So, maybe you can as a user limit the amount of

13  data transferred by turning off your usage and diagnostics

14  setting, for example, but you won't eliminate it.  So that

15  if you are a user who has a phone and you -- it's within the

16  class definition for the relevant period of time, the

17  transfers in these categories are mandatory and automatic

18  except for these few outliers, and I don't know if there's

19  an explanation for that but that you're not getting to your

20  class-wide proof evidence by means of some improper, you

21  know, gap filling in the data or -- you know, according to

22  Google's description -- or assumptions that aren't

23  warranted.

24      That's what I'm trying to understand.  So, on the

25  capable of class-wide proof, what can you tell me about that

1 concern?

2        MS. GIULIANELLI:  I think that that's exactly

3 right.  These transfers are all mandatory.  They are all

4 triggered by GmsCore.  It is the same for every class member

5 across the class period.  For example, Clearcut, it happens

6 on every phone.  It happens according to a scheduler.  It

7 does not vary from class member to class member.

8 Experiments as well.

9        In fact, I think that table, I think it's Exhibits 1 or

10 2, shows that only out of the random sample I think of

11 10,000 users, only -- and I don't know why -- one class

12 member does not -- one -- one did not experience these

13 transfers.  So, this is -- this is class-wide evidence.

14 These transfers happen to almost every single person in the

15 class because they are built into GmsCore, and that's the

16 way the software operates, and that's what our technical

17 experts will explain at trial.

18        THE COURT:  But didn't the data sample of 9,000

19 users include only people who has usage and diagnostics

20 turned on?

21        MS. GIULIANELLI:  That's a -- that's a dispute

22 that we have on the merits.  That's what Google says.  We

23 disagree.  Our technical expert -- and this was the subject

24 of cross examination at the last trial.  And, in fact, the

25 jury I think disagreed because they sided with us and they

32

1  gave damages based on the -- the counting of all the -- all

2  the network transfers.

3      Google says that it only includes people who have usage

4  and diagnostics turned on.  We have evidence and our expert

5  says, Oh, no, no.  This particular log is called the

6  Westworld log.  It's one of the Clearcut logs, and it's what

7  measures the data usage.  This log sends regardless of

8  whether or not users have usage and diagnostics on or off.

9  That's a dispute.  Google's experts disagree, and we will

10 show with class-wide evidence that that's just not correct.

11 That is a dispute between the experts for the merits.  So,

12 our experts disagree on that.

13         THE COURT:  So, when we get to -- let's assume

14 that you have a class and what you're trying to figure out

15 is within the class, for a given class member, how much of

16 this -- of their data was used in the way that is alleged to

17 be conversion.  So, there may be some people who rarely use

18 their phones and have only a tiny tiny amount of data usage

19 at all, including data usage that was converted by Google

20 and others maybe used their phone to a large extent, and

21 perhaps -- perhaps that correlates with a greater usage of

22 the kind that the Plaintiffs are complaining about.

23     So, will there be data for which to, you know, allocate

24 to individual class members their -- you know, whatever it

25 is, the -- their damages based on their alleged converted

1    data?  Does that data exist in the world?

2            MS. GIULIANELLI:  It should -- this is a very

3    specific question, and I'll give you a very specific answer,

4    and then I'll explain how we measure it, but, yes, it should

5    exist.  Google maintains that data unless Google has

6    destroyed it.  But Google maintains data by android ID, by

7    user, of every single user's transfers.  And our expert, Mr.

8    Thompson, has opined that -- and this is actually the other

9    deck that your Honor has, and this is -- or, actually, no.

10   This is slide 17 of this deck that -- there is a way to

11   calculate on an individual-by-individual basis using the

12   same -- same exact methodology how much data each individual

13   phone used, and Google has that data.  It's used running it

14   through the exact same program that he ran the sample of

15   10,000 through, the exact same program.  It's basically a

16   computer program, and it adds up.  For 10,000 samples, we

17   have 15 billion pages.  It's a lot, but it's a couple

18   hundred thousand dollars, we verified, to store the data for

19   all the individuals.  So, Google should have that.

20       Now, so, we have that methodology, and we can do that.

21   Now, what we did for purposes of calculating class-wide

22   damages was take a random sample.  So, it should be

23   representative.

24            THE COURT:  Of the -- of the 10,000?

25            MS. GIULIANELLI:  Of the 10,000.

1          THE COURT:  Okay.

2          MS. GIULIANELLI:  A random sample that Google

3    pulled across the class.  It's a massive sample, and it's

4    representative, of course, because it's random and it's a

5    big sample, of all the users and the -- and their data

6    usage.

7          And, so, what we did -- and this is part of the damages

8    methodology -- we counted the average bytes that was -- that

9    were basically consumed, converted in each of these

10   categories, which are by tags.  You can tell what they are

11   by tag.  We counted those of the 10,000 random sample.  And

12   -- and the use of averages is -- is permitted in calculating

13   damages in class actions, and we've cited cases in our

14   brief, but --

15         THE COURT:  But wait a minute.  I mean maybe I

16   misunderstood this about your papers.  I thought that the

17   showing was that you would calculate the amount of data that

18   was converted, data -- bytes of cellular data that were

19   converted that was used -- that has these defining features,

20   these four categories, that was used by Google without

21   permission, and then there would be an amount, which is the

22   price, the value -- like a value of a given byte, and then

23   you would do a multiplication, and it would -- yes, you

24   could get a number across the entire class and maybe an

25   average would be a way to -- to approximate that, but that

35

what you'd actually be doing in terms of class members

awards would be based on the specific -- the specifics for

each class member.

Is that not how -- I mean, we're talking about more

than 100 million people.  So, I'm -- I'm not -- in terms of

the damage methodology for the class, I'm just not sure I

understood your last remark.

MS. GIULIANELLI:  Yeah.  We don't -- we submit

that we don't need to do that last step.  We don't need to,

but if we absolutely had to, we could.  So, your Honor is

right about the way damages on a class-wide basis are

calculated.  We have the sample of 10,000 users.  We

calculate the average data usage based on the representative

random sample, and then we multiply it by -- and I'll get --

I can get into this too -- the -- the fair market value of a

byte.  And that's how we come up with class-wide damages.

And the use of representative samples and average inputs is

permitted.  And, so, that is the way we come up with

damages.

Now, if the issue is the allocation basically of

damages between class members at the plan of allocation

basically at the -- at that stage, first of all, that

actually is not an issue that really -- I think it was in

the Brown v. Google case actually where the Brown v. Google

court said that if the argument is about apportioning

36

1  aggregate damages --

2          THE COURT:  Afterwards.

3          MS. GIULIANELLI:  Afterwards?

4          THE COURT:  Um-hmm.

5          MS. GIULIANELLI:  -- that's -- that's not an issue

6  and in Brown v. Google, the Court rejected that because they

7  said that's not an issue for Google to argue.  But we could

8  do that.

9          THE COURT:  Okay.

10          MS. GIULIANELLI:  And we could do that based on

11  the data that Google has if we needed to because Google does

12  maintain records of --

13          THE COURT:  Yeah.  Okay.

14          MS. GIULIANELLI:  -- what these people used.

15          THE COURT:  I mean, it puts a lot of --

16          MS. GIULIANELLI:  But we could just do it on a pro

17  rata basis too.

18          THE COURT:  Okay.  I mean, the reason I'm asking

19  about this is it puts a lot of pressure on the nature of the

20  sample that was used and then the randomization within that

21  sample, because if it was -- I thought it was 9,000.  If

22  it's 10,000, whatever it is, it's less than one percent of

23  the class.  And if it's less than one percent that has

24  features that are not shared by the whole class, whether by

25  time or settings turned off or on, then it seems to me

1  potentially problematic to then extrapolate in the way that

2  you're describing, if it is not truly representative.  So, I

3  was trying to understand that.  But I had -- I had put that

4  to the side in my brain because I thought that so long as

5  the fair market value has a basis for being calculated --

6  and we will get to that -- then it is whatever the data

7  usage is for a given user times that.  That's the total, and

8  that's also the allocation.  And, so, if that's possible to

9  do or impossible to do, I thought maybe I should know about

10  that.

11         MS. GIULIANELLI:  It is possible to do, but I

12  think I'd like to say something about the sample --

13         THE COURT:  Sure.

14         MS. GIULIANELLI:  -- because even if it -- it's a

15  huge sample.  So, 10,000 users, even if it's one percent,

16  is, our statistician says, very very -- it's a large large

17  sample.

18         THE COURT:  And who's your statistician that

19  you're referring to?

20         MS. GIULIANELLI:  Jeff Steck is the statistician.

21         THE COURT:  Is the statistician.  Okay.

22         MS. GIULIANELLI:  And, in fact, it -- 10,000 users

23  is a massive sample, and I think cases have recognized that.

24  And, so, as long as it's random and representative -- and it

25  is, and we have no reason to believe -- Google pulled it,

1  and Google told us it was pulling a random sample.  So, we

2  do think that based on that sample, it's very scientifically

3  reasonable, valid, and --

4          THE COURT:  Okay.

5          MS. GIULIANELLI:  -- defensible to extrapolate to

6  the class.

7          THE COURT:  Okay.  Most of my questions are about

8  the damages model --

9          MS. GIULIANELLI:  Okay.

10          THE COURT:  -- after we get past this.  But if

11  there's something you want to tell me more about liability,

12  but I have questions about how liability connects to the

13  damages theory or the -- just the theory of harm in the

14  case, and I don't want to prematurely jump to that if

15  there's something more you'd like to share with me.

16          MS. GIULIANELLI:  I would like to share whatever

17  your Honor has questions about is my -- is my first instinct

18  here.

19          THE COURT:  Okay.

20          MS. GIULIANELLI:  But we -- for -- for the class

21  certification -- and I'm not sure if the damages model

22  questions relate to that, and I think I'll be arguing some,

23  and -- and Mr. Summers will be arguing some.  But I think

24  for the clear point, the clear issue -- and if your Honor --

25  I should just say, you're the Judge.  So, you should

interrupt me and tell me to move on if I don't need to, but
for class certification, I think the key point is that
everything is going to be shown with common evidence, and
that includes all of the elements of conversion.  It
includes consent and implied consent.  Class -- conversion
cases are routinely certified for class treatment.  We cite
them, McClure, Wycart (phonetic), in our brief, and those
are cases where consent was disputed, and cases involving
issues of consent, including implied consent, are also
routinely certified in nonconversion cases as well, the
Frasco v. Flo Health case in the Northern District of
California.  And, of course, the reason -- and I think your
Honor touched on this -- is because implied and express
consent are both judged by the objective reasonable person
standard.  And, so, Judge Donato said you apply that
standard, and that is what you look at in -- in arguing
looking at issues of consent on a class-wide basis.

And, so, you know, Google's arguments that there are
different versions of software, different settings and
different cellular data plans fail, of course.  The
transfers all come from GmsCore.  They all have certain
defining objective characterizations, and none of the
settings disclose the transfers or how they happen over
cellular, how often they happen or what they are.
Therefore, they don't give all the material facts to any

40

person, not an average user, not an MIT engineer.  And, so,
that's going to be shown with class-wide evidence here.
And, so, that's the -- the key part.

Now, I think I've just talked at somewhat length about
the -- the transfers.  And if your Honor would like, I can
talk a little bit, and the reason that I'm happy to talk
about it or not if it's not -- if your Honor doesn't have
questions -- about consent, because google makes a big deal
of consent in its papers.

THE COURT:  I'll just tell you I don't think that
-- well, I will hear from Google on this point.  But it does
seem to me that the -- if the question of consent depends on
particular materials being shown to people or not, the
problem would be if I were to find as a matter of law maybe
on summary judgment some day that a particular disclosure
was consent.  Otherwise, it does seem to me that the
argument that -- that the parties are having is -- is class
wide in the sense of, you know, if a user saw X, does that
constitute consent.  And you're arguing that none of the
documents constitute consent.  Therefore, it's -- it can be,
you know, treated on a class-wide basis.

So, you know, if I credit this argument, that the only
basis for -- for consent are these sort of non-user-specific
communications, they're posted on the website.  They're part
of the privacy -- whatever they are.  They're documents that

41

1  users could have seen, class members could have seen,

2  whether they saw them, understood them or not, and you're

3  arguing that none of them constitute consent, then -- then

4  your framing is on a class-wide basis.

5      It could be that when we get to the summary judgment

6  stage, if I find otherwise, the could be decertification of

7  the class is how I was thinking about it.  Does that make

8  sense?

9          MS. GIULIANELLI:  I think your Honor just

10 summarized my five pages.  So, I really don't -- on -- on

11 this issue, which is exactly what the issue is.  None -- it

12 doesn't matter who saw what, what page or who saw what

13 advertisement because we are going to show exactly that

14 based on class-wide common evidence, that none of these

15 websites or anything out there disclose to the objective

16 reasonable person the average android user, that they

17 disclose the transfers at issue, how they're going to happen

18 or anything.  So, that's exactly right.  And that's why we

19 have no issues of express or implied consent here.

20 They're --

21          THE COURT:  So --

22          MS. GIULIANELLI:  -- class-wide issues.  And they

23 rise or fall maybe at summary judgment or at trial.

24          THE COURT:  And I appreciate that Google's

25 argument will be different, which is that it's not capable

42

1    of class-wide proof because the people who saw, you know, X

2    disclosure will have signed up and consented because that

3    disclosure is sufficient.  So, and -- so, I will let Google,

4    you know, argue that issue, but this is -- this is the

5    puzzling thing to me a little bit about all of our arguments

6    about the merits, to the extent they touch on the merits and

7    to the extent they touch on Daubert issues, which is the

8    threshold for class certification is different from when I'm

9    doing summary judgment, even though you all have already

10   completely finished your evidence development in this case,

11   including expert evidence.  So, I'll -- I'll get to that in

12   a moment about my question about how do I deal with the

13   Daubert motions.

14       But I would like to move on to the -- the damages

15   theory.  And the reason -- so, this is also something that

16   the Plaintiffs must satisfy for purposes of class

17   certification, namely -- and, you know, I have Comcast in

18   mind -- there needs to be a model that can serve as evidence

19   of damages in a class action that measures only those

20   damages that are attributable -- that are attributable to

21   the Plaintiffs' theory of liability.  In other words, the

22   nexus between the theory of liability and the damages model

23   has to be there.  They have to match.  They have to measure

24   the right thing.  The model has to measure the right thing.

25       And, so, I am trying to make sure I understand what the

43

1  thing is that we're measuring.  So, I went back and looked

2  at the Ninth Circuit's decision, and, you know, this was a

3  memorandum decision, and there was not a lot of elaboration,

4  shall we say.  But, nevertheless, the description on the

5  damages theory is -- at least part of it is like a forced

6  sale, Google's alleged surreptitious use of the cellular

7  network through Plaintiffs' data plans causes Plaintiffs to

8  experience an immediate discrete loss of a specific sum of

9  valuable cellular data which is charged against their plans.

10      And I was pondering that in the contest of the parties'

11  debate about unlimited plans, metered plans, and things that

12  have, you know, specific limits and subject to overcharging

13  and throttling.  And I am not sure I totally understand the

14  Plaintiffs' theory here about what the it is because there's

15  a remark -- and I'll point you to it since I noted it --

16  that I found a little bit puzzling in the reply brief.

17  Let's see.  This is at page two.

18          MR. SOMVICHIAN:  This is the class cert reply,

19  your Honor?

20          THE COURT:  Yes.  I'm sorry.  We're all talking

21  about a class cert reply.  Plaintiffs claim -- and this is

22  the middle, around line 10:

23              "Plaintiffs' claim is based on the

24          simple fact that Google's consumed

25          users' valuable cellular data, thereby

44

1           reducing the amount that users

2           themselves could use, share with others

3           or decide not to use.  Cellular data

4           costs money.  Each byte that Google

5           consumes is no longer available to the

6           user who paid for it.  This is true

7           regardless of whether a user had a

8           limited or unlimited plan.  The loss of

9           valuable property has long been

10          recognized as a form of injury,

11          regardless of any further consequential

12          harm," et cetera, et cetera.

13      But then at line 18:

14          "Plaintiffs' case is effectively

15          limited to cellular traffic that

16          carriers categorize as metered, meaning

17          that it is finite and not truly

18          limited."

19      And I had no idea what that meant.  Could you please

20 clarify what -- what you are talking about here?

21          MS. GIULIANELLI:  I -- I sure will.  This -- first

22 of all, it is a -- this is just saying that as a practical

23 matter -- and then I will talk about our methodology.  As a

24 practical matter, for purposes of measuring damages, we

25 measured for purposes of damages everything that Google tags

45

1    as metered.  There's an unmetered category and metered.

2              THE COURT:  Google tags it as metered?

3              MS. GIULIANELLI:  Google does.  Well, Google --

4    the carriers report to Google what's metered and unmetered,

5    and then Google's tags say metered or unmetered in what is

6    called the Westworld data.  It's a little bit of a --

7    honestly, it's a little bit of a -- basically, for purposes

8    of measuring damages, everything was subject to either

9    limitations before 5G by the carriers or when Google moved

10   in 2021 to a dataset called Westworld, the carriers started

11   reporting it as metered or unmetered.  And, so, we counted

12   only metered as part of damages.

13             THE COURT:  On a user-specific basis the carrier

14   would say this data transfer on this user's phone using this

15   user's data plan is metered versus unmetered?

16             MS. GIULIANELLI:  Yes, for the Westworld data,

17   which starts in 2021.

18             THE COURT:  And what does that mean?

19             MS. GIULIANELLI:  That means -- it means that the

20   carrier is metering it and counting it against a plan.

21   Basically, it's -- it's just another form of -- it's a form

22   of count -- of being limited.

23             THE COURT:  So, it's a form of counting?  It's

24   just counting?

25             MS. GIULIANELLI:  Yes.  It's saying that this is a

46

1    metered plan.

2            THE COURT:  And what does that  mean from -- maybe

3    it depends on the carrier, but what does that mean from the

4    carrier's perspective?  Because the carrier maybe has like

5    -- doesn't care about this case at all and just cares about

6    its own business.  And, so, what is the carrier indicating

7    by metered versus unmetered?  If you know, like, is that

8    known in the case?

9            MS. GIULIANELLI:  I mean, Mr. Summers wants to say

10   something, and I want to talk about -- because I'm not sure

11   this actually matters a lot to the methodology -- to the

12   methodology.

13           MR. SUMMERS:  This is an issue that -- that I have

14   a little more detailed knowledge, and then I'll refrain from

15   tag teaming.

16       The -- on this issue, so, what has happened over time,

17   traditionally when unlimited plans came out, the still were

18   subject to throttling limits and/or overcharges.  So, they

19   were called unlimited plans, but they still had specific

20   caps.  In more recent years, the carriers have introduced

21   premium unlimited plans that don't have these hard caps.

22       Traffic that is counted as unmetered is either WiFi or

23   traffic that is on a premium 5G plan that the carriers

24   consider more to be a truly unlimited plan.  So, the bottom

25   line, the point we are making in the brief here is that when

47

we limit our damages case to metered traffic, to the extent

the users have so-called unlimited plans, they are unlimited

plans that have -- that typically have severe throttling or

overcharge caps.  We're not dealing with any plans that are

truly are more properly characterized as unlimited in

nature.  That traffic is actually treated as unmetered and

is not included in our case like WiFi traffic.

THE COURT:  Okay.  So, could I just like follow up

on that?  So, are the Plaintiffs telling me that the only

data transfers that are the subject of this action, this

class action, are ones where if a user is in the position of

exceeding a certain threshold, whatever it may be, there

will either be a reduction in performance, the throttling,

or an overcharge?

MR. SUMMERS:  Generally speaking, yes.  That is

all -- our case is limited to what the carriers define as

metered traffic, which generally means it is being counted

against a cap.

THE COURT:  Counted against a cap, but --

MR. SUMMERS:  But it is finite.

THE COURT:  But your -- your argument doesn't

depend on that cap getting exceeded?

MR. SUMMERS:  Correct.  We're not seeking damages

based on overcharges.  We're not --

THE COURT:  So -- so, in other words, like --

48

1              MR. SUMMERS:  We're not getting into throttling

2   or --

3              THE COURT:  -- you could have like a metered plan

4   that has like so much data available that like a typical

5   user would never ever even approach it even with Google

6   doing its data transfers.  Nevertheless, that would be

7   within the scope of the class action?  Because it's metered,

8   you can count?

9              MR. SUMMERS:  It would.  And we are simply

10  counting everything that is metered and not counting

11  anything that is unmetered.  Correct.  If it's --

12             THE COURT:  And how do you --

13             MR. SUMMERS:  -- counted and finite --

14             THE COURT:  Okay.

15             MR. SUMMERS:  -- it is included in the case.  If

16  it is not counted and is not -- you know, that some in a

17  sense treated by the carriers as not being finite, it's not

18  in the case.  And --

19             THE COURT:  And --

20             MR. SUMMERS:  -- this goes to the nature of the

21  property.

22             THE COURT:  Yeah.  And --

23             MR. SUMMERS:  We're dealing with a finite

24  property, that there is a limitation.

25             MS. GIULIANELLI:  And that -- and that was the --

49

1    and that was the counting of damages, specifically what your

2    Honor was asking about.

3         THE COURT:  Okay.  But does -- does that exclude

4    certain class members who would otherwise be in the case?

5         MS. GIULIANELLI:  No.

6         THE COURT:  How do I understand the class

7    definition?

8         MS. GIULIANELLI:  Yeah.  So, the class definition

9    -- and I think this is the -- the confusion and why your

10   Honor's asking about this.  So, the class definition is all

11   users of android phones during the time period -- I think

12   it's November 2017 -- to the present, because all of them

13   had their data converted and all of them suffered harm,

14   whether or not they were on a so-called unlimited plan, and

15   the evidence at trial is going to show, just as it did in

16   Chupo (phonetic), that there's nothing -- it's not like air.

17   There's no such thing as a true unlimited plan, right.

18   There's always network congestion, and carriers count all of

19   the data.  They do count it.  They measure it.  It can be

20   precisely measured.  It can be throttled.  We don't need to

21   determine whether or not a specific individual was throttled

22   because they are all part of the class, and they have all

23   suffered harm because of the nature of the property and the

24   conversion here.  And, so, the class definition is all users

25   of android phones who have suffered harm regardless of the

1  type of plan that -- the thing that carriers marketed,

2  whether they marketed it as unlimited or not.  And that's

3  consistent with the Ninth Circuit's opinion.

4          THE COURT:  But you say you've excluded meter --

5  people who don't have unmetered -- the carrier doesn't

6  identify them as --

7          MS. GIULIANELLI:  No, I know.

8          THE COURT:  -- unmetered.

9          MS. GIULIANELLI:  That's what I was --

10          THE COURT:  So, like how do I -- is that a subset

11  of your class definition or --

12          MS. GIULIANELLI:  No.

13          THE COURT:  -- am I just relying on your good

14  faith to tell me those people aren't in there?  What --

15          MS. GIULIANELLI:  And I think that's where we got

16  confused.  This is just the damages calculation, and the

17  damages calculation, the point is it was extremely

18  conservative.  And, so, for purposes of calculating damages,

19  we only counted the metered, and that's just because we

20  couldn't tell based on the way -- one of the reasons Google

21  keeps it -- whether unmetered is WiFi or something else.

22      So, for purposes of --

23          THE COURT:  Oh, you --

24          MS. GIULIANELLI:  -- damages calculation, but

25  they're not excluded from the class.

1          THE COURT:  Okay.  But if there is class

2    certification, you're going to give notice to class members.

3    And if class members haven't been -- aren't a member of the

4    damages class, isn't that a problem?

5          MS. GIULIANELLI:  No.  It's -- it's not.  It's not

6    a problem because the -- it's just a way of calculating the

7    damages in a way that's conservative.  So, as Mr. Summers

8    said, there's the unmetered, which could be a lot of WiFi.

9    They're not part of the class.  It's users who use their

10   cellular data, whether it was limited or unlimited.

11         THE COURT:  So, I -- so, my understanding of the

12   present contention that the Plaintiffs have is that it

13   doesn't matter whether it was metered, unmetered, throttled,

14   not throttled, whatever.  Any data that is mine that Google

15   used counts, and we have to value it?

16         MS. GIULIANELLI:  Correct.

17         THE COURT:  That's -- that's it.  No matter what,

18   whether there was economic harm otherwise or not, it's --

19   it's a widget, and you took it from me?

20         MS. GIULIANELLI:  That is correct.  And we would

21   say that there's always economic harm and there's always

22   actual injury because the --

23         THE COURT:  Well -- right.

24         MS. GIULIANELLI:  -- taking of property is injury.

25         THE COURT:  That's --

1              MS. GIULIANELLI:  But that is correct.

2              THE COURT:  I understand that that's -- that's the

3    theory.  So, okay.  So -- so, then your -- your -- the way I

4    understand your argument then is that the project is to

5    value that but the -- the factual basis for coming up with

6    value uses -- maybe subset isn't the right word but uses

7    only the data that is identified as metered to do the

8    valuation?

9              MS. GIULIANELLI:  That is correct.  And I think it

10   -- that is correct because unmetered includes WiFi and --

11   and some of the new 5G plans.  So, it's a conservative

12   damages calculation.

13             THE COURT:  Okay.  All right.  I think -- I think

14   I get that.

15             MS. GIULIANELLI:  But I see why that's confusing.

16             THE COURT:  Yes.  Okay.  So, this gets in a little

17   bit to the Daubert issue I think, and I'm just going to ask

18   this question out loud.  The -- the thing that I found most

19   compelling about Google's argument on the Daubert damages is

20   that the Plaintiffs' experts don't seem to be valuing the it

21   that you have described to me as the converted data.  They

22   are valuing other things, bigger things, broader things.

23   But I want to make sure that I really understand the

24   Plaintiffs' argument.  So, in other words, the marginal data

25   theory really resonated with me, that you should be trying

53

1  to value the value of that marginal data and not all the

2  other stuff that might go into the plan.  Like total

3  revenues divided by total usage to me seemed like not a

4  reliable methodology, but, you know, that said, it's not --

5  it's not a question -- I agree that it's not a question of

6  has a given user suffered economic harm.  That's -- that's

7  not the question.  I think that's -- although there is this

8  alternative damages theory, which I'll -- I'll get to in a

9  moment, but I'm just trying to understand how -- how these

10  numbers that your expert has proposed in his damages report

11  actually are measures of the data that's been converted, and

12  one of the questions I had looking at the jury instructions

13  formulation is in this context, where you're trying to value

14  the value of this bit of data that's been transferred, who

15  is the willing buyer?  Who is the willing seller?  And I

16  don't mean like is there actually a market, but who are

17  these people in the hypothetical market that were instructed

18  to apply?  And I'm not sure of who's going to answer that

19  question.  But, Mr. Summers, if that's -- if that's on your

20  plate, I'll hear from you.

21          MR. SUMMERS:  Sure.  Well, I do think this is a

22  battle of the experts, your Honor.  And Doctor Etner

23  (phonetic) testifies that the primary market is the market

24  that matters, that we should look to the price consumers pay

25  when they buy cellular data from the carriers.  He expresses

54

1   that opinion.  There's an active market.  We have pricing

2   data.  Doctor Gos, on the other hand, argues that we should

3   look at the secondary market and wonder, ask the

4   hypothetical how much would a consumer charge Google.

5   Doctor Etner responds to that and says, We don't -- that

6   there is no active market there.  We don't have data, and I

7   think it's a battle of the experts, and it's for the jury to

8   determine, and there's evidence going both ways.  But I -- I

9   don't think --

10          THE COURT:  See, I'm troubled by that because --

11   for two -- two reasons.  First of all, the damages model has

12   to match the liability theory.  So, if the liability theory

13   is one thing, then the damages model has to value that.

14   And, secondly, the case law says there doesn't have to be an

15   actual market.  What we are trying to do is use the

16   information that we have to say in the hypothetical world

17   what would be the fair market value of this thing, but you

18   can't say, Well, there's no market for that thing.

19   Therefore, we're going to value some other thing which has

20   not matched your liability theory.  And that's where I

21   really struggled, because it seems to me like there is

22   evidence in the world from which experts could necessarily

23   agree but could infer the value of the thing that is

24   actually converted.  And, so -- so, I was -- I was troubled

25   by the idea that, well, we're going to value something else.

55

1      And -- and, so, that's why I come back to the question

2 who's the willing buyer and who's the willing seller in this

3 scenario?  Like who would they be?

4           MR. SUMMERS:  Well, your Honor, I think it's

5 important to understand we're dealing with the same thing.

6 There's one thing, right.  We are dealing with the

7 transmission of cellular -- of information over the

8 carrier's cellular network, right.  Regardless of who the

9 buyer and the seller is, we're dealing with a commodity.

10 Doctor Etner testifies -- proffers the opinions in his

11 supplemental report with a relatively homogenous commodity,

12 and, so -- so, the -- there's no dispute about what is being

13 measured here.

14     And what Doctor Etner does is he does precisely what

15 the industry does in calculating the average price of

16 cellular data looking at the revenue and the amount of data

17 transmitted to come up with an industry average price for

18 cellular data.

19     There's no reason to think that if a consumer were the

20 seller and Google were the buyer, that they wouldn't look to

21 the same data that the telecommunication --

22           THE COURT:  Maybe --

23           MR. SUMMERS:  -- centers would look to.

24           THE COURT:  -- that's true.  Maybe that's true.

25 Maybe that last thing that you said is true, but we still

56

have to start with the point of like who's the willing

buyer, who's the willing seller, and I'm looking again at

your reply brief where the claim is based on the simple fact

Google consumed users' valuable cellular data, thereby

reducing the amount that users themselves could use, not

use, share with others that data.

So, that's what we're valuing, what is the fair market

value of the data that users could have used themselves, not

used, or shared with others.

MR. SUMMERS:  And the evidence remains the same,

your Honor, regardless of who the parties to this

hypothetical are.  There is -- consumers pay a certain

amount of money for their cellular data.  If they had access

to the full information, they would know that Google is

using a portion of it, and there's every reason to think

that they would expect the fair market value of their

cellular data.

THE COURT:  Okay.  So, you --

MR. SUMMERS:  Which Doctor Etner has quantified.

THE COURT:  So, the -- okay.  But in the -- in --

if we're going to apply the methodology that we're

instructed to under California law, the -- the willing buyer

is Google, and the willing sellers are the people who have

the phones and have the data plans.  Is that how I'm to

think of it?

57

1            MR. SUMMERS:  I don't think so, your Honor.  I'm

2   not sure that it -- ultimately, I'm not sure that it

3   matters, but I don't think so.  We're dealing with -- if we

4   were looking at stocks, we would -- we would be looking at

5   the quotations for stocks over the -- over a day or some

6   period of time to determine what class rights was.  We would

7   not look at who the buyer is specifically, who the seller

8   is.  We would look to the market.  And that's exactly what

9   we're doing here.  We have a commodity that is bought and

10  sold by hundreds of millions of people every day from a

11  large number of carriers.  There is an established market

12  price.  There are variations, just as there are buying

13  stocks any given day.  There can be variations, and you

14  might get a better deal, you know, on a certain platform

15  than another.  But there is a market that is relatively

16  efficient.  There is an established market price.  That is

17  what Doctor Etner says.  That is what he estimates and

18  quantifies for the telecommunications industry every two

19  years, and it's tracked.

20       So, the idea that we should look at a hypothetical

21  transaction between a specific consumer and Google, I'm not

22  sure that's what the jury instruction or the relevant law

23  requires.  I think we're to look at this more from the

24  perspective of market, what's the fair market value.  And

25  the fact that we're to look at the highest price suggests

58

1  that we don't look at a particular transaction that would

2  drive a lower price.  We're looking at the value of a

3  commodity, of an article --

4         THE COURT:  Yes.

5         MR. SUMMERS:  -- of commerce.

6         THE COURT:  That's the thing is I agree we're not

7  supposed to look at specific transactions, although, those

8  specific transactions like specific data plans may be

9  evidence of what the fair market value is, and the hundreds

10 and hundreds of different transactions out there in the

11 universe about the value of a particular byte of data or a

12 data plan with, you know, certain limits or -- or not may be

13 evidence upon which an expert could rely to come up with a

14 fair market value.  But we still have to figure out what

15 we're valuing, and I don't think it's -- I don't think it's

16 like stock to say publicly traded stock is going to be the

17 same price on a given day for anybody buying or selling it.

18 This is not like that.  This is a user's property.  And

19 while you can maybe do it on an aggregate basis and have,

20 you know, class-wide evidence of it, it's not in the same

21 scenario as when a -- if there were a conversion claim that

22 Google was stealing from the carrier, okay.  But Google is

23 not alleged to be stealing data from the carrier.  Google's

24 alleged to be sealing data from the user.  So, we should be

25 valuing that, and that's why I felt like the framing of the

1 marginal value was an important distinction over what your

2 expert's methodology was, and I was worried about that

3 because your expert seems to be valuing something other than

4 what is converted.

5          MR. SUMMERS:  On that, your Honor, I would

6 disagree.  Look, we calculate the precise amount of cellular

7 data being consumed by Google for the challenged transfer,

8 and they track this.  Every single transfer is actually

9 tagged and tracked, whether it's metered --

10          THE COURT:  Got it.

11          MR. SUMMERS:  We -- we calculate the exact quantum

12 that Google has converted for its own purposes, and our

13 experts then determine the market value, the fair market

14 value of that data using the industry accepted methodology

15 that the industry uses.

16          THE COURT:  What's the industry accepted

17 methodology that you're referring to?

18          MR. SUMMERS:  Doctor Etner's average --

19          THE COURT:  Total revenue divided by total data

20 usage?

21          MR. SUMMERS:  It's -- essentially, yes, that is

22 the -- that is the model that Doctor Etner uses.  Every two

23 years, he prepares a report for the cellular

24 telecommunications industry association with all the

25 carriers and Google members.  They then utilize this data

60

1  and publish reports to their members, and the -- and the

2  industry tracks this and a lot of other --

3           THE COURT:  Okay.  But that --

4           MR. SUMMERS:  -- related data.

5           THE COURT:  -- is for that industry, right.  And

6  they're offering services in addition to just the data.  So,

7  that's the critique that I -- I'm not entirely sure I

8  understand Plaintiffs' rebuttal to, which is that if you're

9  looking at total revenue and not accounting for some of

10  these other services that go in there, that you may be over

11  valuing -- and I'm not talking about the Google Fi thing at

12  the moment.  I'm talking about the sort of principal

13  methodology.  You will be over valuing the marginal

14  incremental value, because google's not stealing the entire

15  data plan.  Google is stealing, according to Plaintiffs,

16  this quantum or whatever the word the Ninth Circuit used,

17  you know, the specific sum of valuable cellular data, not

18  the subscription to Netflix, not other things, but the

19  particular cellular data that is needed to do this transfer

20  that Google is doing for its own benefit, just kind of

21  paraphrasing there.

22           MR. SUMMERS:  Right.  And, to be clear, Doctor

23  Etner does perform steps to exclude revenue attributable to

24  other services from his calculation of the average cost of

25  data.  So, he -- beginning in -- in 2013, the carrier

61

1   stopped providing breakdowns of service revenue and

2   allocating the apportion to data.

3       And, so, what he does, though, is he takes that

4   proportion.  He carries it forward.  Now, we know the data

5   has been growing rapidly, the use of data, whereas the use

6   of voice has been flat.  And we know from his report -- his

7   supplemental report that data has increased 91 percent

8   premier on an average compounded annual basis.  What he does

9   very conservatively is he takes the ratio of data to voice

10  and -- and text messaging, applies a very con -- and this is

11  the 50 percent estimate that they complain about, saying

12  that there were, you know, telephone discussions or

13  conversations with the carriers involved.  It's a very

14  conservative way of over estimating a portion of the revenue

15  that should be allocated to voice and text messaging and to

16  other services and not to data -- QuaData.  And he does

17  that, and he then takes those two different approaches.

18  One's called the disaggregated.  One is called the bundle,

19  and he uses a blended average where he actually uses the

20  specific ratio of the carrier's transmissions and the extent

21  to which everything is now data versus using voice over,

22  LTE, versus the traditional -- and he -- and he uses these

23  two approaches to estimate and to disaggregate from his data

24  points of data an amount attributable to traditional

25  services like voice and instant -- and -- and traditional

62

1   text messaging.  And he also addresses the issue of

2   subscription, saying that doesn't sweeten it, there's no

3   specific allocation.  So, he's addressed all those issues,

4   and he's -- he's brought down the number.  He does this both

5   for CTIA, and he's used the exact same methodology here.  He

6   basically just took his CTIA methodology and updated it for

7   this case, done the exact same thing here to actually come

8   up with an estimate of the value of the data per se and

9   nothing else.  And -- and it is in his judgment -- and he's

10  expressed opinions.  Again, I'd direct the Court to his

11  supplemental report -- that it is a -- a fair and reasonable

12  estimation of the fair market value of cellular data and

13  that it represents a very conservative measure because

14  purchasers are paying a lot more than the average.

15      Now --

16          THE COURT:  So, do you take issue with Google's

17  argument that what should be valued here is the marginal

18  cost of the data?  I'm trying to under --

19          MR. SUMMERS:  Absolutely.  The --

20          THE COURT:  So, what's the difference?  What --

21          MR. SUMMERS:  And I went through a trial --

22          THE COURT:  Wait, wait, wait.

23          MR. SUMMERS:  -- a few weeks ago where they

24  presented that theory.

25          THE COURT:  What's -- wait.  Just a moment.  Just

1  a moment.  What's -- I don't -- I actually don't want to

2  hear about Chupo too much, but I -- and who won and who

3  didn't.  I want to understand what the argument is.  So,

4  what is the difference between the marginal value of some

5  increment of data and what you're arguing is the fair market

6  value of the data, QuaData?  Like what is the difference

7  there?

8          MR. SUMMERS:  To -- it's difficult to answer that

9  question without explaining the convoluted approach their

10  expert uses.  What their expert does -- does is he trades

11  Google's data as the last data being purchased.  And his

12  idea is, Well, if a consumer is already buying all of this

13  data, as you buy more and more data, the price per gigabyte

14  or per megabyte or per byte goes down.  And, so, he actually

15  looks at different plans and says, when you get to bigger

16  plans, you pay less per gigabyte than with smaller plans.

17  He makes that adjustment in his report, which, again, goes

18  to the reliability of the methodology he --

19          THE COURT:  You're talking about Google's expert?

20          MR. SUMMERS:  Correct, Gos.

21          THE COURT:  Okay.

22          MR. SUMMERS:  -- actually makes an adjustment for

23  that and adjusts Etner's number down, which, again, I think

24  the fact that they're able to do that and to quantify both

25  ways shows that this is something for the jury and not a --

64

1   a fundamental reliability issue that warrants <u>Daubert</u>.

2   They're able to do the calculus, and they actually bring

3   down based on that adjustment and one other, Etner down by

4   92 percent.

5           THE COURT:  Yeah.  No, so, apart from just

6   disagreeing about the numbers, like, I'm -- what I'm really

7   trying to get to -- and I'm sorry for belaboring this point,

8   but it -- I feel like it's kind of important for me to

9   understand.  It's like what -- as a matter of sort of theory

10  or like how are you conceiving of the -- what you're

11  measuring.  How is -- what is the difference between

12  marginal versus what you're doing?

13          MR. SUMMERS:  Our -- our point would be there is

14  no difference because cellular data has a price in the

15  market that the industry tracks and follows and understands,

16  and it is priced on a per-gigabyte basis, and the -- we

17  quantify the specific sum Google uses.  We can't say that

18  Google's is the last rather than the first.  Google is doing

19  these transfers every single day, the first day of the

20  billing cycle, Google last.  It's an overhead.  You treat

21  the overhead as the first or the last.  They would say it

22  should be last, and be --

23          THE COURT:  Whether it's first or last --

24          MR. SUMMERS:  -- marginal.  We would say --

25          THE COURT:  Sorry.  Whether it's first or last

65

doesn't really seem to matter, but would -- would we all

agree that -- maybe this is a wrong assumption on my part

but that for a given user, maybe like a typical user, they

consume a certain amount of gigabytes per month and that

whatever Google is doing is like -- it's kind of a small

subset of whatever that user has done.  Maybe if the user

has a lot more, Google has a lot more.  But if a user is

using it -- his or her phone infrequently, maybe Google's

data transfers are less frequent as well.  I'm not sure.

This -- I'm asking is this a fair assumption on my part that

-- that as a matter of proportion, Google's data transfers

are a small -- the subjective word -- subset of the overall

data usage of that user's phone in a given month?

        MR. SUMMERS:  Yes, Google's utilization is a small

-- relatively small portion of the overall utilization by

the phone in a given month.  That is true.  It's not

necessarily a one-to-one correlation in the terms of the

magnitude of the usage of the phone and the -- the magnitude

of these transfers.  For example -- for example, location

uploads, those do not include any location-based information

that's actually triggered by user, right.  And that's when

your phone is just completely idle.

        THE COURT:  So, it's independent?

        MR. SUMMERS:  You move 200 meters, it's going to

start using your phone to map the world.

66

1          THE COURT:  Okay.

2          MR. SUMMERS:  And using your phone as a mapping

3  device.

4          THE COURT:  Um-hmm.

5          MR. SUMMERS:  So, that is all true, but the fact

6  remains that under the applicable law and the pattern

7  instruction, we are to determine the fair market value.

8  That is an objective measure.

9          THE COURT:  Um-hmm.

10          MR. SUMMERS:  Our experts look at objective real

11  world data about pricing.  What actual consumers pay in the

12  actual market, that is -- that is a primary market, but

13  there's no reason to think -- there is -- there is a bit of

14  a secondary market.  Traditionally, there has been a way of

15  selling through hot spots data.  It's -- it's sort of kind

16  of going away over time.  Like data was much more precious,

17  you know, 10 or 15 years ago and much more expensive per

18  gigabyte.  But there has been -- but there's -- there's no

19  reason to think that there's any delta between the two.

20  And, interestingly, both experts agree that you can look at

21  the primary market for -- for determination of the fair

22  market value.  That's not really a focal point of this

23  agreement.

24          THE COURT:  Well, it's -- and it's agreement on

25  what evidence you can look at but not necessarily -- I

67

1  perceive the -- I thought that was the case, but I -- I

2  perceive now that there's a difference in terms of the

3  model, and that's going to bring me to my last question, and

4  then I really probably should hear from Google.  They're

5  just sitting there very patiently, but I don't want to short

6  circuit things, but, so, bear with me.

7      Section -- Civil Code Section 3336 has two parts, the

8  detriment caused by the wrongful conversion of personal

9  property is presumed to be, first, the value of the property

10 at the time of the conversion with the interest from that

11 time or, an amount sufficient to indemnify the party injured

12 for the loss, which is the natural, reasonable, and

13 proximate result of the wrongful act complained of, et

14 cetera, et cetera.

15         UNIDENTIFIED SPEAKER:  Right.

16         THE COURT:  Okay.  So, I finally understood from

17 reading the Daubert briefing that, in fact, there's a

18 disagreement between the parties.  Plaintiffs have a theory

19 of damages that goes with the value of the property at the

20 time of the conversion, and then -- and Defendant tries to

21 rebut that in terms of the actual number but also is arguing

22 an amount sufficient to indemnify the party injured for the

23 loss, which is the natural, reasonable, and proximate

24 result.

25      So, okay.  I -- you know, those two theories can live

1  in the world and -- and I think Google's right that in --

2  under the case law in appropriate circumstances, that -- I'm

3  going to call it second part of the way to value conversion

4  damages could be available.

5      But what I'm -- what I'm sort of struck by in reading

6  this text is that the party injured by the loss.  The party

7  injured by the loss is the user.  In Plaintiffs' theory, the

8  party is injured like across the board, regardless of plan,

9  by having their data used.  I get that.  That's what the --

10  the law requires, that being deprived of your property, in

11  this case the data, is the injury, and we're valuing that.

12  And there can be additional -- there can be an alternative

13  theory that says, Okay.  But if you compare that loss to the

14  economic loss the party experienced, then somebody's getting

15  a windfall.  This is unfair, unjust, et cetera, and there's

16  case law that allows for potentially -- I mean, it's from

17  1965.  I haven't gone and looked, but whatever.  I haven't

18  drilled down into that particular issue, but those -- those

19  -- let's just say those -- those two competing theories of

20  damages could live in the world.  I still think what we have

21  to do is ask what's the fair market value in the right

22  scenario, meaning the party who has the data, possession of

23  the data.  The party who has possession of the data, what is

24  the fair market value of that property, not the carrier, but

25  the party who has possession of the data, and I just -- I'm

1 just struggling with that point honestly.

2          MS. GIULIANELLI:  Your Honor, it may help actually

3 to -- to point your Honor to the actual slide 21 and --

4          THE COURT:  Okay.

5          MS. GIULIANELLI:  -- slide 22.

6          THE COURT:  In the <u>Daubert</u> --

7          MS. GIULIANELLI:  In the -- actually, it's in

8 class cert, but it goes to the question, and I think it will

9 help answer this.

10          THE COURT:  Um-hmm.

11          MS. GIULIANELLI:  And this is the jury instruction

12 based on California law, and it goes to the question of what

13 the it is.  What is the property?  It's a byte.  A byte is a

14 commodity.  A byte is a byte.  It can be valued.  There is a

15 fair market value, and the jury instruction said the highest

16 price a willing buyer would have paid to a willing seller.

17     And, so, if your Honor goes to the next slide --

18          THE COURT:  No.  Wait.  Wait.  Before we go to the

19 next slide, and, two, if the buyer and seller know all the

20 uses and purposes for which the cellular data is reasonably

21 capable of being used.

22          MS. GIULIANELLI:  Correct.

23          THE COURT:  And you've defined that for me as use,

24 not use or share.

25          MS. GIULIANELLI:  Yes.  And, so, it's basically

70

1  what a -- if -- if someone had full information like a

2  hypothetical one person had full information about how it

3  was going to be used, Google, what they would sell it for.

4  It's -- it is not the value of the property to any

5  particular individual under California law.

6         THE COURT:  But what about the category of users?

7  The market is -- the hypothetical market is this category of

8  users who have -- have purchased cellular data via their

9  plan and have this valuable cellular data that they think

10  they can solely use or control, and now somebody's coming

11  and taking it, and what would they have told it for?  It's

12  like -- forgive me.  I'm going to introduce a thing that is

13  probably not appropriate to introduce now, but like the

14  privacy litigation.  I have my private data.  I don't think

15  anybody's supposed to take it.  Mr. Somvichian can plug his

16  ears right now, but -- but what's the value of the -- that

17  private data?

18         MS. GIULIANELLI:  Well, you --

19         THE COURT:  It's not to -- it's to the user,

20  right?

21         MS. GIULIANELLI:  Right.  And, so, you can look,

22  and then Mr. Summers will get back to -- to Doctor Etner.

23  Some of this overlaps with class cert, but one -- one of the

24  ways -- you can look at evidence of the actual value sold in

25  the marketplace to see what a willing buyer would have paid

71

1  for it, and we have a couple of benchmarks.

2            THE COURT:  Yeah.

3            MS. GIULIANELLI:  One is the average price of data

4  that Doctor Etner calculated, and then the other benchmark

5  is the Google Fi price, and that's actual data that was sold

6  in the marketplace to -- by a willing seller to a willing

7  buyer in the marketplace.  So, both of those are benchmarks,

8  and they're both evidence because you can use market data as

9  evidence of --

10            THE COURT:  Sure.

11            MS. GIULIANELLI:  -- what a willing buyer -- so,

12  both of those are benchmarks, and both are -- apply on a

13  class-wide basis because it's not to any individual.

14            THE COURT:  And is this only -- or if there is a

15  -- there is reliable evidence that this data is a commodity

16  in the way that you've described it -- people have been

17  throwing that word around, but -- but I'm not sure the

18  commodity that you're using it means what you think it

19  means.

20       So, you know, from an economic perspective, a commodity

21  is like really fungible.  It can be -- you know, I'm not

22  sure this is fungible.  Is -- is that the -- is that like --

23  is your theory of fair market value dependent on the

24  assumption that it's fungible?  It's a -- it is a commodity?

25            MR. SUMMERS:  I think that is a relevant

72

1  consideration.

2           THE COURT:  Okay.

3           MR. SUMMERS:  I'm not sure if the test depends on

4  it.  Again, Doctor Etner is providing the average price of

5  cellular data, the way the industry tracks it.  That is an

6  average.  It embraces all plans high and low, and it

7  reflects -- it's a great -- as he explains, it's a reliable

8  input to determine on a class-wide basis what the fair

9  market value of the data consumed would be.  I mean, you

10  can't think of a better match.  An average calculated the

11  way the industry tracks it to apply to this broad set of

12  transfers using a number of plans.

13      But, to the extent it matters, Doctor Etner at

14  paragraph 12 of the supplemental report explains that it's a

15  homogenous good, that it's mostly fungible, that the price

16  does not -- does not significantly differ between the

17  carriers, and in his trial testimony, which Google included

18  -- in fact, it's -- it's attached as Exhibit A to the

19  Somvichian reply declaration -- at page 1167 of the Chupo

20  trial transcript -- and I think this is akin to deposition

21  testimony for this case -- he was asked the question:

22           "Q    In general, when someone buys

23           cellular data on one network, are they

24           buying the same thing for a different --

25           same thing or a different thing than

73

1          when they buy cellular data on a

2          different network?

3          A     Typically, they buy the same

4          thing.  You access the Internet.  You

5          watch a video.  You send an email.  A

6          byte is a byte.  The networks have

7          become very similar in most places."

8     And what he explained is that if you look at the three

9  carriers and look at their coverage now, their coverage is

10  largely comparable.  Their speeds are largely comparable.

11  To most users they are fungible.  And the secondary carriers

12  typically have arrangements where they're piggy backing on

13  the big carriers.

14          THE COURT:  Okay.

15          MR. SUMMERS:  He said in a specific instance you

16  might live in a place where the -- the T Mobile service,

17  you're just missing their cell or whatever and you don't

18  have good -- and -- and for you, Verizon might be better.

19  For someone else it might be different.  On an individual

20  basis, there may be idiosyncratic reasons why a particular

21  user prefers a different carrier, but he says in general --

22  in general, these are -- this has become a commodity.

23          THE COURT:  Okay.  That's helpful.  I am going to

24  give you a few minutes just to kind of highlight any

25  particular things.  I know we didn't go through the whole

74

1   deck, but I really do need to hear from Google before we --

2   we get too far longer into the morning.  So, whichever

3   points you wish to highlight, but, you know --

4           MR. SUMMERS:  Just --

5           THE COURT:  -- pick your most important points.

6           MR. SUMMERS:  Just, again, regardless of -- on the

7   damages, regardless of what the market is --

8           THE COURT:  Um-hmm.

9           MR. SUMMERS:  -- and how we should look at it --

10  and that may be something that we need to explore further at

11  summary judgment and for jury instructions and as the case

12  evolves.  But all of the data that we have presented is

13  relevant regardless of how you slice it and dice it, and

14  it's all reliable.  Doctor Etner is looking at industry

15  average figures, the way the industry calculates it using

16  the exact same methodology.

17      By the way, they -- they raised some concerns about

18  some conversations.  Just so the Court is aware, he

19  addresses that in his supplemental report.  We're talking

20  about a very small issue, the allocation of how do we

21  estimate some value to voice and traditional services that

22  doesn't go to the big numbers.  And -- and he testified, if

23  you look at Exhibit 7 to the Bell declaration, that that

24  issue would have a very small impact on his calculus.

25      As to the Google Fi number, that $10 per gigabyte

75

1  number, that's a plan that was in existence during the

2  entirety of the class period from before it started to the

3  present, $10 per gigabyte, and millions of consumers have

4  been paying that for -- these are data points that are

5  relevant regardless of the exact question of who the buyer

6  is and who the seller is.  This is all data about the fair

7  market value which, again, is an objective inquiry.  This is

8  all relevant to the jury's consideration of these issues,

9  and you couldn't find a more reliable approach than looking

10  at real world transactions, real world pricing, real world

11  data about what happens in the marketplace.  This is not

12  some sort of crazy, you know, science or -- or an expert

13  just saying something.  He's -- he's using real world data.

14  And the fact that they're able to address -- and this goes

15  to the Thompson Daubert as well on both damages motions,

16  damages is attacked.

17      They're able to quantify adjustments for every

18  conceivable error that they see in both Etner and Thompson.

19  The fact that they're able to do that tells you that the

20  fundamental methodologies here are sound, and we can quibble

21  about how they should be applied, but we're not dealing with

22  ipse dixits from an expert or -- or any sort of, you know,

23  voodoo science.

24          THE COURT:  Um-hmm.  Okay.  Thank you.

25      Let me turn to Google now.  And, so, you have a preview

1  from our -- this colloquy of what the things are that I'm

2  most concerned about, both about the -- what the it is in

3  terms of what was transferred allegedly without permission

4  and also whether the damages model maps appropriately to the

5  theory of liability.  Those are kind of like big picture of

6  the things I'm most concerned about.

7       So, I'd be delighted if you would address those but

8  also other matters that you would like to address.

9            MR. SOMVICHIAN:  Yes, your Honor.  Thank you.

10      Before I start, how -- how much time do I have so I can

11  pace --

12            THE COURT:  I'm here for --

13            MR. SOMVICHIAN:  -- myself?

14            THE COURT:  -- how long -- I do want to make sure

15  you -- if people need a break, we can take a break, but I'm

16  here until -- I'm available till 1.

17            MR. SOMVICHIAN:  Okay.

18            THE COURT:  So, I don't want to short circuit your

19  time.

20      Does anybody need to take a break now?  Would you like

21  a break?

22      (No audible response.)

23            THE COURT:  All right.  Please go ahead.

24            MR. SOMVICHIAN:  Thank you, your Honor.

25      Let -- let me start where we started this morning,

1  which is the question of what -- what -- what is the

2  challenged conduct that we're trying to identify here

3  because that -- that dovetails with the <u>Comcast</u> issue, do

4  the damages properly tie to the wrongful conduct.  It ties

5  to other aspects of consent.

6      And I think what came through loud and clear in -- in

7  this morning's dialog is how immensely complex this is and

8  how many different variations, permutations and different

9  context in which these transfers can apply.  And it is not

10 nearly as simple as counsel tried to make it seem.

11      Let's take the Clearcut example.

12          THE COURT:  Um-hmm.

13          MR. SOMVICHIAN:  Right.  It's a thousand -- it's

14 over a thousand logs, and they want to point to certain

15 common characteristics that say, Well, these are -- these

16 can all wait for WiFi.  They -- they never need to use

17 cellular data.  Well, that depends on the log, your Honor.

18 Some of these are crash reports.  Some of these are needed

19 urgently to determine the health of the ecosystem so Google

20 can take care of urgent, pressing issues.  That's part of

21 the Clearcut logs.  That might -- our defense to that might

22 be different from something like a battery usage log that's

23 intended for longer term optimization efforts by the

24 company.

25      The point is it mattes, and all of them, the thousand

78

plus, all roll up into the same tag.  So, when they're

measuring the wrongful conduct, they're measuring all of

that all together without any way to parse among the

different use cases.

THE COURT:  Well, let me ask you that.  Is there a

way that Google can parse between them?  Because there --

there is authority for the idea that if there is some

overinclusiveness, that's not necessarily going to defeat

class certification, if there's some things in there that

can be accounted for.  But if it's on a user-by-user basis,

the only data being transferred in the sense of converted

includes these crash reports.  So, we're going to have some

class members who actually were not subject to this

particular category or transfer.  Well, then that's a

different issue.  But if it's within the -- the tag for

Clearcut, there are some transfers within that tag that

don't have the feature that Plaintiffs are describing as the

defining feature of the conversion, meaning specifically

they're time sensitive and just be done in the moment.  They

can't not -- they're not just historical.

How does that defeat class cert?

MR. SOMVICHIAN:  Well, because the -- because the

defenses to each category may be different and the -- and

the mix of logs that are sent for any particular device are

not the same.  In fact, they're dramatically different

1  across the board.  And that's just Clearcut, your Honor.

2  There's -- there are multiple levels to this.

3      PH is another one.  They refer to these as -- as

4  experiments.  It actually involves a number of use cases.

5  They can be rolling out software updates or AB tests to

6  evaluate new features or urgent things that can't wait for

7  WiFi, like turning off a segment of software that's causing

8  a bug.

9          THE COURT:  That's going to be flagged with a PH?

10         MR. SOMVICHIAN:  That's going to be flagged with

11  PH.  There's no way to isolate that from any other use case

12  that is associated with a PH tag.  So, again, it's

13  overinclusive.  There's no way to tease out what's within

14  their theory versus what is not.

15         THE COURT:  Based on the representative sample

16  data that you all have, has there been any way to quantify

17  how overinclusive the let's say Clearcut category is or the

18  PH category is?

19         MR. SOMVICHIAN:  There's -- there's general

20  testimony.  There was at trial, your Honor, about just a --

21  a general sense that the -- the turning on and off of

22  software modules, including to address bugs is the much more

23  common use case, but because it's not separately tagged by

24  something more granular and they all roll up into the same

25  one, there's no way to get more granular.  There's no way to

80

1  parse out if -- you know, for a particular user which one

2  they had, which kind they had.

3          THE COURT:  But it would -- okay.

4          MR. SOMVICHIAN:  And --

5          THE COURT:  But does -- does Google dispute that

6  in each of the four categories, at least some of the

7  transfers within that category have the features that the

8  Plaintiffs are alleging constitute conversion of data?

9          MR. SOMVICHIAN:  Some -- within each category,

10 there are -- there are some unknown number of transfers that

11 could fit within the Plaintiffs' theory.  But that's the

12 point is that you can't tell which ones are in their theory

13 and which ones are -- are not.  And, so, when they calculate

14 this average for -- for damages, it includes things that are

15 part of their theory and parts that are not, and there's no

16 way to do this on a more granular basis.  There's no way to

17 parse out what's at issue and what's not.

18         THE COURT:  But this argument is the same whether

19 we're talking about a class of people or an individual

20 consumer.  I don't see it as a class -- an argument against

21 class certification.  I see it as an argument that just says

22 our dataset is not capable of that kind of granular parsing.

23    So, you'll be overstating the problem, whether we're

24 talking about an individual user across, you know, a

25 whatever, eight-year period that we were talking about or a

1 class of such users.

2      Is that a fair --

3           MR. SOMVICHIAN:  I don't -- I don't think so, your

4 Honor.  If -- if this case were just about the named

5 Plaintiffs, we'd be able to do a much granular assessment,

6 including potentially examination of their device, their

7 particular settings.

8           THE COURT:  But I thought you said the data wasn't

9 available.  Like if the -- you have a flag, everything's

10 rolled up into the flag, and you can't get any more granular

11 than the flag.  So, how could you do that for a particular

12 user?

13           MR. SOMVICHIAN:  Not on an aggregate basis, your

14 Honor.

15           THE COURT:  Well --

16           MR. SOMVICHIAN:  There's no --

17           THE COURT:  -- okay, but --

18           MR. SOMVICHIAN:  You can't do it on --

19           THE COURT:  That's why I asked about the sample.

20 So --

21           MR. SOMVICHIAN:  Okay.  You can't --

22           THE COURT:  -- within the sample, could you do a

23 random -- you know, random sampling of the sample and say,

24 you know, for these whatever substantive users, we can see

25 that the majority of the transfers are for crash reports in

82

1  the Clearcut logs or whatever?  Like is that something that

2  could be done?  Has been done?

3              MR. SOMVICHIAN:  For -- if this case were about an

4  individual, your Honor, there'd be -- there would be more

5  opportunity to try to get to that level of detail.  That is

6  not possible in a class-wide setting.

7              THE COURT:  But why -- why should I accept this

8  assertion that this is a big problem, class wide or

9  otherwise, if it's not clear how big a problem it is?

10  There's only anecdotal testimony that it happens maybe

11  sometimes -- some unknown amount of time that it's crash

12  reports versus not crash reports for the Clearcut logs?

13              MR. SOMVICHIAN:  Well --

14              THE COURT:  I just -- and, again, the way it's

15  presented is not presented on a this is not suitable for

16  class versus individual determination.  It's just the data

17  doesn't exist.  So, Plaintiffs necessarily over count the

18  instances of alleged conversion.  That's how it's presented

19  in the opposition, which is, you know, a good argument so

20  far as it goes I guess on the merits and scope and all that

21  stuff but not on a -- it doesn't strike me as a class cert

22  argument, which is why I pushed -- pushed back on that.

23              MR. SOMVICHIAN:  I understand, your Honor.

24              THE COURT:  Yeah.

25              MR. SOMVICHIAN:  And -- and the reason we focus on

83

1    the class data and the class sample and the inability to

2    tease -- tease out what's in and what's out is because that

3    is the only source of common evidence that they've pointed

4    to, and that's the question.  For -- for the common evidence

5    that's been presented, does that allow us to isolate the

6    instances that could support liability under their theory or

7    not?  And in an individual claim, I can't -- I can't tell

8    you.

9            THE COURT:  Okay.

10           MR. SOMVICHIAN:  If we had somebody's device, we

11   could definitely tell it was version A versus version B.

12   But that's got to at least be possible in an individual

13   trial, but we know it's impossible in a class trial given

14   the limitations of the common evidence.

15           THE COURT:  So, if they disagree with the -- with,

16   you know, the way that you've described the evidence

17   available -- because they -- they've insisted it's GmsCore

18   automatic mandatory disclosure, and that's what the Clearcut

19   logs have.  That's what the PH logs have, et cetera.  So,

20   they -- they say, you know, our -- our obligation is --

21   well, they don't say this, but the law says it's a

22   preponderance of the evidence standard.  We have to say --

23   we can make our case based on common evidence.  We're going

24   to argue this.  And you tell me you can't argue that because

25   the -- the actual facts in the world are as follows.

84

1      Do I just have a dispute of fact?  And I'm -- I mean,

2  I'm not doing summary judgment right now.  So, what am I

3  supposed to do with the state of the record?

4           MR. SOMVICHIAN:  It's not -- it's not a summary

5  judgment question, your Honor.

6           THE COURT:  Right.

7           MR. SOMVICHIAN:  But to the extent that there's a

8  factual dispute that goes to whether the issue is common,

9  that is something that has to be resolved.

10          THE COURT:  But don't they just -- do they prevail

11  on that if they can show by a preponderance of the evidence

12  that they can make the class-wide showing?  Is that how I

13  resolve that kind of issue at the class cert stage?

14          MR. SOMVICHIAN:  They have -- they bear the burden

15  now of showing that the common evidence allows them to prove

16  up their claims in a way that teases out what's within their

17  theory and what's not.  And if the common evidence only

18  allows them to associate a big number with one tag and we

19  know that the tag includes thousands of logs, multiple use

20  cases -- some are at issue, some are not --

21          THE COURT:  Um-hmm.  Okay.

22          MR. SOMVICHIAN:  -- they haven't met their burden,

23  your Honor.

24          THE COURT:  Okay.

25          MR. SOMVICHIAN:  Very quickly, just to hit some

 1 points on --

 2          THE COURT:  Sure.

 3          MR. SOMVICHIAN:  -- that, I think I need to

 4 correct the record on DroidGuard.  It was a surprise to me

 5 to hear that it's not at issue when Doctor Steck's damages

 6 report includes damages for DroidGuard of hundreds of

 7 millions of dollars.  It's very much at issue, and it's

 8 another good example of why the tags here are overinclusive

 9 and don't allow a common source of evidence to prove up

10 their case.  This is in the declaration of Ms. Benco

11 (phonetic) in support of our class cert opposition.  I don't

12 want to belabor it, but there -- again, multiple use cases.

13 One happens right in the moment.  DroidGuard occurs to guard

14 against abuse.  It's not done on a -- on a lag, can't wait

15 for WiFi.  It's not within their theory.

16     There's another type, another flow that --

17          THE COURT:  But you're saying it's not with -- it

18 shouldn't be within their theory but it's encompassed by

19 their counting?

20          MR. SOMVICHIAN:  Exactly.

21          THE COURT:  Okay.

22          MR. SOMVICHIAN:  And, again, without a way to

23 separately parse it out.

24          THE COURT:  And they -- the distinction of, Well,

25 there's a specific flavor of DroidGuard called SafetyNet

86

1  that is the kind of thing that you're talking about where it

2  has to be done in a timely way.  You're not making that --

3  is that -- is that a distinction?  I mean, I want to make

4  sure we're not talking about apples and oranges and I

5  understand you correctly.  Any DroidGuard, anything time

6  sensitive must be done urgently, can't wait?

7            MR. SOMVICHIAN:  They -- they -- they have not

8  carved out the portion of DroidGuard that happens in the

9  moment, cannot wait for WiFi, and is not within their theory

10 as it's described in Ms. Benco's declaration.

11           THE COURT:  Okay.  But I'm trying to understand

12 your argument.  Is there a portion of DroidGuard that can

13 wait and a portion of DroidGuard that can't wait?

14           MR. SOMVICHIAN:  Correct.

15           THE COURT:  Okay.

16           MR. SOMVICHIAN:  There's -- there's the -- right.

17           THE COURT:  And does Google's data allow that

18 carving out to happen?

19           MR. SOMVICHIAN:  No.

20           THE COURT:  Okay.  So, it's like just can't be

21 shown?

22           MR. SOMVICHIAN:  Again, if there -- there may be

23 some individual evidence based on somebody's device or

24 something that hasn't been developed yet, but we know from

25 the common sources of proof that distinction can't be made.

1          THE COURT:  Okay.

2          MR. SOMVICHIAN:  So, that's another example.  So,

3 these -- these issues cut across the board, your Honor.  So,

4 the -- the case is immensely complex, and the -- the -- the

5 methodology that's been presented doesn't meet their burden

6 of proof with respect to just identifying what's at issue.

7     Let me -- let me address consent next.

8          THE COURT:  Okay.

9          MR. SOMVICHIAN:  There's -- there's debate in the

10 briefs, and there's been discussion today about whether it's

11 an objective or subjective standard.  They point to the

12 Calhoon case, which was this -- which was a case resolved on

13 summary judgment.

14     You know, we don't -- we don't dispute that an

15 objective standard could apply in the context of express

16 consent based on like contractual terms of service or some

17 other binding source of information.  But that -- that's not

18 -- that's not what supports our class certification

19 opposition.  We -- we acknowledge there are terms of

20 service.  There are contractual sources that we'll have to

21 litigate in this case, as we did in the Chupo case.  And --

22 and the interpretation of those will -- will follow normal

23 rules of contract interpretation.  Typically --

24          THE COURT:  Express consent you mean?

25          MR. SOMVICHIAN:  Yes, express consent based on an

88

1  objective standard for contractual sources.

2            THE COURT:  Okay.

3            MR. SOMVICHIAN:  But the point that you can't --

4  but the point for why the consent issue here is

5  individualized is because it goes beyond express contractual

6  consent, and there are a number of additional sources of

7  information that users don't have to go to, they're not

8  contractually bound to, but they, nonetheless, could be

9  exposed to review and understand exactly what's going on

10  here.

11       And -- and the -- the --

12            THE COURT:  What would those be?

13            MR. SOMVICHIAN:  So, let -- let me give you some

14  examples.  So, I think -- I want to address kind of a

15  hypothetical that you posed, your Honor --

16            THE COURT:  Okay.

17            MR. SOMVICHIAN:  -- about, Well, why don't we --

18  can't -- isn't -- isn't the way this case -- you know, isn't

19  the way this all plays out that we'll look at disclosure X

20  and we'll -- we'll make a determination if -- if that's

21  sufficient or not, perhaps on summary judgment.  And then

22  we'll look at the next one and on -- you know, from their

23  perspective, they'll say it doesn't matter what people's

24  subjective understandings were.  We're going to look at this

25  objectively, and we'll look at things piece by piece.

1      You know, that -- that's not how the consent analysis

2  works because in the real world, people become aware of

3  things.  People become -- people understand how their

4  devices work and make decisions on whether they want to

5  continue using android device from a mix of information.

6      So, take -- take, for example, Exhibit 25 to my

7  declaration in the -- to the opposition.  That's a good

8  example, your Honor, of a disclosure that specifically

9  addresses GmsCore.  Counsel noted that that's the software

10  that implements everything that we're talking about.  The

11  outside name is Google Play Services.  This page directly

12  addresses Google Play Services, talks about all the various

13  subcomponents of the different kinds of network transfers

14  enabled by Google Play Services and explains that they occur

15  in the background.  That's what the Plaintiffs are

16  complaining about, and that's disclosed.  And I think their

17  theory would be, well, it still doesn't say -- even though

18  it says in the background and that's our -- that's our

19  central complaint, it still doesn't say that it's in the

20  background, plus it can consume your cellular data.

21      Now, we would say, depending on people's circumstances,

22  if they -- if they very rarely connect to WiFi and they have

23  a cell phone that they connect to a cell network, they will

24  understand that when this disclosure says your device sends

25  this stuff back to Google, they'll understand that it means

90

1  and includes cellular data.  That's pretty intuitive.

2      But even if we think that that somehow still falls

3  short looking at that standing alone, there are other

4  disclosures.  There are carrier terms that make very clear

5  your device is preloaded with software that can use your

6  cellular data in the background even when you're not doing

7  something.  So, people who see a different mix of

8  information may have a different understanding, and that's

9  true whether --

10          THE COURT:  So -- okay.

11          MR. SOMVICHIAN:  -- you think of that as a

12  subjective or objective standard, your Honor.  If it's an

13  objective standard, it still depends on the -- the mix of

14  information that people have seen.  So, that --

15          THE COURT:  I don't think it's subjective or

16  objective, though.  I mean, if I understand you correctly,

17  implied consent is you imply consent from the circumstances.

18  And, so, I'm not entirely sure I'm -- I'm comfortable with

19  the way that you're using the word "subjective" here because

20  implied consent could be an objective standard.  Like, would

21  you imply consent from this behavior or are you suggesting

22  that the only way consent can be litigated in this case is

23  you have to ask each individual user, Did you understand

24  that this would happen, and did you understand that Google

25  would be using your cellular data -- part of your cellular

91

1    data plan to do this transfer?

2    Like, if that's the kind of proof you think is

3    necessary, okay. But it didn't seem to me like that was

4    really the argument. The -- the argument is you can imply

5    that some subset of these people would have this

6    understanding and be okay with it because the evidence is

7    they keep using their phone, even after this disclosure.

8    So, therefore, we imply their consent.

9              MR. SOMVICHIAN: Correct.

10             THE COURT: Okay. So, it's -- it doesn't really

11   depend on what a particular user thought or not thought

12   about a particular disclosure. It depends on whether this

13   is the kind of thing from which you can imply consent?

14             MR. SOMVICHIAN: That's -- that's -- that's --

15             THE COURT: That seems to me like kind of

16   different.

17             MR. SOMVICHIAN: I think that's right, your Honor,

18   but -- but -- but that's different than looking at

19   individual disclosures in isolation and making judgments

20   about whether they're adequate or not adequate on a class-

21   wide basis.

22             The point is there are multiple pieces of information,

23   and the under -- even if these talk about it as objective,

24   the objective understanding that someone might have based on

25   looking at the two pieces of information that I described

92

1   might be different from the objective or subjective

2   understanding that someone might have based on different

3   pieces of information.  We see that in the survey evidence

4   which shows that there are majorities -- substantial

5   majorities of people who understand that their android

6   device will send information in the background when they're

7   not doing anything with the device actively, and that that

8   can occur over cellular -- people understand that.  And

9   then --

10          THE COURT:  Okay.

11          MR. SOMVICHIAN:  -- understanding that from --

12          THE COURT:  Your survey evidence isn't challenged

13  I don't think in this --

14          MR. SOMVICHIAN:  It is -- it was not, your Honor.

15          THE COURT:  -- Daubert I think.  So, does -- but

16  does -- I was curious about it because does the survey take

17  the additional step and say, And do you understand that this

18  will come out of your -- be charged against -- be part of

19  the data that you've already contracted with your carrier to

20  -- to -- so, like, does it have the additional question of

21  like, Yes, you understand this happens over the cellular

22  data network, but do you understand that that's on your

23  plan?

24          MR. SOMVICHIAN:  That wasn't an -- an additional

25  question, your Honor.

93

1          THE COURT:  Okay.

2          MR. SOMVICHIAN:  Not in the survey.

3          THE COURT:  I just was curious --

4          MR. SOMVICHIAN:  Yeah.

5          THE COURT:  -- because it wasn't before me.  All

6    right.

7          MR. SOMVICHIAN:  But, so, again, on consent, we do

8    think that that defeats class certification.  That's

9    consistent with numerous cases that have similar record.

10         THE COURT:  And what's your best case for that?

11         MR. SOMVICHIAN:  There are a number, your Honor.

12   So, the In Re Gmail case from Judge Koh from 2014, the

13   series of cases from Judge Gonzalez Rogers, the RTB case,

14   Brown case.

15         THE COURT:  Brown and RTB, okay.

16         MR. SOMVICHIAN:  All of those involve a similar

17   mix of information, Google disclosures, Google terms, third

18   party disclosures, survey evidence, all very similar mix of

19   information, and I think our record here is very similar to

20   what was deemed sufficient in those cases to support a

21   finding that individualized issues of implied consent defeat

22   class certification.

23         THE COURT:  Okay.  Thank you.

24         MR. SOMVICHIAN:  Okay.  Let me -- let me turn now

25   to some of the damages issues.

94

1          THE COURT:  Okay.

2          MR. SOMVICHIAN:  And let -- let me -- let's start,

3  your Honor, with -- with the Ninth Circuit decision.

4          THE COURT:  Okay.

5          MR. SOMVICHIAN:  And you -- you posed the question

6  as what -- what do the Plaintiffs still have to show in

7  terms of some impact?  What is the thing that's being

8  measured here?  And you pointed to one aspect of the

9  memorandum decision on page five referring to Plaintiffs'

10  "experiencing an immediate discrete loss of a specific sum

11  of valuable cellular data which is charged against their

12  data plans."  That -- that is very relevant.

13      I also want to point out a part on page four.

14          THE COURT:  Page four?

15          MR. SOMVICHIAN:  Right in the middle of the page.

16          THE COURT:  Okay.  I'm looking at the Westlaw

17  numbers.  Sorry.

18          MR. SOMVICHIAN:  Okay.  I'm -- I'm sorry.  I don't

19  have the Westlaw version.

20          THE COURT:  Okay.  Go ahead.  Just tell me where

21  it is.  I'll find it.

22          MR. SOMVICHIAN:  Yeah.  It's in the -- it's in the

23  paragraph that starts "Plaintiffs adequately plead the

24  second element" --

25          THE COURT:  Second element.  Yeah, okay.  Got it.

1          MR. SOMVICHIAN:  And about halfway through that

2  paragraph, the Court says:

3               "Therefore, Google's unauthorized

4               transfer of bytes using Plaintiffs' data

5               allotment necessarily prevents

6               Plaintiffs from using all the data they

7               purchase from their carrier."

8      So, the question is, given the Plaintiff's particular

9  plan terms and what they alleged in the complaint, did the

10 -- did Google's unauthorized transfer prevent them from

11 using all the data they purchased from their carrier.

12          THE COURT:  Yes.

13          MR. SOMVICHIAN:  And -- and --

14          THE COURT:  The Ninth Circuit has said yes.

15          MR. SOMVICHIAN:  And in a context where the

16 complaint included plaintiffs with limited plans, one

17 plaintiff with a pay-as-you-go plan that was based on paying

18 for a gigabyte at a time, in the context where the

19 Plaintiffs on appeal emphasized those types of plans and

20 emphasize their theory that actual throttling, actual

21 overages are not required -- they made that point very clear

22 in their arguments.  Their theory was that the potential for

23 throttling and overages is really the harm because it causes

24 people to ration their use.

25          THE COURT:  I don't think anything in this

96

decision has anything to do with what -- what is the
consequence of the Plaintiffs' behavior in light of these
data transfers.  It's -- it's straight up data is like
water.  You used my water.  You owe me.  That is kind of the
-- that's the reading -- the only fair reading I think I can
give to this decision.  And, as you know, I disagreed with
that, but I think we're past that.  I think it is stuff
that's capable of conversion, so says the Ninth Circuit.

MR. SOMVICHIAN:  We're -- I'm -- I'm not disputing
the property --

THE COURT:  Yeah.

MR. SOMVICHIAN:  -- component of it.  I think we
are past that.  But I don't think -- I don't think that the
Ninth Circuit's decision can fairly be read as simply
assuming that the -- the use of data constitutes the
interference and harm elements that are needed to save
conversion for every type of data plan across the class
period, regardless of what the throttling caps might be,
regardless of what any specific term might be.  That was not
the question presented to the Court.  Procedurally, there
was no need -- reason for the Court to -- to issue a ruling
based on any rationale broader than what it had in front of
it, which was the complaint and a complaint that involved
allegations of limited plans, pay-as-you-go plans and in a
context where those elements were very much emphasized and

1  stressed.  So, when the -- when the Court says that there --

2  there is the necessary impact for the second element of

3  conversion where a use prevents Plaintiffs from using all

4  the data they purchased from their carrier, we have to

5  determine whether a particular plan fits within that

6  contemplated impact.

7         THE COURT:  I -- I'm not sure I agree with that.

8  So, I -- I mean, I don't know what to tell you, but I don't

9  read the Ninth Circuit decision as sort of holding back on

10 the question of this could be dependent on whether it's an

11 unlimited plan where you would never run out of data or

12 would even count, versus a situation where there are limits

13 and you only have X, because the way it's framed is the user

14 has possession of the data, however much it is, and Google

15 takes that data without the user's permission allegedly, and

16 that is sufficient for conversion for the first two

17 elements.  And then the question of harm is just what -- by

18 virtue of having your data taken that you possess, you have

19 been harmed.  It's just kind of --

20         MR. SOMVICHIAN:  Your --

21         THE COURT:  I mean, it's very counterintuitive in

22 some ways, I grant you.  But that's how I read the Ninth

23 Circuit.  I just don't --

24         MR. SOMVICHIAN:  I --

25         THE COURT:  You're not -- this is probably not a

98

1  good use of your time because --

2          MR. SOMVICHIAN:  I hear you.

3          THE COURT:  -- I don't think I could make a

4  finding at this stage that somehow we have to look at every

5  single plan and figure -- and parse it out for the 100

6  million class members in light of the nature of the injury,

7  the nature of the data conversion that's alleged.  I just --

8  I don't think I will find in your favor on that point.

9          MR. SOMVICHIAN:  I -- I --

10         THE COURT:  I -- valiant effort.

11         MR. SOMVICHIAN:  -- assure you, your Honor, and

12 let me just leave you with this on the -- the impact that's

13 needed.

14         THE COURT:  Okay.

15         MR. SOMVICHIAN:  In addition to the Ninth

16 Circuit's memorandum decision, we also have to account for

17 California law.

18         THE COURT:  Okay.

19         MR. SOMVICHIAN:  There's the Intel v. Hamidi case.

20         THE COURT:  They were purporting to apply

21 California law, but okay.  I get you.

22         MR. SOMVICHIAN:  Yes.

23         THE COURT:  Intel v. Hamidi.

24         MR. SOMVICHIAN:  California Supreme Court

25 decision, your Honor, which we think is highly relevant if

1  not dispositive here because it involved -- it involved a

2  situation -- it involved a trespass claim, lower standard,

3  lesser showing needed of interference and impact to the

4  property and harm to the individual.  And even in that

5  instance where the showing was, in our view, greater than

6  what's shown here, the California Supreme Court said that

7  that's not enough, and the specific facts involved a

8  company, Intel, getting spammed by tens of thousands of

9  emails, and that, the Court observed, caused a portion of

10  their systems, their storage, memory, processing ability on

11  their computing system, to be consumed as a result of this

12  email spamming.

13      The Court said that that's not enough.  Even though

14  that that was a measurable impact, even though it was an

15  actual impact, it said there has to be some measurable harm

16  that flows from the use.  It viewed the -- the use of the

17  system to be just that, use, but held that there has to be,

18  beyond that, some showing of a measurable loss to the

19  Defendant -- to the Plaintiff.  I'm sorry.

20      We don't have that here, your Honor.  You could

21  theoretically have it under some individualized facts, but

22  certainly we don't have that here on a class-wide basis

23  based on the mere use of a portion of somebody's data plan,

24  particularly for people who are on unlimited plans, and

25  there are now variations, as counsel noted, of  unlimited

1  plans where there really isn't even throttling.  And --

2          THE COURT:  But this didn't have to do so much

3  with the -- the use of resources as with the interference

4  with the computer's functioning.  That's how the dispute was

5  framed.  This dispute is framed differently.  So, I'm not

6  sure that these things match.  And even putting aside, you

7  know, that's a trespass case, this is a conversion case -- I

8  understand, you know, their argument that the showing needed

9  for trespass is lesser typically than for conversion, it

10 still seems to me like the thing that the California Supreme

11 Court was talking about in <u>Intel v. Hamidi</u> was really

12 focused on the computer itself and not sort of the -- these

13 sort of increments of property which the -- the Plaintiffs

14 are describing here as the -- you know, the data is the

15 increments of property that were -- that were taken.  I

16 mean, nobody argued that the computer was taken.

17         MR. SOMVICHIAN:  But -- but increments of storage,

18 increments of processing power were --

19         THE COURT:  But the Court was looking at the

20 computer as a whole.  If what they were -- if the case was

21 litigated on the basis of the storage is property, you're

22 taking my storage -- and I'm not sure that it was.  At least

23 the Supreme Court didn't frame it that way -- you know,

24 maybe that would be a closer -- closer mesh.  Unfortunately,

25 I think I'm just still bound by what the Ninth Circuit has

1  said.  And maybe the Ninth Circuit got it wrong and you will

2  have an opportunity to tell them that some day or the

3  California Supreme Court will take a look at your <u>Chupo</u> case

4  and tell us all what the right answer is.  But right now I

5  think I would find it very difficult to say that somehow

6  this theory cannot be a basis for class certification at

7  this time.

8          MR. SOMVICHIAN:  Okay.

9          THE COURT:  But --

10          MR. SOMVICHIAN:  Understood, your Honor.

11          THE COURT:  -- I would like to hear about damages,

12  though --

13          MR. SOMVICHIAN:  Yes.

14          THE COURT:  -- very much.

15          MR. SOMVICHIAN:  Very last point on -- I promise

16  this is the --

17          THE COURT:  That's okay.

18          MR. SOMVICHIAN:  -- the 45 seconds on --

19          THE COURT:  Okay.

20          MR. SOMVICHIAN:  -- the Ninth Circuit's opinion.

21  In -- in the portion that you quoted, your Honor, about

22  direct loss of a specific sum of valuable cellular data and

23  the forced sale concept --

24          THE COURT:  Yeah.

25          MR. SOMVICHIAN:  -- that comes from this <u>Tyrone</u>

102

1  Pacific International case, also a Ninth Circuit decision.

2  That case is very interesting because in that case, the --

3  the Court affirmed a lower court's finding that t here was

4  no damages available, neither the fair market value or a

5  consequential damages measure.  Why?  Because it looked to

6  the actual facts and whether there was actual loss or impact

7  from -- from that fact pattern.

8       So, it's very interesting that the Ninth Circuit in

9  this decision cites back to that case.  That's the only --

10            THE COURT:  Yeah.  I mean, I don't know what to

11  make of it.  I could imagine there is a scenario where the

12  fair market value of data like this is like negligible, like

13  really negligible, and all the evidence you all are bringing

14  to bear, both in the world and in terms of the economic harm

15  that in -- you know, a typical user might have suffered,

16  like is there actual economic damage.  Those are relevant to

17  the valuation, but in the end, you don't get to the

18  consequential economic harm.  And this is what I understand

19  is your opposition to the Daubert motion is that our expert

20  is like talking about these economic principles in rebuttal

21  to the fair market value theory being advocated by the

22  Plaintiffs' expert.  That's all fine.  I think that's all

23  fine.  They haven't really argued that in detail, but I

24  think that's all fine.  But it is the case that the -- the

25  California law sets forth the framework for the damages

1  model, and we are valuing the property that was taken and

2  not other things, except for this alternative, you know,

3  potential, I guess in cases where it's unfair, that model

4  results in something unfair either way.

5      Okay.  So, sorry.  I don't want to cut short your

6  opportunity to argue damages.

7          MR. SOMVICHIAN:  Yeah.  So, let's -- let's turn to

8  damages.  And let's take it in -- in portions.

9          THE COURT:  Okay.

10          MR. SOMVICHIAN:  There's the equation that the

11  Plaintiffs are using -- with respect, uses to come up with

12  big damages numbers in this case.  First it's the -- the

13  total amount of cellular data consumed, and you asked some

14  questions about how -- whether and how that could be

15  allocated to individuals or the set person, and the second

16  part is what's -- what's the dollar value you associate with

17  that amount of cellular data.

18      But on -- on the first point, your Honor, you -- you

19  asked the question to counsel how do you allocate this to --

20  to individuals, and there's an aggregate number that's

21  generated.  We don't think that that's reliable for a number

22  of reasons we pointed out in our Daubert motion.  But,

23  separate and apart on -- on top of all those flaws, you put

24  your finger on a fundamental problem here, which is there is

25  no way to allocate this big pot of damages that they've

1 identified and say, Okay.  User X, you had this amount --

2 this -- this number of megabytes that fall within these

3 buckets or within these tags, and, therefore, we'll multiply

4 your cellular usage by this dollar value, and then that will

5 be your damages.

6      There's no way to identify that specific amount because

7 all they've -- all they've come up with is an aggregate

8 number, and then they divide that by the total estimated

9 number of devices to come up with an average.

10          THE COURT:  Doesn't Google have that information?

11          MR. SOMVICHIAN:  We don't, your Honor, not for

12 individual users.  Part of the problem is much of the data

13 is not associated with any given device or user.  It's --

14          THE COURT:  Well, you have the sample.  Where did

15 the sample come from?

16          MR. SOMVICHIAN:  The sample comes from two -- two

17 sets of data.  There is -- a portion of the data is

18 associated with a Google identifier or an android

19 identifier, and another portion of the data, because users

20 toggle versus settings, another part of the data is not

21 associated and cannot be associated with an individual user,

22 and it's instead associated with a pseudonymous identifier

23 that by design --

24          THE COURT:  Okay.

25          MR. SOMVICHIAN:  -- can't be linked up.

1          THE COURT:  So, how do we know there are 100

2    million class members?

3          MR. SOMVICHIAN:  That -- that's the Plaintiffs'

4    estimate based on aggregate statistics of android users.

5          THE COURT:  Okay.  So, like we would -- in an

6    employment case and/or a wage and hour case, we would be

7    calculating damages based on the number of work weeks versus

8    how much overtime you didn't get, like that kind of thing.

9    You're telling me we can't ever do that here, that it will

10   be some average based on the 10,000 --

11         MR. SOMVICHIAN:  You could --

12         THE COURT:  -- applied like times 100 million

13   users?  Like that's -- that's what you're telling me is the

14   way this would work?

15         MR. SOMVICHIAN:  You could -- you could come up

16   with an average, but for any given individual, particularly

17   those where they're not associated with any identifier in

18   the data, there's no way to know if that person had half of

19   the average, a tenth of the average, more than the average,

20   because there's no way to identify a specific user in the

21   dataset because of this use of pseudonymous identifiers for

22   the --

23         THE COURT:  So, how do you even know who the class

24   members -- let's say like Plaintiffs are successful, they

25   get a result, there's a class certified, you have to give

1   notice to the class, number one, and then you have to

2   distribute the proceeds to the class.  How do we even do

3   that, and does everybody get the same amount or some people

4   are overpaid, other people are underpaid?  Like is that --

5   is that what you're telling me is going to happen?

6               MR. SOMVICHIAN:  Yes, your Honor.

7               THE COURT:  Okay.

8               MR. SOMVICHIAN:  You'll have a big lump sum

9   without a meaningful way to distribute it other than, you

10  know, a -- a random method that -- that would dramatically

11  overpay some people because what we -- what we know from the

12  data is that it -- it's not within like a small band.  You

13  know, it's not like, okay, it's like plus or minus 10, 15,

14  20 percent.  There are -- there are devices in the dataset

15  where the total amount of cellular data associated with the

16  bag tags is, you know, one -- a very small fraction, one

17  over 70 or --

18              THE COURT:  When you say the dataset, are you

19  talking about this representative sample or are you talking

20  about the bigger dataset from which the representative

21  sample is pulled?

22              MR. SOMVICHIAN:  I'm talking about the

23  representative sample that was used for class cert purposes.

24  We know in that data that the range is massive.

25              THE COURT:  Okay.

1          MR. SOMVICHIAN:  And, so, if you gave everybody

2    the average, that would dramatically overpay certain users,

3    and we know that that's improper, your Honor, from all of

4    the case law.  A lot of it is in the employment context

5    where the Supreme Court has weighed in about the use of what

6    is called, you know, a trial by formula.  This is the

7    Walmart case, for example.

8         In that case, there was a trial method in which the --

9    the average back pay award for a sample set of plaintiffs

10   was determined, and then the average of that amount was

11   extrapolated to the class as a whole, and the Court said

12   can't do that.  That's a trial by formula.  That deprives

13   the Defendant of being able to assert individualized

14   defenses.

15        That's exactly what this methodology is, your Honor,

16   that we're talking about here.  It's taking an average,

17   applying it across the board in a way that deprives Google

18   of the ability to defend against that by saying, Well, this

19   -- this person, because of their android device

20   configuration and their settings and their operating system

21   version, they would have sent a tenth of that.

22          THE COURT:  But if Google can't say that because

23   it doesn't have the data, then where does that leave us?

24          MR. SOMVICHIAN:  Class certification should be

25   denied, your Honor, because --

108

1          THE COURT:  Okay.  But -- but -- okay.  Class
2  certification can't work, but then you say this deprives
3  Google of its ability to make this kind of individualized
4  defense.  But if you can't make that individualized defense
5  anyway because the data no longer exists, then where does
6  that leave us?
7          MR. SOMVICHIAN:  We can cross examine an
8  individual plaintiff.  We can talk to them about -- we can
9  examine their device.  We can ask them how they used it.  We
10  can ask them what settings they had.  We can ask them what
11  operating system they had.  We can have our expert analyze
12  that and say measured against an average, you would be a
13  small fraction of that or we'd be able to do any other --
14  any number of other methods in an individualized trial that
15  we simply are deprived of the opportunity to do in the class
16  setting and based on the formula that they're -- that
17  they're intending to apply here, your Honor.  That's the
18  fundamental problem.
19          THE COURT:  Okay.  I've noted that issue.
20          MR. SOMVICHIAN:  And -- and on top of the Walmart
21  case, two -- two other cases that I think are -- are very
22  important here in evaluating whether this average method can
23  be extrapolated to the class as a whole.  Counsel said that
24  it's -- it's commonplace and -- and accepted.  It's not.
25      In the Jimenez v. All State Insurance case -- that's

109

1  Ninth Circuit, 765 F.3d 1161.  This is the Ninth Circuit

2  applying Dukes and Comcast, and it says:

3                "Circuit courts, including this

4            one, have consistently held that

5            statistical sampling and a

6            representative testimony are acceptable

7            ways to determine liability so long as

8            the use of these techniques is not

9            expanded into the realm of damages."

10     So, statistical sampling or representative evidence,

11  that's the same as this average methodology that we're

12  talking about here, your Honor.  And in the context of these

13  employment cases, it's been accepted if you do the -- if you

14  do the sample right and you get the methodology correct, you

15  can do that for liability.

16     But what the Ninth Circuit is saying, you still can't

17  extend that to damages.  And in -- in -- in the employment

18  context, it actually is feasible given the numbers once a

19  liability finding has been made to have individualized

20  findings on damages.  That's not possible here, and the

21  Ninth Circuit said you can't apply this statistical or

22  representative or average approach to damages.

23            THE COURT:  But it would still work for purpose of

24  the injunctive class.

25            MR. SOMVICHIAN:  In what way, your Honor?

1          THE COURT:  I mean, you could -- we wouldn't have

2    to worry about these things from a class certification point

3    of view if all we were talking about is certifying an

4    injunctive class, because whether it was, you know, a little

5    bit or a lot of data usage across the class population, it

6    could still be amenable of class-wide treatment -- class-

7    wide remedy of an injunctive nature on a going forward

8    basis, correct?

9          MR. SOMVICHIAN:  Uh --

10          THE COURT:  I mean, this is really damages

11   specific argument.

12          MR. SOMVICHIAN:  I -- I think so, your Honor.  So,

13   that specific issue alone might not relate to the (b)(2)

14   issue, but there are lots of other problems with the (b)(2)

15   class in terms of just the -- the 23(a) commonality

16   threshold being met, but --

17          THE COURT:  Okay.

18          MR. SOMVICHIAN:  -- set aside (b)(2) for --

19          THE COURT:  Yeah.

20          MR. SOMVICHIAN:  -- for a moment.

21          THE COURT:  Okay.

22          MR. SOMVICHIAN:  The -- the last case I want to

23   make sure you have in mind, your Honor, because it bears

24   directly on this idea that you can just -- you can just take

25   an average.  We have 100 million users.  They're on

111

1  thousands of different plans.  Their data usage, one person

2  is 70X of another.  Just take an average and -- and apply it

3  across the board.  That doesn't work.

4      Another case that says it doesn't work is the Supreme

5  Court case <u>Tyson Foods</u>.

6              THE COURT:  Um-hmm.  Okay.

7              MR. SOMVICHIAN:  I think you're well familiar with

8  that -- with that case, your Honor.  But in that case, again

9  -- and in an employment context, so, much more

10 straightforward, but even in that context, the Court was

11 very careful to caution that if you're taking an average

12 calculation or some statistical methodology, first of all,

13 it's really only applicable to liability, and under the

14 Ninth Circuit standard, it shouldn't be applied to damages.

15 But -- but setting that -- even setting that aside, the

16 question is could that average method have been submitted by

17 an individual plaintiff if they were pursuing an individual

18 claim.  And in that case, it was appropriate.  It had to do

19 with, you know, the amount of time that certain employees

20 who all work at the same plant, they all have the same

21 equipment.  On average, it took them X minutes to put their

22 -- take their equipment on and off.

23             THE COURT:  Yes.  Got it.

24             MR. SOMVICHIAN:  And the Court said even in an --

25 even if the case were only about that one individual

112

1 Plaintiff, that evidence would be appropriate.

2     Our circumstances are much different, your Honor.  So,

3 if the case were only about a single plaintiff and -- and we

4 were actually able to determine their -- their amount of

5 data usage and they were on, you know, this end of the

6 spectrum, one -- 1/70th of -- of the average and maybe even

7 a smaller fraction of people on the high end, why on earth

8 would they be allowed to present evidence that, Well, I had,

9 you know, X number of megabytes, but I want to be

10 compensated for taking -- you know, Google taking my

11 property.  I want you to assume that they took 70X because

12 somehow that's the average.

13     That would never be admissible in an individual trial,

14 and that's -- in the Tyson case, I think there's a really

15 important lens from which to think about all of the elements

16 of the -- of the damages equation with respect to not just

17 the amount of cellular data but also the dollar value that

18 we're associating with it.

19     Let me -- let me turn to that next.

20         THE COURT:  Okay.

21         MR. SOMVICHIAN:  We talked a lot about the average

22 price calculation.  I don't want it to get lost that there

23 are other calculations here, and it's really important that

24 we -- we think about those individually because -- I'll talk

25 about the average price next, but there's also this Google

113

1 Fi --

2          THE COURT:  Yeah.

3          MR. SOMVICHIAN:  -- theory.

4          THE COURT:  It's -- yeah.

5          MR. SOMVICHIAN:  Which increases damages by 34X.

6          THE COURT:  I -- and I understand.  I think the

7 argument is pretty discrete on that one about how that

8 number is being used in a way that Google thinks is not

9 appropriate to come up with a per gigabyte number.  I get

10 that.  So, you can talk about it if you want to, but I think

11 I -- I understand that is a discrete argument from the

12 average.

13          MR. SOMVICHIAN:  Okay.

14          THE COURT:  Yeah.

15          MR. SOMVICHIAN:  And sounds like you get it on

16 Google Fi, your Honor, but I do want to point out it's --

17 it's a billion dollar issue.

18          THE COURT:  Yeah.  It's a huge number.

19          MR. SOMVICHIAN:  Whether -- whether Google Fi is

20 in the case or not.

21          THE COURT:  Right.

22          MR. SOMVICHIAN:  And we think for that one we

23 spent a lot of time talking about average price, but for

24 Google Fi, it's -- it's not even a close call if you look at

25 the -- the Plaintiffs' expert reports.

1            THE COURT:  Is Google Fi part of the average or

2    it's left out of the average?  I think someone mentioned

3    that in the papers, but I can't remember what the answer

4    was.

5            MR. SUMMERS:  It would be -- it would be part of

6    the average.

7            THE COURT:  It's part of the average.  Okay.  So,

8    if Google Fi were out of the case in some way, would it be

9    out of the average calculation?  Is that what Google's

10   advocating?  And, so, that average number would be

11   different?

12           MR. SOMVICHIAN:  I -- I think all of the damages

13   models should be --

14           THE COURT:  I -- I know, but --

15           MR. SOMVICHIAN:  -- stricken, your Honor, but --

16           THE COURT:  -- I'm talking about this particular

17   dimension.  I don't understand your argument.  If I say

18   Google Fi is not a reliable measure of the fair market value

19   of data, does that mean it has to come out of the expert's

20   average calculation as well as its own stand-alone

21   calculation?

22           MR. SOMVICHIAN:  I think -- I think the average

23   price calculation fails for separate independent reasons.

24           THE COURT:  I understand.

25           MR. SOMVICHIAN:  Yeah.

1      THE COURT:  Okay.  Go ahead.  I'll let you proceed

2  with your argument.

3      MR. SOMVICHIAN:  On -- on the average price

4  question, your Honor, you -- you asked what -- what is --

5  what is the thing we're trying to put a value on.  So, I

6  think -- and then, relatedly, what -- what is the -- what is

7  the hypothetical market that we should be thinking about,

8  who's the -- who's the buyer and who's the --

9      THE COURT:  Who's the buyer and who's --

10     MR. SOMVICHIAN:  -- seller.

11     THE COURT:  -- the seller.

12     MR. SOMVICHIAN:  So, first of all, the -- the it,

13  the -- the thing that we're trying to value, there's some --

14  there's been some discussion of it being a commodity.  The

15  -- the theory does depend on cellular data services being a

16  commodity.  The ability to take one price, whether it's

17  Google Fi or this average, and apply it across the board to

18  literally thousands of plans over the -- over the course of

19  the class period and to say that that is a reliable measure

20  of class-wide damages necessarily depends on being able to

21  show from an economic scientific perspective that cellular

22  data services are a commodity.  It's the same thing under

23  every single data plan.  They haven't presented a shred of

24  expert or economic or any other support for that notion,

25  your Honor.  It's one passing reference in one paragraph in

the Etner report that even uses the term "commodity", and
you can read every single expert report from every
Plaintiff's expert.  You will find no explanation about why
that should be accepted.  There is no comparison of how
Google Fi or -- or the average price compares to cellular
data services overall.  There's no showing that network
coverage, network speeds, network reliability, all the
things that carriers compete directly against each other on,
all of those metrics, there's no showing that those things
are the same across the board in a way that would allow you
to think of cellular data service as a commodity.  And, in
fact, all of the evidence points the other way, where the
prices span, again, an immense range for -- for a given
year.  This is in the Gos report.  Exhibits to the Gos
report show the price variation across data plans in a given
year 10X, 20X.  You know, layer on top of that, the bundled
services that are included.  You pointed to some of these,
your Honor.

        And, so, when people buy plan X versus plan Y,
something from T Mobile versus Sprint or any other carrier,
these are not fungible commodities.  They're different plans
on different networks with different metrics as it -- as
they relate to reliability, speed, throttling terms,
everything else.  And there's nothing, nothing in any of the
Plaintiffs' expert reports that supports any kind of

1 contrary finding.  So, it's not a battle of the experts.

2 It's not --

3          THE COURT:  Yes.

4          MR. SOMVICHIAN:  -- you know --

5          THE COURT:  But the Plaintiffs say, Our expert has

6 accounted for these kinds of things, has tried to apportion

7 and disaggregate the bundling of services that aren't part

8 of the valuation.  And we've accounted for this variation.

9 Can't be perfect, but, you know, we've accounted for it.

10 And, so, you know, your expert can put up a different much

11 smaller number based on your own analysis.  And this

12 happens.  In every damages case I've ever seen there are

13 vastly different views of what the damages are and the value

14 of whatever it is we're trying to value.  So, why is that a

15 basis for defeating class certification or for excluding the

16 expert if the experts just disagree?

17          MR. SOMVICHIAN:  So, your Honor, it's -- it's not

18 just that -- it's not just a disagreement where there's a

19 record on one side.  Cellular data service is a commodity,

20 and here are the economic reasons why and then contrary

21 opinions on the other.  There -- there isn't a showing in

22 the first instance, certainly not one that can meet the

23 Daubert standards, that this average calculation even passes

24 that initial threshold.

25          THE COURT:  What about this idea that this -- the

1  Plaintiffs' expert calculates this kind of thing on a yearly

2  or biyearly basis --

3          MR. SOMVICHIAN:  Yes.

4          THE COURT:  -- for the industry?  And that's a

5  just normal ordinary industry relies on it there for a data

6  point in the world and it should just be used.

7          MR. SOMVICHIAN:  He does do that for a much

8  different purpose.  So, it's actually not even an average

9  price, and I think you -- I think you pointed this out.  The

10  -- the calculation is the total amount that's spent, not for

11  what consumers buy, not for the cellular data allowances

12  that they get.  That might be a way of deriving an average

13  price for cellular data for consumers, but it's based on a

14  calculation where the denominator is the amount of usage.

15  And that makes sense for this industry purpose that Doctor

16  Etner calculates this for.  It says perfectively to

17  calculate a consumer's surplus for industry use.  But it's

18  not even a calculation of what consumers pay in terms of an

19  average price of -- in relation to -- to what they -- they

20  get.  And then the -- the other disconnect is what you

21  pointed out, which is what's the market that we're talking

22  about here.  That -- because we're -- we're -- the case is

23  not about Google interfering with people's data plans in

24  terms of what they paid for initially.  Somebody could have

25  made a consumer decision, I'm willing to pay $60 a month for

119

1    unlimited data under this T Mobile plan.  I get Netflix for

2    free, whatever it is.

3        What's -- what's being challenged in this case and,

4    therefore, what we should be trying to put a value on is the

5    incremental or marginal amount of cellular data caused by

6    these network transfers.  So, the -- the relevant question I

7    think is what you posed, your Honor, which is for a consumer

8    that's already made that decision, I'm -- I'm paying 60

9    bucks a months for this plan, I now know that Google is

10   using a small increment of that, what is the value of that

11   increment for that consumer?  And there's -- there's nothing

12   in the expert reports from Doctor Etner, certainly not from

13   Doctor Speck who disclaims any expert opinion at all,

14   there's nothing in the expert reports to support the value

15   of cellular data when it's conceived in that way, which is

16   the correct way to think about it because it ties to what's

17   alleged in the case.

18          THE COURT:  So, does Google offer an affirmative

19   opinion on what that number should be?  Like, if you were to

20   value the right thing, what should the number be?

21          MR. SOMVICHIAN:  So, Doctor Gos in his expert

22   report points out the flaws in the Plaintiffs' calculation

23   and applies some adjustment to it.

24          THE COURT:  Yeah.

25          MR. SOMVICHIAN:  But we're not -- we're not

120

1  purporting to provide, you know, our version of an accurate

2  pricing for that hypothetical market.  We're saying that you

3  can't do it because --

4          THE COURT:  Right.

5          MR. SOMVICHIAN:  -- of the individualized nature

6  of it --

7          THE COURT:  Okay.

8          MR. SOMVICHIAN:  -- and because of the need to

9  account for differences in plan terms and bundled services

10 and -- and everything else.

11         THE COURT:  And then you do -- your experts do

12 advocate this alternative theory of what's the economic

13 harm?  I'm calling it alternative theory, but that's not

14 really the correct way to -- to phrase it in the case law.

15 It's really the second part of the first method in Section

16 3336, right?  So, an amount sufficient to indemnify the

17 party injured for the loss, which is natural, reasonable,

18 and a proximate result.  So, that's where you get into the

19 question of unlimited plans versus not throttling or not --

20 that kind of thing?

21         MR. SOMVICHIAN:  Correct.

22         THE COURT:  Right.  So, but that's -- that's a --

23 is it fair to say -- sorry to short circuit this, but is it

24 fair to say that the Defendant's view is you can't actually

25 put a fair market value on this sort of incremental marginal

121

data?  You just can't do it?  It has no value really, and,

so, what we have to do is look at this alternative way of

calculating the value of the property, which is sort of an

indemnification point of view, but what would be the fair

compensation.

MR. SOMVICHIAN:  I think -- yes, your Honor.  I

think -- I think the -- the fairest way to summarize Doctor

Gos's opinions is that there -- there could be value to that

incremental marginal use, but there's no way to calculate it

on a class-wide basis --

THE COURT:  Okay.

MR. SOMVICHIAN:  -- from common proof and is

certainly not measured by either the average price or

certainly the Google Fi price.  And in -- in many instances,

that value could be zero, particularly for users on an

unlimited plan, and they may have a throttling cap that is

so high or it's not even mandatory in a way where the --

that marginal usage may have very little value to them, and

that -- those --

THE COURT:  But not just to those humans but to

the category of people who find themselves in that

situation, because I -- I don't want us to be like mistaking

that we're trying to value it for a particular consumer.

We're trying to assess what the value of that data is.  And,

so, would -- would Google's position be that you have to

122

consider these sort of subsets of the class?  One part of
the class has an unlimited data plan.  Some other part of
the class may have more constrained or limited plans, and
those people are differently situated.  Is that what you're
arguing or are you arguing that it really does have to be an
individualized calculation on a user-by-user basis and that
can't be done in a class cert motion?

MR. SOMVICHIAN:  So, your Honor, I -- I don't
think we're advocating for a -- a standard that's
impossible, you know, to -- to meet in any case, meaning I
don't think we need to try to read people's minds about what
-- what value they would put on something, but the -- the
individual circumstances do matter in terms of the plan type
because that -- that necessarily affects any effort to put a
value on some increment of the data plan.  These things are
all created by contract, and the valuation of it has to
analyze the -- the terms that are -- that are at issue.  And
it's not as simple -- it's not quite as simple as putting
them into -- into a couple of buckets, you know, limited
versus unlimited.  They span an immense spectrum in terms of
the particular types of plans.  Just as a -- in terms of
throttling, for example, some may be mandatory.  Others may
just depend on network congestion.  Some may -- may -- and
for some plans there is no throttling.

So, I think that our point is all that matters for

123

1  trying to put a value on the incremental value of data under

2  any particular type of plan.  But it's not -- I don't think

3  it's -- I don't think it's subjective in -- in the sense of

4  needing --

5           THE COURT:  Right.

6           MR. SOMVICHIAN:  -- to put somebody on the stand

7  and ask them, Well, how much did you think this was worth.

8           THE COURT:  Okay.  Got it.  Thank you.

9      (Pause.)

10          MS. GIULIANELLI:  And, your Honor, when --

11 whenever --

12          THE COURT:  I know you want to have the --

13          MS. GIULIANELLI:  -- Mr. Somvichian -- if we could

14 just have a few minutes to respond to some of the things.

15 Thank you.

16          THE COURT:  That's fine.  And I have a couple of

17 follow-up things I wanted to ask.

18          MR. SOMVICHIAN:  Yeah, so the -- just I think the

19 last point on the average price, your Honor, I -- I think

20 the -- the key takeaways for the average price, number one,

21 as a -- as a legal matter, it -- it goes back to that

22 _Walmart_, _Jimenez_, _Tyson_ line of cases.

23          THE COURT:  Okay.

24          MR. SOMVICHIAN:  I mentioned those in the context

25 of -- of problems of applying an average amount of data, but

124

1  those cases also preclude using some average amount as -- as

2  the value.

3          THE COURT:  Okay.

4          MR. SOMVICHIAN:  So, again, if we -- if we use

5  Tyson as the -- as the framework here, thinking about the --

6  the issue, the question is were -- if -- if somebody has an

7  unlimited plan, if -- if this case were just about an

8  individual plan or if someone had an unlimited plan, very

9  high throttling cap or maybe no throttling cap at all, and

10  they effectively pay less than two dollars or under one

11  dollar per gigabyte, there are many examples of this in the

12  Gos exhibits.  Under Tyson, why would that plaintiff be

13  allowed to present an average price?  I want to -- I want to

14  recover two, three times more.  Why?  Because there's some

15  industry metric for consumer surplus that generates a number

16  that's higher.  That would never be appropriate, your Honor,

17  in the context of an individual case.

18      So, I think that case law precludes this average

19  approach both with respect to the amount of cellular data

20  and also the pricing of the cellular data.

21          THE COURT:  Okay.  I -- I understand that

22  argument.  The average amount of data and also the pricing.

23  Got it.

24      Okay.  Anything else that you'd like to highlight in

25  opposition?

1           MR. SOMVICHIAN:  I'm going to -- I'm going to

2    scour my notes, and I'm --

3           THE COURT:  Okay.

4           MR. SOMVICHIAN:  -- sure there's something else,

5    your Honor, but I'm -- I'm happy to pass the mic.

6           THE COURT:  Okay.  All right.  I'll give the

7    Plaintiff a brief opportunity to respond, and then I do want

8    to address sort of these outstanding issues about how and to

9    what extent I need to resolve the Daubert questions and also

10   the stuff from the Chupo case that people keep wanting to

11   share with me.  Yes?

12          MR. SUMMERS:  Your Honor, very briefly, on the

13   question of the damages model --

14          THE COURT:  Okay.

15          MR. SUMMERS:  -- to be clear, we have a model to

16   determine class-wide damages.

17          THE COURT:  Um-hmm.

18          MR. SUMMERS:  We take the quantity, the specific

19   quantity of data that Google has consumed by virtue of the

20   challenged transfers, which we calculate to the -- the byte,

21   precisely based on tags, and we multiply it by the fair

22   market value of the data.  That is the model.  There's no

23   question that we have a model for determining aggregate

24   class-wide damages.  The question that's really posed here

25   is what is the appropriate price and how should the -- the

126

1  jury determine the appropriate price for that model.  No

2  question that there is a damages model that is seaworthy

3  here that warrants class certification.

4       Now, turning to that question, the _Daubert_ motions

5  really relate to expert testimony evidence relevant to the

6  jury's determination of the fair market value of the bytes

7  of cellular data that are taken.  And I would respectfully

8  submit that the analysis -- what we need to look at here is

9  is the analysis provided by Doctor Etner reliable, and it

10 is, because what he is doing is he is presenting to the jury

11 specific data, data points about actual transactions in the

12 real world during the class period involving actual class

13 members, whether it's average, Google Fi, which is a couple

14 of million consumers -- and even the overage charges.  These

15 are all data points that are relevant to the jury's

16 determination of the fair market value of the cellular data.

17      Now, the Court may -- if the Court doesn't believe, for

18 example, that the Google Fi price is necessarily the right

19 price, that does not mean that this evidence is not

20 relevant.  It does not mean that the evidence is not

21 reliable.  It does not mean that the evidence is not helpful

22 to a jury.  And I would respectfully submit we have an

23 appropriate model for determination of class-wide damages.

24 No question about it, there is a factual issue to be -- to

25 be determined by the jury, and the damages evidence that

1 we've submitted through Doctor Etner is reliable, relevant,

2 probative helpful to the jury and meets all the requirements

3 for expert testimony.  So, I think the <u>Daubert</u> motions

4 should be denied.  Class certification should be granted.

5      I would posit that this issue of whether we need to

6 look at a hypothetical transaction involving Google and

7 consumer, rather than carriers and consumers, that that's

8 something that's a bit new because Google did not make that

9 precise argument the way the Court is articulating it.

10      Previously, Doctor Gos -- and we did not submit this

11 because the issue wasn't really presented in this case, but

12 Doctor Gos, previously their expert, their economist, said

13 that you can look at the primary market and you could view

14 this as a -- an issue -- this isn't an issue that we fully

15 briefed, and I would respectfully -- and didn't really

16 address in Doctor Etner's supplement because of it.

17      Respectfully, I would suggest that if there is a -- a

18 bit of -- if the Court believes there's a bit of a -- a gap

19 in the nexus, that we be afforded an opportunity to

20 supplement Doctor Enter and/or such reports to address -- to

21 tie the evidence he has provided to the secondary market and

22 the hypothetical transaction between Google and consumers.

23 That's something that Doctors Speck and Etner can do which

24 would not involve new data or new -- it would be very

25 discrete and it would be done very easily without disrupting

128

1  the schedule.  And I think the circumstances here warrant

2  it.

3      Just a couple other things.  I know the Court doesn't

4  want to hear about the Chupo case, but --

5          THE COURT:  Well --

6          MR. SOMVICHIAN:  -- the very same arguments

7  presented here were teed up for the Chupo court twice, in

8  2023 and just recently we provided the most recent decision,

9  but --

10          THE COURT:  Okay.  Let me just pause you there

11  because -- let me just sort of say a thing about Chupo,

12  which, okay, if somebody gave evidence in Chupo, you know,

13  so it's like prior testimony, fair game, right.  Fair game

14  in our case, in our trial, whatever.  The fact that there

15  was a decision on some objection, motion, whatever, in

16  Chupo, unless it's binding on me, you know, maybe it has

17  some persuasive value, but I'm not inclined to allow a bunch

18  of supplemental briefing on that.  So, I really -- no.  That

19  just -- no.  We already have piles of material.

20      So, I just wanted to share with you guys that's my

21  reaction is obviously if somebody made an admission in the

22  trial, totally fair game here.  But unless and until you

23  tell me that some judge in the State Court system has made a

24  binding decision, and I would be delighted to hear that --

25  then I just -- don't expend your time on it.

1        MR. SUMMERS:  On the -- that issue, two things,

2  your Honor.  I'm -- and I'm not arguing for the supplemental

3  briefs right now.  I was just --

4        THE COURT:  Okay.

5        MR. SUMMERS:  -- pointing out that we did submit

6  the Chupo Court's initial decision denying -- basically

7  carbon copies of the Daubert motions here was submitted as

8  Exhibit 6 to their declaration, and we just submitted

9  overnight the more recent decision that you then rejected

10  their -- I mean, that's -- I mean carbon copy, verbatim the

11  same motion.

12        THE COURT:  I -- I know, but I'm not going to turn

13  this into a sort of parallel proceeding on your post-trial

14  motions in Chupo.  I'm just not going to do that.  So, I

15  just --

16        MR. SUMMERS:  Understood.  One other thing, your

17  Honor.  Just to advise the Court, I do think that we will be

18  making a motion for collateral estoppel, and but we will do

19  so on or before the schedule for summary judgment.  This

20  case is all fours with Chupo.  The case was tried.  There

21  was a special verdict form.  All the issues were decided

22  from whether this was property to the -- to the way to

23  calculate damages.  And the jury adopted Doctor Etner's

24  average price methodology awarding damages, you know, that

25  -- that reflected an adoption or finding of conversion as to

130

1 all four of the categories that we're going to be presenting

2 in this case, the exact quantity of data that we provided to

3 them, and his average industry price.

4      So, we do anticipate doing that.  The -- the response

5 we anticipate is that collateral estoppel will not be fully

6 applicable until there's an appeal.

7           THE COURT:  Well, don't you just need a judgment?

8 Has judgment been entered?

9           MR. SUMMERS:  A judgment has been entered.

10          THE COURT:  Okay.

11          MR. SUMMERS:  As of July 11th, and it reflects the

12 jury's verdict.  Post-trial briefing will be concluded and

13 decided by November.  But -- but --

14          THE COURT:  Okay.

15          MR. SUMMERS:  -- we will be making a motion for

16 collateral estoppel, which might necessitate a stay for the

17 appeal because under California law, the decision is not

18 fully binding for collateral estoppel purposes at least

19 until the appeal through the California Court of Appeal has

20 been decided.

21          THE COURT:  Okay.  Well, that -- that's helpful to

22 know that that request may be coming.  I mean, from my very

23 very selfish point of view, I'd rather not do a lot of work

24 on something that is not going to matter because there are

25 other events that will have or have already overtaken what

131

1  I'm doing here.  It's just an efficiency point of view, but

2  there may not be agreement on this point, and it may be that

3  Google very much would like me to just kind of proceed, and

4  I'll have to just take up whatever motion gets filed, if

5  it's contested, whenever it is presented.  If you agree on

6  something -- and you have been agreeing on things from time

7  to time, continuation of deadlines, et cetera, et cetera, by

8  all means, let me know sooner rather than later if you agree

9  on something so I can evaluate it then.

10      But -- but let me, if I may, pose the question to you

11  all about what I'm to do with the Daubert motions, because,

12  although you say let's focus on class cert, it necessarily

13  requires me to evaluate what the experts have done, and

14  there's a approach to evaluating expert evidence at the

15  class cert stage that, for lack of a better word, I'm going

16  to call Daubert lite, which is, you know, sometimes the

17  methodology isn't even executed yet, right.  It's like

18  here's the methodology I proposed.  It's class wide.  It's

19  based on class-wide evidence.  It will work, and that is

20  enough.

21      But here your experts have done the things.  It's

22  already done.  There's no more expert evidence to -- to

23  develop apart from this additional request here.

24

25      So, you know, to -- to what extent can I or should I

132

1  reserve some of these things for summary judgment versus I

2  need to decide everything now, at least to the extent I'm

3  going to rely on some expert's opinion for class

4  certification?  I just would like to understand what you all

5  think about that question, and if you need time to ponder,

6  that's fine.

7           MR. SOMVICHIAN:  Yeah, I -- I think I can address

8  that, your Honor.

9           THE COURT:  Okay.

10          MR. SOMVICHIAN:  So, with respect to Google's

11  Daubert motions, if they're granted, that means class

12  certification has to be denied because that means that there

13  is no class-wide model for -- for damages, either with

14  respect to the calculation of the amount of cellular data --

15  that's our Daubert motion on technical issues, or on

16  valuation.

17     So, the Daubert motions go directly to that.  And if

18  they're granted, that's another -- that's a -- that -- the

19  result of that would have to be a denial of class

20  certification separate and apart from what else you --

21  whatever else you might find on consent or other issues,

22  because I think we all recognize that under Comcast, there

23  has to be a workable model of -- of proof for class-wide

24  damages, and if the Daubert motions are granted, that goes

25  by the wayside.

133

1        MS. GIULIANELLI:  Your Honor, we would disagree

2  with that obviously.  With respect to the technical expert

3  Daubert, Mr. Thompson, none of the things that Google -- the

4  adjustments that Mr. Thompson makes that Google challenges

5  eliminate the -- the methodology of counting the bytes.

6  There are adjustment that Mr. Thompson makes and none of

7  that is necessary for class certification because even if

8  your Honor were to -- to grant the Daubert on all of those,

9  which we don't think your Honor should, and we can get into

10 that later, there is still a model.  It's just uber uber

11 conservative for counting the bytes.  So, none of that is

12 necessary for class certification or for Doctor Steck as

13 well.  We believe that that is unnecessary for class

14 certification.

15     Google does one thing.  They -- they challenge the

16 sample.  It is an absolutely random representative sample.

17 We've already discussed that.  And then there's the Doctor

18 Etner that Mr. Summers has been talking about.  So, we do

19 not think that we -- there is a model, and that model is --

20 is there, and the Daubert motions that Google brings have to

21 do with the inputs and various -- various disputes about the

22 inputs and how adjustments are made to that model.

23        THE COURT:  Yeah.  I guess what I'm really asking

24 is not sort of the -- I know you disagree on the merits of

25 the respective motions, but is there a way where I -- my

134

1 evaluation can only go so far and reserve on the remainder

2 for some later time?  Because, you know, I'm not -- I'm not

3 necessarily deciding questions of admissibility at the class

4 certification stage.  It's something a little bit different.

5 I hear Google saying that it -- there has to be a reliable

6 methodology.  Our <u>Daubert</u> motion says there isn't for

7 calculating damages.  Therefore, there isn't a basis for

8 class certification.  So, you should just -- you should

9 decide the motion fully as it's briefed now, at least on the

10 -- the damages experts.

11     And what I'm not entirely sure from the Plaintiffs'

12 point of view is whether you think -- your -- your damages

13 experts have already executed methodology.  So, we're not at

14 the stage where I'm merely being asked to evaluate have they

15 proposed a methodology which, you know, could address this

16 issue on a class-wide basis.  You've done whatever the it is

17 that you're going to do.  So, I -- I feel like maybe the

18 answer is I just need to decide these motions at least to

19 the extent I'm going to rely on expert testimony for class

20 certification.  If there are some things that I'm not

21 relying on for class certification, maybe I can not worry

22 about those until our summary judgment stage or our pretrial

23 stage if we get that far.

24     Does that make sense to the Plaintiffs, like that

25 characterization of what's -- what the situation is?

1           MR. SUMMERS:  I think that's exactly right, your

2    Honor.

3           THE COURT:  Okay.  I have to -- I have to --

4           MR. SOMVICHIAN:  I think --

5           THE COURT:  -- decide it.

6           MR. SOMVICHIAN:  I think you should address them

7    to the extent necessary to rule on class certification.

8           THE COURT:  Okay.

9           MR. SOMVICHIAN:  Otherwise, the Court would be

10   within its discretion.

11          THE COURT:  Okay.  Just kind of hang -- hang onto

12   it.  Okay.  I know some of my colleagues have been in

13   situations where they just have the methodology and then

14   after class certification it gets executed, and then we have

15   additional fights about it, and that's just not where we are

16   as it happens in this case.

17          MR. SOMVICHIAN:  That's exactly what we had, and I

18   know you don't want to hear about Chupo --

19          THE COURT:  Yeah.

20          MR. SOMVICHIAN:  -- but we had a preliminary and

21   then a more definitive post to the trial, and the evidence

22   is more --

23          THE COURT:  You just kind of skipped that step.

24          MR. SOMVICHIAN:  -- developed of course.

25   Understanding it's more developed, yeah.

1      THE COURT:  Okay.  Okay.  Very good.  Well, those

2 were the last issues I wanted to raise with you.  Thank you

3 for a very very long argument this morning.  I appreciate

4 everyone's attention and all the briefing.  I will do my

5 best to get you an order as soon as I can, but you have

6 briefed a ton of stuff, and it's going to take me a while.

7 I'm a little bit concerned about being able to address this

8 is a -- in the time that would be appropriate for you to

9 then proceed with the next stage of what you have in the

10 case, which I think is motions for summary judgment on

11 October 3rd, so, having the benefit of my decision, you

12 know, in that amount of time.

13    Have I got the date wrong?  I see Plaintiffs are

14 wondering about that.

15      MR. SUMMERS:  I think we're amenable to pushing

16 back the schedule to the extent necessary, your Honor.

17      MR. SOMVICHIAN:  We'll confirm with the

18 Plaintiffs, your Honor.

19      THE COURT:  You can talk about it.  Okay.

20      MR. SOMVICHIAN:  I mean, there are no motions that

21 they mentioned for the first time today.  So --

22      THE COURT:  Okay.  It's all right.  And, you know,

23 I just -- I'm just flagging for you that you've presented a

24 lot of material and -- and things for me to decide.  So, I'm

25 just -- this hearing has been very helpful, but I can't

137

 1  really make any promises about how quickly I'm going to get

 2  this order.

 3          UNIDENTIFIED SPEAKER:  By the way, your Honor, we

 4  are very impressed with the amount of information the Court

 5  is able to digest.  It's -- it's impressive.  There's a lot

 6  of motions and a lot of detail to this case, and your

 7  familiarity with the facts and the law is very impressive.

 8  So, thank you.

 9          THE COURT:  All right.  All right.  Very good.

10  Well, thank you all very much, and this matter is concluded.

11  The hearing is concluded.  Thank you.

12          UNIDENTIFIED SPEAKER:  Thank you, your Honor.

13      (Proceedings adjourned at 12:54 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

138

<u>CERTIFICATE OF TRANSCRIBER</u>

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

Echo Reporting, Inc., Transcriber

Saturday, August 23, 2025