# Exhibit A

E-FILED
8/9/2019 4:35 PM
Clerk of Court
Superior Court of CA,
County of Santa Clara
19CV352557
Reviewed By: R. Walker

ANN RAVEL (62139)
McMANIS FAULKNER
a Professional Corporation
50 West San Fernando Street, 10th Floor
San Jose, California 95113
Telephone:    (408) 279-8700
Facsimile:    (408) 279-3244
Email:         aravel@mcmanislaw.com

*Attorneys for Plaintiffs,*
*ATTILA CSUPO, NINEF SARGIS,*
*NICHOLAUS WAETJEN & ANDREW*
*BURKE*

GEORGE A. ZELCS (*pro hac vice* application
forthcoming)
ROBERT E. LITAN (*pro hac vice* application
forthcoming)
RYAN Z. CORTAZAR (*pro hac vice*
application forthcoming)
KOREIN TILLERY LLC
205 North Michigan Avenue
Suite 1950
Chicago, Illinois 60601
Phone: (312) 641-9760
Fax: (312) 641-9751

MICHAEL E. KLENOV (*pro hac vice*
application forthcoming)
AARON ZIGLER (*pro hac vice* application
forthcoming)
CAROL O'KEEFE (*pro hac vice* application
forthcoming)
KOREIN TILLEYR LLC
505 North Seventh Street
Suite 3600
St. Louis, Missouri 63101-1625
Phone: (314) 241-4844
Fax: (314) 241-3525

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SANTA CLARA

| | |
|---|---|
| ATTILA CSUPO, NINEF SARGIS, NICOLAUS WAETJEN & ANDREW BURKE, individually and on behalf of all others similarly situated <br><br> PLAINTIFFS, <br><br> vs. <br><br> ALPHABET, INC. <br><br> Defendant. | Case No.: **19CV352557** <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

**INTRODUCTION**

1.    This case involves the application of long-standing common law principles to new mobile technologies to seek redress for Alphabet, Inc.'s ("Google") practice of using cellular data allowances purchased by Plaintiffs for Google's benefit. Pursuing claims under conversion and quantum meruit, Plaintiffs represent a class of California residents who used mobile devices with Google's Android technology to access the internet on their mobile carriers' cellular data networks.

2.    While Plaintiffs' Android devices were in their purses and pockets, and even while sitting seemingly idle on Plaintiffs' nightstands as they slept, Google's Android technology appropriated cellular data paid for by Plaintiffs—without Plaintiffs' knowledge or consent—to send Google all sorts of information. These "passive" information transfers occur because Google has programmed its Android operating system and Google applications to cause mobile devices to provide enormous amounts of information to Google, much of which Google uses to further its own corporate interests, including targeted digital advertising. The transmission of this data to Google is not time sensitive and could be delayed until Plaintiffs are in Wi-Fi range to avoid consuming Plaintiffs' cellular data allowances. However, Google deliberately designed and coded its Android operating system and Google applications to indiscriminately take advantage of Plaintiffs' data allowances and passively transfer information at all hours of the day—even after Plaintiffs move Google apps to the background or close the programs completely.

3.    Plaintiffs had no say in Google's continual misappropriation of their cellular data allowances, had no knowledge that the transfers were occurring, and remain powerless to stop them. Google has designed its products to prevent users from changing the settings to disable these transfers completely or to restrict them to Wi-Fi networks. Because of Google's deliberate design decisions, these passive information transfers using cellular data allowances purchased by Plaintiffs are mandatory and unavoidable burdens shouldered by Android device users for Google's benefit and convenience.

4.      Plaintiffs at no time explicitly or impliedly consented to these transfers. Google has crafted its various terms of service and policies in ways that purport to create binding contracts with the users of its technologies. However, none of the company's terms or policies alert users that Android devices will needlessly consume their cellular data allowances in order to provide Google with information that is not immediately required to provide the user with the full functionality of the mobile device. While Google's policies inform the users of certain transfers of personal information between Plaintiffs' devices and Google, these extensive "privacy" policies are conspicuously silent on the means by which mandatory, unavoidable passive transfers occur whether an individual is using a Google app or widget[1] or not.

5.      These information transfers are not mere annoyances—they actually injure Plaintiffs. Each month, mobile device users pay their mobile carriers for cellular data allowances that enable them to transmit and receive information on the carriers' cellular data networks. Whether Plaintiffs pay for a specific number of gigabytes or unlimited access subject to speed restrictions above a certain data usage threshold, the contracts between Plaintiffs and their mobile carriers create for Plaintiffs concrete property interests in their purchased data allowances. When it initiates passive transfers of information utilizing Plaintiffs' cellular allowances, Google wrongfully interferes with Plaintiffs' property and commits the longstanding tort of conversion.

6.      Tellingly, significantly less information is sent through passive transfers on Apple iOS devices than on Android devices. Apple's mobile devices running iOS also allow users more control over information sent through passive information transfers.

7.      In addition to misappropriating Plaintiffs' property, the passive transfers also confer a valuable benefit to Google that it acquires at Plaintiffs' expense. Google receives information without bearing the cost of transferring that information between consumers and

---

[1] Applications, or apps, are programs that the user taps open and runs. Widgets are self-contained mini programs that sit on the user's home screen and typically perform simple functions, such as a clock widget that displays the time. A number of Google apps have accompanying widgets, such as the Google Search bar which can be integrated with the Google Search app.

COMPLAINT, Case No.:

Google. Indeed, the information acquired by Google through this practice supports the company's product development and lucrative targeted advertising business. In the absence of contractual provisions disclosing and permitting Google's appropriation of Plaintiffs' property, Google must compensate Plaintiffs for the reasonable market value of the data allowances Google has misappropriated through the passive transfers.

## PARTIES, JURISDICTION, AND VENUE

8.      Plaintiff Attila Csupo, who is a resident and domiciliary of California, bought Android mobile devices that he uses with monthly cellular data plans purchased from carriers AT&T and T-Mobile. Plaintiff Csupo was injured in fact and has been deprived of his property as a result of Google's unlawful data conversion.

9.      Plaintiff Nicolaus Waetjen, who is a resident and domiciliary of California, bought an Android mobile device that he uses with a monthly cellular data plan purchased from carrier Verizon. Plaintiff Waetjen was injured in fact and has been deprived of his property as a result of Google's unlawful data conversion.

10.      Plaintiff Andrew Burke, who is a resident and domiciliary of California, bought an Android mobile device that he uses with a monthly cellular data plan purchased from carrier Sprint. Plaintiff Burke was injured in fact and has been deprived of his property as a result of Google's unlawful data conversion.

11.      Defendant Alphabet, Inc. is the parent company of Google. It is a Delaware corporation with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043. Google created the Android operating system and continues to control all aspects of Android's programming and operation.

12.      Google maintains offices and employees and regularly conducts business throughout Santa Clara County, California.

13.      This action arises under the California common law of torts.

14.      This Court has jurisdiction over the subject matter of this action pursuant to its general jurisdiction under California law.

4

COMPLAINT, Case No.:

15.     This Court has personal jurisdiction over Alphabet because it resides and has a principal place of business in Santa Clara County, California, and the illegal conduct alleged herein was conceived and implemented in whole or in part within Santa Clara County and California.

16.     Venue is proper in this Court because a substantial portion of the events giving rise to Plaintiffs' claims occurred in Santa Clara County, and Google transacts business and maintains facilities in the County, and is subject to personal jurisdiction here.

## FACTUAL ALLEGATIONS

### I.     GOOGLE'S ANDROID SYSTEM IS UBIQUITOUS

17.     Google owns and programs the most popular mobile platform in the world, the Android operating system. Android works on a variety of mobile devices, including smartphones and tablets.

18.     The Android operating system includes an interface that provides the principal means by which users interact with their devices. The interface allows consumers to access and to use applications and widgets on the devices.

19.     In addition to the Android operating system, Plaintiffs' devices come with various Google applications and widgets pre-installed, including the Google application, Chrome browser, Gmail email application, Google Maps, and YouTube.

20.     Android has been available on mobile devices since 2008 and has been the most dominant mobile operating system since 2011.[2] It currently has about a 54.4 percent share of the U.S. smartphone market.[3]

21.     All or virtually all mobile carriers offer cellular data plans that allow Android devices to connect to their cellular networks in order to send and receive internet

---

[2] Charles Arthur, *The History of Smartphones: Timeline*, GUARDIAN (Jan. 24, 2012), https://www.theguardian.com/technology/2012/jan/24/smartphones-timeline.

[3] *Subscriber Share Held by Smartphone Operating Systems in the United States: 2012 to 2018*, STATISTA, https://www.statista.com/statistics/266572/market-share-held-by-smartphone-platforms-in-the-united-states/.

5

communications. These mobile carriers sell mobile devices directly to consumers. Among the mobile carriers that sell Android devices for connection to their cellular networks are Verizon, AT&T, Sprint, and T-Mobile.

22.     Many of the most popular mobile-device manufacturers sell devices with Android preinstalled as the operating system and often with a suite of Google's mobile apps preinstalled. These manufacturers include Samsung, Motorola, LG, Kyocera, Sonim, Huawei, ZTE, and HTC.

## II.     PLAINTIFFS HAVE A PROPERTY INTEREST IN THEIR CELLULAR DATA PLANS

23.     Plaintiffs purchased mobile devices preloaded with Google's Android operating system and suite of mobile apps and widgets.

24.     To use their mobile devices, Plaintiffs contracted with mobile carriers. As part of these contracts, plaintiffs purchased cellular data plans that provided them with data allowances. These plans allow plaintiffs to access the carriers' cellular data networks, thereby providing users with the ability to send and receive information over the internet without a Wi-Fi connection. In this way, cellular data plans provide the essential capability that allows a mobile device to be truly mobile.

25.     Though cellular data networks provide a critical resource for mobile devices, they are not necessary for the mobile device to send and receive information through the internet. When users do not wish to use their cellular networks or when they are unable to use them, mobile devices can also transfer and receive information over the internet through Wi-Fi connections. Indeed, many cost-conscious users maximize their time on Wi-Fi whenever possible and use their cellular networks only when Wi-Fi connections are unavailable in order to "save" the cellular data allowances available under their monthly carrier plans.

26.     Cellular data plans vary by carrier, but they function in essentially the same way. The users pay the carrier a certain price each month for cellular data allowances, which provide the users with the right to send and receive information on their devices through the carrier's cellular network. Some cellular data plans provide users with an unlimited cellular data

COMPLAINT, Case No.:

allowance, while others provide users with a fixed allowance, which grants them the right to send and receive a maximum amount of data (e.g. 10 gigabytes) each month. When users have a fixed cellular data allowance and exceed it, they are typically charged an overage fee. When users have a so-called "unlimited" plan, they are still typically subject to quotas on their usage and will have their cellular connection speeds throttled if they exceed such quotas. When throttled to reduced speeds, a number of functionalities can be lost entirely (such as video streaming), and the overall performance of the device can be significantly impaired.

27.    The purchase of data plans from mobile carriers creates a property interest for Plaintiffs in their cellular data allowances. Each quantum of the data allowance has a fair market value determined by market forces. By contracting for the purchase of their cellular data allowances, Plaintiffs obtain access to send and receive information on the carriers' servers in accordance with the terms of the contract. This access includes the right to exclude other persons and entities from using Plaintiffs' cellular data allowances. Plaintiffs have the right to determine precisely how to use their data allowances and to grant others access to those allowances through their mobile device activity.

28.    For example, Android users may explicitly grant others access to their cellular data allowances by creating a mobile "hotspot," in which the mobile device shares its cellular network connection with other nearby devices so that those devices can access the internet once they are given the hotspot's password. Similarly, "tethering" (either through a USB cable or a Bluetooth connection) allows users to connect their mobile device with a computer to share the device's cellular network connection and grant the computer access to their cellular data allowances. Users can also sell unused data allowances. *See, e.g.*, https://www.simplify.network/ (mobile app enabling Android users to sell their excess data allowances via hotspot).

III.    **MOBILE DEVICE USERS CONSENT TO GOOGLE'S USE OF THEIR CELLULAR DATA ALLOWANCES WHEN THEY ACTIVELY USE GOOGLE'S PRODUCTS**

29.    Under certain circumstances, mobile device users implicitly consent to the use of their cellular data allowances. For example, when users actively engage with applications that

7

require internet access while connected only by their cellular plan, they know that the applications will use some of their cellular data allowance. For example, when a user is in an area without Wi-Fi, opens a browser, and types in a web address, the user consents to use her cellular data allowance to send information to the website's server and to allow the website to send information over the mobile carrier's cellular network to the device. Similarly, when that user opens a video app, she consents to allow the app to send a video to her device over her mobile carrier's cellular network and for that usage to count toward her allowance.

30.    These active transfers of information that are initiated by the user engaging an application are not at issue in this lawsuit. Plaintiffs do not contest Google's right to use Plaintiffs' cellular data allowances pursuant to their consent when Plaintiffs are actively interacting with Google's various products on their mobile devices.

31.    Plaintiffs instead challenge Google's appropriation of their cellular data allowances without Plaintiffs' consent. Specifically, Plaintiffs challenge Google's misappropriation of their cellular data allowances based on "passive transfers," meaning information transfers that occur in the background and which do not result from Plaintiffs' direct engagement with Google products on their devices. These passive transfers, described in more detail below, occur in a variety of ways – including when Google properties are open (though not in active use) and operating in the background, and even when a user has closed out all Google applications on her device and the device is stationary and seemingly dormant. In none of the Google policies discussed below does Google notify users that its operating system, applications, and widgets cause users' mobile devices to indiscriminately consume Plaintiffs' cellular data allowances, even when users are not using an app or widget on their devices.

## IV.    THROUGH GOOGLE'S STANDARD AGREEMENTS, MOBILE DEVICE USERS CONSENT TO GOOGLE'S USE OF THEIR CELLULAR DATA ALLOWANCES ONLY WHEN THEY ACTIVELY USE GOOGLE'S PRODUCTS

32.    Users of Android devices do not pay Google directly to use the company's operating system, apps, or widgets. Instead, they provide consideration in the form of consent to

8

the company's various policies. The policies form a contract between the parties ("Google Agreements"). Users manifest consent to the Google Agreements through performance by using the company's products. But none of those policies disclose that Google appropriates Plaintiffs' cellular data allowances to transmit information when Plaintiffs are not actively using Google's products.

33.     The Google Agreements include four general policies relevant to this suit: the Terms of Service; the Privacy Policy; the Managed Google Play Agreement; and the Google Play Terms of Service.[4]  Google's master policy is its Terms of Service. The Terms of Service themselves incorporate by reference the company's Privacy Policy. In addition, according to the Managed Google Play Agreement, use of the Android operating system is governed by the Google Play Terms of Service. Nothing in these policies suggests that Google uses Plaintiffs' data allowances to transmit information when Plaintiffs are not actively engaged with Google's products.

34.     Specifically, Google's Privacy Policy states, "We collect information about the apps, browsers, and devices you use to access Google services… We collect this information when a Google service on your device contacts our servers—for example, when you install an app from the Play Store or when a service checks for automatic updates. If you're using an Android device with Google apps, your device periodically contacts Google servers to provide information about your device and connection to our services."[5]

35.     The Google Play Terms of Service is the only policy that even mentions cellular data usage.  It applies to the company's Google Play online store, where users can download software applications for their mobile devices. The policy has a disclaimer targeted specifically at Google Play's usage of cellular data allowances. The disclaimer, however, applies only to active usage in connection with the use of Google Play and apps available through Google Play.

---

[4] These policies are posted online at: https://policies.google.com/terms?hl=en-US  (Terms of Service); https://policies.google.com/privacy  (Google Privacy Policy); https://www.android.com/enterprise/terms/ (Managed Google Play Agreement); https://play.google.com/about/play-terms/index.html (Google Play Terms of Service).

[5] Google Privacy Policy, https://policies.google.com/privacy.

9

The Play terms provide: "You are responsible for any access or data fees incurred from third parties (such as your Internet provider or mobile carrier) in connection with *your use and viewing* of Content and Google Play."[6] (emphasis added) Though the disclaimer clarifies that users' data allowances are appropriated as a result of the user's active "use and viewing," it is noticeably silent on Google's misappropriation of cellular data allowances when users are not "using and viewing" Google's products.

36.     The Google Agreements also include Google policies that apply specifically to individual mobile apps. None of those policies disclose Google's passive data usage. For example, the Google Maps terms provide that "[c]ontent you upload, submit, store, send, or receive through Google Maps/Google Earth is subject to Google's Universal Terms."[7] The policy is silent about how that information is sent and does not provide Google with the authority to use Plaintiffs' cellular data allowances for passive information transfers.

37.     The same is true of the Google Chrome browser policy. Despite the policy's specificity, it still does not obtain users' consent to Google accessing users' cellular data allowances for passive information transfers. Instead, the Google Chrome policy merely discloses that Chrome transmits various types of information to Google without user involvement. For example, the policy states that Chrome "periodically sends information to Google to check for updates, get connectivity status, validate the current time, and estimate the number of active users." It further states that "information that Chrome stores [locally on your device] won't be sent to Google unless you choose to store that data in your Google Account." The policy also provides that "sites and Android apps can also ask the browser to preload the pages you might visit next" when using Chrome and that "[p]reloading requests from Android apps are controlled by the same setting as Chrome-initiated predictions." Moreover, "on mobile devices, Chrome automatically shares your location with your default search engine if the Chrome app has permission to access your location and you haven't blocked geolocation for the

---

[6] Google Play Terms of Service, https://play.google.com/about/play-terms/index.html.

[7] Google Maps/Google Earth Additional Terms of Service, https://www.google.com/help/terms_maps/.

COMPLAINT, Case No.:

associated website.". Finally, the policy states that "usage statistics and crash reports are sent to Google to help us improve our products."[8] But again, no language in the policy discloses that Google accesses users' cellular data allowances to initiate passive information transfers.

## V.    GOOGLE'S MISAPPROPRIATION OF PLAINTIFFS' CELLULAR DATA ALLOWANCES

38.    Google designed and implemented its Android operating system and apps to extract large volumes of information from Plaintiffs' cellular devices and transmit it to Google using Plaintiffs' own cellular data allowances.  As described above, Google's usage of Plaintiffs' cellular data allowances includes "active" information transfers, which occur when users are actively engaged with Google's apps and properties on their devices. Those active transfers are not at issue in this lawsuit.  Here, Plaintiffs challenge Google's practice of misappropriating Plaintiffs' cellular data allowances through passive transfers of information between Google and Plaintiffs' devices. These passive transfers occur in the background; do not result from Plaintiffs' direct engagement with Google's apps and properties on their devices; and happen without Plaintiffs' consent.

39.    These passive transfers occur in a variety of ways.  First, such transfers occur when mobile devices are in a completely idle state, meaning they are stationary, untouched, and with all apps closed. To confirm this, Plaintiffs tested a new Samsung Galaxy S7 mobile device with the standard default settings accepted and standard pre-loaded set of apps, which was connected to a brand-new Google account and was not connected to Wi-Fi.  Plaintiffs found that when the device was left in an idle state, the device sent and received 8.88 MB/day of data, with 94% of those communications occurring between Google and the device. In all, the device transferred information to and from Google approximately 389 times in 24 hours, for an average of more than 16 times per hour.  The frequency of passive information transfers in this experiment was striking given the source: a stationary and untouched Android device, with all apps closed.

---

[8] Google Chrome Privacy Notice, https://www.google.com/chrome/privacy/.

COMPLAINT, Case No.:

40.    Many of those communications were comprised of LOG files, which are automatically-produced files that contain a record of certain background information such as the networks that are available, apps that are open, and metrics about the operating system. LOG files are typically not time-sensitive, and transmission of them could easily be delayed until Wi-Fi is available. Google could also program Android to allow users to enable passive transfers only when they are on Wi-Fi connections, but apparently it has chosen not to do so. Instead, Google has chosen to simply take advantage of Plaintiffs' cellular data allowances.

41.    Second, a higher volume of passive transfers occurs when mobile devices are stationary, untouched, but with one or more apps open and unused.  Vanderbilt University Professor Douglas C. Schmidt performed a study of Google's data collection efforts in 2018. (*See* Ex. 1, Douglas C. Schmidt, *Google Data Collection* (Aug. 15, 2018). He found that both Android and Chrome transmit information to Google "even in the absence of *any* user interaction." (*Id*. at p. 3 (emphasis in original).) Professor Schmidt conducted an experiment with an Android device that was outwardly dormant and stationary but with Chrome open and in the background, and he found passive transfers[9] to Google occurred approximately *900 times in 24 hours* (*id*. at 14), for an average of *38 times per hour*.

42.    In comparison, a stationary and untouched iPhone device with the Safari browser open in the background communicated virtually no information to Google, and its information transfers to Apple amounted to only about $1/10^{\text{th}}$ of the information transferred to Google from the Android device. (*Id*. at pp. 3, 14.)

///

///

///

///

///

---

[9] Professor Schmidt consistently defined "passive" information transfers as "information exchanged in the background without any obvious notification to the user," in contrast to "active" transfers, which he defined as "information directly exchanged between the user and a Google product."  *Id*. at 7.

COMPLAINT, Case No.:



(Ex. 1 at p. 14, Figure 6, Traffic data sent from idle Android and iPhone mobiles.)

43.     The Android device passively transferred 4.4 MB of data each day, or around 130MB each month, to Google servers, while the iPhone device transferred around 1/6th that volume of data to Google servers. (*Id*. at 14.)

44.     The contrast between the number of requests made to the two devices, as well as the volume of data transferred from the devices, confirms that Google's products play critical roles in passive information transfers to Google.

45.     Third, even more passive transfers occur once users begin moving around with their Android devices, or interacting with them by visiting web pages, or using apps, despite also eschewing the use of any preloaded Google apps such as Google Search, YouTube, Gmail, or Google Maps. (*Id*. at pp. 3, 23.) This increased activity was driven by Google's publishing and advertising products including Google Analytics, DoubleClick (now Google Ad Manager), and

COMPLAINT, Case No.:

AdWords (now Google Ads). (*Id*.) Passive information transfers represented 46% of requests to Google servers from the device in the Schmidt experiment. (*Id*. at pp. 3–4.)

46.    An iPhone device (again, without the Android operating system or Google's applications) in comparable active use communicated a significantly lower number of times with Google's servers. (*Id*. at 24.) (The two devices did have a comparable number of contacts with Google's advertising domains, as was expected in light of the similar usage on both devices of third party websites and apps which provide information to Google. (*Id*.)) The iPhone device also transferred a small fraction of information to Apple's servers, compared to the information transferred to Google from the Android device. (*Id*.)



(Ex. 1 at p. 24, Figure 12, Information requests from mobile devices during a day of typical use.)

47.    With active use, the Android device passively transferred to Google servers 11.6 MB of data each day, or around 350MB each month, while the iPhone device transferred around half that amount to Google servers. (*Id*. at 24.)

48.    How does Google manage the transfer of this user information to its servers? By designing and implementing its Android operating system and apps to mandate that transfer,

COMPLAINT, Case No.:

regardless of whether a user has access to a Wi-Fi connection or instead has only her cellular

data allowance to transmit information to and from her device.

## CLASS ALLEGATIONS

49.      Plaintiffs bring this case on behalf of themselves and a Class of similarly situated

individuals. Specifically, Plaintiffs will ask the Court to certify the Class under the California

Code of Civil Procedure § 382:

> All natural persons who are citizens of the State of California
> and who have used mobile devices running the Android
> operating system to access the internet through cellular data
> plans provided by mobile carriers.

50.      The Class excludes (a) Defendant, its officers, directors, management, employees,

subsidiaries, and affiliates; and (b) any judges or justices involved in this action and any

members of their immediate families or their staff.

51.      Prosecution of the Class's claims as a class action is appropriate because the

prerequisites of § 382 are met.

52.      Plaintiffs do not currently know the exact number of persons in the Class, but they

number in the millions and are geographically dispersed throughout the State of California.

Joinder of all Class members before this Court would be impracticable. The names, contact

information, and other unique identifiers of the members of the Class are readily obtainable from

Google, which requires users to log in to their Google accounts to download apps from the

Google Play store and sets up profiles for users of Android phones who do not have Google

accounts. This information about class members is also obtainable from nonparty mobile

carriers, which maintain lists of customers who have mobile devices with Android technology.

53.      There is a well-defined community of interest in the questions of law and fact in

this case which are common to the members of the Class, and which predominate over any

individualized questions or issues. These include, but are not limited to, common issues as to:

COMPLAINT, Case No.:

a. Whether Google misappropriates the cellular data of Android mobile-device users to conduct passive information transfers, which occur in the background and do not result from Plaintiffs' direct engagement with their mobile devices or applications;

b. Whether Plaintiffs' cellular data plans that guarantee them clear benefits by contract are property interests recognized by California tort law;

c. Whether Plaintiffs consent to allow Google limited access to their cellular data property through acceptance by performance of contractual terms in Google's policies;

d. Whether Google's passive transmission of information through Plaintiffs' cellular data plans exceeded the scope of any limited consent to allow Google access to the cellular data;

e. Whether Plaintiffs are entitled to recover damages for Google's conversion of their cellular data;

f. Whether the passive information transfers provided Google with a valuable benefit at Plaintiffs' expense;

g. How best to measure the value of data converted by Google and the benefit conferred on Google at Plaintiffs' expense.

54.    Plaintiffs' claims are typical of and fairly encompass the claims of the Class members. Plaintiffs are members of the Class. Plaintiffs have used Android devices to access the internet using their cellular data plans during the Class Period. The members of the Class are similarly harmed by Google's conversion of their cellular data.

55.    Plaintiffs and their counsel will fairly, adequately, and vigorously protect the interests of the members of the Class. There are no material conflicts between the claims of Plaintiffs and the members of the Class making class certification inappropriate. Counsel for the Class will vigorously assert Plaintiffs' claims and those of the members of the Class. Plaintiffs are represented by Counsel who are competent and experienced in the prosecution of consumer class action litigation.

16

56.     The amount of damages is readily ascertainable based on quantifiable economic valuations. The amount of damages due to individual class members is ascertainable through economic analysis of the fair market value of cellular data based on market transactions.

57.     A class action is superior to other methods for the fair and efficient resolution of the controversy.

## COUNTS AND REQUESTED RELIEF

### COUNT ONE: CONVERSION

58.     Plaintiffs re-allege and incorporate by reference each of the allegations set forth above.

59.     Plaintiffs have property interests in the cellular data allowances that they purchase from their mobile carriers.

60.     Plaintiffs at no time consented to Google appropriating their cellular data allowances to send data transmissions to Google when Plaintiffs were not actively using their mobile devices.

61.     Google wrongfully disposed of Plaintiffs' property by causing information to be transferred between Plaintiffs' Android devices and Google using Plaintiffs' cellular data allowances without Plaintiffs' consent. Google initiated these passive transfers when Plaintiffs were not directly engaged with Google products on their devices.

62.     As a result of Defendants' conversion, Plaintiffs have suffered substantial injuries to their property interests in their cellular data allowances in an amount to be proven at trial.

### COUNT TWO: QUANTUM MERUIT

63.     Plaintiffs re-allege and incorporate by reference each of the allegations set forth above.

64.     Google used valuable cellular data allowances that Plaintiffs have purchased in order to send information between Plaintiffs' devices and Google.

17

COMPLAINT, Case No.:

65.     Google has used Plaintiffs' cellular data allowances to collect information through passive transfers to develop and support its advertising business and other ventures.

66.     The cellular data allowances usurped through the passive transfers conferred on Google a valuable benefit to its business.

67.     The use of Plaintiffs' cellular data allowances was at the expense of Plaintiffs, who paid for the cellular data allowances that Google used to send information to its servers through passive transfers.

68.     Plaintiffs did not consent to these passive transfers using Plaintiffs' cellular data allowances. No contract between Plaintiffs and Google authorized information transfers that benefited Google.

69.     Plaintiffs suffered injury when their cellular data allowances were used to transfer to Google information that benefited Google.

70.     Plaintiffs are entitled to recover the reasonable value of the cellular data allowances usurped by Google to transfer information that benefited Google.

WHEREFORE, Plaintiffs pray for relief as follows:

71.     That the Court adjudge and decree that Google has converted Plaintiffs' property in the form of their cellular data allowances.

72.     That the Court award Plaintiffs and the Class:

A.     The fair market value of the cellular data allowances converted by Google;

B.     The reasonable value of the cellular data allowances used by Google to provide information that benefited Google;

C.     Pre- and post-judgment interest on their damages;

D.     Injunctive relief directing Google to stop using cellular data allowances purchased by consumers without their consent;

E.     The costs of this action and reasonable attorneys' fees; and

18

COMPLAINT, Case No.:

F.     Such other and further relief as the Court deems just and proper.

Dated: August 9, 2019                          Respectfully submitted,

                                               McMANIS FAULKNER

                                               /s/ Ann Ravel
                                               ANN RAVEL

                                               George A. Zelcs (*pro hac vice* application
                                               forthcoming)
                                               Robert E. Litan (*pro hac vice* application
                                               forthcoming)
                                               Ryan Z. Cortazar (CA SB#
                                               KOREIN TILLERY LLC
                                               205 North Michigan Avenue
                                               Suite 1950
                                               Chicago, Illinois 60601
                                               Phone: (312) 641-9760
                                               Fax: (312) 641-9751

                                               Michael E. Klenov (*pro hac vice* application
                                               forthcoming)
                                               Aaron Zigler (*pro hac vice* application
                                               forthcoming)
                                               Carol O'Keefe (*pro hac vice* application
                                               forthcoming)
                                               KOREIN TILLEYR LLC
                                               505 North Seventh Street
                                               Suite 3600
                                               St. Louis, Missouri 63101-1625
                                               Phone: (314) 241-4844
                                               Fax: (314) 241-3525

                                               *Attorneys for Plaintiffs*
                                               *ATTILA CSUPO, NINEF SARGIS,*
                                               *NICHOLAUS WAETJEN & ANDREW BURKE*

19

COMPLAINT, Case No.: