# Exhibit C

```
 1                UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3   Before The Honorable Virginia K. DeMarchi, Magistrate Judge

 4

 5  TAYLOR, et al.,                )
                                   )
 6          Plaintiffs,             )
                                   )
 7  vs.                            )   Case No. C 20-07956-VKD
                                   )
 8  GOOGLE, LLC,                   )
                                   )
 9          Defendant.             )
    _____)
10
                                        San Jose, California
11                                      Tuesday, August 19, 2025

12
      TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
13           RECORDING 10:02 - 12:54 = 2 HOURS 52 MINUTES

14  APPEARANCES:

15  For Plaintiffs:
                                     Bartlit Beck, LLP
16                                   1801 Wewatta Street
                                     Suite 1200
17                                   Denver, Colorado 80202
                               BY:   KARMA M. GIULIANELLI, ESQ.
18                             BY:   GLEN E. SUMMERS, ESQ.

19                                   Korein Tillery, LLC
                                     205 North Michigan Avenue
20                                   Suite 1950
                                     Chicago, Illinois 60601
21                             BY:   MARC A. WALLENSTEIN, ESQ.

22

23

24

25            (APPEARANCES CONTINUED ON NEXT PAGE)
```

5

1  motion for class certification and a Daubert motion.  As
2  between the two, we would like to focus on the motion for
3  class certification today and use our time there.  Ms.
4  Giulianelli will be handling that, but I just wanted to make
5  that clear.  That's the one we think is priority for the
6  day.
7           THE COURT:  Okay.  And how did the Defendants
8  think you should proceed?
9           MR. SOMVICHIAN:  Your Honor, I agree we should
10 focus on the class certification issues.  The Daubert issues
11 are -- are also important.  We'll take our cues as to when
12 and -- and how you want to address those, but I agree the
13 class certification motion is probably the right place to
14 start.
15          THE COURT:  That was my sense as well, although it
16 seemed to me like there may be some Daubert issues that --
17          MR. SOMVICHIAN:  Yes.
18          THE COURT:  -- overlap with some of the questions
19 that are presented.  So, before we get that -- to that
20 issue, nobody asked for this hearing to be conducted under
21 seal.  I have not dug into your extremely large omnibus
22 motion to seal papers.
23      Are there massive disagreements about what should and
24 should not be sealed for purposes of the class cert briefing
25 and the Daubert briefing?

1  interrupt me and tell me to move on if I don't need to, but
2  for class certification, I think the key point is that
3  everything is going to be shown with common evidence, and
4  that includes all of the elements of conversion.  It
5  includes consent and implied consent.  Class -- conversion
6  cases are routinely certified for class treatment.  We cite
7  them, McClure, Wycart (phonetic), in our brief, and those
8  are cases where consent was disputed, and cases involving
9  issues of consent, including implied consent, are also
10 routinely certified in nonconversion cases as well, the
11 Frasco v. Flo Health case in the Northern District of
12 California.  And, of course, the reason -- and I think your
13 Honor touched on this -- is because implied and express
14 consent are both judged by the objective reasonable person
15 standard.  And, so, Judge Donato said you apply that
16 standard, and that is what you look at in -- in arguing
17 looking at issues of consent on a class-wide basis.
18      And, so, you know, Google's arguments that there are
19 different versions of software, different settings and
20 different cellular data plans fail, of course.  The
21 transfers all come from GmsCore.  They all have certain
22 defining objective characterizations, and none of the
23 settings disclose the transfers or how they happen over
24 cellular, how often they happen or what they are.
25 Therefore, they don't give all the material facts to any

1          MS. GIULIANELLI:  But that is correct.
2          THE COURT:  I understand that that's -- that's the
3 theory.  So, okay.  So -- so, then your -- your -- the way I
4 understand your argument then is that the project is to
5 value that but the -- the factual basis for coming up with
6 value uses -- maybe subset isn't the right word but uses
7 only the data that is identified as metered to do the
8 valuation?
9          MS. GIULIANELLI:  That is correct.  And I think it
10 -- that is correct because unmetered includes WiFi and --
11 and some of the new 5G plans.  So, it's a conservative
12 damages calculation.
13          THE COURT:  Okay. All right.  I think -- I think
14 I get that.
15          MS. GIULIANELLI:  But I see why that's confusing.
16          THE COURT:  Yes.  Okay.  So, this gets in a little
17 bit to the Daubert issue I think, and I'm just going to ask
18 this question out loud.  The -- the thing that I found most
19 compelling about Google's argument on the Daubert damages is
20 that the Plaintiffs' experts don't seem to be valuing the it
21 that you have described to me as the converted data.  They
22 are valuing other things, bigger things, broader things.
23 But I want to make sure that I really understand the
24 Plaintiffs' argument.  So, in other words, the marginal data
25 theory really resonated with me, that you should be trying

54

1 that opinion.  There's an active market.  We have pricing
2 data.  Doctor Gos, on the other hand, argues that we should
3 look at the secondary market and wonder, ask the
4 hypothetical how much would a consumer charge Google.
5 Doctor Etner responds to that and says, We don't -- that
6 there is no active market there.  We don't have data, and I
7 think it's a battle of the experts, and it's for the jury to
8 determine, and there's evidence going both ways.  But I -- I
9 don't think --
10          THE COURT:  See, I'm troubled by that because --
11 for two -- two reasons.  First of all, the damages model has
12 to match the liability theory.  So, if the liability theory
13 is one thing, then the damages model has to value that.
14 And, secondly, the case law says there doesn't have to be an
15 actual market.  What we are trying to do is use the
16 information that we have to say in the hypothetical world
17 what would be the fair market value of this thing, but you
18 can't say, Well, there's no market for that thing.
19 Therefore, we're going to value some other thing which has
20 not matched your liability theory.  And that's where I
21 really struggled, because it seems to me like there is
22 evidence in the world from which experts could necessarily
23 agree but could infer the value of the thing that is
24 actually converted.  And, so -- so, I was -- I was troubled
25 by the idea that, well, we're going to value something else.

59

```
 1  marginal value was an important distinction over what your
 2  expert's methodology was, and I was worried about that
 3  because your expert seems to be valuing something other than
 4  what is converted.
 5          MR. SUMMERS:  On that, your Honor, I would
 6  disagree.  Look, we calculate the precise amount of cellular
 7  data being consumed by Google for the challenged transfer,
 8  and they track this.  Every single transfer is actually
 9  tagged and tracked, whether it's metered --
10          THE COURT:  Got it.
11          MR. SUMMERS:  We -- we calculate the exact quantum
12  that Google has converted for its own purposes, and our
13  experts then determine the market value, the fair market
14  value of that data using the industry accepted methodology
15  that the industry uses.
16          THE COURT:  What's the industry accepted
17  methodology that you're referring to?
18          MR. SUMMERS:  Doctor Etner's average --
19          THE COURT:  Total revenue divided by total data
20  usage?
21          MR. SUMMERS:  It's -- essentially, yes, that is
22  the -- that is the model that Doctor Etner uses.  Every two
23  years, he prepares a report for the cellular
24  telecommunications industry association with all the
25  carriers and Google members.  They then utilize this data
```

128

1 the schedule.  And I think the circumstances here warrant
2 it.
3      Just a couple other things.  I know the Court doesn't
4 want to hear about the Chupo case, but --
5           THE COURT:  Well --
6           MR. SOMVICHIAN:  -- the very same arguments
7 presented here were teed up for the Chupo court twice, in
8 2023 and just recently we provided the most recent decision,
9 but --
10          THE COURT:  Okay.  Let me just pause you there
11 because -- let me just sort of say a thing about Chupo,
12 which, okay, if somebody gave evidence in Chupo, you know,
13 so it's like prior testimony, fair game, right.  Fair game
14 in our case, in our trial, whatever.  The fact that there
15 was a decision on some objection, motion, whatever, in
16 Chupo, unless it's binding on me, you know, maybe it has
17 some persuasive value, but I'm not inclined to allow a bunch
18 of supplemental briefing on that.  So, I really -- no.  That
19 just -- no.  We already have piles of material.
20      So, I just wanted to share with you guys that's my
21 reaction is obviously if somebody made an admission in the
22 trial, totally fair game here.  But unless and until you
23 tell me that some judge in the State Court system has made a
24 binding decision, and I would be delighted to hear that --
25 then I just -- don't expend your time on it.

1          MR. SUMMERS:  On the -- that issue, two things,
2 your Honor.  I'm -- and I'm not arguing for the supplemental
3 briefs right now.  I was just --
4          THE COURT:  Okay.
5          MR. SUMMERS:  -- pointing out that we did submit
6 the Chupo Court's initial decision denying -- basically
7 carbon copies of the Daubert motions here was submitted as
8 Exhibit 6 to their declaration, and we just submitted
9 overnight the more recent decision that you then rejected
10 their -- I mean, that's -- I mean carbon copy, verbatim the
11 same motion.
12          THE COURT:  I -- I know, but I'm not going to turn
13 this into a sort of parallel proceeding on your post-trial
14 motions in Chupo.  I'm just not going to do that.  So, I
15 just --
16          MR. SUMMERS:  Understood.  One other thing, your
17 Honor.  Just to advise the Court, I do think that we will be
18 making a motion for collateral estoppel, and but we will do
19 so on or before the schedule for summary judgment.  This
20 case is all fours with Chupo.  The case was tried.  There
21 was a special verdict form.  All the issues were decided
22 from whether this was property to the -- to the way to
23 calculate damages.  And the jury adopted Doctor Etner's
24 average price methodology awarding damages, you know, that
25 -- that reflected an adoption or finding of conversion as to

130

```
 1  all four of the categories that we're going to be presenting
 2  in this case, the exact quantity of data that we provided to
 3  them, and his average industry price.
 4       So, we do anticipate doing that.  The -- the response
 5  we anticipate is that collateral estoppel will not be fully
 6  applicable until there's an appeal.
 7            THE COURT:  Well, don't you just need a judgment?
 8  Has judgment been entered?
 9            MR. SUMMERS:  A judgment has been entered.
10            THE COURT:  Okay.
11            MR. SUMMERS:  As of July 11th, and it reflects the
12  jury's verdict.  Post-trial briefing will be concluded and
13  decided by November.  But -- but --
14            THE COURT:  Okay.
15            MR. SUMMERS:  -- we will be making a motion for
16  collateral estoppel, which might necessitate a stay for the
17  appeal because under California law, the decision is not
18  fully binding for collateral estoppel purposes at least
19  until the appeal through the California Court of Appeal has
20  been decided.
21            THE COURT:  Okay.  Well, that -- that's helpful to
22  know that that request may be coming.  I mean, from my very
23  very selfish point of view, I'd rather not do a lot of work
24  on something that is not going to matter because there are
25  other events that will have or have already overtaken what
```

138

1 <u>CERTIFICATE OF TRANSCRIBER</u>

2

3   I certify that the foregoing is a true and correct
4 transcript, to the best of my ability, of the above pages of
5 the official electronic sound recording provided to me by
6 the U.S. District Court, Northern District of California, of
7 the proceedings taken on the date and time previously stated
8 in the above matter.
9   I further certify that I am neither counsel for,
10 related to, nor employed by any of the parties to the action
11 in which this hearing was taken; and, further, that I am not
12 financially nor otherwise interested in the outcome of the
13 action.

*[signature]*

            Echo Reporting, Inc., Transcriber
                Saturday, August 23, 2025