# Exhibit D

WILLIAM W. FAULKNER (83385)
ELIZABETH M. PIPKIN (243611)
ANN M. RAVEL (62139)
McMANIS FAULKNER
50 West San Fernando Street, 10th Floor
San Jose, CA 95113
Telephone: (408) 279-8700
Facsimile:  (408) 279-3244
wfaulkner@mcmanislaw.com
epipkin@mcmanislaw.com
aravel@mcmanislaw.com

GLEN E. SUMMERS (176402)
KARMA M. GIULIANELLI (184175)
LINDLEY J. BRENZA (*pro hac vice*)
JONATHAN JACOB MARSH (*pro hac vice*)
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, CO 80202
Telephone: (303) 592-3100

HAMILTON H. HILL (*pro hac vice*)
BENJAMIN R. MONTAGUE (*pro hac vice*)
BARTLIT BECK LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60654
Telephone: (312) 494-4400

*Attorneys for Plaintiffs ATTILA CSUPO,*
*ANDREW BURKE & KERRY HECHT*

MARC A. WALLENSTEIN (*pro hac vice*)
GEORGE A. ZELCS (*pro hac vice*)
RYAN Z. CORTAZAR (*pro hac vice*)
CHAD E. BELL (*pro hac vice*)
PAMELA I. YAACOUB (*pro hac vice*)
KOREIN TILLERY LLC
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750
Facsimile:  (312) 641-9751

CAROL L. O'KEEFE (*pro hac vice*)
MICHAEL E. KLENOV (277028)
KOREIN TILLERY LLC
505 North Seventh Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Facsimile:  (314) 241-3525

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF SANTA CLARA
## UNLIMITED JURISDICTION - COMPLEX CIVIL LITIGATION

| | |
|---|---|
| ATTILA CSUPO, ANDREW BURKE & KERRY HECHT, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GOOGLE LLC,<br><br>Defendant. | Case No. 19CV352557<br><br>**PLAINTIFFS' MOTION FOR EQUITABLE RELIEF**<br><br>Dept.:        7<br>Judge:        Hon. Charles F. Adams<br><br>Complaint Filed:      August 9, 2019<br>4th Am Compl Filed:  February 1, 2022<br>Trial Date:       June 2, 2025 |

# CONDITIONALLY LODGED UNDER SEAL

# TABLE OF CONTENTS

APPLICABLE PRINCIPLES OF EQUITY ................................................................. 6

ARGUMENT ....................................................................................................... 7

I.    The Jury Determined that Google's Conduct Constitutes Conversion .......................... 7

II.   A Permanent Injunction Is Necessary to Prevent Continuing Harm ............................ 8

III.  The Court Should Order Appropriate Equitable Relief ................................................ 10

A.    Google Must Disclose the Challenged Transfers ......................................................... 14

      1.    Google Must Disclose All Four Categories of Challenged Transfers
            and their Consumption of Cellular Data ......................................................... 14

      2.    Google Must Disclose the Challenged Transfers in the Setup Flow ............... 15

      3.    Google Must Send a Push Notification to All Class Members ......................... 17

B.    Google Must Make the Background Mobile Data Toggle Effective ............................. 17

C.    Google Must Compensate Class Members for Further Ongoing Conversion ............. 18

CONCLUSION ................................................................................................... 19

**PLAINTIFFS' MOTION FOR EQUITABLE RELIEF**
**(CASE NO. 19CV352557)**

1

# TABLE OF AUTHORITIES

2

*Page(s)*

3

**CASES**

4

*Butt v. State of Cal.*,
  4 Cal. 4th 668 (1992) ............................................................................................. 10

5

6

*City of S. Pasadena v. Dep't of Transp.*,
  29 Cal. App. 4th 1280 (1994) .............................................................................. 6, 7

7

*Dawson v. E. Side Union High Sch. Dist.*,
  28 Cal. App. 4th 998 (1994) .................................................................................. 10

8

9

*Donahue Schriber Realty Grp., Inc. v. Nu Creation Outreach*,
  232 Cal. App. 4th 1171 (2014) ......................................................................... 6, 7, 9

10

*Hoopes v. Dolan*,
  168 Cal. App. 4th 146 (2008) ....................................................................... 7, 8, 19

11

12

*In re Google Play Store Antitrust Litig.*,
  _ F.4th _, 2025 WL 2167402 (9th Cir. July 31, 2025) ............................................. 7

13

14

*Mendelson v. McCabe*,
  144 Cal. 230 (1904) ....................................................................................... 7, 9, 10

15

*Ne. Nat. Energy LLC v. Pachira Energy LLC*,
  243 W. Va. 362 (2020) ............................................................................................ 9

16

17

*People ex rel. Mosk v. Nat'l Rsch. Co. of Cal.*,
  201 Cal. App. 2d 765 (1962) .................................................................................... 6

18

19

*People v. Pac. Land Rsch. Co.*,
  20 Cal. 3d 10 (1977) .............................................................................................. 18

20

*People v. Super. Ct.*,
  9 Cal. 3d 283 (1973) ................................................................................................ 6

21

22

*People v. Uber Techs., Inc.*,
  56 Cal. App. 5th 266 (2020) .............................................................................. 7, 10

23

24

*Rilcoff v. Super. Ct.*,
  50 Cal. App. 2d 503 (1942) ...................................................................................... 9

25

*Rivera v. Hillard*,
  89 Cal. App. 5th 964 (2023) ............................................................................ 18, 19

26

27

*Scripps Health v. Marin*,
  72 Cal. App. 4th 324 (1999) ................................................................................... 10

28

**PLAINTIFFS' MOTION FOR EQUITABLE RELIEF**
**(CASE NO. 19CV352557)**

*Uptown Enters. v. Strand*,
    195 Cal. App. 2d 45 (1961) ................................................................................ 9

*Walnut Creek Manor v. Fair Emp. & Hous. Comm'n*,
    54 Cal. 3d 245 (1991) ...................................................................................... 18

*Wickersham v. Crittenden*,
    93 Cal. 17 (1892) .............................................................................................. 6

*Wind v. Herbert*,
    186 Cal. App. 2d 276 (1960) ............................................................................. 9


**STATUTES**

Cal. Civ. Proc. Code § 526(a)(1) ........................................................................... 6

Cal. Civ. Proc. Code § 526(a)(6) ..................................................................... 6, 7, 9

Cal. Civ. Proc. Code § 685.010 ........................................................................... 19

Cal. Civ. Code § 3422 ...................................................................................... 7, 9

Cal. Civ. Code § 3422(3) ...................................................................................... 6

**PLAINTIFFS' MOTION FOR EQUITABLE RELIEF**
**(CASE NO. 19CV352557)**

1    The jury found that, for at least nine years, Google has committed the tort of conversion by

2    causing Android phones to transmit the Challenged Transfers over cellular networks without users'

3    consent. Despite the jury's verdict, Google continues to engage in the very same conduct—thereby

4    misappropriating more of Plaintiffs' cellular data—and will persist unless and until enjoined.

5    The evidence presented at trial reflects a profoundly cavalier attitude by Google regarding

6    the disclosure of its conduct. Google knows, and has known for many years, that users do not

7    understand the remarkable volume of information that Google collects, what that information is,

8    or that Google does so at the expense of users' cellular data. Google understands from internal

9    research that users are deeply confused about what GMS Core is, what it does, and whether, how,

10   and why it consumes users' cellular data. Google's research showed that Google's own marketing

11   causes users to confuse GMS Core ("Google Play Services") with the Android app store ("Google

12   Play Store"), creating the misleading impression that any cellular data consumption supports

13   Google's app store, when in reality it serves only Google's internal business interests. Yet Google

14   has deliberately and strategically allowed that confusion to persist.

15   Worse, Google's current purported "disclosures" and "settings" are a rat's nest of

16   obfuscation that create the *illusion* of control, and little more. Google falsely represents to users

17   that they can see and delete all the data that Google collects about them in their Google account

18   and on Google's web pages, when in reality only a fraction of it is visible to users. Google gives

19   users what appear to be functional settings to control Google's collection of information, but those

20   settings are vague, misleading, and ineffective. Google has given users a false sense of security

21   and illusory power over Google's conduct. But behind the scenes, the entire Android team has

22   known—from line-level engineers to high-level executives—that Google denies users control over

23   its consumption of their cellular data. As a VP at Google explained more than seven years ago,

24   users can "opt[] out of everything," "explicitly disable[]" use of their cellular data, and turn off

25   every "setting[] that can be turned off to reduce data usage," but Google will still consume users'

26   cellular data—invisibly, in the background, whether users like it or not. Ex. B, P124. Google does

27   not provide users anything more than meaningless disclosures and the illusion of control.

28

**PLAINTIFFS' MOTION FOR EQUITABLE RELIEF**
**(CASE NO. 19CV352557)**

1    In view of this conduct, principles of equity demand that the Court issue an injunction

2 requiring Google to accurately disclose the Challenged Transfers, and give users control over

3 whether the transfers may be sent using users' metered cellular data. This Court should also award

4 Plaintiffs post-verdict damages for Google's continuing misappropriation of their cellular data.

5    The jury verdict did not stop Google. This Court should.

6                    **APPLICABLE PRINCIPLES OF EQUITY**

7    This Court has the broad authority to enter injunctions to prevent ongoing tortious acts.

8 Cal. Civ. Code § 3422(3); Cal. C.C.P. §§ 526(a)(1) and (6). A court should grant a permanent

9 injunction when a plaintiff has proven: (1) "the elements of a cause of action involving the

10 wrongful act sought to be enjoined," and (2) "grounds for equitable relief." *City of S. Pasadena v.*

11 *Dep't of Transp.*, 29 Cal. App. 4th 1280, 1293 (1994), *as modified on denial of reh'g* (Nov. 22,

12 1994). There are grounds for equitable relief when an injunction is necessary to prevent "wrongs

13 of a repeated and continuing character." *Donahue Schriber Realty Grp., Inc. v. Nu Creation*

14 *Outreach*, 232 Cal. App. 4th 1171, 1184 (2014).

15    Equity affords this Court the flexibility to craft injunctive relief that is tailored to the facts

16 and equities of this case. "Equity is not limited in the scope or type or relief which may be granted,"

17 and "[i]ts decrees are molded in accordance with the exigencies of each case and the rights of the

18 persons over whom it has acquired jurisdiction." *People ex rel. Mosk v. Nat'l Rsch. Co. of Cal.*,

19 201 Cal. App. 2d 765, 775 (1962). Indeed, it "is often necessary, in order that the plaintiff may

20 obtain full justice, that the relief granted him be as varied and diversified as the means that have

21 been employed by the defendant to produce the grievance complained of." *Id.* at 775-76 (quoting

22 *Wickersham v. Crittenden*, 93 Cal. 17, 32 (1892)). A Court in equity should "attempt to make final

23 disposition of the controversy and to that end will render a decree sufficiently comprehensive" to

24 resolve the controversy permanently. *Mosk*, 201 Cal. App. 2d at 775. Therefore, "a court of equity

25 may exercise the full range of its inherent powers in order to accomplish complete justice between

26 the parties." *People v. Super. Ct.*, 9 Cal. 3d 283, 286 (1973).

27    When a jury has rendered a verdict in the same case, the court is bound by the jury's factual

28 findings on common issues, and should grant equitable relief consistent with the jury's verdict.

1    *Hoopes v. Dolan*, 168 Cal. App. 4th 146, 159-161 (2008). The court "cannot ignore the jury's

2    verdict and grant equitable relief inconsistent with the jury's findings." *Id.*

3          The scope of an injunction is firmly within the trial court's discretion. *People v. Uber*

4    *Techs., Inc.*, 56 Cal. App. 5th 266, 314 (2020), *as modified on denial of reh'g* (Nov. 20, 2020). On

5    appeal, the scope of the injunction will be reviewed only for abuse of discretion, with substantial

6    deference to the trial court's factual findings and exercise of equitable judgment. *Id.* at 283, 314;

7    *see also In re Google Play Store Antitrust Litig.*, _ F.4th _, 2025 WL 2167402, at *15-16, *25 (9th

8    Cir. July 31, 2025), (trial courts have broad equitable discretion to craft final injunctive relief).

9                                      **ARGUMENT**

10          Plaintiffs have proven both prongs necessary for injunctive relief: (1) "the elements of a

11   cause of action involving the wrongful act sought to be enjoined," and (2) "grounds for equitable

12   relief." *S. Pasadena*, 29 Cal. App. 4th at 1293. The jury already found that Plaintiffs proved the

13   elements of conversion. Ex. C, Special Verdict Form (July 1, 2025); Ex. D, Judgment on Jury

14   Verdict (July 23, 2025). In addition, there are grounds for an injunction because it is necessary to

15   prevent "wrongs of a repeated and continuing character." *Donahue*, 232 Cal. App. 4th at 1184; *see*

16   Cal. Civ. Code § 3422 (authorizing injunctions "to prevent a multiplicity of judicial proceedings");

17   Cal. C.C.P. § 526(a)(6) (same). The "constant recurrence" of Google's conduct may be remedied

18   adequately only by an injunction. *Mendelson v. McCabe*, 144 Cal. 230, 233 (1904). Plaintiffs have

19   thus proven that they are entitled to a permanent injunction. *S. Pasadena*, 29 Cal. App. 4th at 1293.

20   **I.    The Jury Determined that Google's Conduct Constitutes Conversion**

21          The jury in this case entered a special verdict in Plaintiffs' favor on each element of

22   conversion. *See* Ex. C, Special Verdict Form. The jury found that "Plaintiffs own cellular data as

23   property," that "Google substantially interfere[d] with Plaintiffs' property by knowingly or

24   intentionally taking possession of or preventing Plaintiffs from having access to their cellular

25   data," that Plaintiffs did not consent, that Plaintiffs were harmed, and that Google's conduct was

26   a substantial factor in causing Plaintiffs' harm. *Id.*

27          The jury also awarded Plaintiffs $314,626,932 in damages, the precise number that

28   Plaintiffs' expert Dr. Jeffery Stec presented to the jury as the aggregate damages for all four

1    categories of Challenged Transfers, using Dr. Entner's industry average price of cellular data. *See*

2    Decl. of Dr. Stec filed with this motion ("Stec Decl.") ¶¶6-11; Ex. E, Trial Transcript ("Tr.")

3    1265:19-1266:2; Ex. F (slide presented by Dr. Stec with $314,626,932 damages figure for all four

4    Challenged Transfers combined). The jury therefore found Google liable for all four categories of

5    Challenged Transfers to the extent they consume data over a metered cellular network, and found

6    that the fair market value of the data is the industry average price of cellular data.

7        This Court is bound by the jury's factual determinations. "In a mixed trial of legal and

8    equitable issues where legal issues are first tried to a jury, the court must follow the jury's factual

9    determinations on common issues of fact." *Hoopes*, 168 Cal. App. 4th at 159-161. After the jury

10   renders a verdict, a court "cannot ignore the jury's verdict"; instead "a jury's factual findings on

11   legal causes of action should bind the trial court when granting ancillary equitable remedies based

12   on the same facts." *Id.*

13   **II.    A Permanent Injunction Is Necessary to Prevent Continuing Harm**

14       Google has made clear through its actions and the testimony of its employees at trial that

15   it will continue to transmit the Challenged Transfers over cellular networks without first obtaining

16   the informed consent of Android users. Google's wrongdoing has continued after this suit was

17   filed, after trial began, after a verdict was rendered, and even after judgment was entered.

18       Google's theory of the case at trial was that it knows better than users what to do with

19   users' cellular data. Google's counsel made it very explicit during closing arguments: "You don't

20   want it . . . Buy an iPhone." Tr. 2494:14-17. Google argued that the Challenged Transfers are so

21   important that the only viable "option" for Android users is "to not accept the service" and "to go

22   somewhere else." Tr. 334:3-8. Google believes that it is "require[d]" to consume users' "cellular

23   data" and that it cannot "just wait for Wi-Fi or Google Fi" networks. Tr. 2078:19-2079:4, 2115:1-

24   2. Google argued that "[t]hey've got to have this information" even at the expense of users' cellular

25   data. Tr. 2479:4-7. When asked whether they could do their job without using class members'

26   cellular data, Google engineers replied: "we don't want to do that." Tr. 1519:27. The former

27   director of Google Play Services could not recall *ever* having "any concern at all about the amount

28

**PLAINTIFFS' MOTION FOR EQUITABLE RELIEF**
**(CASE NO. 19CV352557)**

1  of the user's cellular data that GMS Core was consuming." Ex. G, Troll Dep. 22:5-8, 22:10; *id.*

2  22:12-15, 22:17 (metered data).

3  The evidence at trial also established that while Google has attempted to train its engineers

4  to use QoS tiers that consume less cellular data, specifically the "unmetered only" QoS tier, that

5  the usage of QoS tiers that consume cellular data has actually increased over time. *Compare* Ex.

6  H, P019 (Unmetered Only is 0.2% of traffic in 2020) *with* Ex. I, P048 (Unmetered Only is 0.01%

7  of traffic in 2022); *see* Ex. I, P048 ("Please keep in mind that end-users have to pay for the mobile

8  data [and] default to unmetered networks to minimize costs.").

9  Google simply does not intend to stop consuming users' cellular data, and has made clear

10  that it will continue to convert class members' property until the Court enjoins Google's conduct.

11  An injunction is therefore necessary to stop Google's repeated, continuing wrong.

12  A repeated, continuing tort is a quintessential "irreparable harm" that warrants injunctive

13  relief under California law. *Donahue*, 232 Cal. App. 4th at 1184. "Irreparable harm" does not mean

14  "injury beyond the possibility of repair or beyond possible compensation in damages." *Id.* (quoting

15  *Wind v. Herbert*, 186 Cal. App. 2d 276, 285 (1960)). The concept of "irreparable harm" instead

16  embraces "the rule that an injunction may issue to prevent wrongs of a repeated and continuing

17  character." *Id.* (quoting *Wind*, 186 Cal. App. 2d at 285); *see Ne. Nat. Energy LLC v. Pachira*

18  *Energy LLC*, 243 W. Va. 362, 371 (2020) (holding that a defendant does not "have *the right* to

19  continue causing damages . . . in the future" (emphasis in original) (citing *Wind*, 186 Cal. App. 2d

20  at 284-85)). For example, it is well established that an injunction is "a proper remedy" for torts

21  analogous to conversion involving "repeated acts of trespass." *Uptown Enters. v. Strand*, 195 Cal.

22  App. 2d 45, 52 (1961) (citing cases).

23  Furthermore, "[e]quity abhors a multiplicity of actions." *Rilcoff v. Super. Ct.*, 50 Cal. App.

24  2d 503, 506 (1942). Therefore, "[t]he right to an injunction . . . is clearly established" in cases

25  involving a tort "of a continuing nature," where "it is necessary to prevent a multiplicity of

26  actions," or "numerous petty suits, which it is not the policy of the law to encourage." *Mendelson*,

27  144 Cal. at 233; Cal. Civ. Code § 3422 (authorizing injunctions "to prevent a multiplicity of

28  judicial proceedings."); Cal. C.C.P. § 526(a)(6) (same). California law authorizes a final injunction

1    when it "appear[s] with reasonable certainty that the wrongful acts will be continued or repeated."

2    *Scripps Health v. Marin*, 72 Cal. App. 4th 324, 333 (1999); *see also Dawson v. E. Side Union High*

3    *Sch. Dist.*, 28 Cal. App. 4th 998, 1040 (1994) ("reasonable probability that past acts complained

4    of will recur"). A Plaintiff is entitled to such an injunction when he or she can "show an intention"

5    by the tortfeasor "to continue the injurious acts," and "a reasonable ground to apprehend that [the

6    tortfeasor] could do so." *Mendelson*, 144 Cal. at 233.

7    **III.    The Court Should Order Appropriate Equitable Relief**

8          The contours of equitable relief should be "tailor[ed] to the harm at issue." *Uber Techs.*,

9    56 Cal. App. 5th at 314 (quoting *Butt v. State of Cal.*, 4 Cal. 4th 668, 695 (1992)). An injunction

10   is "appropriately tailored" if it is "fitted to the scale of the ongoing violations of law shown by the

11   evidence." *Id.*

12         Evidence at trial established that Google does not inform Android users of the true nature

13   of the Challenged Transfers or that they will consume the users' cellular data. Tr. 509:28-511:1.

14   Specifically, the evidence established that there is a set of screens known as a "Setup Flow" that

15   must be clicked through when a new Android phone is set up. Tr. 503:28-504:7. The evidence at

16   trial also established that this Setup Flow discloses to Android users that the automatic download

17   and install of updates and apps will consume cellular data, but fails to disclose to users the nature

18   of the Challenged Transfers or that they consume users' cellular data. Tr. 509:24-510:10, 510:18-

19   512:11. The evidence at trial further established that Google maintains several policy documents

20   and webpages, including a Privacy Policy and the Google Play Terms of Service, but that those

21   documents also fail to adequately disclose the Challenged Transfers to users or that the Challenged

22   Transfers will consume users' cellular data. *See, e.g.*, Tr. 631:13-634:10, 693:11-694:21.

23         The evidence at trial also established that Google provides Android users with only the

24   illusion of control, including that they can see (and delete) all the information collected from their

25   Android devices by Google, and that they can control both what information is collected and

26   whether it is collected using their cellular data.

27         For example, Google falsely represents in the Setup Flow and its websites that Android

28   users can see, download, and delete their data. *See, e.g.*, Ex. J, P013 at 39 ("You can see your data,

10

1    delete it, and change your account settings at account.google.com"); *Id.* at 11 ("You can always

2    learn more about these options, adjust them, and review your activity in your Google Account

3    (account.google.com).").[1] But the evidence at trial makes clear that these representations are false.

4    Internal Google documents admitted into evidence at trial confirm that users cannot see, download,

5    or delete their data. *See* Ex. N, P296 at 3, 4 ("For the data collected, users CANNOT see it,

6    download it, or delete it"); Tr. 529:22-530:9 ("You can't see any of the challenged transfers on

7    account.google.com, and you certainly can't delete them."); 537:4-23 (similar). Based on this

8    evidence, Plaintiffs' user interface expert, Dr. Jules White, testified that Google's

9    misrepresentations "give[] users the illusion of control, that they can go to this website, they can

10   see the data that's being collected on them from these experiments, that you can adjust something

11   to prevent it." Tr. 537:4-23. But "[t]he challenged transfers are not on that website. You can't go

12   there and see experiments or clearcuts or any of the other stuff you're going to hear about." *Id.*

13   Google did not attempt to rebut this evidence at trial.

14          Perhaps even more surprisingly, the evidence established that seemingly-relevant settings

15   provided to users did not stop the Challenged Transfers. For example, the evidence established

16   that Android phones have a setting that purports to allow users to allow or disallow "mobile

17   background data" from being used by GMS Core (also referred to by Google as Google Play

18   Services). *See* Ex. O, P014 (the "Background Mobile Data Toggle"). But internal documents

19   admitted into evidence at trial established not only that this setting "typically does not work," but

20   that Google has been aware that the setting does not work for at least 7 years. Ex. B, P124 (VP of

21   Google raising issue that Background Mobile Data Toggle does not work); *see* Ex. P, P101

22   (Background Mobile Data Toggle is "confusing"); Ex. Q, P077 (Google Play Services has

23   "unrestricted data usage" and users should have more control "over which features or modules

24   within GMS Core had background access"); Ex. R, P104 (an employee "turned off background

25

26   [1] Google emphasizes in the Setup Flow that "You're in control," and that "[d]epending on your
     account settings, some of this data may be associated with your Google account." Ex. K, P197 at

27   -3. Google also makes this same representation on its external website. Ex. L, P201 ("You can see
     or delete your data and more at activity.google.com"). The Google Privacy Policy similarly says:

28   "We understand this is a big responsibility and work hard to . . . put you in control." Ex. M, P169.

**PLAINTIFFS' MOTION FOR EQUITABLE RELIEF**
**(CASE NO. 19CV352557)**

1  mobile data on their device but is still seeing high metered usage from Clearcut"); *see also* Tr.

2  454:21-28, 590:4-9, 1062:3-5, 1063:12-16.

3       Google's corporate representative at trial attempted to argue that the setting "works," but

4  admitted that it did so only for "certain very small windows" when GMS Core was performing "its

5  own cleanup tasks." Tr. 1058:5-1060:14. He further admitted that a typical Android user would

6  not understand the setting to have such limited application. Tr. 1060:11-14 ("Do you think the

7  typical Android user would understand that this only affects certain very small windows? A. No.").

8  This testimony was tantamount to an admission that Google knows the Google Play Service

9  Background Mobile Data Toggle, like Google's other settings, is misleading and ineffective.

10      The relevant testimony—and Google internal documents—showed that Google could

11 readily respect user choice by making this setting work consistent with a typical Android user's

12 expectations. Google has the ability to decide when, and over what networks, to send the

13 Challenged Transfers. The evidence at trial established that GMS Core already has multiple

14 Google Quality of Service (QoS) tiers, which can be used to restrict transfers to certain times and

15 networks. *See, e.g.*, Tr. 998:2-1000:5. One of the standard QoS tiers is "unmetered only," which

16 defers transfers until an unmetered connection is available. *Id.* In an internal Google email, Google

17 engineer Dr. Noha Elarief admitted that Google "could honor" users' preferences by changing

18 GMS Core's behavior when the setting is turned off, for example that "Clearcut could switch all

19 QoS tiers to unmetered as long as mobile data is turned off." Ex. R, P104; *see* Ex. S, Elarief Dep.

20 144:19-23, 145:02-03 ("Clearcut could switch—temporarily switch QoS tiers—kind of override

21 all QoS tiers on the device to unmetered as long as the mobile data is turned off."). Consistent with

22 this evidence, Dr. White also testified that Google could "honor user choices" by causing the

23 Background Mobile Data Toggle to send transfers over unmetered networks. Tr. 2204:16-2206:12.

24      Pervasive evidence established that Google knew it is not being transparent and that users

25 were confused, but Google's conduct has continued even through the pendency of this litigation.

26 Google knows that users do not understand that GMS Core or Google Play Services consumes

27 their cellular data, much less understand why. Ex. T, P090 ("[I]magine that we had to explain this

28 data usage to users."); Ex. U, P116 ("Most of the users don't know that GMS Core is installed on

their device."). Google learned from internal user experience research that users "have very little understanding" of Google Play services or what it does, "leading to confusion." Ex. V, P127 at 3. Google understands that "[m]uch of the confusion is derived from confusion with the Play Store," because "[t]he Play brand on an Android phone is strongly associated with the Play Store, leading most users to believe that" GMS Core, or "Google Play services" is "somehow related to the store or other apps." *Id.* at 5. Google recognizes that "most users do not understand Play services or the reason behind our mobile data usage." *Id.* at 3. But Google has still not provided users with transparent disclosures or a meaningful choice about whether Google may use their cellular data.

The arguments of Google's counsel at trial and the testimony of Google's employees showed that Google does not intend ever to offer users a choice whether to use their cellular data for the Challenged Transfers. Google's theory of the case was: "You don't want it . . . Buy an iPhone." Tr. 2494:14-17; *see* Tr. 334:3-8 ("[G]o somewhere else."). Google testified over and over that it is "require[d]" to consume users' "cellular data," that it cannot "just wait for Wi-Fi or Google Fi" networks, that "[t]hey've got to have this information" on demand. Tr. 2078:19-2079:4, 2115:1-2, 2479:4-7; *see* 1519:27 ("[W]e don't want to [wait for Wi-Fi]."). Google believes that it knows better, and does not intend to offer users a choice unless this Court orders otherwise.

In view of this evidence, an appropriate injunction should prohibit Google from engaging in the Challenged Transfers using cellular data unless it: (1) provides users with the material information necessary to understand the Challenged Transfers and that they consume users' cellular data; and (2) affords users a meaningful option to provide (or withhold) consent to the use of their cellular data for Challenged Transfers. Specifically, Google should be required to add language to the Setup Flow and to its relevant policies/websites informing users of the four Challenged Transfers, and directing them to the Background Mobile Data Toggle to allow or disallow the use of metered cellular data by for the Challenged Transfers. And Google should be required to make the Background Mobile Data Toggle actually work in the manner suggested by Dr. Elarief such that when a user turns the setting off, it should the QoS tier for the Challenged Transfers switches to "unmetered only."

**A.    Google Must Disclose the Challenged Transfers**

In order to obtain consent, Google must disclose the Challenged Transfers and their consumption of cellular data. Accordingly, the first element of an injunction should require Google to add an adequate disclosure of the challenged Transfers to the Setup Flow to inform future Android users, and to update its applicable policies and websites with an appropriate push notification to inform existing Android users.

**1.    Google Must Disclose All Four Categories of Challenged Transfers and their Consumption of Cellular Data**

To obtain consent, Google must disclose the information that would be material to a typical Android user's decision to consent to the consumption of their cellular data for the Challenged Transfers. The evidence at trial demonstrated that the following facts are material to users' decision whether to consent to Google's consumption of their cellular data.

All four Challenged Transfers occur over cellular networks, consuming users' cellular data. Tr. 785:27-786:5 (all transfers); 897:19-25 (all transfers); 660:5-15 (clearcut); 485:23-28 (experiments); 1530:5-13 (experiments); 699:10-25 (location); 1868:7-12 (ad attestation). Their cellular data consumption is attributed to users, which may result in throttling, fees, and overcharges. *Id.*; Tr. 1146:25-1147:5, 1155:3-15, 1171:17-20, 1179:11-19; Ex. P, P101 ("Clearcut usage is a significant cost to users," "monetary cost to users"); P103 ("Metered data costs users money."). Cellular network usage may also affect device performance. Tr. 1531:20-1532:2.

The Challenged Transfers are "not connected to what the user is doing in the moment." Tr. 469:16-470:2; *see id.* 376:8-14, 451:22-452:8 ("GMS Core in the Android operating system" is sending these transfers, "passively in the background without any direct use of the phone."); 389:26-390:8 ("[I]t doesn't relate to the direct use of the phone at that time."); 661:16-24 (So they can wait. They're not timely. They're not in service of what the user is doing."); 715:10-20 (They're collecting signals in the background but they're not actually doing anything, showing the

**PLAINTIFFS' MOTION FOR EQUITABLE RELIEF**
**(CASE NO. 19CV352557)**

user anything, giving the user actionable information."). The Challenged Transfers are for Google's purposes, such as developing software and supporting Google's ads. Tr. 379:6-24.

There are four categories of Challenged Transfers. **Clearcut Logs** are historical records that are sent on a delayed schedule for Google to analyze later. Tr. 991:23-992:3. **Experiment Flags** are transmissions to turn on and off software, including experimental features, that have been previously installed on a phone. Tr. 1021:15-25. The results of experiments are uploaded later via Clearcut. Tr. 485:23-28; 1533:21-1534:1. **Ad Attestation Transfers** are a collection of transfers that allow Google to determine whether a device is a real device, operated by a real person. Tr. 767:17-21. These transfers allow Google to determine that it downloaded an ad to a real phone and showed it to a real person, who really clicked it. *Id.* **Location Uploads** send Google the user's location, and information about a user's proximity to cellular towers and Wi-Fi networks, so that Google can later use that information to build a map of cellular towers and Wi-Fi networks, to improve Google's products. Tr. 1010:17-1016:2; Nelson Dep. Tr. 330:2-8, 330:12. Location Uploads occur when a phone moves a certain distance, even when the phone is seemingly completely idle, with no apps open, and the screen off. Tr. 1012:17-28.

The Challenged Transfers occur in the background, invisible to users. Tr. 368:4-83, 663:28-664:4, 1056:1-9, 469:16-25, 716:6-9, 982:10-15, 1118:8-14, 1368:20-23, 1866:13-18, 1920:19-22. Users cannot see or delete the data Google collects about them. Tr. 529:22-530:9.

### 2. Google Must Disclose the Challenged Transfers in the Setup Flow

Google must obtain consent from new Android users prior to sending any of the Challenged Transfers. Accordingly, Google should provide an adequate disclosure in the Setup Flow, so that users are informed of the Challenged Transfers and their potential consumption of cellular data before the transfers begin. In addition, the Court should order Google to allow users to turn the Background Mobile Data Toggle on or off in the Setup Flow, while setting up their device, via a toggle in the Setup Flow itself. Adding the disclosure below (the "Background Data Disclosure")

**PLAINTIFFS' MOTION FOR EQUITABLE RELIEF**
**(CASE NO. 19CV352557)**

1    and a functional setting in the Setup Flow will provide future Android users with a meaningful

2    opportunity to consent, or to deny consent, prior to Google sending any of the transfers.

3        Based on this evidence, Plaintiffs request the Court order Google to add the following

4    Background Data Disclosure to a new screen in the Setup Flow, with a corresponding toggle:

5    ***Background Mobile Data Usage***

6    *If you allow Google to use Background Mobile Data, Google will send information to and*

7    *from your phone over cellular networks, which will consume cellular data associated with*

8    *your device's cellular data account or plan. There are four categories of Background*

9    *Transfers:*

10       • ***Logging.*** *Google will collect records of practically everything that happens on your*

11         *device, and will send these historical records to Google's servers, for Google to*

12         *analyze later to improve its products and services, including advertising.*

13       • ***Experiments.*** *Google will send transmissions that turn on and off features in the*

14         *apps and other software on your device, including experimental features, and will*

15         *then collect information about the results for Google to analyze later to improve its*

16         *products and services, including advertising. Google will provide no additional*

17         *notice that these experiments are taking place.*

18       • ***Ad Attestation.*** *Google will send transmissions to and from your phone to confirm*

19         *that it is a real phone, being used by a real person. Google will analyze that*

20         *information to confirm that Google's advertisements have been downloaded to a*

21         *real device and viewed or clicked by a real person. These transmissions do not*

22         *protect your device from malware but support the integrity of Google's advertising*

23         *ecosystem.*

24       • ***Location Uploads.*** *When your phone moves a certain distance, Google will upload*

25         *to its servers information about your phone's location and movements, including*

26         *information about the cell towers and Wi-Fi networks in your area. Google uses*

27         *this information to crowdsource its location database, to build better maps of cell*

28         *towers and Wi-Fi networks.*

**PLAINTIFFS' MOTION FOR EQUITABLE RELIEF**
**(CASE NO. 19CV352557)**

*These Background Transfers are not directly related to what you are viewing on your phone in the moment, or what you are using your phone to do. You cannot see or delete any of the information Google collects via these Background Transfers on your phone, in your Google account, or on any of Google's websites.*

*When the "Background Mobile Data" setting is turned off, these Background Data Transfers will generally be restricted to Wi-Fi or Unmetered Cellular Networks.*

*To change the Background Data setting after completing device setup, open your Settings app, then navigate to Apps>See all apps>Google Play Services>Mobile Data & Wi-Fi.*

This disclosure will provide users with the minimum material facts necessary to consent to Google consuming their cellular data via the Challenged Transfers. To eliminate the possibility of user confusion, Google should also be ordered to update its online policies and web pages to reflect the updated Setup Flow, including the Background Data Disclosure.

### 3.    Google Must Send a Push Notification to All Class Members

If Google simply adds a disclosure in the Setup Flow, they will not have obtained consent from current Android users. Therefore, the Court should order Google to send a push notification regarding the Challenged Transfers to every Android phone in California, or with a California billing zip code. That push notification should include the Background Data Disclosure above, and a hyperlink that opens the Background Mobile Data Toggle for GMS Core on each phone, so users can turn on or off the use of mobile data by Challenged Transfers.

### B.    Google Must Make the Background Mobile Data Toggle Effective

For consent to be effective, class members must have the ability to choose whether to allow Google to consume their cellular data. This Court should therefore order Google to change the Background Mobile Data Toggle—which already exists—so that it actually restricts the Challenged Transfers to unmetered networks in a way that is consistent with user expectations.

Google has the power to make the Background Mobile Data Toggle effective. As Google's corporate representative, Mr. Sancheti, admitted, "[t]echnically it's possible" for Google and its "thousands of engineers" to correct the functioning of the Background Mobile Data Toggle. Tr. 1072:7-12. And Google's own engineers have proposed a means of doing so. As discussed above,

1   Dr. Elarief testified that Google could make the Background Mobile Data Toggle effective by

2   changing GMS Core's behavior when the setting is turned off. Ex. S, Elarief Dep. 144:19-23,

3   145:02-03. As Dr. Elarief explained, "Clearcut could switch—temporarily switch QoS tiers—kind

4   of override all QoS tiers on the device to unmetered as long as the mobile data is turned off." *Id.*

5   In an internal document, Dr. Elarief also admitted that Google "could honor" the Background

6   Mobile Data Toggle by changing GMS Core's behavior, "E.g., Clearcut could switch all QoS tiers

7   to unmetered as long as mobile data is turned off." Ex. R, P104. Plaintiffs' user interface expect,

8   Dr. White, also testified that Google "could honor that toggle" and could "honor user choices on

9   that toggle" by sending transfers only over unmetered networks. Tr. 2204:16-2206:12.

10          Accordingly, the Court should order Google to correct the Background Mobile Data Toggle

11   to honor users' preferences, so that it restricts all Challenged Transfers to being sent only over

12   unmetered networks when the Background Mobile Data Toggle is set in the "off" position.

13          **C.    Google Must Compensate Class Members for Further Ongoing Conversion**

14          Plaintiffs' damages were calculated through May 31, 2025, and the jury therefore awarded

15   damages only through that date. Tr. 1264:27-1265:11. Yet Google's conduct has continued since

16   that time, and will continue until this Court's injunction becomes effective. Even absent any

17   specific statutory authorization, "a trial court has the inherent power to order restitution as a form

18   of ancillary relief." *People v. Pac. Land Rsch. Co.*, 20 Cal. 3d 10, 19 (1977). This Court should

19   exercise that inherent power and order that Google pay restitution to class members until Google

20   complies with this Court's injunction.

21          Google's ongoing harm warrants an order of restitution until Google ceases its unlawful

22   conduct. "Restitution" may "refer[] to compensation for injury done," and "is commonly

23   understood to mean 'the act of making good, or of giving an equivalent for, loss.'" *Rivera v.*

24   *Hillard*, 89 Cal. App. 5th 964, 978 (2023), *review denied* (June 28, 2023) (quoting *Walnut Creek*

25   *Manor v. Fair Emp. & Hous. Comm'n*, 54 Cal. 3d 245, 263 (1991). "Restitutive damages . . . are

26   quantifiable amounts of money due an injured private party from another party to compensate for

27   the pecuniary loss directly resulting from the second party's violation of law." *Id.* Property may

28   have a "quantifiable value" and its loss constitutes a "pecuniary loss." *See id.* Therefore, a

18

1   defendant's "destruction of property" with a quantifiable value, or failure to "return the . . .

2   property taken" are pecuniary losses, and thus warrant a "restitution order" in the amount of the

3   value of the property. *Id.*; *See id.* at 973 (describing restitution order). A trial court may properly

4   order a defendant to pay restitution in "an assigned monetary amount, with interest" unless the

5   defendant ceases his or her unlawful taking of the property. *Id.* at 973 (describing restitution order),

6   978 (approving of restitution order).

7        Restitution is warranted here because the jury found that Plaintiffs suffer a quantifiable loss

8   directly resulting from Google's violation of law. *Rivera*, 89 Cal. App. 5th at 978. The jury found

9   that Plaintiffs suffer quantifiable loss in the amount of Dr. Stec's industry average price damages

10  calculation, which was $314,626,932. Ex. C, Special Verdict Form; *see* Stec Decl. ¶6. Plaintiffs'

11  damages changed over the course of the class period, because the value of cellular data varied over

12  time, but Dr. Stec's calculations accounted for this. Stec Decl. ¶¶8-10. The industry average

13  damages calculation Dr. Stec presented at trial applied a class-wide damages figure per day for

14  2025 of $107,744.56 for all four transfers. *Id.* ¶¶11-14. This figure was based on the amount of

15  cellular data per-user, per-day calculated by Mr. Thompson and Dr. Stec and presented at trial. *Id.*

16  It was also based on the current industry average price of about $2.40 per GB, as put into evidence

17  at trial. *Id.*; *see* Tr. 1203:4-20 ("about $2.40"). Because the jury found that Plaintiffs are entitled

18  to Dr. Stec's industry average price damages figure, the jury necessarily found that Plaintiffs are

19  entitled to $107,744.56 per day for the cellular data Google takes in the year 2025. The jury

20  necessarily found that this loss is quantifiable, and that it results from Google's violation of law.

21  The Court should honor those findings. *Hoopes*, 168 Cal. App. 4th at 159-161.

22       Therefore, Plaintiffs respectfully request that the Court order Google to pay Plaintiffs

23  restitution damages of $107,744.56 per day, plus post-judgment interest at applicable statutory

24  rates, *see* Cal. C.C.P. § 685.010, until Google finally complies with this Court's injunction or

25  otherwise discontinues the Challenged Transfers over cellular networks.

26                              **CONCLUSION**

27       For the foregoing reasons, Plaintiffs respectfully submit that the Court should order the

28  requested equitable relief. A proposed form of injunction is attached as Exhibit A.

---

19

1   Dated:  August 11, 2025              Respectfully submitted,

2                                    BARTLIT BECK LLP

3                                    */s/ Glen E. Summers*

4                                    Glen E. Summers (176402)
                                   Karma M. Giulianelli (184175)

5                                    Lindley J. Brenza (*pro hac vice*)
                                   Jonathan Jacob Marsh (*pro hac vice*)

6                                    BARTLIT BECK LLP
                                   1801 Wewatta Street, Suite 1200

7                                    Denver, CO 80202
                                   Telephone: (303) 592-3100

8

9                                    Hamilton H. Hill (*pro hac vice*)
                                   Benjamin R. Montague (*pro hac vice*)

10                                 BARTLIT BECK LLP
                                54 West Hubbard Street, Suite 600

11                                 Chicago, IL 60654
                                Telephone: (312) 494-4400

12

13                                 Marc A. Wallenstein (*pro hac vice*)
                                George A. Zelcs (*pro hac vice*)

14                                 Chad E. Bell (*pro hac vice*)
                                Ryan Z. Cortazar (*pro hac vice*)

15                                 Pamela I. Yaacoub (*pro hac vice*)
                                KOREIN TILLERY LLC

16                                 205 North Michigan Avenue, Suite 1950
                                Chicago, IL 60601

17                                 Telephone: (312) 641-9750
                                Facsimile: (312) 641-9751

18

19                                 Carol L. O'Keefe (*pro hac vice*)
                                Michael E. Klenov (277028)

20                                 KOREIN TILLERY LLC
                                505 North Seventh Street, Suite 3600

21                                 St. Louis, MO 63101
                                Telephone: (314) 241-4844

22                                 Facsimile: (314) 241-3525

23

24                                 *Attorneys for Plaintiffs*
                                *ATTILA CSUPO, ANDREW BURKE &*
                                *KERRY HECHT*

25

26

27

28

**PLAINTIFFS' MOTION FOR EQUITABLE RELIEF**
**(CASE NO. 19CV352557)**