ELIZABETH M. PIPKIN (243611)
ANN M. RAVEL (62139)
McMANIS FAULKNER
50 West San Fernando Street, 10th Floor
San Jose, CA 95113
Telephone: (408) 279-8700
Facsimile: (408) 279-3244
epipkin@mcmanislaw.com
aravel@mcmanislaw.com

GLEN E. SUMMERS (176402)
KARMA M. GIULIANELLI (184175)
LINDLEY J. BRENZA (*pro hac vice*)
JONATHAN JACOB MARSH (*pro hac vice*)
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, CO 80202
Telephone: (303) 592-3100

MARC A. WALLENSTEIN (*pro hac vice*)
GEORGE A. ZELCS (*pro hac vice*)
RYAN Z. CORTAZAR (*pro hac vice*)
CHAD E. BELL (*pro hac vice*)
PAMELA I. YAACOUB (*pro hac vice*)
KOREIN TILLERY LLC
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751

CAROL L. O'KEEFE (*pro hac vice*)
MICHAEL E. KLENOV (277028)
KOREIN TILLERY LLC
505 North Seventh Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

*Attorneys for Plaintiffs Joseph Taylor,
Mick Cleary, and Jennifer Nelson*

## UNITED STATE DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| JOSEPH TAYLOR, MICK CLEARY, and JENNIFER NELSON, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GOOGLE LLC,<br><br>Defendant. | Case No. 5:20-CV-07956-VKD<br><br>**DECLARATION OF GLEN E. SUMMERS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Date:   February 17, 2026<br>Time:   10:00 a.m.<br>Judge: Hon. Virginia K. DeMarchi |

I, Glen E. Summers, declare as follows:

1.      I am a partner in the law firm of Bartlit Beck LLP, and am licensed to practice law in California and Colorado. I have represented Plaintiffs in this action as co-lead counsel since the initial Complaint was filed in November 2020.

2.      I make this declaration in support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement. I have personal, first-hand knowledge of the facts set forth in this Declaration. If called as a witness, I could and would competently testify to these facts under oath.

## THE BARTLIT BECK TEAM

3.      Bartlit Beck is one of the nation's leading trial firms. We have a national practice and routinely handle complex, high stakes matters all over the country for some of the largest U.S. and international corporations. We recruit only the most accomplished law school graduates. We have been named "National Litigation Boutique of the Year" (The American Lawyer, 2022),"Trial Firm of the Year" (Benchmark Litigation, 2020), and recognized as the 2025 "Colorado Firm of the Year" and "Illinois Firm of the Year" (Benchmark Litigation, 2025). Bartlit Beck and its lawyers have also received acclaim and top rankings by Benchmark, BTI, Chambers USA, and other organizations. In particular, Bartlit Beck is widely recognized for work in highstakes "bet the company" cases. Bartlit Beck has successfully represented both plaintiffs and defendants in technology cases involving a wide range of technologies including telecommunications, internet commerce platforms, computer software and hardware, aircraft engines, pharmaceutical products, digital media and internet services, digital data transmission and satellite systems, and a variety of traditional manufacturing and service industries. Bartlit Beck has also represented plaintiffs and defendants in putative and certified class actions in federal and state courts throughout the United States concerning a broad range of claims, including antitrust, consumer fraud, environmental, toxic tort, product liability, and breach of warranty. Attached as Exhibit 1 is a true and correct copy of Bartlit Beck's firm biography and attached hereto as Exhibits 2-4 are true and correct copies of publications documenting some of Bartlit Beck's accolades.

DECLARATION OF GLEN E. SUMMERS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT (Case No. 5:20-CV-07956)

4. Bartlit Beck has worked on behalf of Plaintiffs from the inception of this matter, and has taken a leading role in this litigation along with Korein Tillery.

5. The principal attorneys from Bartlit Beck who worked on this case were myself, Karma Giulianelli, Alison Wheeler, Lin Brenza and Jacob Marsh.

6. I graduated from the University of Pennsylvania Law School in 1994, *magna cum laude*. I went on to clerk for J. Clifford Wallace, who was then Chief Judge of the United States Court of Appeals for the Ninth Circuit. Subsequently I clerked for Associate Justice Antonin Scalia of the United States Supreme Court. I joined Bartlit Beck in 1997 following my clerkship with Justice Scalia and was made partner in 1999. I am an accomplished first-chair trial lawyer and have handled high-stakes cases in jurisdictions across the country, including federal courts in California, Texas, New York, Missouri, and Colorado. My work has been recognized in accolades published by Benchmark Litigation, Chambers USA, and other legal publications. Including the jury verdict in *Csupo v. Google*, I have served as lead counsel in cases where we have won a total of approximately $1.2 billion in jury verdicts for plaintiffs. In July of last year, I and my partner, Karma Giulianelli, were named "Litigators of the Week" by The American Lawyer in connection with our work in the *Csupo* case. A true and correct copy of my professional biography is attached hereto as Exhibit 5.

7. Karma Giulianelli graduated from Stanford law School in 1996, *magna cum laude*. Following law school, Ms. Giulianelli was selected for the Department of Justice Honors Program, where she was a core member of the investigatory and trial team in *United States v. Microsoft*, spending nearly eight months as one of six Department of Justice lawyers who tried the case. Ms. Giulianelli joined Bartlit Beck as an associate in 1999 and was named partner in 2001. She has practiced law at Bartlit Beck continuously since then. Ms. Giulianelli has focused on antitrust and technology litigation for nearly 29 years and has spent over a full year in trial days in front of judges and juries as a leading trial team member in high-stakes cases in numerous jurisdictions throughout the United States. Her clients have included a range of Fortune 500 companies, including Pratt & Whitney, Sabre, Inc., Hewlett Packard, E. I. duPont de Nemours & Company,

DECLARATION OF GLEN E. SUMMERS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT (Case No. 5:20-CV-07956)

and Tyco International Ltd. Ms. Giulianelli has taught as an Adjunct Professor at the University of Colorado, and has spoken at numerous conferences and symposia over the past two decades. She has received various recognitions in industry publications. Ms. Giulianelli has been named as one of the Top 250 Women in Litigation by Benchmark Litigation for the last two years in a row. A true and correct copy of Ms. Giulianelli's professional biography is attached hereto as Exhibit 6.

8.    Alison Wheeler graduated from Harvard Law School *magna cum laude* in 1995. Following law school, Ms. Wheeler went on to clerk for the United States Court of Appeals for the Ninth Circuit and the United States District Court for the Central District of California, and to serve as a Skadden Fellow. She joined Bartlit Beck in 1999, where she was a partner until her retirement last year. Prior to her retirement, Ms. Wheeler handled a broad variety of complex cases. A true and correct copy of Ms. Wheeler's professional biography is attached hereto as Exhibit 7.

9.    Lindley J. Brenza graduated from University of Chicago Law School *cum laude* in 1987. Following law school, Mr. Brenza went on to clerk for Frank H. Easterbrook of the United States Court of Appeals for the Seventh Circuit, and then for Chief Justice William H. Rehnquist at the United States Supreme Court. He joined Bartlit Beck as an associate in 1993 and has been a partner for nearly three decades. Mr. Brenza's practice centers on high-stake jury trials in complex cases concerning computer science and other technical subjects. A true and correct copy of Mr. Brenza's professional biography is attached hereto as Exhibit 8.

10.    Jonathan Jacob Marsh graduated from University of Pennsylvania Law School in 2021, *summa cum laude*, Order of the Coif, and second in his class. Following law school, Mr. Marsh went on to clerk for the United States Courts of Appeals for the Ninth and Tenth Circuits, and to work as an associate at Gibson Dunn. He joined Bartlit Beck as an associate in 2024. A true and correct copy of Mr. Marsh's professional biography is attached hereto as Exhibit 9.

11.    In addition to prosecuting this case from its inception, I along with a Bartlit Beck team including several of the lawyers described above also worked on the related *Csupo* matter from the investigation and preparation of the initial complaint to the present. We were deeply

DECLARATION OF GLEN E. SUMMERS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT (Case No. 5:20-CV-07956)

involved in all aspects of the development and prosecution of the case, and Ms. Giulianelli and I were leading members of the *Csupo* trial team.

## NEGOTIATION OF THE PROPOSED SETTLEMENT

12.    In early October 2024, following the close of fact and expert discovery, the parties agreed to engage in mediation with the assistance of renowned mediators Kenneth R. Feinberg and Camille S. Biros. By that time, the parties had thoroughly investigated the facts underlying Plaintiffs' claims. On November 13 and 14, 2024, the parties engaged in two days of in-person mediation, which were preceded and followed by several mediation sessions conducted by video and telephone. Following the jury verdict in *Csupo* and briefing of the parties' respective post-trial motions in that case, the parties resumed their settlement negotiations with the assistance of the same mediators. The parties continued settlement negotiations, including with the assistance of the same mediators, over the following year. In addition to various mediation discussions conducted by videoconference and telephone, the parties participated in another two days of in-person mediation with Mr. Feinberg and Ms. Biros on October 6 and 7, 2025.

13.    In early November 2025, Plaintiffs engaged Graeme W. Bush of Zuckerman Spaeder LLP to serve as Special Settlement Counsel exclusively for the putative class in this case. At the same time, Philip C. Korologos of Boies Schiller Flexner LLP was engaged to serve as Special Settlement Counsel exclusively for the certified class in *Csupo v. Google*. Mr. Bush and Mr. Korologos each conducted their own independent evaluation of the merits of the cases, including the potential recoveries and risks to those potential recoveries, and ultimately provided direction regarding appropriate settlement terms for their respective cases.

14.    After weeks of further negotiations, on November 26, 2025, the parties executed a term sheet outlining the principal terms of a proposed Settlement of this case. At the same time, the parties also executed a similar term sheet outlining the principal terms of a proposed settlement of the *Csupo* case. On December 23, 2025, after nearly a month of additional negotiations, the parties executed a definitive long-form Settlement Agreement documenting the proposed Settlement of this case. A true and correct copy of the Settlement Agreement is attached hereto as

Exhibit 10 (the "Settlement Agreement"). A true and correct copy of the Confidential Attachment A to the Settlement Agreement is attached hereto as Exhibit 11. On the same date, the parties also executed a definitive long-form settlement agreement in the *Csupo* case. Attached hereto as Exhibit 12 is a true and correct copy of the Settlement Agreement and Release in the matter of *Csupo v. Google LLC*, No. 19CV352557 (Santa Clara Cty. Superior Ct.), dated December 23, 2025.

15. I personally participated in the mediation and related settlement negotiations leading to the Settlement Agreement and was generally the lead negotiator for Plaintiffs. All of those negotiations were completely at arms-length. Indeed, the material terms of the Settlement were the result of zealous and at times contentious negotiations.

## THE PROPOSED SETTLEMENT

16. In my professional judgment, the proposed Settlement is fair, reasonable, adequate, and in the best interests of the proposed Settlement Class. The proposed Settlement provides both fulsome injunctive relief to remedy the conduct at issue, as well as significant monetary relief.

17. With regard to the injunctive relief, the Settlement Agreement requires Google both to disclose the conduct at issue to Android users and to require users to expressly consent to it when they set up new Android phones. Specifically, the Settlement Agreement requires Google to update the Google Play Terms of Service and the "Learn about Google Play services" Help Center webpage to include clear disclosures of the challenged transfers at issue in this case, as well as the fact that they may consume Android users' cellular data. Among other things, Google will be required to change the Google Play Terms of Service to disclose that its system services "often require network connectivity and may use your cellular data" and that these network communications "may happen in the background, when you are not directly interacting with your device, including when the device's screen is locked." Exhibit 10, Exhibit A to Settlement Agreement at 34. In addition, the Settlement Agreement requires Google to change the "Learn about Google Play services" Help Center webpage to explain that Google Play Services "causes Android devices to exchange information with Google over cellular networks if the device is not

connected to Wi-Fi, meaning Google Play services may use your mobile data" and that some of these transfers "cannot be turned off." *Id.* at 47.

18.    The Settlement Agreement also requires Google to revise the screens shown to users when setting up a new Android device (known as the "setup flow"). Those changes will add a new section entitled "Use of cellular data," which will contain the following disclosure:

> By tapping "Accept" at the bottom of this screen and continuing, you agree that software and apps on your device may automatically communicate with Google servers for a range of purposes, including using your cellular data when you are not connected to Wi-Fi – learn more. These purposes include, but are not limited to, safely rolling out new features, fixing problems on your device, maintaining and monitoring your device's health, developing new products, protecting the Android ecosystem, supporting advertising, and automatically downloading and configuring software, possibly using cellular data. Some of these communications may happen in the background, when you are not directly interacting with your device, including when the device's screen is locked. You can control some of the communications through user settings, including the settings on this screen, but some of the communications cannot be turned off. You are responsible for any fees incurred from third parties (such as your mobile carrier) in connection with these cellular communications.

*Id.* at 49-50.

19.    The Settlement Agreement further requires Google to take the steps technically feasible to deactivate the Google Play services mobile background data toggle. Exhibit 10, Settlement Agreement § 5.1. This toggle has until now purported to give users the ability to turn off the use of "mobile background data" by Google Play Services, but generally did not disable the transfers at issue in this case. By graying out this toggle and not allowing it to be moved by users into the "off" position, this Settlement will require Google to avoid creating the false impression that the relevant transfers can be turned off with the toggle. Under the Settlement Agreement, these changes must remain in effect for at least two years, subject to reasonable modifications if changes in Google's practices or technologies render the agreed-upon language no longer accurate. *Id.* § 5.2.

20.    In addition to the injunctive relief described above, the Settlement Agreement requires Google to create a non-reversionary monetary settlement fund of $135 million. *Id.* § 3.1. To the best of my knowledge and belief, this monetary compensation is greater than any prior

7

settlement of a conversion case. Based on public accounts of Google's prior settlements, it is also one of the largest class action settlements Google has ever entered into.

21.    While the monetary consideration provided for in the proposed Settlement is significantly less than the amount of damages Plaintiffs intended to seek at trial, in my professional judgment such an amount is fair, reasonable and adequate in view of the substantial risks presented by continued litigation of the case.

22.    In continued litigation, Google would assert substantial defenses both as to liability and damages, which it would present in summary judgment motions, at trial, and if necessary on appeal. With regard to liability, Google would argue, among other things, that users consent to the transfers at issue, and that it's use of Plaintiffs' cellular data is *de minimis*, such that the transfers at issue do not substantially interfere with users' rights to their cellular data plans and cause no harm. With regard to damages, Google would argue both that Plaintiffs' damages claims are based on an overstated value of cellular data and that Plaintiffs have over-estimated the amount of cellular data consumed by the transfers at issue. These defenses are all presented in Google's expert reports in this case. *See* Dkt. 174-11, Expert Report of Dr. Kevin Jeffay at i-ii, 6-10 (summarizing opinions); Dkt. 174-18, Expert Report of Sandeep Chatterjee, Ph.D. at 2-3, 10-13 (summarizing opinion); Dkt. 174-25, Expert Rebuttal Report of Anindya Ghose at Table of Contents, 10-11 (summarizing opinions). In my professional judgment, the liability defenses discussed above present significant risk of the Plaintiffs obtaining no relief at all (monetary or injunctive) if the case is litigated to conclusion. The damages defenses discussed above create further risk of Plaintiffs obtaining no monetary recovery at all. While Plaintiffs prevailed in the *Csupo* trial, the jury reached its verdict by a vote of only 9 to 3. In this Court, a unanimous verdict would be required. Fed. R. Civ. P. 48(b).

23.    In continued litigation, Plaintiffs would also face risk of the Court denying certification of a Rule 23(b)(3) damages class. In opposing Plaintiffs' class certification motion, Google argued that Plaintiffs' damages theory could not be applied classwide, on the theory that applying a single fair market value for cellular data made no sense given the wide variety of

DECLARATION OF GLEN E. SUMMERS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT (Case No. 5:20-CV-07956)

cellular data plans. Dkt. 194-1 at 22-24 (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)). At the August 19, 2025 hearing on Plaintiffs' motion for class certification, the Court questioned Plaintiffs' counsel vigorously about this argument, remarking that *Comcast* requires the damages model to measure "only those damages that are attributable . . . to the Plaintiffs' theory of liability" and that the model "has to measure the right thing." Exhibit 13, Hr'g Tr. 42:14-43:1. A true and correct copy of the August 19, 2025 Hearing Transcript (Dkt. 228) is attached hereto as Exhibit 13.

24.     Additional risks of continued litigation are also presented by Google's pending *Daubert* motions. In its *Daubert* motions, Google presents several challenges to the expert testimony supporting Plaintiffs' damages claim. If granted, those motions could dramatically reduce Plaintiffs' damages claim, if not eliminate those damages claims altogether. One of Google's *Daubert* arguments is that industry average price of cellular data used as an input in calculating Plaintiffs' claimed damages is inappropriate because it fails to focus on the marginal value of the cellular data allegedly converted by Google. At the August 19, 2025 hearing on Google's *Daubert* motions, the Court stated that it found this argument to be "compelling" and that the marginal value of the cellular data at issue could be "negligible." Exhibit 13 at 52:16-53:15.

25.     In addition to these many risks, continued litigation would also necessarily delay any relief to Plaintiffs by several years, including the important injunctive relief secured by the Settlement which will inform Android users of the transfers at issue and that those transfers consume users' cellular data. The trial of this case was scheduled for August 5, 2026. Even if the trial were to proceed on that date, post-trial motions and appeal would likely delay final resolution of this case until late 2028 or early 2029 at the earliest.

26.     Given the many risks summarized above and the certain delay of any relief that would result from continued litigation, in my professional judgment the proposed Settlement is fair, reasonable, adequate, and preferable to continued litigation for the proposed Settlement Class.

DECLARATION OF GLEN E. SUMMERS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT (Case No. 5:20-CV-07956)

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 27, 2026.

/s/ Glen E. Summers
Glen E. Summers

DECLARATION OF GLEN E. SUMMERS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT (Case No. 5:20-CV-07956)