# Exhibit 13

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Virginia K. DeMarchi, Magistrate Judge

TAYLOR, et al.,                    )
                                   )
         Plaintiffs,               )
                                   )
vs.                                )   Case No. C 20-07956-VKD
                                   )
GOOGLE, LLC,                       )
                                   )
         Defendant.                )
_____)

                                   San Jose, California
                                   Tuesday, August 19, 2025

TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
     RECORDING 10:02 - 12:54 = 2 HOURS 52 MINUTES

APPEARANCES:

For Plaintiffs:
                         Bartlit Beck, LLP
                         1801 Wewatta Street
                         Suite 1200
                         Denver, Colorado 80202
                    BY:  KARMA M. GIULIANELLI, ESQ.
                    BY:  GLEN E. SUMMERS, ESQ.

                         Korein Tillery, LLC
                         205 North Michigan Avenue
                         Suite 1950
                         Chicago, Illinois 60601
                    BY:  MARC A. WALLENSTEIN, ESQ.

                    (APPEARANCES CONTINUED ON NEXT PAGE)

2

For Defendant:

Cooley, LLP
3 Embarcadero Center
20th Floor
San Francisco, California
94111
BY:  EMILY BORN, ESQ.
BY:  WHITTY SOMVICHIAN, ESQ.

Transcribed by:

Echo Reporting, Inc.
Contracted Court Reporter/
Transcriber
echoreporting@yahoo.com

3

Tuesday, August 19, 2025                              10:02 a.m.

P-R-O-C-E-E-D-I-N-G-S

--oOo--

THE CLERK:  Now calling Case 20-CV-07956-VKD, Taylor, et al. versus Google, LLC.

Counsel, if you can please state your appearance, beginning with the Plaintiff.

MS. GIULIANELLI:  Karma Giulianelli for the Plaintiffs, from Bartlit Beck.

THE COURT:  Good morning.

MS. GIULIANELLI:  Good morning.

MR. SUMMERS:  And also Glen Summers from Bartlit Beck.

MR. WALLENSTEIN:  And Marc Wallenstein from Korein Tillery.

THE COURT:  Okay.  Good morning.

MR. SOMVICHIAN:  Good morning, your Honor.  Whitty Somvichian with Cooley for Google today.

THE COURT:  Good morning.

MR. BORN:  And Emily Born, also with Cooley for Google.

THE COURT:  Okay.  Good morning.

So, we have several matters on for hearing this morning.  We have the Plaintiffs' motion for class certification, the Plaintiffs' Daubert motion regarding the

4

Defendant's damages experts, Gos (phonetic)?  Am I saying that correctly?

MR. SOMVICHIAN:  Gos.

THE COURT:  Gos.  And Jeffay (phonetic), yes?

MR. SOMVICHIAN:  Correct.

THE COURT:  All right.  And then we also have the Defendant's Daubert motions regarding Plaintiffs' damages experts Huntner (phonetic) and Steck (phonetic), and the Defendant's Daubert motion regarding the Plaintiffs' experts on network usage, purpose of transfers, and some other things regarding Mr. Thompson, Doctor Steck, and Doctor White.

And then there's all the things that you all have filed recently, supplemental briefing requested, last-minute stuff last night.  I'm not really going to belabor that.  We can maybe talk about that at the end, but I'm not going to spend a lot of time on those additional things at the moment.

I understand you have some plans about how you want to argue I guess.  I have some -- five decks here.  I'm happy to hear from you about how you would like to proceed.  Let me invite the Plaintiffs' side first to address that question.

MR. SUMMERS:  Your Honor, Glen Summers on behalf of the Plaintiffs.  I would just say that the Plaintiffs have two motions as -- as the Court has already mentioned, a

5

motion for class certification and a Daubert motion.  As between the two, we would like to focus on the motion for class certification today and use our time there.  Ms. Giulianelli will be handling that, but I just wanted to make that clear.  That's the one we think is priority for the day.

THE COURT:  Okay.  And how did the Defendants think you should proceed?

MR. SOMVICHIAN:  Your Honor, I agree we should focus on the class certification issues.  The Daubert issues are -- are also important.  We'll take our cues as to when and -- and how you want to address those, but I agree the class certification motion is probably the right place to start.

THE COURT:  That was my sense as well, although it seemed to me like there may be some Daubert issues that --

MR. SOMVICHIAN:  Yes.

THE COURT:  -- overlap with some of the questions that are presented.  So, before we get that -- to that issue, nobody asked for this hearing to be conducted under seal.  I have not dug into your extremely large omnibus motion to seal papers.

Are there massive disagreements about what should and should not be sealed for purposes of the class cert briefing and the Daubert briefing?

6

MR. SOMVICHIAN:  Your Honor, given who's in the courtroom, I don't think that's a live concern.

THE COURT:  Well, this is a public hearing, and there will be a public transcript.  I mean, you know the procedures for once a transcript is made.

If there is something that should not be said out loud, I'm going to rely on the parties to alert the Court to that issue if you need to discuss something that everybody agrees is sealed or subject to a sealing request, but, otherwise, it's a public hearing is how I plan to proceed.  Okay.

Is that -- is that acceptable to the Plaintiffs' side?

MS. GIULIANELLI:  That is, and I was going to say I do not intend for the class cert or the <u>Daubert</u> to say anything that was not -- that -- that I think is confidential and that was not already publicly available and testified to in a trial that was just in the State Court case.  So, there's nothing confidential that I am aware of that I intend to say.

THE COURT:  Right.  And -- and it would be principally Google's information.  So, Mr. Somvichian, I'll count on you to raise your hand and alert the Court if there's something that you think shouldn't be discussed.  Okay?

MR. SOMVICHIAN:  Yes, your Honor.  And -- and with counsel's representation, I think -- I think we're on fairly

7

safe territory today.

THE COURT:  Okay.  Very good.

MR. SOMVICHIAN:  I would ask just procedurally, it was my understanding with -- that there -- there could be a request after the public --

THE COURT:  Yes.

MR. SOMVICHIAN:  -- transcript is made available to -- before it is made public to request sealing in --

THE COURT:  Yes.  You --

MR. SOMVICHIAN:  -- that context.

THE COURT:  That is -- that is true.  That is, under the rules, how we have it.  However, presumptively, I'm conducting this sealing -- this hearing in public. Anybody could walk in the door while we're talking, and you would be saying things out loud in a public forum.  Okay.

MR. SOMVICHIAN:  Understood.

THE COURT:  So, that's how we proceed.

All right.  Let me start.  The first question that I had for class certification -- now, I know you have prepared materials.  I don't want to disrupt your presentation, but I did want to highlight a concern I had, which is I was surprised -- maybe I shouldn't be surprised, but given that you've already been through a trial in a parallel proceeding, there seems to be disagreement about what was allegedly converted here.

8

So, initially, it was five categories of data transfer. Then it was four categories of data transfer. So, the Plaintiffs are talking about in terms of categories of transfer. Google refers to specific data transfers that are maybe within the categories. I had a little bit of trouble even mapping what goes within a Plaintiff category, you know, what -- what goes with what. And there are -- there's a discussion about things within the larger categories that are like not actionable because they don't fit what the Plaintiffs' sort of definition is of a subject, you know, converted data.

So, I was hoping that as a very fundamental point, the Plaintiffs could explain to me what are the defining features of the challenged transfers. I think I have some idea, but I'd like to hear from you.

MS. GIULIANELLI:  I can do that.

THE COURT:  Good.

MS. GIULIANELLI:  And, in fact, that was one of -- and let me do that immediately. It was the first segment of my argument --

THE COURT:  Okay.

MS. GIULIANELLI:  -- after an introduction. I'd like to go back to the introduction in a minute, but in terms of the challenged transfers, your Honor -- and we have on -- we've prepared a slide deck --

9

THE COURT: Um-hmm.

MS. GIULIANELLI: -- that is in front of your Honor and the clerk has as well on Google. Page three just lists the categories. And let me explain the defining features of each of those categories.

As an initial matter, your Honor, we are no longer -- and we did not in the California case -- pursuing check-in transfers. So, they're not on here. They're just a very small category of -- of transfers. And, so, we're not pursuing those. We're pursuing the ones listed on slide three.

THE COURT: Okay. I'm looking at slide three, and it says, How much cellular data Google converted.

MS. GIULIANELLI: I think that your Honor may have the Daubert deck.

THE COURT: Oh, wrong one. Okay. No.

MS. GIULIANELLI: There's a class certification deck which I can hand up.

THE COURT: I have two Daubert ones. Okay. I don't have the class cert one I don't think. Maybe my clerk has two class cert ones. I'll switch. There we go. Okay. That seems more reasonable.

Okay. So, yes, I think I'm on the page that you're referring to. Thank you.

MS. GIULIANELLI: And, so, the categories of

10

transfers -- and I -- and I will get into a little detail because it's complicated and it matters to your Honor's question.

The first category is Clearcut logs, and Clearcut is a system at Google for logging historical information about everything basically that happened on the phone. So, whenever someone does something on the phone, these logs, which are just historical information, are sent to Google on a scheduler. It's a defined schedule. And it's built into Google's android operating system called GmsCore, and none of the logs need to be sent over cellular because they just provide google with non-time-sensitive information about things that have occurred in the past.

And, so, the first category of transfers are Clearcut logs, and the defining characteristic of this and the reason that these are converted is they are historical information about things that happened on the phone that are unnecessary for the usage of any -- of anything that the user is doing in the moment on the phone to make any application work. They do not need to be sent over cellular. They don't need to consume user's data, and it doesn't matter what information is in the log, and this may be one of the things that is confusing the Court with respect to Clearcut because Google argues that there are all sorts of different logs. There are 1300 logs in Clearcut, and it argues that some of

11

them are for this or some of them are for battery and some of them are to record certain types of data and other types of data.  What is in the logs does not matter.  So, there will be no individualized issues.  And that's because all of the logs are sent over cellular for historical information.  They're not time sensitive, and none of them are disclosed to the user.

THE COURT:  So, can I pause you there?

MS. GIULIANELLI:  Yes.

THE COURT:  So, when we -- when I last heard from you all on this case, the framing was passive data transfers.  Is that the same thing as historical, doesn't require the use of cellular data, you know, sort of in the moment, can wait till there's a WiFi connection?  Is that what that means?

MS. GIULIANELLI:  It basically is.  I think passive is shorthand, and the way that the experts have basically defined passive in the merits reports is that it is passive.  In other words, it's not prompted by what the user is doing in the moment or what the user is doing on the phone.  So, it's not like the user is using an application and immediately there needs to be a transfer sent in connection with the use of the application.  So, passive is defined --

THE COURT:  Okay.

12

MS. GIULIANELLI:  -- as -- is that.

THE COURT:  So, that's when -- so, passive and sort of historical nonsensitive -- non-time-sensitive information is kind of -- I should think of that as kind of a single sort of feature, defining feature of this category.

And then you said unnecessary to the operation of the phone.  So, there seems to be a lot of discussion of the purpose of the transfer.

So, when you say "unnecessary", it sounds like it's a little bit different than saying it's just not immediately needed in the moment, and I want to understand what you mean by unnecessary because I understand Google argues that some data transfers are necessary to make sure the phone is safe, secure, operational, gets updates, et cetera, et cetera.

So, when you say "unnecessary", what do the Plaintiffs mean by that?

MS. GIULIANELLI:  So, the Plaintiffs mean that it is unnecessary for Google to send this historical information over cellular in order to make -- using cellular data in order to make the transfers -- excuse me -- in order to make the phone or the application work.

Now, Google says that certain transfers may be Clearcut, but I think it talks -- and I'm getting to ad attestation and experiments.  Google says these are necessary for, as your Honor said, experiments or updating

13

or installing.  That is a dispute, and that is a dispute on the merits about what these transfers are that will be resolved on a class-wide basis.  And we are going to show with common evidence that none of the transfers are about security for the user.  None of them are about updating or installing software.  And, so, Google's characterization of the transfers is different from what we will -- is -- is a dispute on the merits, and we will prove that with common evidence.  But they are un -- all of the Clearcut, none of the transfers are necessary for security, for the operation of the phone in the moment to be sent over cellular.

THE COURT:  Why does that matter, though?  So, here -- here's where I'm getting hung up.  So, if the defining -- if the -- if the critical thing is you don't need to use cellular, okay, you could say that about a lot of things.  You could just wait for WiFi.  As long as it's not time sensitive, just wait for WiFi, assuming that the phone -- and maybe this is a good assumption.  Maybe it's not a good assumption -- always will eventually connect to WiFi.

So, when the observation is made that it's not only passive and -- and not time sensitive, a log can be sent whenever, but it's also unnecessary.  That seems like something else.  It means like there's all this debate about Google's using it for its own marketing purposes, its own

14

targeted advertising purposes, its own business development purposes, like piggy backing unfairly as opposed to doing it at a time when it wouldn't have to but, nevertheless, doing things that are important for the phone, to make sure that it's secure and gets updated and all of those things, but you don't have to do it via cellular.  And I'm just -- I'm trying to understand if there are two arguments or everything is just under the umbrella of you don't need to do it with cellular, therefore, it's a converted data byte.

MS. GIULIANELLI:  I think it's a great question, and it goes to the issue of consent and whether the users had all material information and the language in Google's disclosures.

So, first of all, the fact that none of it has to be sent over cellular is enough, and we will show that nothing in Google's disclosures say that it needs to be sent over cell -- the information will be sent over cellular, and that's enough.  However, there if more, and this is where the  unnecessary or the purpose or whether or not it's about security comes in.  And the reason for that dispute, if you will, is that Google has certain disclosures in its terms and conditions and its privacy policy that use the word "security", use the word "update".  Now, even those do not say that things will be sent using cellular.  So, the fact that it's not cellular is enough, to be clear --

15

THE COURT:  If I'm going to ask you --

MS. GIULIANELLI:  -- but --

THE COURT:  -- about Plaintiffs' theory of the case --

MS. GIULIANELLI:  Yes.

THE COURT:  -- you would say, We don't think there's consent for anything.  But if we got into the weeds on that and we lost on that issue and there was some consent based on a disclosure for some -- some subset of data sent over the cellular network, we would say, Okay.  Fine, but then there's the rest of it that was sent over the cellular network for which there was no consent, because it doesn't fall into the security of the et cetera bucket.

Is that fair?

MS. GIULIANELLI:  That's -- that's very close, yes.  So, whatever google says is going to transfer in the disclosures, it cannot exceed the scope of the consent.  So, I think your Honor is -- is asking about the scope of the consent.

So, if Google were to show -- which we dispute, and we will show it using class-wide evidence, that some portion of the transfer or one of the purposes is about security, we will show that -- and we dispute that, by the way, with classified evidence, but we will show that Google's transfers go way beyond security, that they are unnecessary,

16

that they serve Google's own business purposes, its advertising, and that they are unnecessarily using cellular data for non-time-sensitive transfers.

And, so, in that situation, your Honor, we would show that Google has exceeded the scope of any consent, and that is not allowed.  So, the reason that we are talking about the purpose, whether or not it's security or whether or not it's updating, it goes -- it's both, that every disclosure needs to have all material fact.  The disclosures, as the cases say, the, you know, Calhoon (phonetic) case, the Frasco, they have to -- actually, both implied and express consent, and also implied explicitly notify the users of the conduct.  That's the standard.

And when Google does not notify the users about the purpose -- now, Google says in disclosures that it will make transfers not over cellular but for security purposes. That's why this is an issue.  Google is trying to shoehorn these transfers into the language of its disclosures to argue express consent.

THE COURT:  I'd rather not get into the consent issue.

MS. GIULIANELLI:  Okay.  Yes.

THE COURT:  Because now what I'm trying to understand is --

MS. GIULIANELLI:  But that's the reason.

17

THE COURT: -- what -- it is, but I thank -- I thank you for that explanation, but I am just trying to figure out what the Plaintiffs' theory of the case -- and I think some of this may matter a lot when we get into quantification because then I can see how slicing and dicing what was the purpose for the transfer might matter in terms of how you count. I don't know. But -- but I'd rather just understand at the -- the front end what the it is.

MS. GIULIANELLI: Yes.

THE COURT: What was the subject of the alleged conversion. Okay. So, Clearcut logs.

MS. GIULIANELLI: Yes.

THE COURT: I think I've got that.

MS. GIULIANELLI: So, for Clearcut logs, they are the subject of the conversion is all historical logs sent over the Clearcut system, which are -- do not need to be sent over cellular, not time sensitive, sent on a scheduler. And they are not for the security of the phone or what the user is doing in the moment.

And, now, the next one is experiments. Experiments is a category of transfers where Google conducts secret testing of software changes that Google makes on phones. It runs tens of thousands of experiments on phones every day. So, these experiments, the category of experiments -- and I don't think that there's a dispute about how the categories

18

are transferred because Google tags them internally as Clearcut tags.  So, it knows everything that's Clearcut, and we can get into this with damages.

Experiments are tagged by Google in its data under what it calls PH transfers, and these are signals that turn on or off software if the phone has already downloaded and -- and installed using cellular data.  And, so, basically, it's a way for Google to experiment with like settings on the phone.  If it moves something around on the interface or if it has -- you know, if -- it experiments with all sorts of different things.

Now, Google argues that experiments serve multiple functions and that there are multiple types of experiments. That's true, but it's irrelevant because, regardless of the function, Plaintiffs will show with class-wide evidence that they are still experiments, and they're not disclosed.

THE COURT:  So, would you say that anything that has this PH tag in your experiments bucket is in the category of what we're talking about, alleged converged data bates, and we're not going to look under the hood about what the experiment is or is not for?

MS. GIULIANELLI:  Correct.  For purposes of showing conversion, we do not need to show what the experiment is not for.  Now, it's -- it is -- the -- the fact that Google -- how Google is experimenting on users is

19

relevant.  There are many different kinds of experiments.  There's AB testing.  There's experiments about software that's not yet released.  All of this stuff fall under the kinds of things that Google experiments on, and that's relevant for the jury to know how it impacts advertising, but it does not define whether or not it's conversion.

THE COURT:  We'll get to whether it's relevant for the jury to know in a moment, but -- but in terms of the Plaintiffs' theory of the case, it's anything that has a Clearcut tag, anything that has a PG tag -- is it PH?

MS. GIULIANELLI:  Correct.

THE COURT:  Okay.  Anything that has a PH tag, that's the entire category?

MS. GIULIANELLI:  Correct.

THE COURT:  Okay.  And then we move on to ad attestation, and that's where it seemed to me that Google was arguing there are sort of subcategories that were meaningful for the analysis, and I'd like to hear -- I'm not entirely sure I understand the Plaintiffs' view of that.

MS. GIULIANELLI:  Yes.  So -- so, we disagreed, but there are different categories of ad attestation transfers, but they are all -- the defining characteristic of the entire set -- and I can speak to the categories -- is that they are triggered -- it's a complex set of transfers that are triggered basically by when an ad is called for.

20

So, every time a user clicks on an ad, it secretly triggers a cascade of transfers that are all under the bucket of ad attestation, without notifying the user, and they support Google's advertising business because what these particular transfers are -- and, again, they are delineated by tags that we counted, specific tags, and these specific tags are associated with basically verifying to Google so that it could tell the advertiser that there's a real person clicking on the ads.

So, basically, these are happening so that Google can charge more money for each click.  And, again, they're not for the user's security.  So --

THE COURT:  So, wait a minute.  I mean, I -- I'm really kind of resisting having to get into the notion of the sort of morality or not of what's going on, whether it's -- I mean, lots of things our devices do, thank God, are secret from the user because I wouldn't want to know every time my computer is doing a particular operation.  So, I'm not sure what -- when you're highlighting for me this happens in secret and that happens in secret, I mean, for obvious reasons, the way that the -- the device and the applications are supported by advertising.  I think we all know this now.  So, the fact that there is advertising on the phone doesn't seem to me to be a critical feature of the Plaintiffs' case.  So, I'm really just trying to tease out

21

what is the critical feature.  Is it that the ad attestation operation that you're describing is something that is necessary to have happened between Google and its ad customer and the phone user could care, or could not care, could only care in the indirect sense that if it -- there weren't advertising on the platform, it would have to pay more for services.  I mean, I'm not really sure what to make of these observations here from, you know, the point of view of what is the theory of conversion in this category.

MS. GIULIANELLI:  So, the theory of conversion -- and it's not a morality thing.  It really goes to consent because the theory of conversion here is that there are transfers that are triggered by Google's advertising business that are specifically connected with Google attesting that it's a real user that's using user cellular data, and that is not disclosed, and that is the real issue.

What is disclosed in various disclosures, Google talks about user security or transfers that may happen for user security.  By the way, it still never says cellular.  So, that's not enough of a disclosure.  But with respect to the ad attestation transfers, the critical feature is that these are transfers that, using Google's -- excuse me -- using Plaintiffs' cellular data, that support Google's advertising business because they attest to the advertiser that it's a real human, and the reason it's conversion is because it is

22

using -- it's not about morality, and users know that Google is an advertising platform, certainly.  But what users do not know and what Google never discloses is that every time an ad is clicked, their cellular data will be used in order for Google to prove through this series of transfers to the advertiser that it's a human clicking it, and that's what's not disclosed, and that's why it's conversion.

THE COURT:  So -- okay.  That's -- this is a useful juncture maybe for me to ask this other question which has been puzzling me, which is that there's -- there seem to be some categories of data transfer that I understand Google to say people know this is happening because this is the way phones work.  Okay.

Is this kind of thing the kind of thing that people would assume is happening because this is the way phones -- android phones work, meaning, yes, Google will let an advertiser know that you're a human and not a bot.  That's the way advertising works.  It's an advertising platform. Whether someone literally knows or doesn't know, I mean, this is the way these things work.  How is -- how is this sort of the kind of thing that would be something -- and I'm not even sure this is the right framing, but this is something that a -- you know, a -- a class member would be like, That's my data.  You should not be using it for that purpose.

23

You know, it's like the -- I'm -- I'm trying to figure out like where do the Plaintiffs draw this line, and it may not be anything like the sort of sentiment I just expressed. It may be just completely -- I'm hoping it's completely objective. That's why I was asking what are the defining features, but -- and I'm hoping it doesn't depend on consent either, although some of these things may. But does this question make any sense to you?

MS. GIULIANELLI: It -- it does make sense, and I think that -- that your Honor is asking basically -- is basically trying to figure out Google's argument and then Plaintiffs' response. And with respect to the issue of, Wait a minute. Don't people know that this is the way things work, that depends on Google's characterization of what these transfers are because Google says these transfers are for security or they're to update phones. Of course, people know that there are security features on the phone for the user or it's to update software.

But Plaintiffs are going to show with common class-wide evidence that these transfers with expert technical testimony are not about how Google characterizes them. So, a lot of this issue of, Wait a minute. This is just how phones work. Users know this, that depends on Google's characterization of what these transfers are, not what Plaintiffs will show these transfers are with common class-

24

wide evidence.

Now, with respect to the issue -- your Honor used the example of like advertising -- advertising.  Wait a minute.  Don't people just know that there's -- you know, that Google will verify?  There is no objective evidence that an objective reasonable user, which is the standard for implied consent and express consent under the Calhoon Ninth Circuit and also the Frasco v. Flo and Meta Pixel, the standard, as your Honor said, is not up to -- is not subjective.  It's the objective reasonable person, and there is not any evidence that the reasonable person would understand because it's not in Google's disclosures, and there's no other evidence.  There's no survey evidence or anything that -- that these transfers -- that Google's going to be using user's cellular data charged against a user's plan in order to verify to advertisers that it's a real human.  That's what people don't know, and that's what the common average reasonable user does not -- does not know.

THE COURT:  And is this ad attestation bucket limited to Google using the data transfer to -- to verify that the user is a human and not a bot?  That's what -- from Plaintiffs' perspective, that's what that bucket is about?

MS. GIULIANELLI:  Yes.  From Plaintiffs' perspective, that bucket is all about transfers that are being made by Google to show that there -- that there's a

25

real human.

So, for instance --

THE COURT:  And is there a tag in the data that you can rely on to objectively distinguish those from other things?

MS. GIULIANELLI:  Exactly.  I was just going to say that.  For instance, there are very -- and -- and we can get to this when we count damages.  Google actually tags these transfers by category, and with respect to ad attestation, there's like four different subcategories here. There's GAS, which is about -- you know, it's a Google Ad Services system.  And then there's DroidGuard.  These are very specific tags that Google itself tags them to say all of the transfers under DroidGuard are under this tag.  We rely on those tags, and we don't need to and we do not say only some sort of DroidGuard is this and some sort of DroidGuard is some other purpose because everything under the DroidGuard tag, which is the largest category under ad attestation, is for the purpose of showing to an advertiser, using the user cellular data charged against their plan, which is the key, that it's a real person.

Now, Google says, Well, DroidGuard does other things. It provides safety.  It provides, you know, stuff for banking, and -- and it does other things too.

Now, DroidGuard supports a separate tag called

26

SafetyNet.  We do not count those categories in our damages.  SafetyNet is a separate tag, and it is not included.  So, the DroidGuard transfers, when DroidGuard makes a transfer, it is under the DroidGuard tag, and it is for ad attestation.  DroidGuard supports other things like, you know, maybe some banking applications or third parties that want to verify something.  That does not prompt a challenged transfer.

THE COURT:  Okay.

MS. GIULIANELLI:  So, we do not need to get into that.  We do not count those.

THE COURT:  Okay.  All right.  So, that's the ad attestation category.  What about the fourth category that you have?

MS. GIULIANELLI:  The fourth category is actually a very small amount of damages, and we're seeking to have all these categories certified, and the fourth category is location uploads.

Now, these are uploads that happen when the user is moving like 200 meters and they are uploads of where routers are and where like cellular towers are.  And, so, Google uses these uploads to build its internal map, and it refreshes the internal map like every seven days, sometimes more.  But these uploads are not to tell the user where the user is.  It is not Google Maps.  It is not for the user to

27

find themselves in the moment when the user's looking for directions.  That's not what these are.  They're uploads basically of like right now I don't know if there's some router in here and I had an android, it would be -- and then I moved, it would be pinging Google and saying, Oh, there's a router in the courtroom so that Google knows where routers are.

THE COURT:  So, when you say internal maps, it's -- because there was some part of the -- the papers that suggested it was -- and maybe this was the checking category that's no longer here --

MS. GIULIANELLI:  Yeah.

THE COURT:  -- that Google's building profiles of users, et cetera, et cetera.  Okay.  That's not what you're talking about here.  It's not an internal map of where the humans who have androids are going at any given time.  It's for Google to understand what infrastructure surrounds users who have the android phones?

MS. GIULIANELLI:  Correct.  It's for Google basically to -- to build its mapping application.  So, it wants to know where all the routers and WiFi towers are, and that happens even when the phone is idle.  So, if it's on your night stand or if it's in your purse and you're walking, it will be constantly pinging Google when you move like 200 meters to show it where things are.  And the

28

defining characteristic of this is that they are uploads and they go to a very specific table.  It's like a tag again.  So, we know we can count these uploads because they are measured in a table, and -- and it's unnecessary to use users' cellular data.  Again, they're not time sensitive.  Google doesn't need thousands of uploads of where the router is in this courtroom from people even when they're not using the phone and it's idle to build its internal map.  It's historical information.

THE COURT:  Okay.  So --

MS. GIULIANELLI:  And -- and basically this happens when all apps are turned off.  The user's doing nothing.  It's just they just happen, these uploads.

THE COURT:  Okay.  So, again, at risk of derailing your whole presentation by asking my favorite --

MS. GIULIANELLI:  These are important.

THE COURT:  You've referred repeatedly to Plaintiffs will show this by common evidence.  And, of course, I've read Google's opposition papers, which say different devices, different plans, you know, different things happen at different times, and then I see the representation that based on this sample of 9,000 users, there are these various percentages of 96 percent of these users had this category of data transfer, 99 percent, all but one has this category.

29

So, I am trying to sort out how the parties can have such vast disagreement on those issues, and I'm wondering does the dispute about the commonality of the evidence and the -- the extent to which everyone in this sample set or almost everyone in the sample set experienced a particular category of transfer.  Does that require me to investigate the Daubert issues that are raised about, for example, Mr. Thompson's work?  So --

MS. GIULIANELLI:  I can --

THE COURT:  Yeah.

MS. GIULIANELLI:  I can answer that.  No, I don't think that this goes to the Daubert issues that are raised. I think that the dispute comes from Google's characterization of these transfers.  We -- as -- as I just explained, these transfers all have certain defining characteristics.  Like Clearcut logs are historical logging. Experiments are PH flags.

Google says, Wait.  There are 1300 Clearcut logs, and every one has a different information in it.  I think part of the dispute comes from that.  We say that the information in the logs doesn't matter because they're all converted. None of the evidence is -- none of what is in the logs is necessary to show that they're all converted, that they all use cellular data that's unconsented to, undisclosed and -- and the improper taking of Plaintiffs' information.

30

So, I think part of the issue comes with Google's characterization of what these transfers are versus the fact that these are categories with common characteristics and we're going to show that all of the categories, for instance, all PH flags are undisclosed experiments.

THE COURT:  So, that may be, but I understand Google to say those transfers don't happen on all devices and for all users within the class, that there is not class-wide evidence of that happening, and to put a fine point on it, I understand Plaintiffs' thesis to be that these transfers are mandatory and automatic, at least to some extent.  So, maybe you can as a user limit the amount of data transferred by turning off your usage and diagnostics setting, for example, but you won't eliminate it.  So that if you are a user who has a phone and you -- it's within the class definition for the relevant period of time, the transfers in these categories are mandatory and automatic except for these few outliers, and I don't know if there's an explanation for that but that you're not getting to your class-wide proof evidence by means of some improper, you know, gap filling in the data or -- you know, according to Google's description -- or assumptions that aren't warranted.

That's what I'm trying to understand.  So, on the capable of class-wide proof, what can you tell me about that

31

concern?

MS. GIULIANELLI:  I think that that's exactly right.  These transfers are all mandatory.  They are all triggered by GmsCore.  It is the same for every class member across the class period.  For example, Clearcut, it happens on every phone.  It happens according to a scheduler.  It does not vary from class member to class member.  Experiments as well.

In fact, I think that table, I think it's Exhibits 1 or 2, shows that only out of the random sample I think of 10,000 users, only -- and I don't know why -- one class member does not -- one -- one did not experience these transfers.  So, this is -- this is class-wide evidence.  These transfers happen to almost every single person in the class because they are built into GmsCore, and that's the way the software operates, and that's what our technical experts will explain at trial.

THE COURT:  But didn't the data sample of 9,000 users include only people who has usage and diagnostics turned on?

MS. GIULIANELLI:  That's a -- that's a dispute that we have on the merits.  That's what Google says.  We disagree.  Our technical expert -- and this was the subject of cross examination at the last trial.  And, in fact, the jury I think disagreed because they sided with us and they

32

gave damages based on the -- the counting of all the -- all the network transfers.

Google says that it only includes people who have usage and diagnostics turned on. We have evidence and our expert says, Oh, no, no. This particular log is called the Westworld log. It's one of the Clearcut logs, and it's what measures the data usage. This log sends regardless of whether or not users have usage and diagnostics on or off. That's a dispute. Google's experts disagree, and we will show with class-wide evidence that that's just not correct. That is a dispute between the experts for the merits. So, our experts disagree on that.

THE COURT: So, when we get to -- let's assume that you have a class and what you're trying to figure out is within the class, for a given class member, how much of this -- of their data was used in the way that is alleged to be conversion. So, there may be some people who rarely use their phones and have only a tiny tiny amount of data usage at all, including data usage that was converted by Google and others maybe used their phone to a large extent, and perhaps -- perhaps that correlates with a greater usage of the kind that the Plaintiffs are complaining about.

So, will there be data for which to, you know, allocate to individual class members their -- you know, whatever it is, the -- their damages based on their alleged converted

33

data?  Does that data exist in the world?

MS. GIULIANELLI:  It should -- this is a very specific question, and I'll give you a very specific answer, and then I'll explain how we measure it, but, yes, it should exist.  Google maintains that data unless Google has destroyed it.  But Google maintains data by android ID, by user, of every single user's transfers.  And our expert, Mr. Thompson, has opined that -- and this is actually the other deck that your Honor has, and this is -- or, actually, no.  This is slide 17 of this deck that -- there is a way to calculate on an individual-by-individual basis using the same -- same exact methodology how much data each individual phone used, and Google has that data.  It's used running it through the exact same program that he ran the sample of 10,000 through, the exact same program.  It's basically a computer program, and it adds up.  For 10,000 samples, we have 15 billion pages.  It's a lot, but it's a couple hundred thousand dollars, we verified, to store the data for all the individuals.  So, Google should have that.

Now, so, we have that methodology, and we can do that.  Now, what we did for purposes of calculating class-wide damages was take a random sample.  So, it should be representative.

THE COURT:  Of the -- of the 10,000?

MS. GIULIANELLI:  Of the 10,000.

34

THE COURT:  Okay.

MS. GIULIANELLI:  A random sample that Google pulled across the class.  It's a massive sample, and it's representative, of course, because it's random and it's a big sample, of all the users and the -- and their data usage.

And, so, what we did -- and this is part of the damages methodology -- we counted the average bytes that was -- that were basically consumed, converted in each of these categories, which are by tags.  You can tell what they are by tag.  We counted those of the 10,000 random sample.  And -- and the use of averages is -- is permitted in calculating damages in class actions, and we've cited cases in our brief, but --

THE COURT:  But wait a minute.  I mean maybe I misunderstood this about your papers.  I thought that the showing was that you would calculate the amount of data that was converted, data -- bytes of cellular data that were converted that was used -- that has these defining features, these four categories, that was used by Google without permission, and then there would be an amount, which is the price, the value -- like a value of a given byte, and then you would do a multiplication, and it would -- yes, you could get a number across the entire class and maybe an average would be a way to -- to approximate that, but that

35

what you'd actually be doing in terms of class members awards would be based on the specific -- the specifics for each class member.

Is that not how -- I mean, we're talking about more than 100 million people. So, I'm -- I'm not -- in terms of the damage methodology for the class, I'm just not sure I understood your last remark.

MS. GIULIANELLI: Yeah. We don't -- we submit that we don't need to do that last step. We don't need to, but if we absolutely had to, we could. So, your Honor is right about the way damages on a class-wide basis are calculated. We have the sample of 10,000 users. We calculate the average data usage based on the representative random sample, and then we multiply it by -- and I'll get -- I can get into this too -- the -- the fair market value of a byte. And that's how we come up with class-wide damages. And the use of representative samples and average inputs is permitted. And, so, that is the way we come up with damages.

Now, if the issue is the allocation basically of damages between class members at the plan of allocation basically at the -- at that stage, first of all, that actually is not an issue that really -- I think it was in the Brown v. Google case actually where the Brown v. Google court said that if the argument is about apportioning

36

aggregate damages --

THE COURT:  Afterwards.

MS. GIULIANELLI:  Afterwards?

THE COURT:  Um-hmm.

MS. GIULIANELLI:  -- that's -- that's not an issue and in Brown v. Google, the Court rejected that because they said that's not an issue for Google to argue.  But we could do that.

THE COURT:  Okay.

MS. GIULIANELLI:  And we could do that based on the data that Google has if we needed to because Google does maintain records of --

THE COURT:  Yeah.  Okay.

MS. GIULIANELLI:  -- what these people used.

THE COURT:  I mean, it puts a lot of --

MS. GIULIANELLI:  But we could just do it on a pro rata basis too.

THE COURT:  Okay.  I mean, the reason I'm asking about this is it puts a lot of pressure on the nature of the sample that was used and then the randomization within that sample, because if it was -- I thought it was 9,000.  If it's 10,000, whatever it is, it's less than one percent of the class.  And if it's less than one percent that has features that are not shared by the whole class, whether by time or settings turned off or on, then it seems to me

37

potentially problematic to then extrapolate in the way that you're describing, if it is not truly representative.  So, I was trying to understand that.  But I had -- I had put that to the side in my brain because I thought that so long as the fair market value has a basis for being calculated -- and we will get to that -- then it is whatever the data usage is for a given user times that.  That's the total, and that's also the allocation.  And, so, if that's possible to do or impossible to do, I thought maybe I should know about that.

MS. GIULIANELLI:  It is possible to do, but I think I'd like to say something about the sample --

THE COURT:  Sure.

MS. GIULIANELLI:  -- because even if it -- it's a huge sample.  So, 10,000 users, even if it's one percent, is, our statistician says, very very -- it's a large large sample.

THE COURT:  And who's your statistician that you're referring to?

MS. GIULIANELLI:  Jeff Steck is the statistician.

THE COURT:  Is the statistician.  Okay.

MS. GIULIANELLI:  And, in fact, it -- 10,000 users is a massive sample, and I think cases have recognized that.  And, so, as long as it's random and representative -- and it is, and we have no reason to believe -- Google pulled it,

38

and Google told us it was pulling a random sample.  So, we do think that based on that sample, it's very scientifically reasonable, valid, and --

THE COURT:  Okay.

MS. GIULIANELLI:  -- defensible to extrapolate to the class.

THE COURT:  Okay.  Most of my questions are about the damages model --

MS. GIULIANELLI:  Okay.

THE COURT:  -- after we get past this.  But if there's something you want to tell me more about liability, but I have questions about how liability connects to the damages theory or the -- just the theory of harm in the case, and I don't want to prematurely jump to that if there's something more you'd like to share with me.

MS. GIULIANELLI:  I would like to share whatever your Honor has questions about is my -- is my first instinct here.

THE COURT:  Okay.

MS. GIULIANELLI:  But we -- for -- for the class certification -- and I'm not sure if the damages model questions relate to that, and I think I'll be arguing some, and -- and Mr. Summers will be arguing some.  But I think for the clear point, the clear issue -- and if your Honor -- I should just say, you're the Judge.  So, you should

39

interrupt me and tell me to move on if I don't need to, but for class certification, I think the key point is that everything is going to be shown with common evidence, and that includes all of the elements of conversion.  It includes consent and implied consent.  Class -- conversion cases are routinely certified for class treatment.  We cite them, McClure, Wycart (phonetic), in our brief, and those are cases where consent was disputed, and cases involving issues of consent, including implied consent, are also routinely certified in nonconversion cases as well, the Frasco v. Flo Health case in the Northern District of California.  And, of course, the reason -- and I think your Honor touched on this -- is because implied and express consent are both judged by the objective reasonable person standard.  And, so, Judge Donato said you apply that standard, and that is what you look at in -- in arguing looking at issues of consent on a class-wide basis.

And, so, you know, Google's arguments that there are different versions of software, different settings and different cellular data plans fail, of course.  The transfers all come from GmsCore.  They all have certain defining objective characterizations, and none of the settings disclose the transfers or how they happen over cellular, how often they happen or what they are.  Therefore, they don't give all the material facts to any

40

person, not an average user, not an MIT engineer.  And, so, that's going to be shown with class-wide evidence here.  And, so, that's the -- the key part.

Now, I think I've just talked at somewhat length about the -- the transfers.  And if your Honor would like, I can talk a little bit, and the reason that I'm happy to talk about it or not if it's not -- if your Honor doesn't have questions -- about consent, because google makes a big deal of consent in its papers.

THE COURT:  I'll just tell you I don't think that -- well, I will hear from Google on this point.  But it does seem to me that the -- if the question of consent depends on particular materials being shown to people or not, the problem would be if I were to find as a matter of law maybe on summary judgment some day that a particular disclosure was consent.  Otherwise, it does seem to me that the argument that -- that the parties are having is -- is class wide in the sense of, you know, if a user saw X, does that constitute consent.  And you're arguing that none of the documents constitute consent.  Therefore, it's -- it can be, you know, treated on a class-wide basis.

So, you know, if I credit this argument, that the only basis for -- for consent are these sort of non-user-specific communications, they're posted on the website.  They're part of the privacy -- whatever they are.  They're documents that

41

users could have seen, class members could have seen, whether they saw them, understood them or not, and you're arguing that none of them constitute consent, then -- then your framing is on a class-wide basis.

It could be that when we get to the summary judgment stage, if I find otherwise, the could be decertification of the class is how I was thinking about it. Does that make sense?

MS. GIULIANELLI: I think your Honor just summarized my five pages. So, I really don't -- on -- on this issue, which is exactly what the issue is. None -- it doesn't matter who saw what, what page or who saw what advertisement because we are going to show exactly that based on class-wide common evidence, that none of these websites or anything out there disclose to the objective reasonable person the average android user, that they disclose the transfers at issue, how they're going to happen or anything. So, that's exactly right. And that's why we have no issues of express or implied consent here. They're --

THE COURT: So --

MS. GIULIANELLI: -- class-wide issues. And they rise or fall maybe at summary judgment or at trial.

THE COURT: And I appreciate that Google's argument will be different, which is that it's not capable

42

of class-wide proof because the people who saw, you know, X disclosure will have signed up and consented because that disclosure is sufficient.  So, and -- so, I will let Google, you know, argue that issue, but this is -- this is the puzzling thing to me a little bit about all of our arguments about the merits, to the extent they touch on the merits and to the extent they touch on Daubert issues, which is the threshold for class certification is different from when I'm doing summary judgment, even though you all have already completely finished your evidence development in this case, including expert evidence.  So, I'll -- I'll get to that in a moment about my question about how do I deal with the Daubert motions.

But I would like to move on to the -- the damages theory.  And the reason -- so, this is also something that the Plaintiffs must satisfy for purposes of class certification, namely -- and, you know, I have Comcast in mind -- there needs to be a model that can serve as evidence of damages in a class action that measures only those damages that are attributable -- that are attributable to the Plaintiffs' theory of liability.  In other words, the nexus between the theory of liability and the damages model has to be there.  They have to match.  They have to measure the right thing.  The model has to measure the right thing.

And, so, I am trying to make sure I understand what the

43

thing is that we're measuring.  So, I went back and looked at the Ninth Circuit's decision, and, you know, this was a memorandum decision, and there was not a lot of elaboration, shall we say.  But, nevertheless, the description on the damages theory is -- at least part of it is like a forced sale, Google's alleged surreptitious use of the cellular network through Plaintiffs' data plans causes Plaintiffs to experience an immediate discrete loss of a specific sum of valuable cellular data which is charged against their plans.

And I was pondering that in the contest of the parties' debate about unlimited plans, metered plans, and things that have, you know, specific limits and subject to overcharging and throttling.  And I am not sure I totally understand the Plaintiffs' theory here about what the it is because there's a remark -- and I'll point you to it since I noted it -- that I found a little bit puzzling in the reply brief. Let's see.  This is at page two.

MR. SOMVICHIAN:  This is the class cert reply, your Honor?

THE COURT:  Yes.  I'm sorry.  We're all talking about a class cert reply.  Plaintiffs claim -- and this is the middle, around line 10:

"Plaintiffs' claim is based on the simple fact that Google's consumed users' valuable cellular data, thereby

44

reducing the amount that users themselves could use, share with others or decide not to use.  Cellular data costs money.  Each byte that Google consumes is no longer available to the user who paid for it.  This is true regardless of whether a user had a limited or unlimited plan.  The loss of valuable property has long been recognized as a form of injury, regardless of any further consequential harm," et cetera, et cetera.

But then at line 18:

"Plaintiffs' case is effectively limited to cellular traffic that carriers categorize as metered, meaning that it is finite and not truly limited."

And I had no idea what that meant.  Could you please clarify what -- what you are talking about here?

MS. GIULIANELLI:  I -- I sure will.  This -- first of all, it is a -- this is just saying that as a practical matter -- and then I will talk about our methodology.  As a practical matter, for purposes of measuring damages, we measured for purposes of damages everything that Google tags

45

as metered.  There's an unmetered category and metered.

THE COURT:  Google tags it as metered?

MS. GIULIANELLI:  Google does.  Well, Google -- the carriers report to Google what's metered and unmetered, and then Google's tags say metered or unmetered in what is called the Westworld data.  It's a little bit of a -- honestly, it's a little bit of a -- basically, for purposes of measuring damages, everything was subject to either limitations before 5G by the carriers or when Google moved in 2021 to a dataset called Westworld, the carriers started reporting it as metered or unmetered.  And, so, we counted only metered as part of damages.

THE COURT:  On a user-specific basis the carrier would say this data transfer on this user's phone using this user's data plan is metered versus unmetered?

MS. GIULIANELLI:  Yes, for the Westworld data, which starts in 2021.

THE COURT:  And what does that mean?

MS. GIULIANELLI:  That means -- it means that the carrier is metering it and counting it against a plan.  Basically, it's -- it's just another form of -- it's a form of count -- of being limited.

THE COURT:  So, it's a form of counting?  It's just counting?

MS. GIULIANELLI:  Yes.  It's saying that this is a

46

metered plan.

THE COURT:  And what does that  mean from -- maybe it depends on the carrier, but what does that mean from the carrier's perspective?  Because the carrier maybe has like -- doesn't care about this case at all and just cares about its own business.  And, so, what is the carrier indicating by metered versus unmetered?  If you know, like, is that known in the case?

MS. GIULIANELLI:  I mean, Mr. Summers wants to say something, and I want to talk about -- because I'm not sure this actually matters a lot to the methodology -- to the methodology.

MR. SUMMERS:  This is an issue that -- that I have a little more detailed knowledge, and then I'll refrain from tag teaming.

The -- on this issue, so, what has happened over time, traditionally when unlimited plans came out, the still were subject to throttling limits and/or overcharges.  So, they were called unlimited plans, but they still had specific caps.  In more recent years, the carriers have introduced premium unlimited plans that don't have these hard caps.

Traffic that is counted as unmetered is either WiFi or traffic that is on a premium 5G plan that the carriers consider more to be a truly unlimited plan.  So, the bottom line, the point we are making in the brief here is that when

47

we limit our damages case to metered traffic, to the extent the users have so-called unlimited plans, they are unlimited plans that have -- that typically have severe throttling or overcharge caps.  We're not dealing with any plans that are truly are more properly characterized as unlimited in nature.  That traffic is actually treated as unmetered and is not included in our case like WiFi traffic.

THE COURT:  Okay.  So, could I just like follow up on that?  So, are the Plaintiffs telling me that the only data transfers that are the subject of this action, this class action, are ones where if a user is in the position of exceeding a certain threshold, whatever it may be, there will either be a reduction in performance, the throttling, or an overcharge?

MR. SUMMERS:  Generally speaking, yes.  That is all -- our case is limited to what the carriers define as metered traffic, which generally means it is being counted against a cap.

THE COURT:  Counted against a cap, but --

MR. SUMMERS:  But it is finite.

THE COURT:  But your -- your argument doesn't depend on that cap getting exceeded?

MR. SUMMERS:  Correct.  We're not seeking damages based on overcharges.  We're not --

THE COURT:  So -- so, in other words, like --

48

MR. SUMMERS:  We're not getting into throttling or --

THE COURT:  -- you could have like a metered plan that has like so much data available that like a typical user would never ever even approach it even with Google doing its data transfers.  Nevertheless, that would be within the scope of the class action?  Because it's metered, you can count?

MR. SUMMERS:  It would.  And we are simply counting everything that is metered and not counting anything that is unmetered.  Correct.  If it's --

THE COURT:  And how do you --

MR. SUMMERS:  -- counted and finite --

THE COURT:  Okay.

MR. SUMMERS:  -- it is included in the case.  If it is not counted and is not -- you know, that some in a sense treated by the carriers as not being finite, it's not in the case.  And --

THE COURT:  And --

MR. SUMMERS:  -- this goes to the nature of the property.

THE COURT:  Yeah.  And --

MR. SUMMERS:  We're dealing with a finite property, that there is a limitation.

MS. GIULIANELLI:  And that -- and that was the --

49

and that was the counting of damages, specifically what your Honor was asking about.

THE COURT:  Okay.  But does -- does that exclude certain class members who would otherwise be in the case?

MS. GIULIANELLI:  No.

THE COURT:  How do I understand the class definition?

MS. GIULIANELLI:  Yeah.  So, the class definition -- and I think this is the -- the confusion and why your Honor's asking about this.  So, the class definition is all users of android phones during the time period -- I think it's November 2017 -- to the present, because all of them had their data converted and all of them suffered harm, whether or not they were on a so-called unlimited plan, and the evidence at trial is going to show, just as it did in Chupo (phonetic), that there's nothing -- it's not like air. There's no such thing as a true unlimited plan, right. There's always network congestion, and carriers count all of the data.  They do count it.  They measure it.  It can be precisely measured.  It can be throttled.  We don't need to determine whether or not a specific individual was throttled because they are all part of the class, and they have all suffered harm because of the nature of the property and the conversion here.  And, so, the class definition is all users of android phones who have suffered harm regardless of the

50

type of plan that -- the thing that carriers marketed, whether they marketed it as unlimited or not.  And that's consistent with the Ninth Circuit's opinion.

THE COURT:  But you say you've excluded meter -- people who don't have unmetered -- the carrier doesn't identify them as --

MS. GIULIANELLI:  No, I know.

THE COURT:  -- unmetered.

MS. GIULIANELLI:  That's what I was --

THE COURT:  So, like how do I -- is that a subset of your class definition or --

MS. GIULIANELLI:  No.

THE COURT:  -- am I just relying on your good faith to tell me those people aren't in there?  What --

MS. GIULIANELLI:  And I think that's where we got confused.  This is just the damages calculation, and the damages calculation, the point is it was extremely conservative.  And, so, for purposes of calculating damages, we only counted the metered, and that's just because we couldn't tell based on the way -- one of the reasons Google keeps it -- whether unmetered is WiFi or something else.

So, for purposes of --

THE COURT:  Oh, you --

MS. GIULIANELLI:  -- damages calculation, but they're not excluded from the class.

51

THE COURT: Okay. But if there is class certification, you're going to give notice to class members. And if class members haven't been -- aren't a member of the damages class, isn't that a problem?

MS. GIULIANELLI: No. It's -- it's not. It's not a problem because the -- it's just a way of calculating the damages in a way that's conservative. So, as Mr. Summers said, there's the unmetered, which could be a lot of WiFi. They're not part of the class. It's users who use their cellular data, whether it was limited or unlimited.

THE COURT: So, I -- so, my understanding of the present contention that the Plaintiffs have is that it doesn't matter whether it was metered, unmetered, throttled, not throttled, whatever. Any data that is mine that Google used counts, and we have to value it?

MS. GIULIANELLI: Correct.

THE COURT: That's -- that's it. No matter what, whether there was economic harm otherwise or not, it's -- it's a widget, and you took it from me?

MS. GIULIANELLI: That is correct. And we would say that there's always economic harm and there's always actual injury because the --

THE COURT: Well -- right.

MS. GIULIANELLI: -- taking of property is injury.

THE COURT: That's --

52

MS. GIULIANELLI:  But that is correct.

THE COURT:  I understand that that's -- that's the theory.  So, okay.  So -- so, then your -- your -- the way I understand your argument then is that the project is to value that but the -- the factual basis for coming up with value uses -- maybe subset isn't the right word but uses only the data that is identified as metered to do the valuation?

MS. GIULIANELLI:  That is correct.  And I think it -- that is correct because unmetered includes WiFi and -- and some of the new 5G plans.  So, it's a conservative damages calculation.

THE COURT:  Okay.  All right.  I think -- I think I get that.

MS. GIULIANELLI:  But I see why that's confusing.

THE COURT:  Yes.  Okay.  So, this gets in a little bit to the Daubert issue I think, and I'm just going to ask this question out loud.  The -- the thing that I found most compelling about Google's argument on the Daubert damages is that the Plaintiffs' experts don't seem to be valuing the it that you have described to me as the converted data.  They are valuing other things, bigger things, broader things. But I want to make sure that I really understand the Plaintiffs' argument.  So, in other words, the marginal data theory really resonated with me, that you should be trying

53

to value the value of that marginal data and not all the other stuff that might go into the plan.  Like total revenues divided by total usage to me seemed like not a reliable methodology, but, you know, that said, it's not -- it's not a question -- I agree that it's not a question of has a given user suffered economic harm.  That's -- that's not the question.  I think that's -- although there is this alternative damages theory, which I'll -- I'll get to in a moment, but I'm just trying to understand how -- how these numbers that your expert has proposed in his damages report actually are measures of the data that's been converted, and one of the questions I had looking at the jury instructions formulation is in this context, where you're trying to value the value of this bit of data that's been transferred, who is the willing buyer?  Who is the willing seller?  And I don't mean like is there actually a market, but who are these people in the hypothetical market that were instructed to apply?  And I'm not sure of who's going to answer that question.  But, Mr. Summers, if that's -- if that's on your plate, I'll hear from you.

        MR. SUMMERS:  Sure.  Well, I do think this is a battle of the experts, your Honor.  And Doctor Etner (phonetic) testifies that the primary market is the market that matters, that we should look to the price consumers pay when they buy cellular data from the carriers.  He expresses

54

that opinion.  There's an active market.  We have pricing data.  Doctor Gos, on the other hand, argues that we should look at the secondary market and wonder, ask the hypothetical how much would a consumer charge Google. Doctor Etner responds to that and says, We don't -- that there is no active market there.  We don't have data, and I think it's a battle of the experts, and it's for the jury to determine, and there's evidence going both ways.  But I -- I don't think --

THE COURT:  See, I'm troubled by that because -- for two -- two reasons.  First of all, the damages model has to match the liability theory.  So, if the liability theory is one thing, then the damages model has to value that. And, secondly, the case law says there doesn't have to be an actual market.  What we are trying to do is use the information that we have to say in the hypothetical world what would be the fair market value of this thing, but you can't say, Well, there's no market for that thing. Therefore, we're going to value some other thing which has not matched your liability theory.  And that's where I really struggled, because it seems to me like there is evidence in the world from which experts could necessarily agree but could infer the value of the thing that is actually converted.  And, so -- so, I was -- I was troubled by the idea that, well, we're going to value something else.

55

And -- and, so, that's why I come back to the question who's the willing buyer and who's the willing seller in this scenario?  Like who would they be?

MR. SUMMERS:  Well, your Honor, I think it's important to understand we're dealing with the same thing. There's one thing, right.  We are dealing with the transmission of cellular -- of information over the carrier's cellular network, right.  Regardless of who the buyer and the seller is, we're dealing with a commodity. Doctor Etner testifies -- proffers the opinions in his supplemental report with a relatively homogenous commodity, and, so -- so, the -- there's no dispute about what is being measured here.

And what Doctor Etner does is he does precisely what the industry does in calculating the average price of cellular data looking at the revenue and the amount of data transmitted to come up with an industry average price for cellular data.

There's no reason to think that if a consumer were the seller and Google were the buyer, that they wouldn't look to the same data that the telecommunication --

THE COURT:  Maybe --

MR. SUMMERS:  -- centers would look to.

THE COURT:  -- that's true.  Maybe that's true. Maybe that last thing that you said is true, but we still

56

have to start with the point of like who's the willing buyer, who's the willing seller, and I'm looking again at your reply brief where the claim is based on the simple fact Google consumed users' valuable cellular data, thereby reducing the amount that users themselves could use, not use, share with others that data.

So, that's what we're valuing, what is the fair market value of the data that users could have used themselves, not used, or shared with others.

MR. SUMMERS:  And the evidence remains the same, your Honor, regardless of who the parties to this hypothetical are.  There is -- consumers pay a certain amount of money for their cellular data.  If they had access to the full information, they would know that Google is using a portion of it, and there's every reason to think that they would expect the fair market value of their cellular data.

THE COURT:  Okay.  So, you --

MR. SUMMERS:  Which Doctor Etner has quantified.

THE COURT:  So, the -- okay.  But in the -- in -- if we're going to apply the methodology that we're instructed to under California law, the -- the willing buyer is Google, and the willing sellers are the people who have the phones and have the data plans.  Is that how I'm to think of it?

57

MR. SUMMERS:  I don't think so, your Honor.  I'm not sure that it -- ultimately, I'm not sure that it matters, but I don't think so.  We're dealing with -- if we were looking at stocks, we would -- we would be looking at the quotations for stocks over the -- over a day or some period of time to determine what class rights was.  We would not look at who the buyer is specifically, who the seller is.  We would look to the market.  And that's exactly what we're doing here.  We have a commodity that is bought and sold by hundreds of millions of people every day from a large number of carriers.  There is an established market price.  There are variations, just as there are buying stocks any given day.  There can be variations, and you might get a better deal, you know, on a certain platform than another.  But there is a market that is relatively efficient.  There is an established market price.  That is what Doctor Etner says.  That is what he estimates and quantifies for the telecommunications industry every two years, and it's tracked.

So, the idea that we should look at a hypothetical transaction between a specific consumer and Google, I'm not sure that's what the jury instruction or the relevant law requires.  I think we're to look at this more from the perspective of market, what's the fair market value.  And the fact that we're to look at the highest price suggests

58

that we don't look at a particular transaction that would drive a lower price.  We're looking at the value of a commodity, of an article --

THE COURT:  Yes.

MR. SUMMERS:  -- of commerce.

THE COURT:  That's the thing is I agree we're not supposed to look at specific transactions, although, those specific transactions like specific data plans may be evidence of what the fair market value is, and the hundreds and hundreds of different transactions out there in the universe about the value of a particular byte of data or a data plan with, you know, certain limits or -- or not may be evidence upon which an expert could rely to come up with a fair market value.  But we still have to figure out what we're valuing, and I don't think it's -- I don't think it's like stock to say publicly traded stock is going to be the same price on a given day for anybody buying or selling it.  This is not like that.  This is a user's property.  And while you can maybe do it on an aggregate basis and have, you know, class-wide evidence of it, it's not in the same scenario as when a -- if there were a conversion claim that Google was stealing from the carrier, okay.  But Google is not alleged to be stealing data from the carrier.  Google's alleged to be sealing data from the user.  So, we should be valuing that, and that's why I felt like the framing of the

59

marginal value was an important distinction over what your expert's methodology was, and I was worried about that because your expert seems to be valuing something other than what is converted.

MR. SUMMERS:  On that, your Honor, I would disagree.  Look, we calculate the precise amount of cellular data being consumed by Google for the challenged transfer, and they track this.  Every single transfer is actually tagged and tracked, whether it's metered --

THE COURT:  Got it.

MR. SUMMERS:  We -- we calculate the exact quantum that Google has converted for its own purposes, and our experts then determine the market value, the fair market value of that data using the industry accepted methodology that the industry uses.

THE COURT:  What's the industry accepted methodology that you're referring to?

MR. SUMMERS:  Doctor Etner's average --

THE COURT:  Total revenue divided by total data usage?

MR. SUMMERS:  It's -- essentially, yes, that is the -- that is the model that Doctor Etner uses.  Every two years, he prepares a report for the cellular telecommunications industry association with all the carriers and Google members.  They then utilize this data

60

and publish reports to their members, and the -- and the industry tracks this and a lot of other --

THE COURT: Okay. But that --

MR. SUMMERS: -- related data.

THE COURT: -- is for that industry, right. And they're offering services in addition to just the data. So, that's the critique that I -- I'm not entirely sure I understand Plaintiffs' rebuttal to, which is that if you're looking at total revenue and not accounting for some of these other services that go in there, that you may be over valuing -- and I'm not talking about the Google Fi thing at the moment. I'm talking about the sort of principal methodology. You will be over valuing the marginal incremental value, because google's not stealing the entire data plan. Google is stealing, according to Plaintiffs, this quantum or whatever the word the Ninth Circuit used, you know, the specific sum of valuable cellular data, not the subscription to Netflix, not other things, but the particular cellular data that is needed to do this transfer that Google is doing for its own benefit, just kind of paraphrasing there.

MR. SUMMERS: Right. And, to be clear, Doctor Etner does perform steps to exclude revenue attributable to other services from his calculation of the average cost of data. So, he -- beginning in -- in 2013, the carrier

61

stopped providing breakdowns of service revenue and allocating the apportion to data.

And, so, what he does, though, is he takes that proportion. He carries it forward. Now, we know the data has been growing rapidly, the use of data, whereas the use of voice has been flat. And we know from his report -- his supplemental report that data has increased 91 percent premier on an average compounded annual basis. What he does very conservatively is he takes the ratio of data to voice and -- and text messaging, applies a very con -- and this is the 50 percent estimate that they complain about, saying that there were, you know, telephone discussions or conversations with the carriers involved. It's a very conservative way of over estimating a portion of the revenue that should be allocated to voice and text messaging and to other services and not to data -- QuaData. And he does that, and he then takes those two different approaches. One's called the disaggregated. One is called the bundle, and he uses a blended average where he actually uses the specific ratio of the carrier's transmissions and the extent to which everything is now data versus using voice over, LTE, versus the traditional -- and he -- and he uses these two approaches to estimate and to disaggregate from his data points of data an amount attributable to traditional services like voice and instant -- and -- and traditional

62

text messaging.  And he also addresses the issue of subscription, saying that doesn't sweeten it, there's no specific allocation.  So, he's addressed all those issues, and he's -- he's brought down the number.  He does this both for CTIA, and he's used the exact same methodology here.  He basically just took his CTIA methodology and updated it for this case, done the exact same thing here to actually come up with an estimate of the value of the data per se and nothing else.  And -- and it is in his judgment -- and he's expressed opinions.  Again, I'd direct the Court to his supplemental report -- that it is a -- a fair and reasonable estimation of the fair market value of cellular data and that it represents a very conservative measure because purchasers are paying a lot more than the average.

Now --

THE COURT:  So, do you take issue with Google's argument that what should be valued here is the marginal cost of the data?  I'm trying to under --

MR. SUMMERS:  Absolutely.  The --

THE COURT:  So, what's the difference?  What --

MR. SUMMERS:  And I went through a trial --

THE COURT:  Wait, wait, wait.

MR. SUMMERS:  -- a few weeks ago where they presented that theory.

THE COURT:  What's -- wait.  Just a moment.  Just

63

a moment.  What's -- I don't -- I actually don't want to hear about Chupo too much, but I -- and who won and who didn't.  I want to understand what the argument is.  So, what is the difference between the marginal value of some increment of data and what you're arguing is the fair market value of the data, QuaData?  Like what is the difference there?

MR. SUMMERS:  To -- it's difficult to answer that question without explaining the convoluted approach their expert uses.  What their expert does -- does is he trades Google's data as the last data being purchased.  And his idea is, Well, if a consumer is already buying all of this data, as you buy more and more data, the price per gigabyte or per megabyte or per byte goes down.  And, so, he actually looks at different plans and says, when you get to bigger plans, you pay less per gigabyte than with smaller plans. He makes that adjustment in his report, which, again, goes to the reliability of the methodology he --

THE COURT:  You're talking about Google's expert?

MR. SUMMERS:  Correct, Gos.

THE COURT:  Okay.

MR. SUMMERS:  -- actually makes an adjustment for that and adjusts Etner's number down, which, again, I think the fact that they're able to do that and to quantify both ways shows that this is something for the jury and not a --

64

a fundamental reliability issue that warrants Daubert. They're able to do the calculus, and they actually bring down based on that adjustment and one other, Etner down by 92 percent.

THE COURT: Yeah. No, so, apart from just disagreeing about the numbers, like, I'm -- what I'm really trying to get to -- and I'm sorry for belaboring this point, but it -- I feel like it's kind of important for me to understand. It's like what -- as a matter of sort of theory or like how are you conceiving of the -- what you're measuring. How is -- what is the difference between marginal versus what you're doing?

MR. SUMMERS: Our -- our point would be there is no difference because cellular data has a price in the market that the industry tracks and follows and understands, and it is priced on a per-gigabyte basis, and the -- we quantify the specific sum Google uses. We can't say that Google's is the last rather than the first. Google is doing these transfers every single day, the first day of the billing cycle, Google last. It's an overhead. You treat the overhead as the first or the last. They would say it should be last, and be --

THE COURT: Whether it's first or last --

MR. SUMMERS: -- marginal. We would say --

THE COURT: Sorry. Whether it's first or last

65

doesn't really seem to matter, but would -- would we all agree that -- maybe this is a wrong assumption on my part but that for a given user, maybe like a typical user, they consume a certain amount of gigabytes per month and that whatever Google is doing is like -- it's kind of a small subset of whatever that user has done.  Maybe if the user has a lot more, Google has a lot more.  But if a user is using it -- his or her phone infrequently, maybe Google's data transfers are less frequent as well.  I'm not sure.  This -- I'm asking is this a fair assumption on my part that -- that as a matter of proportion, Google's data transfers are a small -- the subjective word -- subset of the overall data usage of that user's phone in a given month?

MR. SUMMERS:  Yes, Google's utilization is a small -- relatively small portion of the overall utilization by the phone in a given month.  That is true.  It's not necessarily a one-to-one correlation in the terms of the magnitude of the usage of the phone and the -- the magnitude of these transfers.  For example -- for example, location uploads, those do not include any location-based information that's actually triggered by user, right.  And that's when your phone is just completely idle.

THE COURT:  So, it's independent?

MR. SUMMERS:  You move 200 meters, it's going to start using your phone to map the world.

66

THE COURT:  Okay.

MR. SUMMERS:  And using your phone as a mapping device.

THE COURT:  Um-hmm.

MR. SUMMERS:  So, that is all true, but the fact remains that under the applicable law and the pattern instruction, we are to determine the fair market value. That is an objective measure.

THE COURT:  Um-hmm.

MR. SUMMERS:  Our experts look at objective real world data about pricing.  What actual consumers pay in the actual market, that is -- that is a primary market, but there's no reason to think -- there is -- there is a bit of a secondary market.  Traditionally, there has been a way of selling through hot spots data.  It's -- it's sort of kind of going away over time.  Like data was much more precious, you know, 10 or 15 years ago and much more expensive per gigabyte.  But there has been -- but there's -- there's no reason to think that there's any delta between the two. And, interestingly, both experts agree that you can look at the primary market for -- for determination of the fair market value.  That's not really a focal point of this agreement.

THE COURT:  Well, it's -- and it's agreement on what evidence you can look at but not necessarily -- I

67

perceive the -- I thought that was the case, but I -- I perceive now that there's a difference in terms of the model, and that's going to bring me to my last question, and then I really probably should hear from Google. They're just sitting there very patiently, but I don't want to short circuit things, but, so, bear with me.

Section -- Civil Code Section 3336 has two parts, the detriment caused by the wrongful conversion of personal property is presumed to be, first, the value of the property at the time of the conversion with the interest from that time or, an amount sufficient to indemnify the party injured for the loss, which is the natural, reasonable, and proximate result of the wrongful act complained of, et cetera, et cetera.

UNIDENTIFIED SPEAKER: Right.

THE COURT: Okay. So, I finally understood from reading the Daubert briefing that, in fact, there's a disagreement between the parties. Plaintiffs have a theory of damages that goes with the value of the property at the time of the conversion, and then -- and Defendant tries to rebut that in terms of the actual number but also is arguing an amount sufficient to indemnify the party injured for the loss, which is the natural, reasonable, and proximate result.

So, okay. I -- you know, those two theories can live

68

in the world and -- and I think Google's right that in -- under the case law in appropriate circumstances, that -- I'm going to call it second part of the way to value conversion damages could be available.

But what I'm -- what I'm sort of struck by in reading this text is that the party injured by the loss. The party injured by the loss is the user. In Plaintiffs' theory, the party is injured like across the board, regardless of plan, by having their data used. I get that. That's what the -- the law requires, that being deprived of your property, in this case the data, is the injury, and we're valuing that. And there can be additional -- there can be an alternative theory that says, Okay. But if you compare that loss to the economic loss the party experienced, then somebody's getting a windfall. This is unfair, unjust, et cetera, and there's case law that allows for potentially -- I mean, it's from 1965. I haven't gone and looked, but whatever. I haven't drilled down into that particular issue, but those -- those -- let's just say those -- those two competing theories of damages could live in the world. I still think what we have to do is ask what's the fair market value in the right scenario, meaning the party who has the data, possession of the data. The party who has possession of the data, what is the fair market value of that property, not the carrier, but the party who has possession of the data, and I just -- I'm

69

just struggling with that point honestly.

MS. GIULIANELLI:  Your Honor, it may help actually to -- to point your Honor to the actual slide 21 and --

THE COURT:  Okay.

MS. GIULIANELLI:  -- slide 22.

THE COURT:  In the Daubert --

MS. GIULIANELLI:  In the -- actually, it's in class cert, but it goes to the question, and I think it will help answer this.

THE COURT:  Um-hmm.

MS. GIULIANELLI:  And this is the jury instruction based on California law, and it goes to the question of what the it is.  What is the property?  It's a byte.  A byte is a commodity.  A byte is a byte.  It can be valued.  There is a fair market value, and the jury instruction said the highest price a willing buyer would have paid to a willing seller.

And, so, if your Honor goes to the next slide --

THE COURT:  No.  Wait.  Wait.  Before we go to the next slide, and, two, if the buyer and seller know all the uses and purposes for which the cellular data is reasonably capable of being used.

MS. GIULIANELLI:  Correct.

THE COURT:  And you've defined that for me as use, not use or share.

MS. GIULIANELLI:  Yes.  And, so, it's basically

70

what a -- if -- if someone had full information like a hypothetical one person had full information about how it was going to be used, Google, what they would sell it for. It's -- it is not the value of the property to any particular individual under California law.

THE COURT:  But what about the category of users? The market is -- the hypothetical market is this category of users who have -- have purchased cellular data via their plan and have this valuable cellular data that they think they can solely use or control, and now somebody's coming and taking it, and what would they have told it for?  It's like -- forgive me.  I'm going to introduce a thing that is probably not appropriate to introduce now, but like the privacy litigation.  I have my private data.  I don't think anybody's supposed to take it.  Mr. Somvichian can plug his ears right now, but -- but what's the value of the -- that private data?

MS. GIULIANELLI:  Well, you --

THE COURT:  It's not to -- it's to the user, right?

MS. GIULIANELLI:  Right.  And, so, you can look, and then Mr. Summers will get back to -- to Doctor Etner. Some of this overlaps with class cert, but one -- one of the ways -- you can look at evidence of the actual value sold in the marketplace to see what a willing buyer would have paid

71

for it, and we have a couple of benchmarks.

THE COURT:  Yeah.

MS. GIULIANELLI:  One is the average price of data that Doctor Etner calculated, and then the other benchmark is the Google Fi price, and that's actual data that was sold in the marketplace to -- by a willing seller to a willing buyer in the marketplace.  So, both of those are benchmarks, and they're both evidence because you can use market data as evidence of --

THE COURT:  Sure.

MS. GIULIANELLI:  -- what a willing buyer -- so, both of those are benchmarks, and both are -- apply on a class-wide basis because it's not to any individual.

THE COURT:  And is this only -- or if there is a -- there is reliable evidence that this data is a commodity in the way that you've described it -- people have been throwing that word around, but -- but I'm not sure the commodity that you're using it means what you think it means.

So, you know, from an economic perspective, a commodity is like really fungible.  It can be -- you know, I'm not sure this is fungible.  Is -- is that the -- is that like -- is your theory of fair market value dependent on the assumption that it's fungible?  It's a -- it is a commodity?

MR. SUMMERS:  I think that is a relevant

72

consideration.

THE COURT:  Okay.

MR. SUMMERS:  I'm not sure if the test depends on it.  Again, Doctor Etner is providing the average price of cellular data, the way the industry tracks it.  That is an average.  It embraces all plans high and low, and it reflects -- it's a great -- as he explains, it's a reliable input to determine on a class-wide basis what the fair market value of the data consumed would be.  I mean, you can't think of a better match.  An average calculated the way the industry tracks it to apply to this broad set of transfers using a number of plans.

But, to the extent it matters, Doctor Etner at paragraph 12 of the supplemental report explains that it's a homogenous good, that it's mostly fungible, that the price does not -- does not significantly differ between the carriers, and in his trial testimony, which Google included -- in fact, it's -- it's attached as Exhibit A to the Somvichian reply declaration -- at page 1167 of the Chupo trial transcript -- and I think this is akin to deposition testimony for this case -- he was asked the question:

"Q     In general, when someone buys cellular data on one network, are they buying the same thing for a different -- same thing or a different thing than

73

when they buy cellular data on a different network?

A    Typically, they buy the same thing.  You access the Internet.  You watch a video.  You send an email.  A byte is a byte.  The networks have become very similar in most places."

And what he explained is that if you look at the three carriers and look at their coverage now, their coverage is largely comparable.  Their speeds are largely comparable.  To most users they are fungible.  And the secondary carriers typically have arrangements where they're piggy backing on the big carriers.

THE COURT:  Okay.

MR. SUMMERS:  He said in a specific instance you might live in a place where the -- the T Mobile service, you're just missing their cell or whatever and you don't have good -- and -- and for you, Verizon might be better.  For someone else it might be different.  On an individual basis, there may be idiosyncratic reasons why a particular user prefers a different carrier, but he says in general -- in general, these are -- this has become a commodity.

THE COURT:  Okay.  That's helpful.  I am going to give you a few minutes just to kind of highlight any particular things.  I know we didn't go through the whole

74

deck, but I really do need to hear from Google before we -- we get too far longer into the morning.  So, whichever points you wish to highlight, but, you know --

MR. SUMMERS:  Just --

THE COURT:  -- pick your most important points.

MR. SUMMERS:  Just, again, regardless of -- on the damages, regardless of what the market is --

THE COURT:  Um-hmm.

MR. SUMMERS:  -- and how we should look at it -- and that may be something that we need to explore further at summary judgment and for jury instructions and as the case evolves.  But all of the data that we have presented is relevant regardless of how you slice it and dice it, and it's all reliable.  Doctor Etner is looking at industry average figures, the way the industry calculates it using the exact same methodology.

By the way, they -- they raised some concerns about some conversations.  Just so the Court is aware, he addresses that in his supplemental report.  We're talking about a very small issue, the allocation of how do we estimate some value to voice and traditional services that doesn't go to the big numbers.  And -- and he testified, if you look at Exhibit 7 to the Bell declaration, that that issue would have a very small impact on his calculus.

As to the Google Fi number, that $10 per gigabyte

75

number, that's a plan that was in existence during the entirety of the class period from before it started to the present, $10 per gigabyte, and millions of consumers have been paying that for -- these are data points that are relevant regardless of the exact question of who the buyer is and who the seller is.  This is all data about the fair market value which, again, is an objective inquiry.  This is all relevant to the jury's consideration of these issues, and you couldn't find a more reliable approach than looking at real world transactions, real world pricing, real world data about what happens in the marketplace.  This is not some sort of crazy, you know, science or -- or an expert just saying something.  He's -- he's using real world data. And the fact that they're able to address -- and this goes to the Thompson Daubert as well on both damages motions, damages is attacked.

They're able to quantify adjustments for every conceivable error that they see in both Etner and Thompson. The fact that they're able to do that tells you that the fundamental methodologies here are sound, and we can quibble about how they should be applied, but we're not dealing with ipse dixits from an expert or -- or any sort of, you know, voodoo science.

THE COURT:  Um-hmm.  Okay.  Thank you.

Let me turn to Google now.  And, so, you have a preview

76

from our -- this colloquy of what the things are that I'm most concerned about, both about the -- what the it is in terms of what was transferred allegedly without permission and also whether the damages model maps appropriately to the theory of liability.  Those are kind of like big picture of the things I'm most concerned about.

So, I'd be delighted if you would address those but also other matters that you would like to address.

MR. SOMVICHIAN:  Yes, your Honor.  Thank you.

Before I start, how -- how much time do I have so I can pace --

THE COURT:  I'm here for --

MR. SOMVICHIAN:  -- myself?

THE COURT:  -- how long -- I do want to make sure you -- if people need a break, we can take a break, but I'm here until -- I'm available till 1.

MR. SOMVICHIAN:  Okay.

THE COURT:  So, I don't want to short circuit your time.

Does anybody need to take a break now?  Would you like a break?

(No audible response.)

THE COURT:  All right.  Please go ahead.

MR. SOMVICHIAN:  Thank you, your Honor.

Let -- let me start where we started this morning,

77

which is the question of what -- what -- what is the challenged conduct that we're trying to identify here because that -- that dovetails with the Comcast issue, do the damages properly tie to the wrongful conduct.  It ties to other aspects of consent.

And I think what came through loud and clear in -- in this morning's dialog is how immensely complex this is and how many different variations, permutations and different context in which these transfers can apply.  And it is not nearly as simple as counsel tried to make it seem.

Let's take the Clearcut example.

THE COURT:  Um-hmm.

MR. SOMVICHIAN:  Right.  It's a thousand -- it's over a thousand logs, and they want to point to certain common characteristics that say, Well, these are -- these can all wait for WiFi.  They -- they never need to use cellular data.  Well, that depends on the log, your Honor. Some of these are crash reports.  Some of these are needed urgently to determine the health of the ecosystem so Google can take care of urgent, pressing issues.  That's part of the Clearcut logs.  That might -- our defense to that might be different from something like a battery usage log that's intended for longer term optimization efforts by the company.

The point is it mattes, and all of them, the thousand

78

plus, all roll up into the same tag.  So, when they're measuring the wrongful conduct, they're measuring all of that all together without any way to parse among the different use cases.

THE COURT:  Well, let me ask you that.  Is there a way that Google can parse between them?  Because there -- there is authority for the idea that if there is some overinclusiveness, that's not necessarily going to defeat class certification, if there's some things in there that can be accounted for.  But if it's on a user-by-user basis, the only data being transferred in the sense of converted includes these crash reports.  So, we're going to have some class members who actually were not subject to this particular category or transfer.  Well, then that's a different issue.  But if it's within the -- the tag for Clearcut, there are some transfers within that tag that don't have the feature that Plaintiffs are describing as the defining feature of the conversion, meaning specifically they're time sensitive and just be done in the moment.  They can't not -- they're not just historical.

How does that defeat class cert?

MR. SOMVICHIAN:  Well, because the -- because the defenses to each category may be different and the -- and the mix of logs that are sent for any particular device are not the same.  In fact, they're dramatically different

79

across the board.  And that's just Clearcut, your Honor.  There's -- there are multiple levels to this.

PH is another one.  They refer to these as -- as experiments.  It actually involves a number of use cases.  They can be rolling out software updates or AB tests to evaluate new features or urgent things that can't wait for WiFi, like turning off a segment of software that's causing a bug.

THE COURT:  That's going to be flagged with a PH?

MR. SOMVICHIAN:  That's going to be flagged with PH.  There's no way to isolate that from any other use case that is associated with a PH tag.  So, again, it's overinclusive.  There's no way to tease out what's within their theory versus what is not.

THE COURT:  Based on the representative sample data that you all have, has there been any way to quantify how overinclusive the let's say Clearcut category is or the PH category is?

MR. SOMVICHIAN:  There's -- there's general testimony.  There was at trial, your Honor, about just a -- a general sense that the -- the turning on and off of software modules, including to address bugs is the much more common use case, but because it's not separately tagged by something more granular and they all roll up into the same one, there's no way to get more granular.  There's no way to

80

parse out if -- you know, for a particular user which one they had, which kind they had.

THE COURT:  But it would -- okay.

MR. SOMVICHIAN:  And --

THE COURT:  But does -- does Google dispute that in each of the four categories, at least some of the transfers within that category have the features that the Plaintiffs are alleging constitute conversion of data?

MR. SOMVICHIAN:  Some -- within each category, there are -- there are some unknown number of transfers that could fit within the Plaintiffs' theory.  But that's the point is that you can't tell which ones are in their theory and which ones are -- are not.  And, so, when they calculate this average for -- for damages, it includes things that are part of their theory and parts that are not, and there's no way to do this on a more granular basis.  There's no way to parse out what's at issue and what's not.

THE COURT:  But this argument is the same whether we're talking about a class of people or an individual consumer.  I don't see it as a class -- an argument against class certification.  I see it as an argument that just says our dataset is not capable of that kind of granular parsing.

So, you'll be overstating the problem, whether we're talking about an individual user across, you know, a whatever, eight-year period that we were talking about or a

81

class of such users.

Is that a fair --

MR. SOMVICHIAN:  I don't -- I don't think so, your Honor.  If -- if this case were just about the named Plaintiffs, we'd be able to do a much granular assessment, including potentially examination of their device, their particular settings.

THE COURT:  But I thought you said the data wasn't available.  Like if the -- you have a flag, everything's rolled up into the flag, and you can't get any more granular than the flag.  So, how could you do that for a particular user?

MR. SOMVICHIAN:  Not on an aggregate basis, your Honor.

THE COURT:  Well --

MR. SOMVICHIAN:  There's no --

THE COURT:  -- okay, but --

MR. SOMVICHIAN:  You can't do it on --

THE COURT:  That's why I asked about the sample.  So --

MR. SOMVICHIAN:  Okay.  You can't --

THE COURT:  -- within the sample, could you do a random -- you know, random sampling of the sample and say, you know, for these whatever substantive users, we can see that the majority of the transfers are for crash reports in

82

the Clearcut logs or whatever?  Like is that something that could be done?  Has been done?

MR. SOMVICHIAN:  For -- if this case were about an individual, your Honor, there'd be -- there would be more opportunity to try to get to that level of detail.  That is not possible in a class-wide setting.

THE COURT:  But why -- why should I accept this assertion that this is a big problem, class wide or otherwise, if it's not clear how big a problem it is?  There's only anecdotal testimony that it happens maybe sometimes -- some unknown amount of time that it's crash reports versus not crash reports for the Clearcut logs?

MR. SOMVICHIAN:  Well --

THE COURT:  I just -- and, again, the way it's presented is not presented on a this is not suitable for class versus individual determination.  It's just the data doesn't exist.  So, Plaintiffs necessarily over count the instances of alleged conversion.  That's how it's presented in the opposition, which is, you know, a good argument so far as it goes I guess on the merits and scope and all that stuff but not on a -- it doesn't strike me as a class cert argument, which is why I pushed -- pushed back on that.

MR. SOMVICHIAN:  I understand, your Honor.

THE COURT:  Yeah.

MR. SOMVICHIAN:  And -- and the reason we focus on

83

the class data and the class sample and the inability to tease -- tease out what's in and what's out is because that is the only source of common evidence that they've pointed to, and that's the question.  For -- for the common evidence that's been presented, does that allow us to isolate the instances that could support liability under their theory or not?  And in an individual claim, I can't -- I can't tell you.

THE COURT:  Okay.

MR. SOMVICHIAN:  If we had somebody's device, we could definitely tell it was version A versus version B. But that's got to at least be possible in an individual trial, but we know it's impossible in a class trial given the limitations of the common evidence.

THE COURT:  So, if they disagree with the -- with, you know, the way that you've described the evidence available -- because they -- they've insisted it's GmsCore automatic mandatory disclosure, and that's what the Clearcut logs have.  That's what the PH logs have, et cetera.  So, they -- they say, you know, our -- our obligation is -- well, they don't say this, but the law says it's a preponderance of the evidence standard.  We have to say -- we can make our case based on common evidence.  We're going to argue this.  And you tell me you can't argue that because the -- the actual facts in the world are as follows.

84

Do I just have a dispute of fact?  And I'm -- I mean, I'm not doing summary judgment right now.  So, what am I supposed to do with the state of the record?

MR. SOMVICHIAN:  It's not -- it's not a summary judgment question, your Honor.

THE COURT:  Right.

MR. SOMVICHIAN:  But to the extent that there's a factual dispute that goes to whether the issue is common, that is something that has to be resolved.

THE COURT:  But don't they just -- do they prevail on that if they can show by a preponderance of the evidence that they can make the class-wide showing?  Is that how I resolve that kind of issue at the class cert stage?

MR. SOMVICHIAN:  They have -- they bear the burden now of showing that the common evidence allows them to prove up their claims in a way that teases out what's within their theory and what's not.  And if the common evidence only allows them to associate a big number with one tag and we know that the tag includes thousands of logs, multiple use cases -- some are at issue, some are not --

THE COURT:  Um-hmm.  Okay.

MR. SOMVICHIAN:  -- they haven't met their burden, your Honor.

THE COURT:  Okay.

MR. SOMVICHIAN:  Very quickly, just to hit some

85

points on --

THE COURT:  Sure.

MR. SOMVICHIAN:  -- that, I think I need to correct the record on DroidGuard.  It was a surprise to me to hear that it's not at issue when Doctor Steck's damages report includes damages for DroidGuard of hundreds of millions of dollars.  It's very much at issue, and it's another good example of why the tags here are overinclusive and don't allow a common source of evidence to prove up their case.  This is in the declaration of Ms. Benco (phonetic) in support of our class cert opposition.  I don't want to belabor it, but there -- again, multiple use cases.  One happens right in the moment.  DroidGuard occurs to guard against abuse.  It's not done on a -- on a lag, can't wait for WiFi.  It's not within their theory.

There's another type, another flow that --

THE COURT:  But you're saying it's not with -- it shouldn't be within their theory but it's encompassed by their counting?

MR. SOMVICHIAN:  Exactly.

THE COURT:  Okay.

MR. SOMVICHIAN:  And, again, without a way to separately parse it out.

THE COURT:  And they -- the distinction of, Well, there's a specific flavor of DroidGuard called SafetyNet

86

that is the kind of thing that you're talking about where it has to be done in a timely way.  You're not making that -- is that -- is that a distinction?  I mean, I want to make sure we're not talking about apples and oranges and I understand you correctly.  Any DroidGuard, anything time sensitive must be done urgently, can't wait?

MR. SOMVICHIAN:  They -- they -- they have not carved out the portion of DroidGuard that happens in the moment, cannot wait for WiFi, and is not within their theory as it's described in Ms. Benco's declaration.

THE COURT:  Okay.  But I'm trying to understand your argument.  Is there a portion of DroidGuard that can wait and a portion of DroidGuard that can't wait?

MR. SOMVICHIAN:  Correct.

THE COURT:  Okay.

MR. SOMVICHIAN:  There's -- there's the -- right.

THE COURT:  And does Google's data allow that carving out to happen?

MR. SOMVICHIAN:  No.

THE COURT:  Okay.  So, it's like just can't be shown?

MR. SOMVICHIAN:  Again, if there -- there may be some individual evidence based on somebody's device or something that hasn't been developed yet, but we know from the common sources of proof that distinction can't be made.

87

THE COURT:  Okay.

MR. SOMVICHIAN:  So, that's another example.  So, these -- these issues cut across the board, your Honor.  So, the -- the case is immensely complex, and the -- the -- the methodology that's been presented doesn't meet their burden of proof with respect to just identifying what's at issue.

Let me -- let me address consent next.

THE COURT:  Okay.

MR. SOMVICHIAN:  There's -- there's debate in the briefs, and there's been discussion today about whether it's an objective or subjective standard.  They point to the Calhoon case, which was this -- which was a case resolved on summary judgment.

You know, we don't -- we don't dispute that an objective standard could apply in the context of express consent based on like contractual terms of service or some other binding source of information.  But that -- that's not -- that's not what supports our class certification opposition.  We -- we acknowledge there are terms of service.  There are contractual sources that we'll have to litigate in this case, as we did in the Chupo case.  And -- and the interpretation of those will -- will follow normal rules of contract interpretation.  Typically --

THE COURT:  Express consent you mean?

MR. SOMVICHIAN:  Yes, express consent based on an

88

objective standard for contractual sources.

THE COURT:  Okay.

MR. SOMVICHIAN:  But the point that you can't --
but the point for why the consent issue here is
individualized is because it goes beyond express contractual
consent, and there are a number of additional sources of
information that users don't have to go to, they're not
contractually bound to, but they, nonetheless, could be
exposed to review and understand exactly what's going on
here.

And -- and the -- the --

THE COURT:  What would those be?

MR. SOMVICHIAN:  So, let -- let me give you some
examples.  So, I think -- I want to address kind of a
hypothetical that you posed, your Honor --

THE COURT:  Okay.

MR. SOMVICHIAN:  -- about, Well, why don't --
can't -- isn't -- isn't the way this case -- you know, isn't
the way this all plays out that we'll look at disclosure X
and we'll -- we'll make a determination if -- if that's
sufficient or not, perhaps on summary judgment.  And then
we'll look at the next one and on -- you know, from their
perspective, they'll say it doesn't matter what people's
subjective understandings were.  We're going to look at this
objectively, and we'll look at things piece by piece.

89

You know, that -- that's not how the consent analysis works because in the real world, people become aware of things.  People become -- people understand how their devices work and make decisions on whether they want to continue using android device from a mix of information.

So, take -- take, for example, Exhibit 25 to my declaration in the -- to the opposition.  That's a good example, your Honor, of a disclosure that specifically addresses GmsCore.  Counsel noted that that's the software that implements everything that we're talking about.  The outside name is Google Play Services.  This page directly addresses Google Play Services, talks about all the various subcomponents of the different kinds of network transfers enabled by Google Play Services and explains that they occur in the background.  That's what the Plaintiffs are complaining about, and that's disclosed.  And I think their theory would be, well, it still doesn't say -- even though it says in the background and that's our -- that's our central complaint, it still doesn't say that it's in the background, plus it can consume your cellular data.

Now, we would say, depending on people's circumstances, if they -- if they very rarely connect to WiFi and they have a cell phone that they connect to a cell network, they will understand that when this disclosure says your device sends this stuff back to Google, they'll understand that it means

90

and includes cellular data.  That's pretty intuitive.

But even if we think that that somehow still falls short looking at that standing alone, there are other disclosures.  There are carrier terms that make very clear your device is preloaded with software that can use your cellular data in the background even when you're not doing something.  So, people who see a different mix of information may have a different understanding, and that's true whether --

THE COURT:  So -- okay.

MR. SOMVICHIAN:  -- you think of that as a subjective or objective standard, your Honor.  If it's an objective standard, it still depends on the -- the mix of information that people have seen.  So, that --

THE COURT:  I don't think it's subjective or objective, though.  I mean, if I understand you correctly, implied consent is you imply consent from the circumstances.  And, so, I'm not entirely sure I'm -- I'm comfortable with the way that you're using the word "subjective" here because implied consent could be an objective standard.  Like, would you imply consent from this behavior or are you suggesting that the only way consent can be litigated in this case is you have to ask each individual user, Did you understand that this would happen, and did you understand that Google would be using your cellular data -- part of your cellular

91

data plan to do this transfer?

Like, if that's the kind of proof you think is necessary, okay.  But it didn't seem to me like that was really the argument.  The -- the argument is you can imply that some subset of these people would have this understanding and be okay with it because the evidence is they keep using their phone, even after this disclosure.  So, therefore, we imply their consent.

MR. SOMVICHIAN:  Correct.

THE COURT:  Okay.  So, it's -- it doesn't really depend on what a particular user thought or not thought about a particular disclosure.  It depends on whether this is the kind of thing from which you can imply consent?

MR. SOMVICHIAN:  That's -- that's -- that's --

THE COURT:  That seems to me like kind of different.

MR. SOMVICHIAN:  I think that's right, your Honor, but -- but -- but that's different than looking at individual disclosures in isolation and making judgments about whether they're adequate or not adequate on a class-wide basis.

The point is there are multiple pieces of information, and the under -- even if these talk about it as objective, the objective understanding that someone might have based on looking at the two pieces of information that I described

92

might be different from the objective or subjective understanding that someone might have based on different pieces of information.  We see that in the survey evidence which shows that there are majorities -- substantial majorities of people who understand that their android device will send information in the background when they're not doing anything with the device actively, and that that can occur over cellular -- people understand that.  And then --

THE COURT:  Okay.

MR. SOMVICHIAN:  -- understanding that from --

THE COURT:  Your survey evidence isn't challenged I don't think in this --

MR. SOMVICHIAN:  It is -- it was not, your Honor.

THE COURT:  -- Daubert I think.  So, does -- but does -- I was curious about it because does the survey take the additional step and say, And do you understand that this will come out of your -- be charged against -- be part of the data that you've already contracted with your carrier to -- to -- so, like, does it have the additional question of like, Yes, you understand this happens over the cellular data network, but do you understand that that's on your plan?

MR. SOMVICHIAN:  That wasn't an -- an additional question, your Honor.

93

THE COURT:  Okay.

MR. SOMVICHIAN:  Not in the survey.

THE COURT:  I just was curious --

MR. SOMVICHIAN:  Yeah.

THE COURT:  -- because it wasn't before me.  All right.

MR. SOMVICHIAN:  But, so, again, on consent, we do think that that defeats class certification.  That's consistent with numerous cases that have similar record.

THE COURT:  And what's your best case for that?

MR. SOMVICHIAN:  There are a number, your Honor.  So, the In Re Gmail case from Judge Koh from 2014, the series of cases from Judge Gonzalez Rogers, the RTB case, Brown case.

THE COURT:  Brown and RTB, okay.

MR. SOMVICHIAN:  All of those involve a similar mix of information, Google disclosures, Google terms, third party disclosures, survey evidence, all very similar mix of information, and I think our record here is very similar to what was deemed sufficient in those cases to support a finding that individualized issues of implied consent defeat class certification.

THE COURT:  Okay.  Thank you.

MR. SOMVICHIAN:  Okay.  Let me -- let me turn now to some of the damages issues.

94

THE COURT: Okay.

MR. SOMVICHIAN: And let -- let me -- let's start, your Honor, with -- with the Ninth Circuit decision.

THE COURT: Okay.

MR. SOMVICHIAN: And you -- you posed the question as what -- what do the Plaintiffs still have to show in terms of some impact? What is the thing that's being measured here? And you pointed to one aspect of the memorandum decision on page five referring to Plaintiffs' "experiencing an immediate discrete loss of a specific sum of valuable cellular data which is charged against their data plans." That -- that is very relevant.

I also want to point out a part on page four.

THE COURT: Page four?

MR. SOMVICHIAN: Right in the middle of the page.

THE COURT: Okay. I'm looking at the Westlaw numbers. Sorry.

MR. SOMVICHIAN: Okay. I'm -- I'm sorry. I don't have the Westlaw version.

THE COURT: Okay. Go ahead. Just tell me where it is. I'll find it.

MR. SOMVICHIAN: Yeah. It's in the -- it's in the paragraph that starts "Plaintiffs adequately plead the second element" --

THE COURT: Second element. Yeah, okay. Got it.

95

MR. SOMVICHIAN:  And about halfway through that paragraph, the Court says:

"Therefore, Google's unauthorized transfer of bytes using Plaintiffs' data allotment necessarily prevents Plaintiffs from using all the data they purchase from their carrier."

So, the question is, given the Plaintiff's particular plan terms and what they alleged in the complaint, did the -- did Google's unauthorized transfer prevent them from using all the data they purchased from their carrier.

THE COURT:  Yes.

MR. SOMVICHIAN:  And -- and --

THE COURT:  The Ninth Circuit has said yes.

MR. SOMVICHIAN:  And in a context where the complaint included plaintiffs with limited plans, one plaintiff with a pay-as-you-go plan that was based on paying for a gigabyte at a time, in the context where the Plaintiffs on appeal emphasized those types of plans and emphasize their theory that actual throttling, actual overages are not required -- they made that point very clear in their arguments.  Their theory was that the potential for throttling and overages is really the harm because it causes people to ration their use.

THE COURT:  I don't think anything in this

96

decision has anything to do with what -- what is the consequence of the Plaintiffs' behavior in light of these data transfers.  It's -- it's straight up data is like water.  You used my water.  You owe me.  That is kind of the -- that's the reading -- the only fair reading I think I can give to this decision.  And, as you know, I disagreed with that, but I think we're past that.  I think it is stuff that's capable of conversion, so says the Ninth Circuit.

MR. SOMVICHIAN:  We're -- I'm -- I'm not disputing the property --

THE COURT:  Yeah.

MR. SOMVICHIAN:  -- component of it.  I think we are past that.  But I don't think -- I don't think that the Ninth Circuit's decision can fairly be read as simply assuming that the -- the use of data constitutes the interference and harm elements that are needed to save conversion for every type of data plan across the class period, regardless of what the throttling caps might be, regardless of what any specific term might be.  That was not the question presented to the Court.  Procedurally, there was no need -- reason for the Court to -- to issue a ruling based on any rationale broader than what it had in front of it, which was the complaint and a complaint that involved allegations of limited plans, pay-as-you-go plans and in a context where those elements were very much emphasized and

97

stressed. So, when the -- when the Court says that there -- there is the necessary impact for the second element of conversion where a use prevents Plaintiffs from using all the data they purchased from their carrier, we have to determine whether a particular plan fits within that contemplated impact.

THE COURT: I -- I'm not sure I agree with that. So, I -- I mean, I don't know what to tell you, but I don't read the Ninth Circuit decision as sort of holding back on the question of this could be dependent on whether it's an unlimited plan where you would never run out of data or would even count, versus a situation where there are limits and you only have X, because the way it's framed is the user has possession of the data, however much it is, and Google takes that data without the user's permission allegedly, and that is sufficient for conversion for the first two elements. And then the question of harm is just what -- by virtue of having your data taken that you possess, you have been harmed. It's just kind of --

MR. SOMVICHIAN: Your --

THE COURT: I mean, it's very counterintuitive in some ways, I grant you. But that's how I read the Ninth Circuit. I just don't --

MR. SOMVICHIAN: I --

THE COURT: You're not -- this is probably not a

98

good use of your time because --

MR. SOMVICHIAN:  I hear you.

THE COURT:  -- I don't think I could make a finding at this stage that somehow we have to look at every single plan and figure -- and parse it out for the 100 million class members in light of the nature of the injury, the nature of the data conversion that's alleged.  I just -- I don't think I will find in your favor on that point.

MR. SOMVICHIAN:  I -- I --

THE COURT:  I -- valiant effort.

MR. SOMVICHIAN:  -- assure you, your Honor, and let me just leave you with this on the -- the impact that's needed.

THE COURT:  Okay.

MR. SOMVICHIAN:  In addition to the Ninth Circuit's memorandum decision, we also have to account for California law.

THE COURT:  Okay.

MR. SOMVICHIAN:  There's the Intel v. Hamidi case.

THE COURT:  They were purporting to apply California law, but okay.  I get you.

MR. SOMVICHIAN:  Yes.

THE COURT:  Intel v. Hamidi.

MR. SOMVICHIAN:  California Supreme Court decision, your Honor, which we think is highly relevant if

99

not dispositive here because it involved -- it involved a situation -- it involved a trespass claim, lower standard, lesser showing needed of interference and impact to the property and harm to the individual.  And even in that instance where the showing was, in our view, greater than what's shown here, the California Supreme Court said that that's not enough, and the specific facts involved a company, Intel, getting spammed by tens of thousands of emails, and that, the Court observed, caused a portion of their systems, their storage, memory, processing ability on their computing system, to be consumed as a result of this email spamming.

The Court said that that's not enough.  Even though that that was a measurable impact, even though it was an actual impact, it said there has to be some measurable harm that flows from the use.  It viewed the -- the use of the system to be just that, use, but held that there has to be, beyond that, some showing of a measurable loss to the Defendant -- to the Plaintiff.  I'm sorry.

We don't have that here, your Honor.  You could theoretically have it under some individualized facts, but certainly we don't have that here on a class-wide basis based on the mere use of a portion of somebody's data plan, particularly for people who are on unlimited plans, and there are now variations, as counsel noted, of  unlimited

plans where there really isn't even throttling.  And --

THE COURT:  But this didn't have to do so much with the -- the use of resources as with the interference with the computer's functioning.  That's how the dispute was framed.  This dispute is framed differently.  So, I'm not sure that these things match.  And even putting aside, you know, that's a trespass case, this is a conversion case -- I understand, you know, their argument that the showing needed for trespass is lesser typically than for conversion, it still seems to me like the thing that the California Supreme Court was talking about in <u>Intel v. Hamidi</u> was really focused on the computer itself and not sort of the -- these sort of increments of property which the -- the Plaintiffs are describing here as the -- you know, the data is the increments of property that were -- that were taken.  I mean, nobody argued that the computer was taken.

MR. SOMVICHIAN:  But -- but increments of storage, increments of processing power were --

THE COURT:  But the Court was looking at the computer as a whole.  If what they were -- if the case was litigated on the basis of the storage is property, you're taking my storage -- and I'm not sure that it was.  At least the Supreme Court didn't frame it that way -- you know, maybe that would be a closer -- closer mesh.  Unfortunately, I think I'm just still bound by what the Ninth Circuit has

101

said.  And maybe the Ninth Circuit got it wrong and you will have an opportunity to tell them that some day or the California Supreme Court will take a look at your <u>Chupo</u> case and tell us all what the right answer is.  But right now I think I would find it very difficult to say that somehow this theory cannot be a basis for class certification at this time.

MR. SOMVICHIAN:  Okay.

THE COURT:  But --

MR. SOMVICHIAN:  Understood, your Honor.

THE COURT:  -- I would like to hear about damages, though --

MR. SOMVICHIAN:  Yes.

THE COURT:  -- very much.

MR. SOMVICHIAN:  Very last point on -- I promise this is the --

THE COURT:  That's okay.

MR. SOMVICHIAN:  -- the 45 seconds on --

THE COURT:  Okay.

MR. SOMVICHIAN:  -- the Ninth Circuit's opinion. In -- in the portion that you quoted, your Honor, about direct loss of a specific sum of valuable cellular data and the forced sale concept --

THE COURT:  Yeah.

MR. SOMVICHIAN:  -- that comes from this <u>Tyrone</u>

102

Pacific International case, also a Ninth Circuit decision. That case is very interesting because in that case, the -- the Court affirmed a lower court's finding that t here was no damages available, neither the fair market value or a consequential damages measure.  Why?  Because it looked to the actual facts and whether there was actual loss or impact from -- from that fact pattern.

So, it's very interesting that the Ninth Circuit in this decision cites back to that case.  That's the only --

THE COURT:  Yeah.  I mean, I don't know what to make of it.  I could imagine there is a scenario where the fair market value of data like this is like negligible, like really negligible, and all the evidence you all are bringing to bear, both in the world and in terms of the economic harm that in -- you know, a typical user might have suffered, like is there actual economic damage.  Those are relevant to the valuation, but in the end, you don't get to the consequential economic harm.  And this is what I understand is your opposition to the Daubert motion is that our expert is like talking about these economic principles in rebuttal to the fair market value theory being advocated by the Plaintiffs' expert.  That's all fine.  I think that's all fine.  They haven't really argued that in detail, but I think that's all fine.  But it is the case that the -- the California law sets forth the framework for the damages

103

model, and we are valuing the property that was taken and not other things, except for this alternative, you know, potential, I guess in cases where it's unfair, that model results in something unfair either way.

Okay.  So, sorry.  I don't want to cut short your opportunity to argue damages.

MR. SOMVICHIAN:  Yeah.  So, let's -- let's turn to damages.  And let's take it in -- in portions.

THE COURT:  Okay.

MR. SOMVICHIAN:  There's the equation that the Plaintiffs are using -- with respect, uses to come up with big damages numbers in this case.  First it's the -- the total amount of cellular data consumed, and you asked some questions about how -- whether and how that could be allocated to individuals or the set person, and the second part is what's -- what's the dollar value you associate with that amount of cellular data.

But on -- on the first point, your Honor, you -- you asked the question to counsel how do you allocate this to -- to individuals, and there's an aggregate number that's generated.  We don't think that that's reliable for a number of reasons we pointed out in our Daubert motion.  But, separate and apart on -- on top of all those flaws, you put your finger on a fundamental problem here, which is there is no way to allocate this big pot of damages that they've

104

identified and say, Okay.  User X, you had this amount -- this -- this number of megabytes that fall within these buckets or within these tags, and, therefore, we'll multiply your cellular usage by this dollar value, and then that will be your damages.

There's no way to identify that specific amount because all they've -- all they've come up with is an aggregate number, and then they divide that by the total estimated number of devices to come up with an average.

THE COURT:  Doesn't Google have that information?

MR. SOMVICHIAN:  We don't, your Honor, not for individual users.  Part of the problem is much of the data is not associated with any given device or user.  It's --

THE COURT:  Well, you have the sample.  Where did the sample come from?

MR. SOMVICHIAN:  The sample comes from two -- two sets of data.  There is -- a portion of the data is associated with a Google identifier or an android identifier, and another portion of the data, because users toggle versus settings, another part of the data is not associated and cannot be associated with an individual user, and it's instead associated with a pseudonymous identifier that by design --

THE COURT:  Okay.

MR. SOMVICHIAN:  -- can't be linked up.

105

THE COURT: So, how do we know there are 100 million class members?

MR. SOMVICHIAN: That -- that's the Plaintiffs' estimate based on aggregate statistics of android users.

THE COURT: Okay. So, like we would -- in an employment case and/or a wage and hour case, we would be calculating damages based on the number of work weeks versus how much overtime you didn't get, like that kind of thing. You're telling me we can't ever do that here, that it will be some average based on the 10,000 --

MR. SOMVICHIAN: You could --

THE COURT: -- applied like times 100 million users? Like that's -- that's what you're telling me is the way this would work?

MR. SOMVICHIAN: You could -- you could come up with an average, but for any given individual, particularly those where they're not associated with any identifier in the data, there's no way to know if that person had half of the average, a tenth of the average, more than the average, because there's no way to identify a specific user in the dataset because of this use of pseudonymous identifiers for the --

THE COURT: So, how do you even know who the class members -- let's say like Plaintiffs are successful, they get a result, there's a class certified, you have to give

106

notice to the class, number one, and then you have to distribute the proceeds to the class. How do we even do that, and does everybody get the same amount or some people are overpaid, other people are underpaid? Like is that -- is that what you're telling me is going to happen?

MR. SOMVICHIAN: Yes, your Honor.

THE COURT: Okay.

MR. SOMVICHIAN: You'll have a big lump sum without a meaningful way to distribute it other than, you know, a -- a random method that -- that would dramatically overpay some people because what we -- what we know from the data is that it -- it's not within like a small band. You know, it's not like, okay, it's like plus or minus 10, 15, 20 percent. There are -- there are devices in the dataset where the total amount of cellular data associated with the bag tags is, you know, one -- a very small fraction, one over 70 or --

THE COURT: When you say the dataset, are you talking about this representative sample or are you talking about the bigger dataset from which the representative sample is pulled?

MR. SOMVICHIAN: I'm talking about the representative sample that was used for class cert purposes. We know in that data that the range is massive.

THE COURT: Okay.

107

MR. SOMVICHIAN:  And, so, if you gave everybody the average, that would dramatically overpay certain users, and we know that that's improper, your Honor, from all of the case law.  A lot of it is in the employment context where the Supreme Court has weighed in about the use of what is called, you know, a trial by formula.  This is the Walmart case, for example.

In that case, there was a trial method in which the -- the average back pay award for a sample set of plaintiffs was determined, and then the average of that amount was extrapolated to the class as a whole, and the Court said can't do that.  That's a trial by formula.  That deprives the Defendant of being able to assert individualized defenses.

That's exactly what this methodology is, your Honor, that we're talking about here.  It's taking an average, applying it across the board in a way that deprives Google of the ability to defend against that by saying, Well, this -- this person, because of their android device configuration and their settings and their operating system version, they would have sent a tenth of that.

THE COURT:  But if Google can't say that because it doesn't have the data, then where does that leave us?

MR. SOMVICHIAN:  Class certification should be denied, your Honor, because --

108

THE COURT:  Okay.  But -- but -- okay.  Class certification can't work, but then you say this deprives Google of its ability to make this kind of individualized defense.  But if you can't make that individualized defense anyway because the data no longer exists, then where does that leave us?

MR. SOMVICHIAN:  We can cross examine an individual plaintiff.  We can talk to them about -- we can examine their device.  We can ask them how they used it.  We can ask them what settings they had.  We can ask them what operating system they had.  We can have our expert analyze that and say measured against an average, you would be a small fraction of that or we'd be able to do any other -- any number of other methods in an individualized trial that we simply are deprived of the opportunity to do in the class setting and based on the formula that they're -- that they're intending to apply here, your Honor.  That's the fundamental problem.

THE COURT:  Okay.  I've noted that issue.

MR. SOMVICHIAN:  And -- and on top of the Walmart case, two -- two other cases that I think are -- are very important here in evaluating whether this average method can be extrapolated to the class as a whole.  Counsel said that it's -- it's commonplace and -- and accepted.  It's not.

In the Jimenez v. All State Insurance case -- that's

109

Ninth Circuit, 765 F.3d 1161.  This is the Ninth Circuit applying Dukes and Comcast, and it says:

"Circuit courts, including this one, have consistently held that statistical sampling and a representative testimony are acceptable ways to determine liability so long as the use of these techniques is not expanded into the realm of damages."

So, statistical sampling or representative evidence, that's the same as this average methodology that we're talking about here, your Honor.  And in the context of these employment cases, it's been accepted if you do the -- if you do the sample right and you get the methodology correct, you can do that for liability.

But what the Ninth Circuit is saying, you still can't extend that to damages.  And in -- in -- in the employment context, it actually is feasible given the numbers once a liability finding has been made to have individualized findings on damages.  That's not possible here, and the Ninth Circuit said you can't apply this statistical or representative or average approach to damages.

THE COURT:  But it would still work for purpose of the injunctive class.

MR. SOMVICHIAN:  In what way, your Honor?

110

THE COURT: I mean, you could -- we wouldn't have to worry about these things from a class certification point of view if all we were talking about is certifying an injunctive class, because whether it was, you know, a little bit or a lot of data usage across the class population, it could still be amenable of class-wide treatment -- class-wide remedy of an injunctive nature on a going forward basis, correct?

MR. SOMVICHIAN: Uh --

THE COURT: I mean, this is really damages specific argument.

MR. SOMVICHIAN: I -- I think so, your Honor. So, that specific issue alone might not relate to the (b)(2) issue, but there are lots of other problems with the (b)(2) class in terms of just the -- the 23(a) commonality threshold being met, but --

THE COURT: Okay.

MR. SOMVICHIAN: -- set aside (b)(2) for --

THE COURT: Yeah.

MR. SOMVICHIAN: -- for a moment.

THE COURT: Okay.

MR. SOMVICHIAN: The -- the last case I want to make sure you have in mind, your Honor, because it bears directly on this idea that you can just -- you can just take an average. We have 100 million users. They're on

111

thousands of different plans.  Their data usage, one person is 70X of another.  Just take an average and -- and apply it across the board.  That doesn't work.

Another case that says it doesn't work is the Supreme Court case Tyson Foods.

THE COURT:  Um-hmm.  Okay.

MR. SOMVICHIAN:  I think you're well familiar with that -- with that case, your Honor.  But in that case, again -- and in an employment context, so, much more straightforward, but even in that context, the Court was very careful to caution that if you're taking an average calculation or some statistical methodology, first of all, it's really only applicable to liability, and under the Ninth Circuit standard, it shouldn't be applied to damages.  But -- but setting that -- even setting that aside, the question is could that average method have been submitted by an individual plaintiff if they were pursuing an individual claim.  And in that case, it was appropriate.  It had to do with, you know, the amount of time that certain employees who all work at the same plant, they all have the same equipment.  On average, it took them X minutes to put their -- take their equipment on and off.

THE COURT:  Yes.  Got it.

MR. SOMVICHIAN:  And the Court said even in an -- even if the case were only about that one individual

112

Plaintiff, that evidence would be appropriate.

Our circumstances are much different, your Honor.  So, if the case were only about a single plaintiff and -- and we were actually able to determine their -- their amount of data usage and they were on, you know, this end of the spectrum, one -- 1/70th of -- of the average and maybe even a smaller fraction of people on the high end, why on earth would they be allowed to present evidence that, Well, I had, you know, X number of megabytes, but I want to be compensated for taking -- you know, Google taking my property.  I want you to assume that they took 70X because somehow that's the average.

That would never be admissible in an individual trial, and that's -- in the Tyson case, I think there's a really important lens from which to think about all of the elements of the -- of the damages equation with respect to not just the amount of cellular data but also the dollar value that we're associating with it.

Let me -- let me turn to that next.

THE COURT:  Okay.

MR. SOMVICHIAN:  We talked a lot about the average price calculation.  I don't want it to get lost that there are other calculations here, and it's really important that we -- we think about those individually because -- I'll talk about the average price next, but there's also this Google

113

Fi --

THE COURT:  Yeah.

MR. SOMVICHIAN:  -- theory.

THE COURT:  It's -- yeah.

MR. SOMVICHIAN:  Which increases damages by 34X.

THE COURT:  I -- and I understand.  I think the argument is pretty discrete on that one about how that number is being used in a way that Google thinks is not appropriate to come up with a per gigabyte number.  I get that.  So, you can talk about it if you want to, but I think I -- I understand that is a discrete argument from the average.

MR. SOMVICHIAN:  Okay.

THE COURT:  Yeah.

MR. SOMVICHIAN:  And sounds like you get it on Google Fi, your Honor, but I do want to point out it's -- it's a billion dollar issue.

THE COURT:  Yeah.  It's a huge number.

MR. SOMVICHIAN:  Whether -- whether Google Fi is in the case or not.

THE COURT:  Right.

MR. SOMVICHIAN:  And we think for that one we spent a lot of time talking about average price, but for Google Fi, it's -- it's not even a close call if you look at the -- the Plaintiffs' expert reports.

114

THE COURT:  Is Google Fi part of the average or it's left out of the average?  I think someone mentioned that in the papers, but I can't remember what the answer was.

MR. SUMMERS:  It would be -- it would be part of the average.

THE COURT:  It's part of the average.  Okay.  So, if Google Fi were out of the case in some way, would it be out of the average calculation?  Is that what Google's advocating?  And, so, that average number would be different?

MR. SOMVICHIAN:  I -- I think all of the damages models should be --

THE COURT:  I -- I know, but --

MR. SOMVICHIAN:  -- stricken, your Honor, but --

THE COURT:  -- I'm talking about this particular dimension.  I don't understand your argument.  If I say Google Fi is not a reliable measure of the fair market value of data, does that mean it has to come out of the expert's average calculation as well as its own stand-alone calculation?

MR. SOMVICHIAN:  I think -- I think the average price calculation fails for separate independent reasons.

THE COURT:  I understand.

MR. SOMVICHIAN:  Yeah.

115

THE COURT:  Okay.  Go ahead.  I'll let you proceed with your argument.

MR. SOMVICHIAN:  On -- on the average price question, your Honor, you -- you asked what -- what is -- what is the thing we're trying to put a value on.  So, I think -- and then, relatedly, what -- what is the -- what is the hypothetical market that we should be thinking about, who's the -- who's the buyer and who's the --

THE COURT:  Who's the buyer and who's --

MR. SOMVICHIAN:  -- seller.

THE COURT:  -- the seller.

MR. SOMVICHIAN:  So, first of all, the -- the it, the -- the thing that we're trying to value, there's some -- there's been some discussion of it being a commodity.  The -- the theory does depend on cellular data services being a commodity.  The ability to take one price, whether it's Google Fi or this average, and apply it across the board to literally thousands of plans over the -- over the course of the class period and to say that that is a reliable measure of class-wide damages necessarily depends on being able to show from an economic scientific perspective that cellular data services are a commodity.  It's the same thing under every single data plan.  They haven't presented a shred of expert or economic or any other support for that notion, your Honor.  It's one passing reference in one paragraph in

116

the Etner report that even uses the term "commodity", and you can read every single expert report from every Plaintiff's expert.  You will find no explanation about why that should be accepted.  There is no comparison of how Google Fi or -- or the average price compares to cellular data services overall.  There's no showing that network coverage, network speeds, network reliability, all the things that carriers compete directly against each other on, all of those metrics, there's no showing that those things are the same across the board in a way that would allow you to think of cellular data service as a commodity.  And, in fact, all of the evidence points the other way, where the prices span, again, an immense range for -- for a given year.  This is in the Gos report.  Exhibits to the Gos report show the price variation across data plans in a given year 10X, 20X.  You know, layer on top of that, the bundled services that are included.  You pointed to some of these, your Honor.

And, so, when people buy plan X versus plan Y, something from T Mobile versus Sprint or any other carrier, these are not fungible commodities.  They're different plans on different networks with different metrics as it -- as they relate to reliability, speed, throttling terms, everything else.  And there's nothing, nothing in any of the Plaintiffs' expert reports that supports any kind of

117

contrary finding.  So, it's not a battle of the experts. It's not --

THE COURT:  Yes.

MR. SOMVICHIAN:  -- you know --

THE COURT:  But the Plaintiffs say, Our expert has accounted for these kinds of things, has tried to apportion and disaggregate the bundling of services that aren't part of the valuation.  And we've accounted for this variation. Can't be perfect, but, you know, we've accounted for it. And, so, you know, your expert can put up a different much smaller number based on your own analysis.  And this happens.  In every damages case I've ever seen there are vastly different views of what the damages are and the value of whatever it is we're trying to value.  So, why is that a basis for defeating class certification or for excluding the expert if the experts just disagree?

MR. SOMVICHIAN:  So, your Honor, it's -- it's not just that -- it's not just a disagreement where there's a record on one side.  Cellular data service is a commodity, and here are the economic reasons why and then contrary opinions on the other.  There -- there isn't a showing in the first instance, certainly not one that can meet the Daubert standards, that this average calculation even passes that initial threshold.

THE COURT:  What about this idea that this -- the

118

Plaintiffs' expert calculates this kind of thing on a yearly or biyearly basis --

MR. SOMVICHIAN:  Yes.

THE COURT:  -- for the industry?  And that's a just normal ordinary industry relies on it there for a data point in the world and it should just be used.

MR. SOMVICHIAN:  He does do that for a much different purpose.  So, it's actually not even an average price, and I think you -- I think you pointed this out.  The -- the calculation is the total amount that's spent, not for what consumers buy, not for the cellular data allowances that they get.  That might be a way of deriving an average price for cellular data for consumers, but it's based on a calculation where the denominator is the amount of usage.  And that makes sense for this industry purpose that Doctor Etner calculates this for.  It says perfectively to calculate a consumer's surplus for industry use.  But it's not even a calculation of what consumers pay in terms of an average price of -- in relation to -- to what they -- they get.  And then the -- the other disconnect is what you pointed out, which is what's the market that we're talking about here.  That -- because we're -- we're -- the case is not about Google interfering with people's data plans in terms of what they paid for initially.  Somebody could have made a consumer decision, I'm willing to pay $60 a month for

119

unlimited data under this T Mobile plan.  I get Netflix for free, whatever it is.

What's -- what's being challenged in this case and, therefore, what we should be trying to put a value on is the incremental or marginal amount of cellular data caused by these network transfers.  So, the -- the relevant question I think is what you posed, your Honor, which is for a consumer that's already made that decision, I'm -- I'm paying 60 bucks a months for this plan, I now know that Google is using a small increment of that, what is the value of that increment for that consumer?  And there's -- there's nothing in the expert reports from Doctor Etner, certainly not from Doctor Speck who disclaims any expert opinion at all, there's nothing in the expert reports to support the value of cellular data when it's conceived in that way, which is the correct way to think about it because it ties to what's alleged in the case.

THE COURT:  So, does Google offer an affirmative opinion on what that number should be?  Like, if you were to value the right thing, what should the number be?

MR. SOMVICHIAN:  So, Doctor Gos in his expert report points out the flaws in the Plaintiffs' calculation and applies some adjustment to it.

THE COURT:  Yeah.

MR. SOMVICHIAN:  But we're not -- we're not

120

purporting to provide, you know, our version of an accurate pricing for that hypothetical market.  We're saying that you can't do it because --

THE COURT:  Right.

MR. SOMVICHIAN:  -- of the individualized nature of it --

THE COURT:  Okay.

MR. SOMVICHIAN:  -- and because of the need to account for differences in plan terms and bundled services and -- and everything else.

THE COURT:  And then you do -- your experts do advocate this alternative theory of what's the economic harm?  I'm calling it alternative theory, but that's not really the correct way to -- to phrase it in the case law. It's really the second part of the first method in Section 3336, right?  So, an amount sufficient to indemnify the party injured for the loss, which is natural, reasonable, and a proximate result.  So, that's where you get into the question of unlimited plans versus not throttling or not -- that kind of thing?

MR. SOMVICHIAN:  Correct.

THE COURT:  Right.  So, but that's -- that's a -- is it fair to say -- sorry to short circuit this, but is it fair to say that the Defendant's view is you can't actually put a fair market value on this sort of incremental marginal

121

data?  You just can't do it?  It has no value really, and, so, what we have to do is look at this alternative way of calculating the value of the property, which is sort of an indemnification point of view, but what would be the fair compensation.

MR. SOMVICHIAN:  I think -- yes, your Honor.  I think -- I think the -- the fairest way to summarize Doctor Gos's opinions is that there -- there could be value to that incremental marginal use, but there's no way to calculate it on a class-wide basis --

THE COURT:  Okay.

MR. SOMVICHIAN:  -- from common proof and is certainly not measured by either the average price or certainly the Google Fi price.  And in -- in many instances, that value could be zero, particularly for users on an unlimited plan, and they may have a throttling cap that is so high or it's not even mandatory in a way where the -- that marginal usage may have very little value to them, and that -- those --

THE COURT:  But not just to those humans but to the category of people who find themselves in that situation, because I -- I don't want us to be like mistaking that we're trying to value it for a particular consumer. We're trying to assess what the value of that data is.  And, so, would -- would Google's position be that you have to

122

consider these sort of subsets of the class?  One part of the class has an unlimited data plan.  Some other part of the class may have more constrained or limited plans, and those people are differently situated.  Is that what you're arguing or are you arguing that it really does have to be an individualized calculation on a user-by-user basis and that can't be done in a class cert motion?

MR. SOMVICHIAN:  So, your Honor, I -- I don't think we're advocating for a -- a standard that's impossible, you know, to -- to meet in any case, meaning I don't think we need to try to read people's minds about what -- what value they would put on something, but the -- the individual circumstances do matter in terms of the plan type because that -- that necessarily affects any effort to put a value on some increment of the data plan.  These things are all created by contract, and the valuation of it has to analyze the -- the terms that are -- that are at issue.  And it's not as simple -- it's not quite as simple as putting them into -- into a couple of buckets, you know, limited versus unlimited.  They span an immense spectrum in terms of the particular types of plans.  Just as a -- in terms of throttling, for example, some may be mandatory.  Others may just depend on network congestion.  Some may -- may -- and for some plans there is no throttling.

So, I think that our point is all that matters for

123

trying to put a value on the incremental value of data under any particular type of plan.  But it's not -- I don't think it's -- I don't think it's subjective in -- in the sense of needing --

THE COURT:  Right.

MR. SOMVICHIAN:  -- to put somebody on the stand and ask them, Well, how much did you think this was worth.

THE COURT:  Okay.  Got it.  Thank you.

(Pause.)

MS. GIULIANELLI:  And, your Honor, when -- whenever --

THE COURT:  I know you want to have the --

MS. GIULIANELLI:  -- Mr. Somvichian -- if we could just have a few minutes to respond to some of the things. Thank you.

THE COURT:  That's fine.  And I have a couple of follow-up things I wanted to ask.

MR. SOMVICHIAN:  Yeah, so the -- just I think the last point on the average price, your Honor, I -- I think the -- the key takeaways for the average price, number one, as a -- as a legal matter, it -- it goes back to that Walmart, Jimenez, Tyson line of cases.

THE COURT:  Okay.

MR. SOMVICHIAN:  I mentioned those in the context of -- of problems of applying an average amount of data, but

124

those cases also preclude using some average amount as -- as the value.

THE COURT:  Okay.

MR. SOMVICHIAN:  So, again, if we -- if we use Tyson as the -- as the framework here, thinking about the -- the issue, the question is were -- if -- if somebody has an unlimited plan, if -- if this case were just about an individual plan or if someone had an unlimited plan, very high throttling cap or maybe no throttling cap at all, and they effectively pay less than two dollars or under one dollar per gigabyte, there are many examples of this in the Gos exhibits.  Under Tyson, why would that plaintiff be allowed to present an average price?  I want to -- I want to recover two, three times more.  Why?  Because there's some industry metric for consumer surplus that generates a number that's higher.  That would never be appropriate, your Honor, in the context of an individual case.

So, I think that case law precludes this average approach both with respect to the amount of cellular data and also the pricing of the cellular data.

THE COURT:  Okay.  I -- I understand that argument.  The average amount of data and also the pricing.  Got it.

Okay.  Anything else that you'd like to highlight in opposition?

125

MR. SOMVICHIAN:  I'm going to -- I'm going to scour my notes, and I'm --

THE COURT:  Okay.

MR. SOMVICHIAN:  -- sure there's something else, your Honor, but I'm -- I'm happy to pass the mic.

THE COURT:  Okay.  All right.  I'll give the Plaintiff a brief opportunity to respond, and then I do want to address sort of these outstanding issues about how and to what extent I need to resolve the Daubert questions and also the stuff from the Chupo case that people keep wanting to share with me.  Yes?

MR. SUMMERS:  Your Honor, very briefly, on the question of the damages model --

THE COURT:  Okay.

MR. SUMMERS:  -- to be clear, we have a model to determine class-wide damages.

THE COURT:  Um-hmm.

MR. SUMMERS:  We take the quantity, the specific quantity of data that Google has consumed by virtue of the challenged transfers, which we calculate to the -- the byte, precisely based on tags, and we multiply it by the fair market value of the data.  That is the model.  There's no question that we have a model for determining aggregate class-wide damages.  The question that's really posed here is what is the appropriate price and how should the -- the

126

jury determine the appropriate price for that model.  No question that there is a damages model that is seaworthy here that warrants class certification.

Now, turning to that question, the Daubert motions really relate to expert testimony evidence relevant to the jury's determination of the fair market value of the bytes of cellular data that are taken.  And I would respectfully submit that the analysis -- what we need to look at here is is the analysis provided by Doctor Etner reliable, and it is, because what he is doing is he is presenting to the jury specific data, data points about actual transactions in the real world during the class period involving actual class members, whether it's average, Google Fi, which is a couple of million consumers -- and even the overage charges.  These are all data points that are relevant to the jury's determination of the fair market value of the cellular data.

Now, the Court may -- if the Court doesn't believe, for example, that the Google Fi price is necessarily the right price, that does not mean that this evidence is not relevant.  It does not mean that the evidence is not reliable.  It does not mean that the evidence is not helpful to a jury.  And I would respectfully submit we have an appropriate model for determination of class-wide damages.  No question about it, there is a factual issue to be -- to be determined by the jury, and the damages evidence that

127

we've submitted through Doctor Etner is reliable, relevant, probative helpful to the jury and meets all the requirements for expert testimony.  So, I think the Daubert motions should be denied.  Class certification should be granted.

I would posit that this issue of whether we need to look at a hypothetical transaction involving Google and consumer, rather than carriers and consumers, that that's something that's a bit new because Google did not make that precise argument the way the Court is articulating it.

Previously, Doctor Gos -- and we did not submit this because the issue wasn't really presented in this case, but Doctor Gos, previously their expert, their economist, said that you can look at the primary market and you could view this as a -- an issue -- this isn't an issue that we fully briefed, and I would respectfully -- and didn't really address in Doctor Etner's supplement because of it.

Respectfully, I would suggest that if there is a -- a bit of -- if the Court believes there's a bit of a -- a gap in the nexus, that we be afforded an opportunity to supplement Doctor Enter and/or such reports to address -- to tie the evidence he has provided to the secondary market and the hypothetical transaction between Google and consumers. That's something that Doctors Speck and Etner can do which would not involve new data or new -- it would be very discrete and it would be done very easily without disrupting

128

the schedule.  And I think the circumstances here warrant it.

Just a couple other things.  I know the Court doesn't want to hear about the Chupo case, but --

THE COURT:  Well --

MR. SOMVICHIAN:  -- the very same arguments presented here were teed up for the Chupo court twice, in 2023 and just recently we provided the most recent decision, but --

THE COURT:  Okay.  Let me just pause you there because -- let me just sort of say a thing about Chupo, which, okay, if somebody gave evidence in Chupo, you know, so it's like prior testimony, fair game, right.  Fair game in our case, in our trial, whatever.  The fact that there was a decision on some objection, motion, whatever, in Chupo, unless it's binding on me, you know, maybe it has some persuasive value, but I'm not inclined to allow a bunch of supplemental briefing on that.  So, I really -- no.  That just -- no.  We already have piles of material.

So, I just wanted to share with you guys that's my reaction is obviously if somebody made an admission in the trial, totally fair game here.  But unless and until you tell me that some judge in the State Court system has made a binding decision, and I would be delighted to hear that -- then I just -- don't expend your time on it.

129

MR. SUMMERS:  On the -- that issue, two things, your Honor.  I'm -- and I'm not arguing for the supplemental briefs right now.  I was just --

THE COURT:  Okay.

MR. SUMMERS:  -- pointing out that we did submit the Chupo Court's initial decision denying -- basically carbon copies of the Daubert motions here was submitted as Exhibit 6 to their declaration, and we just submitted overnight the more recent decision that you then rejected their -- I mean, that's -- I mean carbon copy, verbatim the same motion.

THE COURT:  I -- I know, but I'm not going to turn this into a sort of parallel proceeding on your post-trial motions in Chupo.  I'm just not going to do that.  So, I just --

MR. SUMMERS:  Understood.  One other thing, your Honor.  Just to advise the Court, I do think that we will be making a motion for collateral estoppel, and but we will do so on or before the schedule for summary judgment.  This case is all fours with Chupo.  The case was tried.  There was a special verdict form.  All the issues were decided from whether this was property to the -- to the way to calculate damages.  And the jury adopted Doctor Etner's average price methodology awarding damages, you know, that -- that reflected an adoption or finding of conversion as to

130

all four of the categories that we're going to be presenting in this case, the exact quantity of data that we provided to them, and his average industry price.

So, we do anticipate doing that.  The -- the response we anticipate is that collateral estoppel will not be fully applicable until there's an appeal.

THE COURT:  Well, don't you just need a judgment? Has judgment been entered?

MR. SUMMERS:  A judgment has been entered.

THE COURT:  Okay.

MR. SUMMERS:  As of July 11th, and it reflects the jury's verdict.  Post-trial briefing will be concluded and decided by November.  But -- but --

THE COURT:  Okay.

MR. SUMMERS:  -- we will be making a motion for collateral estoppel, which might necessitate a stay for the appeal because under California law, the decision is not fully binding for collateral estoppel purposes at least until the appeal through the California Court of Appeal has been decided.

THE COURT:  Okay.  Well, that -- that's helpful to know that that request may be coming.  I mean, from my very very selfish point of view, I'd rather not do a lot of work on something that is not going to matter because there are other events that will have or have already overtaken what

131

I'm doing here.  It's just an efficiency point of view, but there may not be agreement on this point, and it may be that Google very much would like me to just kind of proceed, and I'll have to just take up whatever motion gets filed, if it's contested, whenever it is presented.  If you agree on something -- and you have been agreeing on things from time to time, continuation of deadlines, et cetera, et cetera, by all means, let me know sooner rather than later if you agree on something so I can evaluate it then.

But -- but let me, if I may, pose the question to you all about what I'm to do with the Daubert motions, because, although you say let's focus on class cert, it necessarily requires me to evaluate what the experts have done, and there's a approach to evaluating expert evidence at the class cert stage that, for lack of a better word, I'm going to call Daubert lite, which is, you know, sometimes the methodology isn't even executed yet, right.  It's like here's the methodology I proposed.  It's class wide.  It's based on class-wide evidence.  It will work, and that is enough.

But here your experts have done the things.  It's already done.  There's no more expert evidence to -- to develop apart from this additional request here.

So, you know, to -- to what extent can I or should I

132

reserve some of these things for summary judgment versus I need to decide everything now, at least to the extent I'm going to rely on some expert's opinion for class certification?  I just would like to understand what you all think about that question, and if you need time to ponder, that's fine.

MR. SOMVICHIAN:  Yeah, I -- I think I can address that, your Honor.

THE COURT:  Okay.

MR. SOMVICHIAN:  So, with respect to Google's Daubert motions, if they're granted, that means class certification has to be denied because that means that there is no class-wide model for -- for damages, either with respect to the calculation of the amount of cellular data -- that's our Daubert motion on technical issues, or on valuation.

So, the Daubert motions go directly to that.  And if they're granted, that's another -- that's a -- that -- the result of that would have to be a denial of class certification separate and apart from what else you -- whatever else you might find on consent or other issues, because I think we all recognize that under Comcast, there has to be a workable model of -- of proof for class-wide damages, and if the Daubert motions are granted, that goes by the wayside.

133

MS. GIULIANELLI:  Your Honor, we would disagree with that obviously.  With respect to the technical expert Daubert, Mr. Thompson, none of the things that Google -- the adjustments that Mr. Thompson makes that Google challenges eliminate the -- the methodology of counting the bytes. There are adjustment that Mr. Thompson makes and none of that is necessary for class certification because even if your Honor were to -- to grant the Daubert on all of those, which we don't think your Honor should, and we can get into that later, there is still a model.  It's just uber uber conservative for counting the bytes.  So, none of that is necessary for class certification or for Doctor Steck as well.  We believe that that is unnecessary for class certification.

Google does one thing.  They -- they challenge the sample.  It is an absolutely random representative sample. We've already discussed that.  And then there's the Doctor Etner that Mr. Summers has been talking about.  So, we do not think that we -- there is a model, and that model is -- is there, and the Daubert motions that Google brings have to do with the inputs and various -- various disputes about the inputs and how adjustments are made to that model.

THE COURT:  Yeah.  I guess what I'm really asking is not sort of the -- I know you disagree on the merits of the respective motions, but is there a way where I -- my

134

evaluation can only go so far and reserve on the remainder for some later time?  Because, you know, I'm not -- I'm not necessarily deciding questions of admissibility at the class certification stage.  It's something a little bit different. I hear Google saying that it -- there has to be a reliable methodology.  Our Daubert motion says there isn't for calculating damages.  Therefore, there isn't a basis for class certification.  So, you should just -- you should decide the motion fully as it's briefed now, at least on the -- the damages experts.

And what I'm not entirely sure from the Plaintiffs' point of view is whether you think -- your -- your damages experts have already executed methodology.  So, we're not at the stage where I'm merely being asked to evaluate have they proposed a methodology which, you know, could address this issue on a class-wide basis.  You've done whatever the it is that you're going to do.  So, I -- I feel like maybe the answer is I just need to decide these motions at least to the extent I'm going to rely on expert testimony for class certification.  If there are some things that I'm not relying on for class certification, maybe I can not worry about those until our summary judgment stage or our pretrial stage if we get that far.

Does that make sense to the Plaintiffs, like that characterization of what's -- what the situation is?

135

MR. SUMMERS: I think that's exactly right, your Honor.

THE COURT: Okay. I have to -- I have to --

MR. SOMVICHIAN: I think --

THE COURT: -- decide it.

MR. SOMVICHIAN: I think you should address them to the extent necessary to rule on class certification.

THE COURT: Okay.

MR. SOMVICHIAN: Otherwise, the Court would be within its discretion.

THE COURT: Okay. Just kind of hang -- hang onto it. Okay. I know some of my colleagues have been in situations where they just have the methodology and then after class certification it gets executed, and then we have additional fights about it, and that's just not where we are as it happens in this case.

MR. SOMVICHIAN: That's exactly what we had, and I know you don't want to hear about Chupo --

THE COURT: Yeah.

MR. SOMVICHIAN: -- but we had a preliminary and then a more definitive post to the trial, and the evidence is more --

THE COURT: You just kind of skipped that step.

MR. SOMVICHIAN: -- developed of course. Understanding it's more developed, yeah.

136

THE COURT:  Okay.  Okay.  Very good.  Well, those were the last issues I wanted to raise with you.  Thank you for a very very long argument this morning.  I appreciate everyone's attention and all the briefing.  I will do my best to get you an order as soon as I can, but you have briefed a ton of stuff, and it's going to take me a while.  I'm a little bit concerned about being able to address this is a -- in the time that would be appropriate for you to then proceed with the next stage of what you have in the case, which I think is motions for summary judgment on October 3rd, so, having the benefit of my decision, you know, in that amount of time.

Have I got the date wrong?  I see Plaintiffs are wondering about that.

MR. SUMMERS:  I think we're amenable to pushing back the schedule to the extent necessary, your Honor.

MR. SOMVICHIAN:  We'll confirm with the Plaintiffs, your Honor.

THE COURT:  You can talk about it.  Okay.

MR. SOMVICHIAN:  I mean, there are no motions that they mentioned for the first time today.  So --

THE COURT:  Okay.  It's all right.  And, you know, I just -- I'm just flagging for you that you've presented a lot of material and -- and things for me to decide.  So, I'm just -- this hearing has been very helpful, but I can't

137

really make any promises about how quickly I'm going to get this order.

UNIDENTIFIED SPEAKER:  By the way, your Honor, we are very impressed with the amount of information the Court is able to digest.  It's -- it's impressive.  There's a lot of motions and a lot of detail to this case, and your familiarity with the facts and the law is very impressive. So, thank you.

THE COURT:  All right.  All right.  Very good. Well, thank you all very much, and this matter is concluded. The hearing is concluded.  Thank you.

UNIDENTIFIED SPEAKER:  Thank you, your Honor.

(Proceedings adjourned at 12:54 p.m.)

138

CERTIFICATE OF TRANSCRIBER

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

Echo Reporting, Inc., Transcriber

Saturday, August 23, 2025