UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

JOSEPH TAYLOR, et al.,

               Plaintiffs,

    v.

GOOGLE LLC,

               Defendant.

Case No. 20-cv-07956-VKD

**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**

Re: Dkt. No. 260

      Plaintiffs Joseph Taylor, Mick Cleary, and Jennifer Nelson[1] move for preliminary approval of their class action settlement. Dkt. No. 260. Defendant Google LLC ("Google") does not oppose the motion. Dkt. No. 265. Based on the discussion at the February 17, 2026 motion hearing, and with leave of court, plaintiffs subsequently filed a supplemental declaration from the proposed settlement administrator, Angeion Group, LLC ("Angeion"). Dkt. No. 267. Upon consideration of the moving papers, as well as the oral arguments presented, the Court grants plaintiffs' motion for preliminary approval of the settlement.[2]

---

[1] The Court granted as unopposed plaintiffs' motion for the withdrawal of named plaintiffs Edward Mlakar and Eugene Alvis. Dkt. No. 256.

[2] All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by a magistrate judge. Dkt. Nos. 16, 23; 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. The Ninth Circuit has held that all parties, meaning "all plaintiffs and defendants named in the complaint," must consent to the jurisdiction of a magistrate judge before the judge acts on a dispositive matter, *Williams v. King*, 875 F.3d 500, 503 (9th Cir. 2017), but also that "Congress did not intend absent class members to be treated as parties in this context," *Koby v. ARS Nat'l Servs., Inc.*, 846 F.3d 1071, 1076 (9th Cir. 2017).

1    **I.    BACKGROUND**

2        Plaintiffs, each of whom are non-California residents and domiciliaries, filed this proposed

3    class action against Google, asserting claims for conversion and quantum meruit based on alleged

4    "passive" data transfers performed by Google over its Android operating system.  According to

5    the operative first amended complaint ("FAC"), the challenged data transfers are made without

6    plaintiffs' knowledge or consent, and at times when their mobile devices are idle, stationary,

7    untouched, and with all applications closed.  Dkt. No. 60.  Plaintiffs claim that through these data

8    transfers, Google transmits significant quantities of information between Android devices and

9    Google's servers, unlawfully consuming Android users' cellular data in the process.  Plaintiffs

10   further claim that Google conducts these data transfers for Google's own purposes, without users'

11   knowledge or consent, and without compensating them for the cellular data consumed.  Federal

12   jurisdiction is based on the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).

13       Plaintiffs filed this action on November 12, 2020, asserting claims for conversion and

14   quantum meruit.  Dkt. No. 1.  After the Court granted Google's motion to dismiss the complaint

15   with leave to amend (Dkt. No. 51), plaintiffs filed their FAC, for themselves and on behalf of a

16   proposed class,[3] defined as:

17           All natural persons in the United States (excluding citizens of the
             State of California) who have used mobile devices running the
18           Android operating system to access the internet through cellular data
             networks operated by mobile carriers.
19

20   Dkt. No. 60 ¶ 84.[4]  The Court granted Google's motion to dismiss the FAC, without leave to

21   amend.  Dkt. No. 74.  The Ninth Circuit affirmed the dismissal of plaintiffs' quantum meruit

22   claim, and reversed and remanded the matter with respect to plaintiffs' conversion claim.  Dkt.

23   No. 79.

24

25   ───────────────
     [3] The proposed class expressly excludes:  (1) Google, "its officers, directors, management,
26   employees, subsidiaries, and affiliates"; and (2) "any judges or justices involved in this action and
     any members of their immediate families or their staff."  *Id.* ¶ 85.

27   [4] A separate action, filed on behalf of a class of California residents, was filed in the Santa Clara
28   County Superior Court, *Csupo, et al. v. Google LLC*, Case No. 19CV352557.

United States District Court
Northern District of California

United States District Court
Northern District of California

Following remand, the litigation proceeded through fact and expert discovery.  *See* Dkt. Nos. 99, 164, 187, 189.  Plaintiffs then moved pursuant to Rule 23 to certify two classes:  an injunctive class under Rule 23(b)(2) and a damages class under Rule 23(b)(3).  Dkt. No. 181.  The motion sought certification for the period from November 12, 2017 to the present.  Google opposed class certification.  *See* Dkt. No. 191.  The parties also filed *Daubert*[5] motions regarding each side's respective experts.  *See* Dkt. Nos. 171, 172, 180.  The Court heard the class certification and *Daubert* motions on August 19, 2025.  Dkt. Nos. 228, 231.

On August 29, 2025, plaintiffs moved to stay this litigation pending the completion of state court appellate proceedings in the *Csupo* litigation.  Dkt. No. 234.  That motion was held in abeyance for a time while the parties discussed a potential settlement.  *See* Dkt. Nos. 241-250.  On November 24, 2025, the Court denied plaintiffs' motion for a stay.  Dkt. No. 251.

On November 26, 2025, the parties advised that they reached an agreement on the terms of a proposed settlement.  Dkt. No. 252.  Following a December 9, 2025 status conference, the Court terminated the pending class certification and *Daubert* motions without prejudice.  The Court also set deadlines for plaintiffs' motion for preliminary approval of the settlement.  *See* Dkt. Nos. 255, 256.

Plaintiffs now move for preliminary approval of the parties' December 23, 2025 settlement.

## II.    PROPOSED SETTLEMENT

The proposed settlement covers the period from November 12, 2017 to the date of a "Final Order and Judgment," defined as "the final judgment and order to be entered by the Court following the Final Approval Hearing, approving the Settlement set forth in [the December 23, 2025 settlement agreement] under Fed. R. Civ. P. 23(e)."  Dkt. No. 260-11 § 1.16.  The settlement class is defined as:

> [A]ll natural persons in the United States, who have used mobile devices running the Android operating system to access the internet through cellular data networks operated by mobile carriers from

---

[5] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

> November 12, 2017 to the date of the Final Order, excluding persons who are class members in *Csupo et al v. Google LLC*, Santa Clara Superior Court Case No. 19CV352557.

*Id.* § 1.5.[6]  The definition of the settlement class is substantially identical to that of the FAC's class definition (Dkt. No. 60 ¶ 84).  The only differences are that the settlement class definition specifies the class period and replaces the phrase "excluding citizens of the State of California" in the FAC with "excluding persons who are class members in *Csupo et al v. Google LLC*, Santa Clara Superior Court Case No. 19CV352557."[7]

The proposed terms of the settlement are described below.

**A.    Relief**

The settlement contemplates both monetary and injunctive relief in return for a release of claims.

**1.    Monetary Relief**

The monetary component of the settlement is non-reversionary and requires a total payment of $135 million to be deposited into an interest-bearing qualified settlement trust no later than 45 days after entry of a preliminary approval order.  *See* Dkt. No. 260-11 §§ 3.1 and 3.5.  From that fund will be deducted any court-approved attorneys' fees, costs, service awards, and settlement administration expenses.  Plaintiffs' counsel intend to move for payment of no more than $39,825,000 in attorneys' fees (i.e., 29.5% of the settlement fund), as well as for reimbursement of approximately $750,000 in costs and expenses.  *See* Dkt. No. 260 at ECF 28.  Additionally, each of the three named plaintiffs will request a service award of no more than $25,000.  *See* Dkt. No. 260-11 § 12.5.  The estimated settlement administration costs are $9.3

---

[6] As defined by the settlement agreement, the term "Class Member" specifically excludes (1) Google and "its subsidiaries and affiliates, officers, and directors"; (2) "the judges to whom this case is or has been assigned and any member of the judges' immediate family"; (3) "Class Counsel"; and (4) "any Person who successfully exercises their right to be excluded" from the class.  *See* Dkt. No. 260-11 § 1.7.

[7] As plaintiffs note, the *Csupo* certified class is defined as "'All natural persons who, while residing in the State of California, have used a mobile phone running a Google-licensed version of the Android operating system with a cellular data plan from August 9, 2016 to' the date of the Final Order and Judgment, excluding any persons who timely opted out of the class in advance of the trial in this Action."  *See* Dkt. No. No. 260 at ECF 30 n.13 (quoting Dkt. No. 260-13 § 1.5).

United States District Court
Northern District of California

million.  *See* Dkt. No. 260 at ECF 32.

After payment of any court-approved attorneys' fees, litigation costs and expenses, service awards, and administration expenses from the $135 million fund, the net proceeds will be available for distribution to class members after final approval of the settlement and the expiration of all contingencies.  *See* Dkt. No. 260-11 §§ 3.8, 3.9, 3.12.  The proposed distribution will be made on a *pro rata* basis, meaning that the amount of the individual payment to each class member will be the net settlement fund divided by the total number of class members.  *See* Dkt. No. 260-18 ¶ 48.  Although individual settlement payments are capped at $100 per class member (*see* Dkt. No. 260-11 § 3.9), plaintiffs' counsel do not expect the cap to be reached (*see* Dkt. No. 260 at ECF 14 n.4).  Individual settlement payments will be made to class members via an electronic payment method.  *See* Dkt. No. 260-11 § 3.13.  Any unclaimed funds remaining after the first distribution will be re-distributed to class members.  If a second distribution is not feasible, the remaining funds will be donated to a court-approved *cy pres* recipient.  *Id*. § 3.14.

### 2. Injunctive Relief

The proposed injunctive relief requires Google to disclose the conduct at issue to Android users and to require users to expressly consent to it when they set up new Android phones.  *Id*. § 5. Among other things, Google will be required to change the Google Play Terms of Service to disclose that its "[s]ystem services often require network connectivity and may use your cellular data" and that "[s]ome network communications may happen in the background, when you are not directly interacting with your device, including when the device's screen is locked."  *Id*. at ECF 38.  Google will also be required to change the "Learn about Google Play services" Help Center page to explain that "Google Play services causes Android devices to exchange information with Google over cellular networks if the device is not connected to Wi-Fi, meaning Google Play services may use your mobile data" and that these transfers "cannot be turned off."  *Id*. at ECF 51. Additionally, Google must revise the screens shown to users when setting up a new Android device (known as the "setup flow"), to include a new section entitled "Use of cellular data" containing the following disclosure:

By tapping "Accept" at the bottom of this screen and continuing,

United States District Court
Northern District of California

> you agree that software and apps on your device may automatically communicate with Google servers for a range of purposes, including using your cellular data when you are not connected to Wi-Fi—learn more. These purposes include, but are not limited to, safely rolling out new features, fixing problems on your device, maintaining and monitoring your device's health, developing new products, protecting the Android ecosystem, supporting advertising, and automatically downloading and configuring software, possibly using cellular data. Some of these communications may happen in the background, when you are not directly interacting with your device, including when the device's screen is locked. You can control some of the communications through user settings, including the settings on this screen, but some of the communications cannot be turned off. You are responsible for any fees incurred from third parties (such as your mobile carrier) in connection with these cellular communications.

*Id*. at ECF 56.[8]  The settlement also requires Google to "[t]ake the steps technically feasible" to deactivate (or "gray out") the Google Play services mobile background data toggle. *Id.* § 5.1. According to plaintiffs, this toggle purported to give users the ability to turn off Google's use of mobile data in the background, but has not disabled the data transfers at issue. Plaintiffs say that graying out this toggle avoids creating the false impression that the challenged transfers can be turned off with the toggle. *See* Dkt. No. 260 at ECF 15-16.

These changes, including deactivation of the toggle, will remain in effect for at least two years "from when the changes are implemented in full," subject to reasonable modifications if changes in Google's practices or technologies render the agreed-upon language no longer accurate. Dkt. No. 260-11 § 5.2.

### B.    Release

The scope of the released claims extends to:

> any and all claims, liabilities, rights, demands, arbitrations, suits, actions, causes of action, obligations, damages, penalties costs, attorneys' fees, losses, and remedies of every kind or description against the Releasees—whether known or unknown, existing or potential or that hereafter may exist or might have existed, suspected or unsuspected, asserted or unasserted, liquidated or unliquidated, legal, statutory, or equitable—that were asserted in the Action, could have been asserted in the Action, and/or that reasonably relate to or arise from the same predicate facts alleged in the Class Action Complaint(s), to the maximum extent allowed by law, regardless of

---

[8] As confirmed at the motion hearing, the "learn more" text in this disclosure will contain a hyperlink to the "Learn About Google Play services" webpage.

6

whether such claims arise under federal, state, and/or local law, statute, ordinance, regulation, common law, or other source of law. For the avoidance of doubt, the Released Claims include all claims reasonably related to any alleged use or consumption of cellular data by Defendant "in the background" or when a user is not directly engaging with their Android mobile device(s) or apps, products, or software thereon, and/or in connection with "passive" transfers of any kind between Android mobile devices and Defendant and/or its servers.

*Id.* § 1.33; *see also id.* § 13. The release expressly excludes "any claims relating to the enforcement of the Settlement" and "any claims already specifically alleged in any operative complaint in a pending action that was served on Google as of November 26, 2025, other than this Action." *Id.*; *see also id.* § 13.

### III.    LEGAL STANDARD

Court approval is required for the settlement of Rule 23 class actions. *See* Fed. R. Civ. P. 23(e) ("The claims, issues, or defenses of a certified class—or a class proposed to be certified for purposes of settlement—may be settled, voluntarily dismissed, or compromised only with the court's approval."). The Ninth Circuit has declared that a strong judicial policy favors settlement of Rule 23 class actions. *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992). However, no presumption of fairness applies to such settlements. *Roes v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1049 (9th Cir. 2019). And where the parties reach a settlement before class certification, courts must "employ[] extra caution and more rigorous scrutiny," *id.*, and "peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement," *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003); *see also In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) ("Prior to formal class certification, there is an even greater potential for a breach of fiduciary duty owed the class during settlement. Accordingly, such agreements must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair."). The decision to approve or reject a settlement proposal is within the district court's discretion. *Class Plaintiffs*, 955 F.2d at 1276, 1291.

### IV.    DISCUSSION

In considering plaintiffs' motion for preliminary approval, the Court must first assess

whether a class exists and meets the four prerequisites for class certification under Rule 23(a).  *In re Hyundai and Kia Fuel Economy Litig.*, 926 F.3d 539, 556 (9th Cir. 2019); *Staton*, 327 F.3d at 952.  Second, the Court must assess whether the proposed settlement is "fundamentally fair, adequate, and reasonable," considering "the settlement taken as a whole, rather than the individual component parts, that must be examined."  *Staton*, 327 F.3d at 952 (citation modified; citation omitted).

### A.    Rule 23(a) Certification

Plaintiffs bear the burden of establishing, by a preponderance of the evidence, that class certification is appropriate under Rule 23.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc.").  Class certification under Rule 23 requires two steps.  First, plaintiffs must satisfy the four prerequisites under Rule 23(a), namely numerosity, commonality, typicality and adequacy of representation.  *Id.* at 349.  Additionally, plaintiffs must also show that at least one of the bases for certification under Rule 23(b) is met.  *Amchem. Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997).

"The criteria for class certification are applied differently in litigation classes and settlement classes."  *In re Hyundai*, 926 F.3d at 556.  While courts "must be concerned with manageability at trial" when certifying a litigation class, "such manageability is not a concern in certifying a settlement class where, by definition, there will be no trial."  *Id.* at 556-57.  "On the other hand, in deciding whether to certify a settlement class, a district court must give heightened attention to the definition of the class or subclasses."  *Id.* at 557 (citing *Amchem*, 521 U.S. at 620); *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1021 (9th Cir. 1998) ("District courts must be skeptical of some settlement agreements put before them because they are presented with a 'bargain proffered for . . . approval without benefit of an adversarial investigation.'") (quoting *Amchem*, 521 U.S. at 621).

#### 1.    Numerosity

Rule 23(a)(1) requires that the class must be "so numerous that joinder of all members is

United States District Court
Northern District of California

1    impracticable." Fed. R. Civ. P. 23(a)(1).  While there is no fixed number for this requirement,

2    courts generally find that the numerosity requirement is satisfied where the class consists of 40 or

3    more members.  *In re Facebook, Inc. PPC Advertising Litig.*, 282 F.R.D. 446, 452 (N.D. Cal.

4    2012).  The numerosity requirement is met here, as the record reflects that there are more than 100

5    million Americans who used Android smartphones with cellular data plans during the class period.

6    *See* Dkt. No. 176 ¶ 22 & Table 7; *see also* Dkt. No. 176-1, Ex. A Fig. 13 & Ex. B Fig. 18-A; *see*

7    *also* Dkt. No. 194-1 at ECF 7.

8    **2.    Commonality**

9        Commonality requires "questions of law or fact common to the class," Fed. R. Civ. P.

10    23(a)(2), and "requires the plaintiff to demonstrate that the class members have suffered the same

11    injury." *Dukes*, 564 U.S. at 349-50.  "This does not mean merely that they have all suffered a

12    violation of the same provision of law," as a provision of law "can be violated in many ways . . .."

13    *Id.* at 350.  Rather, "[t]heir claims must depend upon a common contention." *Id.*  "That common

14    contention, moreover, must be of such a nature that it is capable of classwide resolution—which

15    means that determination of its truth or falsity will resolve an issue that is central to the validity of

16    each one of the claims in one stroke." *Id.*  "All questions of fact and law need not be common to

17    satisfy the commonality requirement.  The existence of shared legal issues with divergent factual

18    predicates is sufficient." *Gonzalez v. U.S. Immigr. & Customs Enf't*, 975 F.3d 788, 807 (9th Cir.

19    2020) (citation modified; citation omitted).  "What matters to class certification is not the raising

20    of common 'questions'—even in droves—but rather the capacity of a classwide proceeding to

21    generate common *answers* apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350

22    (citation modified).  A single common question of fact or law is sufficient to satisfy Rule 23(a)(2).

23    *Id.* at 359.

24        Here, the commonality requirement is met because resolution of the class claim for

25    conversion depends on the common contention that Google used cellular data in a manner

26    inconsistent with plaintiffs' and class members' rights, through the same software, i.e., GMS Core,

27    which is present on all or virtually all Android devices.  *See* Dkt. No. 175-6 at ECF 28; Dkt. No.

28    183 at ECF 198.  While Google maintains that the challenged data transfers are necessary for

proper functionality and/or security purposes, and disputes that the data transfers have resulted in injury to plaintiffs or class members, there appears to be no dispute that Google performed the challenged data transfers over its Android operating system that resulted in the consumption of some amount of users' cellular data.

### 3.    Typicality

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class," and the "test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation modified; citations omitted). "Typicality does not mean that the claims of the class representatives must be identical or substantially identical to those of the absent class members." *Staton*, 327 F.3d at 957 (citation modified; citation omitted). The typicality requirement is met if the "representatives' claims are reasonably coextensive with those of absent class members." *Id.* (citation modified; citation omitted).

As discussed above, plaintiffs' conversion claim is based on Google's use of cellular data in a manner inconsistent with plaintiffs' and class members' rights, through GMS Core. The typicality requirement is met, as plaintiffs' conversion claim is coextensive with those of the settlement class members, who used Android phones running GMS Core. *See B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 970 (9th Cir. 2019) ("The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.") (citation modified; citations omitted); *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (same).

### 4.    Adequacy of Representation

Adequacy requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In assessing this factor, the Court addresses two

United States District Court
Northern District of California

1   questions: (1) whether plaintiffs and their counsel have any conflicts of interest with other class

2   members, and (2) whether plaintiff and their counsel will prosecute the action vigorously on

3   behalf of the class.  *Staton*, 327 F.3d at 957.

4          With respect to the first factor, plaintiffs' interests appear to be aligned with those of the

5   proposed class.  The named plaintiffs assert the same claim for conversion based on the same

6   conduct and have the same interests as the absent class members in obtaining redress from Google

7   addressed by the settlement.  There is no indication on the present record that the named plaintiffs

8   or their counsel have any conflicts of interest with other class members.  While the settlement

9   allows the named plaintiffs to each apply for a service award of up to $25,000, such an award is

10  not guaranteed and must be approved by the Court.  *See* Dkt. No. 260-11 §§ 1.39, 12.5.  As

11  discussed below, the Court's approval will depend on the Court's independent assessment of the

12  named plaintiffs' entitlement to their respectively requested service payments.  Additionally, the

13  Court perceives no conflict between the class and proposed class counsel of Bartlit Beck LLP and

14  Korein Tillery LLC.

15         With respect to the second factor, plaintiffs' counsel have diligently prosecuted this matter

16  on behalf of plaintiffs and the proposed class.  The record indicates that plaintiffs' counsel are

17  well-qualified and have extensive experience litigating large complex matters, including class

18  actions.  *See* Dkt. No. 260-1 ¶¶ 3-11 & Exs. 1-9; Dkt. No. 260-15 ¶¶ 19-31 & Ex. 1.  In the past

19  six years since this action was filed, counsel vigorously litigated this matter through two rounds of

20  motion practice regarding the sufficiency of the pleadings, a Ninth Circuit appeal, post-remand

21  litigation through fact and expert discovery, and extensive briefing on class certification and

22  *Daubert* motions.  *See* Dkt. Nos. 74, 79, 99, 164, 171, 172, 180, 181, 187, 189, 191, 228, 231.

23  The Court has been given no reason to question that plaintiffs' counsel will continue to diligently

24  prosecute this matter on behalf of plaintiffs and the proposed class.  For these reasons, the court

25  concludes that the adequacy requirement is satisfied.

26         **B.     Rule 23(b)(3) Certification**

27         Rule 23(b)(3) requires that "the questions of law or fact common to class members

28  predominate over any questions affecting only individual members" and "that a class action is

1    superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed.

2    R. Civ. P. 23(b)(3).  Based on its review of the record, the Court concludes that the predominance

3    and superiority requirements are met.

### 1.    Predominance

5        The "predominance inquiry tests whether the proposed classes are sufficiently cohesive to

6    warrant adjudication by representation," and "asks whether the common, aggregation-enabling,

7    issues in the case are more prevalent or important than the non-common, aggregation-defeating,

8    individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citations

9    omitted).  "When one or more of the central issues in the action are common to the class and can

10   be said to predominate, the action may be considered proper under Rule 23(b)(3) even though

11   other important matters will have to be tried separately, such as damages or some affirmative

12   defenses peculiar to some individual class members." *Id*. (citation omitted).  In making this

13   determination, a court must "give careful scrutiny to the relation between common and individual

14   questions in a case." *Id.*

15       In the present case, the predominance inquiry is satisfied because plaintiffs and class

16   members share the same, single claim for relief, i.e., conversion.  The nature of the alleged

17   injury—Google's consumption or use of cellular data without permission—is also the same for all

18   plaintiffs and across the class.  Additionally, there appears to be no dispute that Google performed

19   the challenged data transfers over its Android operating system that resulted in the consumption of

20   some amount of users' cellular data.  The Court has been presented with no evidence of additional

21   or different injury by only some plaintiffs or class members.  Additionally, the measure of the

22   alleged injury, i.e., fair market value, is set by California statute.  *See* Cal. Civ. Code § 3336; Cal.

23   C.C.P. § 1263.320; *People v. Grant*, 57 Cal. App. 5th 323, 329 (2020) ("The fair market value of

24   an item is 'the highest price obtainable in the market place' as between 'a willing buyer and a

25   willing seller, neither of whom is forced to act.'") (quoting *People v. Pena*, 68 Cal. App. 3d 100,

26   103 (1977)).  The parties do not dispute that the "value of the property" at issue is the fair market

27   value of the data that plaintiffs claim Google converted.

28

United States District Court
Northern District of California

12

United States District Court
Northern District of California

2.      **Superiority**

In determining whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," courts consider four nonexclusive factors: (1) the class members' interest in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against the class; (3) the desirability of concentrating the litigation of the controversy in the particular forum; and (4) the difficulties likely to be encountered in managing a class action.  Fed. R. Civ. P. 23(b)(3).

The proposed class here meets the superiority requirement.  Permitting the case to proceed as a single class action is an efficient use of the Court's and the parties' resources and the most expeditious way to resolve common questions about Google's use of cellular data.  Further, the present forum is appropriate, and there are no obvious difficulties in managing this case as a class action for purposes of approval and administration of the settlement.  The record presented indicates that the damages at issue likely are not great enough for individual putative class members to want to litigate separate actions against Google.  Additionally, the parties have not identified any other litigation already commenced by or against the class.

* * *

Accordingly, the Court concludes that plaintiffs have demonstrated that the proposed class satisfies the requirements for provisional certification under Rule 23.

C.      **Preliminary Approval of Settlement**

Under Rule 23(e), review of a proposed class action settlement proceeds in two steps.  Fed. R. Civ. P. 23(e); *Bellinghausen v. Tractor Supply Co.*, 303 F.R.D. 611, 616 (N.D. Cal. 2015). First, the Court conducts a preliminary fairness evaluation.  If the Court preliminarily approves the settlement, then notice to the class is disseminated and the Court sets a final hearing for approval of the settlement.  *Bellinghausen*, 303 F.R.D. at 616.  Ultimately, a settlement should only be approved if it is "fair, reasonable and adequate."  Fed. R. Civ. P. 23(e)(2).  In determining whether a proposed settlement meets this standard, the Court does not have "the ability to delete, modify, or substitute certain provisions," and "[t]he settlement must stand or fall in its entirety."  *Staton*,

327 F.3d at 969 (citation omitted).  The Court's evaluation of a settlement reached prior to class

certification "requires a higher standard of fairness and a more probing inquiry than may normally

be required under Rule 23(e)."  *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012) (citation

modified; citation omitted).

> The Ninth Circuit has described several factors a court may consider in evaluating the

fairness of a proposed settlement:

> [1] the strength of the plaintiffs' case; [2] the risk, expense, complexity, and likely duration of further litigation; [3] the risk of maintaining class action status throughout trial; [4] the amount offered in settlement; [5] the extent of discovery completed and the stage of the proceedings; [6] the experience and views of counsel; [7] the presence of a governmental participant; and [8] the reaction of the class members to the proposed settlement.

*Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1121 (9th Cir. 2020) (quoting *Hanlon*, 150 F.3d at

1011).  Rule 23(e)(2) requires a court to consider a similar list of factors before approving a

settlement, including whether:

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
> > (i) the costs, risks, and delay of trial and appeal;
> > (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
> > (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
> > (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).  This list of factors is not intended to displace any factors identified by

courts, "but rather to focus the court and the lawyers on the core concerns of procedure and

substance that should guide the decision whether to approve the proposal."  Fed. R. Civ. P. 23(e)

advisory committee note to 2018 amendment; *see also McKinney-Drobnis v. Oreshack*, 16 F.4th

594, 609 (9th Cir. 2021) ("The amended Rule 23(e) did not 'displace' this court's previous

articulation of the relevant factors, and it is still appropriate for district courts to consider these

factors in their holistic assessment of settlement fairness.").  In any event, "the district court must

United States District Court
Northern District of California

1    show it has explored comprehensively all Rule 23(e)(2) factors." *In re Apple Inc. Device*

2    *Performance Litig.*, 50 F.4th 769, 782 (9th Cir. 2022) (citation modified; citation omitted).

3    When a settlement agreement is negotiated prior to formal class certification, consideration

4    of the above-listed factors alone is insufficient. *In re Bluetooth*, 654 F.3d at 946. "Accordingly,

5    such agreements must withstand an even higher level of scrutiny for evidence of collusion or other

6    conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's

7    approval as fair." *Id.* "Collusion may not always be evident on the face of a settlement," and

8    courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs

9    that class counsel have allowed pursuit of their own self-interests and that of certain class

10    members to infect the negotiations." *Id.* Such signs include (1) class counsel's receipt of a

11    disproportionate distribution of the settlement, (2) a "clear sailing" agreement "providing for the

12    payment of attorneys' fees separate and apart from class funds, which carries the potential of

13    enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel

14    accepting an unfair settlement on behalf of the class"; and (3) an arrangement whereby fees that

15    are not awarded revert to the defendant, rather than being added to the class fund. *Id.*

16    Additionally, the Northern District of California has published procedural guidance for

17    class action settlements, which includes guidelines for parties seeking preliminary approval of

18    class action settlements ("Guidelines"). *See* https://cand.uscourts.gov/rules-forms-fees/northern-

19    district-guidelines/procedural-guidance-class-action-settlements. The Guidelines identify

20    information that is often helpful to district courts in assessing whether a class action settlement

21    satisfies the standards identified above.

22    As the Court cannot fully assess all fairness factors until after the final approval hearing,[9]

23    at this stage the Court evaluates whether the proposed settlement is potentially fair. *See*

24    *Bellinghausen*, 303 F.R.D. at 619.

25

26    ⸻⸻⸻⸻⸻⸻

27    [9] The Court defers consideration of factors concerning government participants and the reaction of class members to the proposed settlement. Although no government entity is a party to this action, plaintiffs invoke federal jurisdiction under CAFA and state that the settlement administrator will provide notice of the proposed settlement to the relevant state and federal officials pursuant to 28

28    U.S.C. § 1715(b). *See* Dkt. No. 260 at ECF 33; Dkt. No. 260-18 ¶ 46.

United States District Court
Northern District of California

1.     **Strength of Plaintiffs' Case and the Risk, Expense, Complexity; Likely Duration of Further Litigation; and Risk of Maintaining Class Action Status Throughout Trial**

Plaintiffs acknowledge that they face several significant risks, and concomitant costs and delays, from the continued litigation of this case, particularly with respect to their efforts to certify a damages class and their proffered method of proving damages on a classwide basis.

Plaintiffs note that Google "presented several non-trivial arguments" in opposing class certification. *See* Dkt. No. 260 at ECF 20. While the parties do not dispute that "fair market value" is the appropriate measure of any damages, they sharply disagree about whether and how the fair market value of the cellular data at issue properly can or should be calculated. In opposing class certification, Google argued, with some persuasive force, that plaintiffs' proposed method for calculating damages (based on the industry average price of cellular data) does not account for the wide variety in cellular data plans across the class, and improperly relies on the average amount consumers pay for their entire package of services, rather than focusing on the fair market value of the cellular data portion of those plans. *See* Dkt. No. 194-1 at ECF 28-30. Google maintains that plaintiffs' damages model is grossly overinflated and does not measure only those damages attributable to the cellular data that Google allegedly converted under plaintiffs' theory of liability. *See id.*; *see also Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (stating that "a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to [plaintiff's theory of liability accepted for class-action treatment.]").

Google also presented similar arguments in moving to exclude plaintiffs' experts' testimony, and plaintiffs also note a significant risk that their damages methodology could be excluded under *Daubert*. For example, Google argued that plaintiffs' "average price" calculation does not account for differences in cellular data plans across the class, inappropriately inflating damages based on the "average price" of *all* cellular data (rather than the value of the alleged converted property) and based on revenues associated with additional bundled services and not directly tied to cellular data services alone. Google maintains that the value of the allegedly converted cellular data is marginal. *See* Dkt. No. 171 at ECF 14-19. While plaintiffs note that the *Csupo* plaintiffs successfully opposed Google's motions to exclude expert testimony, they

United States District Court
Northern District of California

1    acknowledge that there is no guarantee the same result would be obtained in this federal action,

2    which is governed by different rules and standards.  *See generally Daubert v. Merrell Dow*

3    *Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *Sargon Enters., Inc. v. Univ. of S. Cal.*, 55 Cal.4th

4    747 (2012).

5        Plaintiffs also note that they face potential risks in establishing the basis for the measure of

6    damages under California Civil Code § 3336.  Plaintiffs contend that damages properly are based

7    on the "value of the property at the time of conversion," as set forth in the first part of that statute.

8    *See* Cal. Civ. Code § 3336 ("The detriment caused by the wrongful conversion of personal

9    property is presumed to be:  First—The value of the property at the time of the conversion . . ..").

10    Google, on the other hand, argues that to the extent there are any measurable damages, such

11    damages should be based on "fair compensation" as provided by the second part of California

12    Civil Code § 3336.  *See id.* ("The detriment caused by the wrongful conversion of personal

13    property is presumed to be . . . Second—A fair compensation for the time and money properly

14    expended in pursuit of the property."); *see also* Dkt. No. 260-14 at 120:22-121:10.  Google

15    maintains that any such "fair compensation" is based on the incremental marginal value of the

16    allegedly converted cellular data—an amount that plaintiffs appear to acknowledge "is arguably

17    zero."  Dkt. No. 260 at ECF 21.

18        Beyond damages and class certification, plaintiffs note other substantial risks on summary

19    judgment, at trial, and on any appeal, in establishing elements of liability for conversion.  For

20    example, plaintiffs acknowledge that they would need to contend with Google's defenses based on

21    express and implied consent to the challenged data transfers, as well as Google's contention that

22    the challenged transfers are industry standard and are necessary for functional, security, and other

23    reasons that benefit (not harm) users.  *See* Dkt. No. 260 at ECF 21-22; Dkt. No. 260-15 ¶ 11.

24    While the *Csupo* plaintiffs prevailed at trial in the state court, plaintiffs' counsel also pointed out

25    at the preliminary approval hearing that the *Csupo* jury's decision was based on the bare minimum

26    number of juror votes that the *Csupo* plaintiffs needed for a successful verdict.  Plaintiffs

27    acknowledge that a successful result at trial in the present federal action is neither guaranteed nor a

28    foregone conclusion, as any jury verdict in this case must be unanimous.  *See* Fed. R. Civ. P.

1   48(b).

2       Even if they were to prevail in this action, plaintiffs express that this case has been hard-

3   fought from the outset, and Google has vast resources and tenacious counsel.  They posit that trial

4   and appeal of this matter would add years of additional litigation and delay in any recovery to

5   plaintiffs and the class.  *See* Dkt. No. 260 at ECF 22.

6       These considerations suggest that the proposed class would face meaningful litigation

7   risk—on the merits and on class certification—if the case were to proceed, including a risk of

8   "going home empty-handed."  *See Burgos v. Sunvalleytek Int'l, Inc*., No. 18-cv-06910-HSG, 2020

9   WL 7319354, at *7 (N.D. Cal. Dec. 11, 2020).  For the same reasons, the risk of maintaining class

10  certification throughout trial also favors settlement.  *See Ching v. Siemens Indus., Inc*., No. 11-cv-

11  04838-MEJ, 2014 WL 2926210, at *4 (N.D. Cal. June 27, 2014) (concluding risk of maintaining

12  class action status favored settlement where "Plaintiff [had] identified several meritorious

13  arguments that Defendants could raise to class certification in the event this lawsuit was to

14  proceed").

15      These factors weigh in favor of preliminary approval of the settlement.

16          **2.    Amount Offered in Settlement**

17      When considering the fairness and adequacy of the amount offered in settlement, "it is the

18  complete package taken as a whole, rather than the individual component parts, that must be

19  examined for overall fairness."  *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 256 (N.D.

20  Cal. 2015) (citation modified).  "The fact that a proposed settlement may only amount to a fraction

21  of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly

22  inadequate and should be disapproved."  *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242

23  (9th Cir. 1998) (citation omitted); *see also Bellinghausen*, 306 F.R.D. at 256 (same).

24      The parties agree that Google will establish a settlement fund of $135 million.  After

25  payment of any court-approved attorneys' fees and costs, service awards, and settlement

26  administration costs, and in view of the size of the proposed federal class, the remaining net

27  settlement fund is estimated to be around $85 million.  Angeion's President and Chief Executive

28  Officer, Steven Weisbrot, avers, based on digital payment user statistics and Angeion's experience

United States District Court
Northern District of California

18

United States District Court
Northern District of California

1  in issuing digital payments, that approximately 55%-80% of the class will receive payments. *See*

2  Dkt. No. 260-18 ¶ 67.  At the preliminary approval hearing, plaintiffs' counsel explained that this

3  would mean that the estimated individual payments to each class member could range from $1.01

4  to $1.48.  If the class member participation rate falls closer to the median between 55% and 80%

5  (i.e., 67.5%), plaintiffs estimate that individual payments to each class member would be around

6  $1.20.  *See* Dkt. No. 266.

7       Plaintiffs believe that if they were to prevail at trial, the monetary recovery to the class

8  could be as high as $2 billion (or approximately $19.05 per class member).  *See* Dkt. No. 260 at

9  ECF 23 & n.10; Dkt. No. 179-3.  Under plaintiffs' theory of liability, the estimated individual

10  payment to each class member under the proposed settlement therefore presents a substantial

11  discount from the amount plaintiffs would seek to recover at trial.  However, plaintiffs

12  acknowledge that Google's marginal value approach to valuation of the cellular data at issue

13  would reduce their potential recovery by 71% to 93%; and under the marginal value approach, the

14  individual payments under the proposed settlement represent a *premium* payment to each class

15  member.  *See* Dkt. No. 260 at ECF 23-24.  Indeed, a settlement's value "cannot be assessed in a

16  vacuum, but rather must be considered in light of the strength of the plaintiff's case and the risks

17  in pursuing further litigation."  *In re Uber FCRA Litig.*, No. 14-cv-05200-EMC, 2017 WL

18  2806698, at *6 (N.D. Cal. June 29, 2017) (citation modified).  As discussed above, plaintiffs face

19  potentially substantial hurdles if they continue with litigation through trial, and a real possibility of

20  recovering nothing, absent the settlement.  *See Custom LED, LLC v. eBay, Inc.*, No. 12-cv-00350-

21  JST, 2014 WL 2916871, at *4 (N.D. Cal. June 24, 2014) (approving $4,750,000 settlement in

22  contract action, representing 1.8% to 16% of potential damages, stating that "courts have held that

23  a recovery of only 3% of the maximum potential recovery is fair and reasonable when the

24  plaintiffs face a real possibility of recovering nothing absent the settlement"); *see also Bayat v.

25  Bank of the West*, No. 13-cv-02376-EMC, 2015 WL 1744342, at *5 (N.D. Cal. Apr. 15, 2015)

26  (approving $ 2,485,914.85 settlement, with net settlement individual payments of $2.85 per class

27  member, in view of litigation risks that could "leav[e] all class members with nothing.").  Notably,

28  the Court has been presented with no evidence that the challenged data transfers resulted in

19

throttling, overage charges, or other palpably adverse monetary consequences to plaintiffs or the class.

At the preliminary approval hearing, the Court inquired about the differences between the monetary recovery offered under the proposed settlement and that offered in the *Csupo* litigation. The *Csupo* settlement agreement indicates that the total dollar amount of that settlement ($350 million) is nearly three times higher than the proposed $135 million settlement of the present federal action. As no one disputes that the *Csupo* certified class of California residents is smaller than the proposed federal class (which excludes California Android users), the individual recovery per *Csupo* class member would be higher than the individual monetary recovery for individual members of the proposed federal class. *See* Dkt. No. 260-13. Plaintiffs' counsel explained that the *Csupo* action was filed about 18 months before the present federal suit. As such, *Csupo* involves a longer damages period, which counsel asserted also encompasses a period of time when so-called "unlimited" data plans were less prevalent and costs of cellular data were higher than in more recent years. More fundamentally, counsel noted that the *Csupo* case proceeded through more than six years of litigation—including extensive discovery, class certification, dispositive motions practice, a jury trial resulting in a verdict for the plaintiffs, and post-trial proceedings in which plaintiffs requested enhanced damages and in which Google sought an appeal before the state appellate court. Based on the discussion held at the motion hearing, the Court is satisfied that the disparity between the *Csupo* settlement and the present proposed settlement in this federal action reflects the fact that the two actions are in very different procedural postures, with greater uncertainty attending the outcome of the present action, and with different circumstances and legal standards affecting risks of proceeding in this litigation, as discussed above.

The proposed settlement also provides comprehensive injunctive relief, which plaintiffs contend is "a resounding victory for transparency" and the more important aspect of the settlement. Dkt. No. 260 at ECF 25. At the preliminary approval hearing, plaintiffs' counsel expressed that the injunctive relief required by the proposed settlement addresses all aspects of the conduct at issue, including existing disclosures that plaintiffs contend are misleading. A significant aspect of plaintiffs' conversion claim is the clandestine nature of Google's alleged

conduct, and the surreptitious nature of the alleged conversion of cellular data features prominently in plaintiffs' FAC.  *See* Dkt. No. 60 ¶¶ 6, 10, 59-62, 68, 76, 78, 83.  As discussed above, the settlement requires Google to make disclosures clearly informing users of its practices, including that Google performs certain data transfers that consume users' cellular data.  The proposed injunctive relief thus requires Google to provide information enabling users to make informed decisions about whether they wish to continue using Android mobile devices.  Additionally, Google is required to deactivate a toggle to avoid creating what plaintiffs maintain is the false impression that the challenged transfers can be turned off with that toggle.  *See* Dkt. No. 260-11 § 5.  While it is difficult to assign a specific monetary value to the agreed-upon injunctive relief,[10] the Court finds that the injunctive relief is significant and provides meaningful value to plaintiffs and the class.  *See, e.g., Campbell*, 951 F.3d at 1123 (in privacy litigation, finding that injunctive relief requiring disclosure of defendant's practices for a one-year period "has value . . . making it less likely that users will unwittingly divulge private information to [defendant] or third parties in the course of using [defendant's] messaging platform."); *In re TracFone Unlimited Service Plan Litig.*, 112 F. Supp. 3d 993, 1005 (N.D. Cal. 2015) (in deceptive marketing practices litigation, finding that injunctive relief requiring defendant to modify its terms and conditions and other practices had "significant value for both class members and the general public.").

For these reasons, the Court concludes that the monetary and injunctive relief offered by the proposed settlement weighs in favor of preliminary approval of the settlement.  The proposed settlement falls within the range of reasonableness, particularly given the robust injunctive relief that will benefit the class.

### 3.    Extent of Discovery Completed, the Stage of the Proceedings, and Arm's Length Negotiations

The focus of the Court's inquiry here is "whether the parties carefully investigated the claims before reaching a resolution," *Bellinghausen*, 306 F.R.D. at 257, and whether the

---

[10] While plaintiffs proffer the analysis of one of their experts as to the potential monetary value of the injunctive relief (*see* Dkt. No. 260 at ECF 26; Dkt. No. 260-26), the Court declines at this time to ascribe any particular monetary value to that relief.  *See Roes*, 944 F.3d at 1055.

United States District Court
Northern District of California

settlement is the result of good faith, arms-length negotiations, or whether there are signs of collusion or self-interest, *In re Bluetooth*, 654 F.3d at 946. As discussed above, the parties have litigated this matter for nearly six years, including two rounds of motion practice regarding the sufficiency of the pleadings, an appeal to the Ninth Circuit, fact and expert discovery, and extensive briefing and a hearing on plaintiffs' motion for class certification and on the parties' respective *Daubert* motions. Plaintiffs' counsel avers that in October 2024, following the close of fact and expert discovery, the parties agreed to mediate this matter. By that time, the parties had thoroughly investigated the factual bases for plaintiffs' conversion claim. *See* Dkt. No. 260-1 ¶ 12. Plaintiffs' counsel further notes that the parties engaged in several mediation sessions, with the assistance of two highly experienced mediators, beginning with two days of in-person mediation sessions in November 2024, followed by several video and telephonic sessions. *Id*. Those negotiations were paused during the *Csupo* trial in the summer of 2025, and while the parties briefed their respective post-trial motions in that case. The parties then resumed their settlement negotiations with the same mediators, including another two days of in-person mediation sessions that took place in October 2025. *Id*. In early November 2025, plaintiffs engaged special settlement counsel to serve exclusively for the putative class and to conduct an independent evaluation of the merits of the case, potential recovery, and risks to recovery. *Id*. ¶ 13. On November 26, 2025, the parties executed a term sheet with the principal terms of a proposed settlement. *Id*. ¶ 14; *see also* Dkt. No. 252. The parties executed their settlement agreement on December 23, 2025. Dkt. No. 260-1 ¶ 14; Dkt. No. 260-11. Plaintiffs' counsel, Mr. Summers, attests that the settlement negotiations "were completely at arms-length" and were "at times contentious"—an assertion echoed by Google's counsel at the preliminary approval hearing. *See* Dkt. No. 260-1 ¶ 15; *see also* Dkt. No. 266. At the motion hearing, plaintiffs' counsel expressed that the negotiations were difficult and that there were times when it appeared that the parties might not be able to agree on a settlement, which is also reflected in the parties' status reports to the Court last fall. *See, e.g.,* Dkt. No. 243, 245.

While the mere presence of a neutral mediator is not, by itself, determinative, *see Bluetooth*, 654 F.3d at 948, here the parties' considerable mediation efforts, which occurred after

United States District Court
Northern District of California

1    all discovery was completed and over an extended period time, the apparent complexity and

2    difficulty of the negotiations, the parties' reliance on experienced neutral mediators, and plaintiffs'

3    consideration of special settlement counsel's assessment, demonstrate that the parties had a

4    comprehensive understanding of the merits of their case before settlement negotiations began, and

5    had sufficient information to make an informed decision about settlement.

6         These factors weigh in favor of preliminary approval of the settlement.

7              **4.    Experience and Views of Counsel**

8         The record indicates that plaintiffs' counsel are highly experienced litigators.  Plaintiffs'

9    counsel avers that their respective firms are well experienced in handling large, complex litigation

10   across the country, including class actions.  Counsel also aver that their respective firms and

11   litigation teams are experienced in litigating a wide variety of cases, including antitrust, consumer

12   fraud, and technology matters.  *See* Dkt. No. 260-1 ¶¶ 3-11 & Exs. 1-9; Dkt. No. 260-15 ¶¶ 19-31

13   & Ex. 1.  Plaintiffs' counsel opine that the proposed settlement is fair, reasonable, adequate, and in

14   the best interests of the class, in view of significant risks of proceeding with the litigation through

15   trial.  *See* Dkt. No. 260-1 ¶¶ 16-26; Dkt. No. 260-15 ¶ 4.  The Court gives considerable weight to

16   plaintiffs' counsel's opinions regarding the settlement, in view of their experience and familiarity

17   with the litigation.  *See Bellinghausen*, 306 F.R.D. at 257.  Special settlement counsel also

18   expresses his view that the settlement is reasonable, fair, adequate, and in the best interests of the

19   class, "given the many risks to success on liability and to the amount of any potential recovery."

20   Dkt. No. 260-25 ¶¶ 6, 10.

21        This factor weighs in favor of preliminary approval of the settlement.

22             **5.    Adequate Representation and Equitable Treatment**

23        As discussed above, the Court finds that plaintiffs' interests appear to be aligned with those

24   of the proposed class and that plaintiffs will fairly and adequately protect the interests of the class.

25        In assessing whether "the proposal treats class members equitably relative to each other,"

26   Fed. R. Civ. P. 23(e)(2)(D), the Court considers whether the proposed settlement "improperly

27   grant[s] preferential treatment to class representatives or segments of the class . . .."  *In re*

28   *Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007) (citation modified).  The

United States District Court
Northern District of California

23

proposed settlement permits each of the three named plaintiffs—Joseph Taylor, Mick Cleary, and

Jennifer Nelson—to apply for a service award of up to $25,000, also commonly referred to as an

"incentive award," for a total of up to $75,000.  *See* Dkt. No. 260-11 § 12.5.  "Incentive awards

are payments to class representatives for their service to the class in bringing the lawsuit,"

*Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1163 (9th Cir. 2013), and "compensate class

representatives for work done on behalf of the class, to make up for financial or reputational risk

undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private

attorney general," *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009).  While

such awards are permissible and "are fairly typical in class action cases," they are also

discretionary, *Rodriguez*, 563 F.3d at 958, and must be reasonable, *Staton*, 327 F.3d at 977.  The

Ninth Circuit has cautioned that granting incentive awards "should not become routine practice."

*Radcliffe*, 715 F.3d at 1163 (citing *Staton*, 327 F.3d at 975).  Rather, "district courts must be

vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the

class representatives" because incentive awards may also "corrupt the settlement by undermining

the adequacy of the class representatives and class counsel."  *Id*. at 1164.

There is a very significant disparity between the proposed incentive award of up to

$25,000 for each of the three named plaintiffs and the individual payments to the rest of the class

members.  "A class representative must justify an incentive award through evidence demonstrating

the quality of plaintiff's representative service, such as substantial efforts taken as class

representative to justify the discrepancy between [the] award and those of the unnamed plaintiffs."

*Bellinghausen*, 303 F.R.D. at 623 (citation modified; citations omitted).  The proposed incentive

awards may be reasonable, taking into account "the number of class representatives, the average

incentive award amount, and the proportion of the total settlement that is spent on incentive

awards," *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 947 (9th Cir. 2015), as well as

"the actions the plaintiff has taken to protect the interests of the class, the degree to which the class

has benefited from those actions, the amount of time and effort the plaintiff expended in pursuing

the litigation and reasonable fears of workplace retaliation," *Staton*, 327 F.3d at 977 (citation

modified); *see also In re Apple Inc. Device Performance Litig.*, 50 F.4th at 786 (incentive awards

must be "limited to that which is deemed 'reasonable' under the circumstances.") (citation modified).

Plaintiffs' proposed incentive award must be approved by the Court and is not guaranteed. *See* Dkt. No. 260-11 § 12.5. As the named plaintiffs have not yet filed their anticipated motions for incentive awards or provided any declarations about the efforts they contributed to this action, the Court cannot on this record determine whether the proposed incentive payments are fair or should be granted. In determining whether any plaintiff's request for an incentive award will be approved, the Court will closely scrutinize each plaintiff's contributions on behalf of the class and determine whether the award he or she requests is reasonable. *See, e.g., In re Facebook, Inc. Internet Tracking Litig.*, No. 22-16903, 2024 WL 700985, at *2 (9th Cir. Feb. 21, 2024), *cert. denied sub nom. Isaacson v. Meta Platforms, Inc.*, 145 S. Ct. 1138 (2025) (characterizing as "modest" service awards of $3,000 to $5,000 for each of seven class representatives); *Jarrell v. Amerigas Propane, Inc.*, No. 16-cv-01481-JST, 2018 WL 1640055, at *4 (N.D. Cal. Apr. 5, 2018) (rejecting class representative's application for a $10,000 service award when his involvement in the lawsuit did not "go beyond what would be expected of any class representative," " was not a current employee during the pendency of this lawsuit and therefore did not risk retaliation," and the award in question was "more than the average class recovery before fees, and more than double the average class recovery after fees").

While the Court has some concerns about the amount of the proposed incentive payments, at this time it has not been presented with evidence that the amount unduly influenced plaintiffs to accept a settlement on behalf of the class. Nothing in the present record suggests that the proposed settlement is conditioned or contingent upon any incentive award, or that plaintiffs only agreed to serve as representatives of the class because they were guaranteed incentive payments of this amount. The significant settlement amount, robust injunctive relief, the extensive arms-length settlement negotiations, the lack of reversion, and the appropriate scope of release all indicate that the proposed settlement is otherwise fair.

### 6.    Potential for Collusion and Attorneys' Fees Award

Courts "must be particularly vigilant not only for explicit collusion, but also for more

1    subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain

2    class members to infect the negotiations." *In re Bluetooth*, 654 F.3d at 947.  As noted above, such

3    signs include (1) class counsel's receipt of a disproportionate distribution of the settlement, (2) a

4    "clear sailing" agreement "providing for the payment of attorneys' fees separate and apart from

5    class funds, which carries the potential of enabling a defendant to pay class counsel excessive fees

6    and costs in exchange for counsel accepting an unfair settlement on behalf of the class"; and (3) an

7    arrangement whereby fees that are not awarded revert to the defendants, rather than being added to

8    the class fund.  *Id*.

9        The second and third *Bluetooth* factors do not present an issue, as the settlement agreement

10    does not contain a "clear sailing" agreement, and the proposed settlement is non-reversionary.

11    There is also no indication that the proposed settlement is conditioned or contingent upon an

12    award of attorneys' fees.

13        With respect to the amount of fees that will be requested, while the settlement agreement

14    permits plaintiffs' counsel to seek an attorneys' fees award of up to 33% of the total settlement

15    fund, counsel state that they intend to request fees of no more than $39,825,000, which represents

16    29.5% of the total settlement fund.  *See* Dkt. No. 260-11 § 12.1; Dkt. No. 260 at ECF 28.  Even so,

17    the Ninth Circuit has held that an award representing 25% of a common settlement fund is a

18    "benchmark" for a reasonable fee award, unless special circumstances warrant a departure.  *See In*

19    *re Bluetooth*, 654 F.3d at 942; *Staton*, 327 F.3d at 968; *see also Vigil v. Hyatt Corp*., No. 22-cv-

20    00693-HSG, 2024 WL 2137640, at *7-9 (N.D. Cal. May 13, 2024) (describing why fee award

21    above 25% benchmark was not warranted).

22        As the settlement agreement contemplates that any award of fees will be the subject of a

23    separate motion, the matter need not be addressed conclusively at the preliminary approval stage.

24    However, as discussed at the preliminary approval hearing, in any fees motion, plaintiffs' counsel

25    should be prepared to answer the following questions:  (1) In view of the different posture of

26    *Csupo* and the present litigation, what are the differences (if any) in the fees requested and/or

27    obtained in *Csupo* and those sought in the present litigation? (2) As the Court understands that

28    some amount of work was done and used in both cases, how (if at all) is the overlap accounted for

United States District Court
Northern District of California

26

with respect to the requested lodestar amount? and (3) Do the requested fees include fees for special settlement counsel, or are special settlement counsel's fees being paid from some other source?

### 7.    Adequacy of Notice and Plan for Distribution

#### a.    Notice

Under Federal Rule of Civil Procedure 23(e), the Court "must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1)(B). For any class certified under Rule 23(b)(3), Rule 23(c)(2)(B) requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Specifically, "[t]he notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment under Rule 23(c)(3)." Fed. R. Civ. P. 23(c)(2)(B). "Notice is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Churchill Village, LLC v. Gen'l Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (citation modified; citation omitted). Although Rule 23 requires that reasonable efforts be made to reach all class members, it does not require that each class member actually receive notice. *See Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994) (noting that the standard for class notice is "best practicable" notice, not "actually received" notice).

The proposed plan for providing class members with this notice is sufficient. Pursuant to the settlement, Google will provide Angeion with the email addresses associated with class members' Android accounts, and Angeion will email notice of the settlement to those addresses. Dkt. No. 260-11 § 7.3. Based on the results of emailed notices in the *Csupo* litigation, and assuming the class information Angeion receives is of similar quality to that received in *Csupo*, Angeion expects to receive valid email addresses for approximately 77.4% percent of the class.

*See* Dkt. No. 260-18 ¶ 23.  Angeion will also attempt to obtain updated email address information for any email address for which the notice of settlement cannot be delivered.  *Id*. ¶ 22.  Additionally, the settlement agreement requires the administrator to maintain a dedicated website for the benefit of class members as follows:

> The Settlement Website shall (i) post, without limitation, the Class Action Complaint, [the parties' December 23, 2025 settlement agreement], the Notice, and the Payment Form; (ii) notify Class Members of their rights to object and to opt out; (iii) inform Class Members that they should monitor the Settlement Website for developments; and (iv) to the extent reasonably practicable provide estimates or estimated ranges of the Settlement Payments based on the number of Class Members and other relevant factors.  The Settlement Website also will include answers to frequently asked questions; a list of important deadlines; case documents; and contact information for the Settlement Administrator.  Class Counsel shall determine the content of the Settlement Website, and Google shall have the right to approve such content before it is posted, which approval shall not be unreasonably withheld or delayed.

Dkt. No. 260-11 § 7.5; *see also id*. § 1.43.  In a further effort to reach class members, Angeion will also conduct a targeted online advertising campaign using social media.  *See* Dkt. No. 260-18 ¶¶ 26-36.

The Court finds that the information provided in the proposed notice (*see* Dkt. No. 260-20; Dkt. No. 260-21) meets the requirements of Rule 23(c)(2)(B) and appears to be reasonably designed to reach a substantial number of class members.

### b.    Distribution

Under the proposed plan of distribution, individual payments to class members will be made electronically and on a *pro rata* basis.  *See* Dkt. No. 260-11 §§ 3.12, 3.13; Dkt. No. 260-18 ¶ 48.  As noted above, the amount of the *pro rata* payment to each class member will be calculated by dividing the net settlement fund by the total number of class members.  *See* Dkt. No. 260-18 ¶ 48.  This means that individual class members will be paid the same amount, regardless of the length of time they have been an Android user.  At the preliminary approval hearing, plaintiffs' counsel noted that Google may not have the data necessary to determine the length of time for which class members have had Android phones.  Dkt. No. 266.  More fundamentally, counsel explained that in view of the magnitude of the class, the burden and difficulty of calculating

United States District Court
Northern District of California

1    individual payments for more than 100 million class members would result in higher settlement

2    administration costs, which would not make sense in view of the relatively modest payments to

3    individual class members.  The proposed calculation method therefore is intended to simplify the

4    calculation of individual class member payments and lower settlement administration costs,

5    yielding a greater benefit to the class as a whole.

6            Given the size of the class, the proposed electronic distribution of payments is also

7    intended to pay class members directly and as quickly and efficiently as possible.  Plaintiffs state

8    that the estimated settlement administration costs, representing 6.8% of the settlement fund,

9    consist largely of the transaction fees charged by electronic payment processors for individual

10   settlement payments, and that such fees are far lower than the costs of mailing hard copy checks to

11   class members.  Dkt. No. 260-15 ¶¶ 14, 15; Dkt. No. 260-18 ¶ 62.  Additionally, plaintiffs'

12   counsel avers that the proposed settlement administrator was able to negotiate a lower per-

13   transaction fee (the lowest that plaintiffs' counsel is aware of in any prior case), and submitted a

14   bid that was 60-70% lower than the other two potential settlement administrators.  Dkt. No. 260-

15   15 ¶ 15.  The estimated settlement administration costs are similar to those approved in other

16   cases.  *See Cottle v. Plaid Inc.*, 340 F.R.D. 356, 374 (N.D. Cal. 2021) (approving $58 million

17   settlement involving $5.5 million in settlement administration costs).

18           Class members will not be required to submit a claim form, and will be given the option of

19   selecting a form of electronic payment from available payment options, including Zelle,

20   PayPal/Venmo, ACH transfer, or Virtual Mastercard.  Dkt. No. 260-11 § 3.13.  Angeion

21   anticipates that 1% to 5% of class members will affirmatively select a payment method.  *See* Dkt.

22   No. 260-18 ¶ 67.  For those class members who do not make a selection or whose selected

23   payment method fails, Angeion will attempt to send automatic payments through Zelle, PayPal,

24   and/or Venmo, using information provided by Google.  Angeion estimates that 50-75% of class

25   members will not affirmatively select a payment option and will be paid in this manner.  *Id*.  After

26   the first distribution is completed, any residual funds will be re-distributed to class members on a

27   *pro rata* basis.  If a second distribution is not feasible, any residual funds will be donated to a

28   court-approved *cy pres* recipient.  Dkt. No. 260-11 § 3.14.

United States District Court
Northern District of California

Virtual prepaid cards will not be sent to class members unless they specifically select a prepaid card as their preferred payment method.  *See* Dkt. No. 267 ¶ 3.  Based on its experience in other cases, Angeion estimates that of the 1%-5% of class members who affirmatively choose a payment method, 20% of that group will choose to receive a Virtual Mastercard, meaning that 1% or less of the class will receive a virtual prepaid card.  *Id*.  Angeion avers that it "does not receive compensation from unused funds remaining on pre-paid digital payment cards, including Virtual Mastercards, or from any inactivity fees associated with the non-use of pre-paid digital payment cards including Virtual Mastercards."  *Id*. ¶ 5.  Angeion further avers that it may receive compensation from a third-party digital payment vendor used to facilitate the issuance of prepaid digital cards.  *Id.* ¶ 4.  However, such compensation is pursuant to an arm's-length, enterprise-level master services agreement negotiated independently of, and not specifically with respect to, this case.  *Id*.  Additionally, Angeion confirms that such compensation does not increase the cost to the settlement fund and does not reduce the funds available for distribution to class members. *Id*.

Angeion states that it "will not sell any customer data it receives from Google"; that such customer data "will be used only in performance of duties assigned to the Settlement Administrator in the Settlement Agreement"; and "[a]ll Protected Material," as defined by the stipulated protective order (Dkt. No. 107) received by Angeion will be destroyed following the performance of its duties in administering the settlement.  *Id*. ¶¶ 6.7.

The Court finds that the proposed notice and payment distribution plan weighs in favor of preliminary approval of the settlement.

### 8.    Northern District of California Guidelines

To the extent this District's Guidelines are not addressed in the Ninth Circuit and Rule 23(e)(2) factors discussed above, the Court considers them here.

### a.    Definition of the settlement class

The Guidelines require a motion for preliminary approval of a settlement to state "[a]ny differences between the settlement class and the class proposed in the operative complaint," as well as "an explanation as to why the differences are appropriate in the instant case."  Guidelines

§ 1.1.  For the reasons discussed above, plaintiffs have satisfactorily explained that the class

identified in the FAC and the proposed settlement class are substantially similar.

### b.    Scope of release

The Guidelines require a motion for preliminary approval of a settlement to state "[a]ny

differences between the claims to be released and the claim in the operative complaint," as well as

"an explanation as to why the differences are appropriate."  Guidelines § 1.2.  As discussed above,

the release encompasses:

> any and all claims, liabilities, rights, demands, arbitrations, suits,
> actions, causes of action, obligations, damages, penalties costs,
> attorneys' fees, losses, and remedies of every kind or description
> against [Google]—whether known or unknown, existing or potential
> or that hereafter may exist or might have existed, suspected or
> unsuspected, asserted or unasserted, liquidated or unliquidated,
> legal, statutory, or equitable—that were asserted in the Action, could
> have been asserted in the Action, and/or that reasonably relate to or
> arise from the same predicate facts alleged in the Class Action
> Complaint(s), to the maximum extent allowed by law, regardless of
> whether such claims arise under federal, state, and/or local law,
> statute, ordinance, regulation, common law, or other source of law.

Dkt. No. 260-11 §§ 1.33, 13.  The release excludes claims "already specifically alleged in any

operative complaint in a pending action that was served on Google as of November 26, 2025,"

other than the present action.  *Id.*  The scope of the proposed release is appropriate.  "[T]he Ninth

Circuit allows federal courts to release not only those claims alleged in the complaint, but also

claims 'based on the identical factual predicate as that underlying the claims in the settled class

action.'"  *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 327 (N.D. Cal. 2018) (quoting

*Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010)); *see also Custom LED*, 2013 WL

6114379, at *3, *8 (granting preliminary approval of release of claims "arising out of or relating in

any way to any of the legal, factual, or other allegations made in the Action, or any legal theories

that could have been raised based on the allegations of the Action.").

### c.    Other cases affected by settlement

The Guidelines require the identification of "[a]ny other cases that will be affected by the

settlement," as well as additional information about any such cases, including the claims to be

released and the procedural posture of the actions.  Guidelines § 1.4.  The only case plaintiffs

United States District Court
Northern District of California

1    identify is the *Csupo* action, which asserted the same claim for conversion on behalf of a class

2    limited to California Android phone users.    *See* Dkt. No. 260 at ECF 31.    Counsel for plaintiffs

3    and Google in the present federal action also represented the parties in *Csupo* and negotiated a

4    settlement involving monetary relief and the same injunctive relief, in exchange for an identical

5    release of claims.    *See* Dkt. No. 260-13.    Shortly after the preliminary approval hearing in the

6    present action, the parties advised that the state court granted final approval of the *Csupo*

7    settlement.    *See* Dkt. No. 268.

8                                 **d.    Settlement administration**

9                Under the Guidelines, a motion for preliminary approval should "[i]dentify the proposed

10    settlement administrator, the settlement administrator selection process, how many settlement

11    administrators submitted proposals, what methods of notice and claims payment were proposed,

12    and the lead class counsel's firms' history of engagements with the settlement administrator over

13    the last two years."    Guidelines § 2.1.    Additionally, the motion for preliminary approval should

14    "[a]ddress the settlement administrator's procedures for securely handling class member data

15    (including technical, administrative, and physical controls; retention; destruction; audits; crisis

16    response; etc.), the settlement administrator's acceptance of responsibility and maintenance of

17    insurance in case of errors, the anticipated administrative costs, the reasonableness of those costs

18    in relation to the value of the settlement, and who will pay the costs."    *Id.* § 2.2.

19                Plaintiffs' counsel avers that Angeion was selected through bids solicited from eight

20    "reputable settlement administration firms."    Dkt. No. 260-15 ¶ 12.    Four firms did not respond; a

21    fifth responded, but ultimately declined to submit a bid "due to the difficulty of providing

22    automatic payments through PayPal, Venmo, and Zelle."    *Id.* ¶ 13.    Of the three remaining firms,

23    Angeion submitted a bid that "was 60-70% lower than the other two firms."    *Id.* ¶ 14.    Plaintiffs'

24    counsel and Angeion state that Angeion was able to submit a lower bid because it was able to

25    negotiate a lower per-payment charge for the automatic payments to be sent to class members.    *Id.*

26    ¶ 15; *see also* Dkt. No. 260-18 ¶ 62.    The Korein Tillery firm has worked with Angeion on three

27    other matters, and the Bartlit Beck firm has worked with Angeion on one other matter.    *See* Dkt.

28    No. 260-15 ¶ 17; Dkt. No. 260-18 ¶ 63.    Plaintiffs' counsel avers that "Angeion has longstanding

United States District Court
Northern District of California

32

United States District Court
Northern District of California

experience administering settlements similar to this one," and opines that "Angeion has the skill, work ethic, and responsiveness to successfully administer the Settlement." Dkt. No. 260-15 ¶¶ 16, 18.

Mr. Weisbrot also describes Angeion's fraud detection systems, data security practices, and insurance. *See* Dkt. No. 260-18 ¶¶ 43-45, 56-60. As noted above, Mr. Weisbrot also submitted a supplemental declaration attesting that Angeion will not sell to third parties the class member information received from Google; will use such class member information only for the purpose of administering the settlement; and will destroy such information following Angeion's performance of its duties in administering the settlement. Dkt. No. 267 ¶¶ 6, 7.

Plaintiffs have sufficiently explained the process by which Angeion was selected and Angeion's security practices and other information required by the Guidelines.

### e.    Notice

The Guidelines require the parties to "ensure that the class notice is easily understandable, in light of the class members' communication patterns, education levels, and language needs." Guidelines § 3. The Guidelines list certain information that should appear in the notice, such as (1) class counsel's contact information; (2) the address for the settlement website to be maintained by the settlement administrator; (3) information on how to access the case docket on PACER, and (4) the date and time of the final approval hearing, and (5) a note advising class members to check the settlement website or the Court's PACER site to confirm that the final approval hearing date has not changed. *Id.* In addition, "[t]he notice distribution plan should rely on U.S. mail, email, and/or social media as appropriate to achieve the best notice that is practicable under the circumstances, consistent with Federal Rule of Civil Procedure 23(c)(2)." *Id.* As discussed in more detail above, the Court finds that the proposed class notice is sufficient and appropriate.

### f.    Opt-outs

The Guidelines provide that notice to the class "should instruct class members who wish to opt out of the settlement to send a letter, setting forth their name and information needed to be properly identified and to opt out of the settlement, to the settlement administrator and/or the person or entity designated to receive opt outs." Guidelines § 4. Additionally, the notice "should

United States District Court
Northern District of California

1    require only the information needed to opt out of the settlement and no extraneous information or

2    hurdles" and "should clearly advise class members of the deadline, methods to opt out, and the

3    consequences of opting out." *Id*. The proposed notice provides sufficient and appropriate

4    instructions to class members regarding opting-out by a signed letter, as well as other information

5    required by the Guidelines. *See* Dkt. No. 260-11 § 8; Dkt. No. 260-20 at ECF 4-5; Dkt. No. 260-

6    21 at ECF 7. Additionally, under plaintiffs' proposed timeline, class members will have at least

7    35 days to opt out of the settlement. *See* Guidelines § 9; *see also* Dkt. No. 260 at ECF 37.

8        The Court finds that the proposed opt-out procedures are reasonable.

9                            **g.    Objections**

10       Under the Guidelines, the "notice should instruct class members who wish to object to the

11   settlement to send their written objections only to the court, and that "[a]ll objections will be

12   scanned into the electronic case docket, and the parties will receive electronic notices of filings."

13   Guidelines § 5. Additionally, "[t]he notice should make clear that the court can only approve or

14   deny the settlement and cannot change the terms of the settlement" and "should clearly advise

15   class members of the deadline for submission of any objections." The proposed notices to be sent

16   to class members has all of the information required by the Guidelines § 5. *See* Dkt. No. 260-20 at

17   ECF 5; Dkt. No. 260-21 at ECF 8; *see also* Dkt. No. 260-11 § 9. Additionally, under plaintiffs'

18   proposed timeline, class members will have at least 35 days to object to the settlement. *See*

19   Guidelines § 9; *see also* Dkt. No. 260 at ECF 37.

20       The Court finds that the proposed procedures for objections are reasonable.

21                           **h.    Comparable outcomes**

22       The Guidance also requires the parties to "provide information about comparable cases,

23   including settlements and litigation outcomes." Guidance § 11. Plaintiffs state that while they

24   were not able to find comparable conversion cases, they have provided a chart of cases involving

25   data and privacy issues, with comparably large potential recoveries, settlement amounts, and class

26   sizes. *See* Dkt. No. 260-17. While plaintiffs' chart indicates that the individual payments in those

27   other cases are higher than in the present action, the anticipated payment rate in the present case is

28   expected to range between 55% and 80% compared to much lower payment rates in the cases

identified in plaintiffs' chart.  For the reasons discussed above, the Court finds that the amount and benefit to the class offered by the proposed settlement is reasonable.

* * *

The Court finds that the proposed settlement is reasonable, fair, and adequate such that preliminary approval of the settlement is appropriate.

## V.    CONCLUSION

Based on the foregoing, plaintiffs' motion for preliminary approval of their class action settlement is granted as follows:

1. The Court finds, preliminarily and for purposes of this settlement only, that the requirements of Rule 23 of the Federal Rules of Civil Procedure and other laws and rules applicable to preliminary settlement approval of class actions have been satisfied.

2. The Court preliminarily approves the settlement of this action as memorialized in the parties' December 23, 2025 settlement agreement, subject to further consideration at the final approval hearing described below.

3. The Court conditionally certifies, for purposes of implementing the settlement, the following settlement class:  All natural persons in the United States, who have used mobile devices running the Android operating system to access the internet through cellular data networks operated by mobile carriers from November 12, 2017 to the date of the Final Order, excluding persons who are class members in *Csupo et al v. Google LLC*, Santa Clara Superior Court Case No. 19CV352557.

4. The Court appoints Joseph Taylor, Mick Cleary, and Jennifer Nelson as representatives of the settlement class.

5. The Court appoints Glen E. Summers of Bartlit Beck LLP and Marc A. Wallenstein of Korein Tillery LLC as settlement class counsel.

6. The Court approves the selection of Angeion Group, LLC as the settlement administrator.

7. The deadline for plaintiffs to file a motion for attorneys' fees, costs and expenses, and service awards is **April 24, 2026**.

8. The deadline for settlement class members to submit opt-out requests or objections to the settlement is **May 29, 2026**.

9. The deadline for filing a motion for final approval of the settlement is **June 12, 2026**.

10. The Final Approval Hearing will be held on **June 23, 2026 at 10:00 a.m.** before the Honorable Virginia K. DeMarchi, in Courtroom 2, 5th Floor, of the United States District Court for the Northern District of California, located at the San Jose Federal Courthouse, 280 South 1st Street, San Jose, California 95113.  The hearing may be re-set or continued without further notice to settlement class members.

**IT IS SO ORDERED.**

Dated: March 5, 2026

Virginia K. DeMarchi
United States Magistrate Judge