Mike Sussman
1686 S FEDERAL HWY #151
DELRAY BEACH, FL 33483
mike.sussman@pm.me
Notice ID: GGT101717178

**FILED**

**JUN 01 2026**

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA
SAN JOSE OFFICE

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

Joseph Taylor, et al., v. Google LLC
Case No. 20-cv-07956-VKD

## OBJECTION TO CLASS ACTION SETTLEMENT

Michael Sussman ("Objector") respectfully submits this objection pursuant to Federal Rule of Civil Procedure 23(e)(5). Objector received a Class Action Notice regarding the above-captioned matter with Notice ID: GGT101717178.

The proposed Settlement fails to satisfy Rule 23(e)'s requirement that class action settlements be fair, reasonable, and adequate. Its defects are structural, not incidental, and arise directly from the Settlement's design: an overbroad release, a closed and exclusionary distribution mechanism, the absence of any injury verification, an ineffective and self-funded notice program, and undisclosed claims administration practices. Taken together, these deficiencies deprive the class of meaningful relief while extinguishing valuable rights.

## I. INTRODUCTION

The Settlement suffers from several interrelated defects:

- A sweeping release that extinguishes known and unknown claims far beyond the scope of the litigation (California Civil Code §1542 waiver per §13.3 of the settlement agreement);
- A closed, email-dependent "payment election" distribution system referred to and described in §4 as "optional," yet functionally required for participation because no alternative mechanism exists for class members who do not receive or respond to the Payment Election Email.
- No mechanism to distinguish between injured and uninjured class members (§1.5);
- A notice program funded by the class itself despite its foreseeable ineffectiveness (§1.18 - §1.19; §7); and
- Undisclosed claims administration practices (§1.40)

1

These features are not independent flaws—they reinforce one another. A broad release paired with a narrow and unreliable distribution process ensures that class members relinquish rights without receiving commensurate value.

## II. THE RELEASE IS OVERBROAD AND EXTENDS TO UNKNOWN AND FUTURE CLAIMS

The Settlement defines "Released Claims" in sweeping terms, encompassing:

- "Any and all claims… whether known or unknown… suspected or unsuspected… that hereafter may exist,"
- Claims broadly related to Android devices and "passive transfers of any kind" (§1.33), and
- A complete bar on future litigation, with class members expressly assuming the risk of unknown facts (§13.2).

This is reinforced by an express waiver of California Civil Code §1542, extinguishing claims that class members do not know exist at the time of release.

The breadth of this release is untethered to the specific claims litigated. In exchange, class members receive, at most, $100 (§3.9)—and often nothing at all unless they successfully navigate the Settlement's restrictive distribution system (§4.1). This mismatch between the scope of the release and the value of relief renders the Settlement substantively unfair.

Worse, a settlement cannot release future claims such as those that "hereafter may exist" but do not exist at the time of approval.  This would enable Google to engage in similar conduct or even more egregious conduct.

California courts have explained that the waiver requires analysis and is generally "not appropriate." California courts require authority and factual reasons why the case is an exception. Israel-Curley v. California Fair Plan, 126 Cal.App.4th 123, 129 (2005); Salehi v. Surfside III Condominium Owners' Assn., 200 Cal.App.4th 1146, 1159–1161 (2011).

The California courts' guide to state class actions explains, "a section 1542 waiver by absent class members is generally inappropriate in the class settlement context." See Page 12, Judge Melissa McCormick, Guidelines for Approval of Class Action Settlements & Paga Settlements (Sept. 3, 2025), retrieved May 26, 2026, from https://www.occourts.org/system/files/civil/cx105-motions-preliminary-approval-class-action-settlement-guidelines.pdf

2

## III. THE DISTRIBUTION STRUCTURE IS CLOSED, EMAIL-DEPENDENT, AND EXCLUSIONARY

### A. Participation Is Conditioned on Receipt of an Email

The Settlement does not provide a traditional claims process. Instead, it requires class members to respond to a "Payment Election Email" sent by the Settlement Administrator (§4.1). Despite the payment election process being described as "optional" there is no meaningful mechanism for a class member to initiate a claim independently if that email is not received. As a result, the Settlement operates as a closed system in which access to relief is controlled by receipt of a single communication, raising concerns under Rule 23(e)(2)(C)(ii) regarding the effectiveness of the distribution method. It also does not treat Class Members "equitably relative to each other" as required by Rule 23(e)(2)(D) considering that a person that no longer has access to the email is denied the ability to file a claim.

### B. The Design Predictably Excludes Large Segments of the Class

Because eligibility is functionally tied to receipt of an email (which is not guaranteed to reach the class member's inbox and may be diverted to spam or junk folders), the Settlement systematically excludes class members who:

- No longer access associated email accounts,
- Have abandoned or inactive Gmail accounts, or
- Do not receive the email due to filtering or delivery failure.

Google itself maintains policies permitting deletion of inactive accounts after two years of inactivity. See Google's Account Inactivity Policy (*https://support.google.com/accounts/answer/12418290?hl=en*). As a result, many class members that fall into this category may never receive notice of eligibility or the credentials necessary to obtain payment.

The absence of any meaningful fallback mechanism is not a minor administrative defect—it is a structural barrier to participation.

As explained above, this violates Rule 23(e)(2)(C)(ii) and (D).

### C. The Settlement Is Simultaneously Overinclusive and Underinclusive.

The class definition broadly includes individuals who used Android devices that consumed cellular data (§1.5), regardless of injury. Yet the distribution mechanism excludes many actual class members who cannot access the email-based system.

The result is a Settlement that is internally inconsistent:

3

- **It is overinclusive and overbroad** because it includes uninjured individuals (such as users on unlimited data plans, individuals who did not pay for their data usage, individuals who had service on a corporate account paid for by their employer or family member, and even people who borrowed a telephone but "used" the device thus falling into the class definition); and
- **Underinclusive in practice**, because it excludes valid class members who no longer have access to the relevant email account or who do not receive the notice email, who paid for the service but did not have their email associated with the account to receive the email. Under the Settlement structure, payment credentials may be routed to device-associated email accounts rather than the individual or entity that incurred the alleged economic loss. (such as an employer that paid for a group cellular plan while employees used the devices associated with the accounts.)

This renders the settlement invalid due to both a lack of standing and creates an unfair and inadequate distribution method in contravention of Rule 23(e)(2)(C)(ii), which requires the Court to assure that the proposed method of distributing relief is effective. As explained in the argument below, it also allows inclusion of class members who lack standing.

## IV. THE SETTLEMENT FAILS TO DISTINGUISH BETWEEN INJURED AND UNINJURED CLASS MEMBERS

The Settlement contains no requirement that claimants attest to, or demonstrate, injury:

- No certification requirement exists in §4.1 or elsewhere;
- No showing of economic loss is required;
- No distinction is made between users with capped data plans and those with unlimited plans.

As a result, individuals who suffered no injury may recover on equal terms with those who did, diluting the limited settlement fund and undermining proportional recovery.

As explained above, the settlement includes any person who "used" an Android telephone over a mobile network, not just those who paid for mobile network services or whose bills were increased as a result of Google's improperly sending and receiving data.

There are several examples of this: A person may have "used" an Android device on a mobile network, but: (1) Had unlimited data so that there would be no loss; (2) Had a third-party paying the service such as an employer or family member; or (3) Borrowed a telephone and "used" the Android telephone on a mobile network. These class members fall into the class definition, and may have received payment numbers, but were not injured. They lack standing. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021)("Every class member must have Article III standing in order to recover individual damages"). Simply put, a class with "a great number of members who for some reason could not have been harmed … is defined too broadly to permit certification." *Messner v. Northshore University HealthSystem*, 669 F.3d 802, 824 (7th Cir. 2012). In *Van v. LLR*, 61 F.4th 1053, 1064 (2023), the Ninth Circuit recognized that any loss, even a fraction of a cent, conferred standing in a

4

class action.  However, in the present case, no loss exists at all with respect to the persons being paid because they simply "used" an Android device on a mobile network.

Worse, the persons who were harmed have no way to recover.  The companies or family members who paid for the service lost the money, but the person who "used" the service receives the payment. Therefore, the settlement cannot be approved absent modification of the class definition to assure that those receiving payment were actually harmed by the actions of Google.

## V. THE NOTICE PROGRAM IS INADEQUATE AND IMPROPERLY FUNDED BY THE CLASS

### A. The Class Bears the Cost

Notice and administration costs—approximately $1.5 million—are deducted from the Settlement Fund (§7), directly reducing class recovery.

### B. The Method of Notice Is Foreseeably Ineffective

The Settlement relies heavily on email notice, despite known issues with:

- Inactive or abandoned accounts, and
- Spam filtering or delivery failures.  (In fact, the objector's notice was found in his SPAM folder despite the account being a Google provided *Gmail* account making it clear that Google itself, despite knowing about the settlement, did not whitelist the claims administrator's email).

### C. Superior Notice Mechanisms Were Available

Defendant both provided the email data and controls the underlying Gmail infrastructure. Yet the Settlement does not require more reliable forms of notice, such as in-account notifications or first-party delivery mechanisms with improved deliverability.

For example, why is the class paying over $1,000,000 for Angeion Group to provide notification to Google's Android users, most of whom have a Google *Gmail* account because of compatibility requirements, instead of Google providing the notices itself?  Moreover, Google knows the identity of the persons whose accounts it deleted because of the two year inactivity policy, so with that data, other forms of notification, such as a post-card mailing, or an email to the account's "backup email," which Google often knows, could be utilized.

### D. The Class Bears the Risk of Failure

Even if notice proves ineffective, its cost is still borne by the class. This structure shifts both the cost and the risk of notice failure to absent class members.

## VI. THE FINANCIAL STRUCTURE FURTHER LIMITS CLASS RECOVERY

Attorneys' fees and costs are deducted from the Settlement Fund (§1.15), and individual recovery is capped at $100 (§3.9).

This limited recovery stands in stark contrast to the breadth of the release, reinforcing the imbalance between what class members give up and what they receive.

## VII. CY PRES RECIPIENT IS NOT IDENTIFIED

The Settlement provides for cy pres distribution of residual funds unable to be practically distributed to the class (§1.38; §3.14). Critically:

- The cy pres recipient is not identified at the time of approval; and

This lack of specificity prevents the Court from evaluating whether the recipient bears a sufficient nexus to the interests of the class.

## VIII. THE COURT LACKS SUFFICIENT INFORMATION TO EVALUATE CLAIMS ADMINISTRATION AND POTENTIAL CONFLICTS

Rule 23(e)(2)(C)(ii) requires the Court to evaluate the effectiveness of the proposed method of distributing relief. That determination cannot be made on the present record due to the absence of material disclosures regarding claims administration.

The Settlement delegates critical functions to third-party administrator Angeion Group (§1.40) but discloses none of the underlying agreements made by Angeion Group governing:

- Compensation structures,
- Relationships with payment vendors,
- Data collection and usage practices, or
- Terms imposed on class members as a condition of payment.

Modern claims administration frequently involves layered financial and technological intermediaries that may introduce:

- Transaction fees or commissions,
- Breakage or dormancy provisions,
- Identity verification barriers,
- Additional contractual obligations, and
- Data-sharing risks.

The Settlement is silent on all of these issues.

6

Class members should not be required to submit additional personal information or accept undisclosed terms without full disclosure and judicial review. Absent disclosure of these arrangements, the Court cannot assess whether the distribution process is fair, effective, or free from conflicts of interest.

## IX. THE SETTLEMENT AGREEMENT FAILS TO PROVIDE ADEQUATE SAFEGUARDS REGARDING CLASS MEMBER DATA

The Settlement provides insufficient transparency and protection regarding the data that class members must provide in order to participate.

The Settlement contemplates that Settlement Administrator Angeion Group will collect and maintain class member data, including through the creation of a database of class member information (§4.6). However, the Agreement does not disclose:

- What specific data will be collected from class members;
- How that data will be used beyond the administration of this Settlement;
- Whether such data will be retained after the conclusion of the Settlement;
- Whether the data will be shared with third parties or subcontractors; or
- What rights, if any, class members have to access, correct, or delete their information

### a.  Angeion Group's Prolific and Continuous Misuse of Judicially Owned Claims Data

Class members should not be required to provide additional personal information as a condition of receiving settlement funds without clear disclosures regarding how that information will be handled and the data already provided to Angeion Group should have a simple, one button method, to delete the data on request.

Specifically, Angeion Group brags that it created a system called AngeionAffirm 2.0. This system is discussed in their press releases. *See* https://www.prnewswire.com/news-releases/angeion-group-announces-angeionaffirm-2-0--302192239. html

According to the press release, they prevent fraud through "unique data insights". The "data insights" include an analysis "largely based on signatures Angeion has identified through the analysis of over 100M claims." *Id.*

In other words, Angeion Group has amassed all of the claims data from other class action cases despite neither obtaining permission from the respective district courts nor the claimants in those settlements. That data was compiled into a database and claims are rejected when the information from *prior claims* does not match the *current claim.*

For instance, in the *In re Telescope* case, **5:20-cv-03639 (NDCal.)**, Angeion *did not* act as the administrator and played no role. Nevertheless, they prepared a declaration attacking objectors in that case. *See* (Temporarily Sealed) Declaration of Ryan Hallman, the Chief Technology Officer of Angeion. Mr. Hallman explains that after settlements, various Class Counsel "reach[] out" to Angeion to ask whether they have "any experience" with objectors "in class action settlements that Angeion has

7

administered." *Id* at 8. This "reach[ing] out" appears to occur without any form of judicial process or notification to claimants.

Angeion then checks to see whether objectors are "linked to claims submitted in other class action matters administered by Angeion" and their executives "queried Angeion's structured databases to obtain the relevant results." In other words, they datamine claims in other class actions without district court approval simply because an attorney from a *different* class action – where they are not even administrator – asked them to. *Id* at 10.

Angeion states, "These structured databases are maintained as part of Angeion's regularly conducted business activities and constitute business records that we consider reliable. My colleagues and I regularly rely on these databases in performing our duties and fulfilling our business responsibilities." *Id*.

What Angeion left out is that it does not notify claimants, or the respective district court judges, that when a person places a claim, the data becomes part of this consumer reporting agency, that it will be disseminated to class counsels in other cases, and that it will be used to launch vicious personal attacks on objectors in class actions.

As to objectors, Angeion conducts "a more extensive investigation" when "individuals suspected of attempting to perpetrate fraudulent activity engage directly with counsel or *appeal to the Court concerning fraud prevention practices and claims submission processes implemented by settlement administrators.* When such circumstances arise, Angeion performs a more detailed review of the individual involved, utilizing public records, reputable third-party data sources, and proprietary resources to further validate its findings and conclusions." *Id* at 16.

Angeion then utilizes databases such as "whitepages.com." *Id* at 18. However, whitepages.com's terms specifically prohibit the use of its data to make decisions about the person's suitability for any "Benefits, privileges or services provided by any business establishment." *See* https://www.whitepages.com/terms-of-service . [1]

In the class action of *Kessler v. Quaker Oats*, 7:24-cv-00526 (S.D.N.Y.), at Entry 75, pages 107, et seq. (Exhibit A attached), Angeion Group provides more information about the data it lifts from other class actions without notifying the appropriate district judges that it was doing so. Angeion Chief

---

[1] Angeion's relying on whitepages.com to investigate claims also violates the terms of service with that company. Angeion promised that it "will take reasonable steps to ensure that the information you receive from the pay-to-use Services is stored in a secure manner," *id*, but it publishes the data freely in public court documents as if the information is accurate. Contrary to Angeion's reliance on whitepages.com for its data verification, the terms state, "**Mistaken Identities.** Extreme care must be taken in the use of information because mistaken identification may occur when relying solely upon name, age, and address to identify individuals." Finally, the data is unverified. "Whitepages does not verify Public Information, Breach Content or any other Content. While we are constantly updating and refining the Services, we do not warrant or guarantee that the results provided will be complete, accurate and up to date and, consequently, Whitepages shall not be responsible or liable for the accuracy, completeness, usefulness, or legality of any Public Information or the availability or unavailability of the Services or Content. Whitepages does not make any representation or warranty as to the character or the integrity of the person, business, or entity that is the subject of any searches. Whitepages also reserves the right to delete any information from its databases at any time." *Id.*

8

Operating Officer Derek Burrows testified as well that Angeion data-mines claims data from other cases when reviewing claims.

Paragraph 18 of the Burrows Declaration shows that Angeion considers it fraudulent when a claim in another case contains different contact information than a current claim, "In this Settlement, the contact information provided by [Objector] with the attempted claim submission *differs from the contact information* provided in the objection and claim submissions in other matters. The attempted claim submission in this matter was flagged as having indicia of fraud."

In other words, Angeion Group takes claims data taken from older cases – all without permission of the respective district courts – and compares it to the newer claim. If the information does not match, the claim is considered to have an "indicia of fraud."

Now, with Class Counsel giving Angeion Group all of Google's email addresses, if a user submits a claim in a different class action using a different email address, Angeion will find an indicia of fraud all while nobody gave them permission to create this type of consumer reporting agency.

Paragraph 36 of Angeion's *Quaker Oats* Declaration confirms the use of data-mining of district court class actions to attack class action objections and also to deny claims. It states, "Finally, Angeion's records show that other submissions under the name [of Objector] have used differing and/or invalid mailing addresses and contact information, including some contact information that appears to be associated with other individuals. As a result, certain submissions were rejected or marked for additional review in accordance with the applicable settlement protocols."

Therefore, this Court needs to immediately take action to segregate and secure all data provided to Angeion Group to assure that they do not access it for their consumer reporting agency, to attack objectors, or to deny claims in other class actions where the courts have not authorized the queries.

Sussman recognizes that the settlement agreement contains an assertion that Angeion will purge the claims data in this case when it is no longer needed; however, with the anticipated appeals and other matters, this could be years from now. Angeion Group literally brags about the use of data from other cases where it has no authority to access those claims for use in other cases. Yet Class Counsel provided Angeion with every email address of persons in the United States that accessed their Google account utilizing a mobile network with only vague protections.

### b. Data-sharing between Angeion Group and Pathward N.A., Blackhawk Networks, and other vendors are not clear or disclosed.

In this case, users can choose an electronic payment such as a Pathward debit card administered by Blackhawk Networks, or by using third-party payment services. To do so, Angeion Group transmits the claims data to Blackhawk and an account is set up on www.myprepaidcenter.com . The transfer of data and privacy policies of Blackhawk are not clearly available or communicated to claimants.

Worse, Blackhawk Network was subject to several data breaches. One of those data breaches resulted in a class action settlement where Blackhawk, on appeal, admitted that its agents provided incorrect information to some cardholders that their accounts were (or were not) breached. *See* https://www.prepaidcarddatabreachsettlement.com/ This settlement is on appeal considering the confusion with claimants not knowing if their data was breached.

In this case, there exists nothing in the settlement agreement that protects the Class Members choosing a prepaid card from Blackhawk or their faulty and breachable website, www.myprepaidcenter.com . No information has been provided to this Court as to how Angeion Group will transmit the personal data to Blackhawk, what data will be transferred, and the limitations on the use of the data.

As discussed in Section VIII, the Settlement does not disclose the full scope of the Settlement Administrator's relationships with third-party vendors or payment processors. Without such disclosure, and without the identities of other vendors, the Court cannot evaluate whether class member data will be subject to additional uses, transfers, or risks beyond those necessary to effectuate the Settlement.

Absent clear limitations and disclosures regarding data collection, retention, and use, the Court cannot conclude that the Settlement provides adequate safeguards for class members' personal information.

## X. ANGEION GROUP RECEIVES KICKBACKS FROM BLACKHAWK NETWORKS

Class Counsel speciously states that, "Angeion avers that it 'does not receive compensation from unused funds remaining on pre-paid digital payment cards, including Virtual Mastercards, or from any inactivity fees associated with the non-use of pre-paid digital payment cards including Virtual Mastercards.' Id. ¶ 5. Angeion further avers that it may receive compensation from a third-party digital payment vendor used to facilitate the issuance of prepaid digital cards. Id. ¶ 4. However, such compensation is pursuant to an arm's-length, enterprise level master services agreement negotiated independently of, and not specifically with respect to, this case. Id. Additionally, Angeion confirms that such compensation does not increase the cost to the settlement fund and does not reduce the funds available for distribution to class members. Id."

That sounds nice, but the reality is that this Court neither reviewed nor approved the "enterprise level master services agreement." Class Counsel is quite aware that Angeion is presently defending a RICO class action for its kickbacks at MDL No. 3162 for two things. First, because it receives money from Blackhawk for the Pathward debit cards that it is utilizing in this case. Second, because it received money from the banks holding the escrows.

In both cases, these do not "increase" the amount the class pays for services to Angeion as Class Counsel furtively states. On the contrary, this vigorish that Angeion receives results in higher fees paid by the class members for things such as inactivity fees on the prepaid debit card or a longer time limit before the card starts incurring fees. Certainly, Blackhawk cannot both provide a lower fee and pay off Angeion.

As Judge Davila noted in *Cabrera v. Google, LLC, No.* 5:11-c-01263-EJD, 2025 U.S. Dist. LEXIS 169496, at *14-15 (N.D. Cal. Aug. 29, 2025), full disclosure is required. Class Counsel glosses over Angeion's arrangement and does not provide any specifics. There simply is nothing for class members to review to challenge the fairness or conflict of interest through this agreement, and without knowing the terms, Class Members cannot point to other products where the class, not the administrator, receives the funds. Class Members have a right to know precisely what is being paid to Angeion, by whom, and precisely for what, and this Court should require certification that it negotiated the absolute lowest fees prior to asking for a commission.

10

**XII.  ANGEION FAILS TO INFORM CLASS MEMBERS OF THE TERMS AND CONDITIONS OF THE BLACKHAWK/PATHWARD DEBIT CARD PRIOR TO THEIR CHOOSING IT AND IT IS NOT POSSIBLE TO RECEIVE A REFUND**

Attached as Exhibit B is a sample contract that governs the consumers choosing a Blackhawk/Pathward debit card.  It includes harsh terms such as the fact that Blackhawk can freeze the account at its whim, that consumers must succumb to arbitration.

However, Angeion Group does not disclose these terms *prior* to the consumer choosing the card.  If a consumer receives the virtual card, reviews the terms, and does not agree, there is no free method to obtain the money.

This Court cannot force consumers into this contract without first advising them what the terms are or providing them the ability to back out once they see the terms.  Forcing class members into a contract as confusing and ambiguous as Exhibit B is more egregious than Google's misconduct that lead to this class action.  Rule 23(e)(2)(C)(ii) requires this Court to analyze the situation and it must end the hypocrisy of granting an award in a class action and then allowing Angeion and Blackhawk to victimize class members once again.

**XIII. THE SETTLEMENT PROVIDES NO ABILITY FOR BUSINESSES TO PLACE A CLAIM AND CONFLICTING INFORMATION ABOUT THE DEFINITION OF THE CLASS AND WHO IS ELIGIBLE RENDERS THE SETTLEMENT UNINTELLIGIBLE AND UNFAIR**

Sussman has a financial interest in several businesses, and the participation of businesses in this settlement will affect the amount paid to each class member.

As explained above, the class definition includes persons who "used" their Android devices on a cellular network but does not necessarily include the real parties harmed, i.e., the businesses that paid for the persons to "use" the service.

The payment form has no place for a business to enter their data. Rather, only a person's data can be entered.

Indeed, the Long Form Notice explains, "You are a class member who is part of this Settlement if you are: (1) a natural person in the United States who (2) has used a mobile device running the Android operating system with a cellular data plan, (3) at any time from November 12, 2017 to the date this Settlement receives final approval, and (4) you are not a class member in Csupo v. Google LLC, Santa Clara County Superior Court, No. 19CV352557, which is a similar lawsuit involving residents of California. If this describes you, you may be able to receive money from this Settlement."

Section 1.5 of the Settlement Agreement also refers to the class as consisting of "all natural persons in the United States, who have used mobile  devices running the Android operating system to access the internet through cellular data networks operated by mobile carriers...."

Natural persons are ordinarily individuals.

However, Section 1.3 in the definitions states that a "person" "means a natural person, individual, or legal entity, including an association or his, her, or its respective successors or assigns.

This makes it unclear whether corporations, entities, schools, government agencies, etc. are releasing their claims considering they are defined in the class as "persons," but the claim and class definition uses the term "natural person."

Section 1.2 seems to release "affiliates" of the natural persons.  However, those "affiliates," to the extent they are corporations, are separate entities from the natural persons.  A class action cannot release the rights of a corporation – which cannot be paid – simply because a class member "controlled" it or "in the past" was "controlled by" the natural person.  Indeed, as corporations are not

natural persons, and because they are the ones who paid for the service, they have a right to file a separate class action for the same causes of action.

## XIV. ONLY THE USER CAN "PERSONALLY" SUBMIT A PAYMENT REQUEST, BUT THE SETTLEMENT RELEASES ASSIGNS, ESTATES, ETC.

The settlement at 4.3(B) states, "Payment Forms must be submitted personally by the Class Member. No Payment Forms will be accepted from third parties."

However, the settlement at 1.35 states, "'Releasing Party' means Plaintiffs and all Class Members and each of their respective trustees, beneficiaries, assigns, heirs, estates, and all other individuals or entities acting or claiming to act on a Releasing Party's behalf."

This cannot be. If a person assigned the claim, or is a member of a trust, passed away, etc., they cannot "personally" submit the payment form. It must be filed by the assignee, trustee, executor, etc. Moreover, as to Estates, there's nothing on the payment form to allow an Estate to enter its full legal name.

This prejudices me and hundreds of thousands of other people. As an example, I am the beneficiary of an Estate. Specifically, my mother was an Android user falling into the class definition, but she passed away. Her claim is now owned by the Estate, of which I am a beneficiary. My mother cannot "personally" submit the payment form, yet the "releasing parties" include her Estate, depriving it of a payment yet releasing the claims.

## XV. THE FEE MOTION DOES NOT COMPLY WITH FED. R. CIV. PROC. 23(h) AND FAILS TO ITEMIZE THE HOURS SPENT

Long after the settlement was announced and the time started ticking for objections, Class Counsel filed a fee motion. The only notice to the class of this motion was that it was buried on the "Important Documents" page of the settlement website. This does not comply with Rule 23(h)(1) which directs that "Notice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner." Rule 23(h)(2) explains that, "A class member, or a party from whom payment is sought, may object to the motion," but this Court provided no instructions for a less sophisticated person to do so. There exists no deadline, no notice to the class, and no information. This Court only provided a deadline for objections to the settlement.

A review of the motion shows that Class Counsel utterly failed to provide an itemization of the time spent on the case. Class Members cannot determine whether the hours are duplicative or necessary. Courts ofter require contemporaneous time records when making a fee application. *Scott v. City of N.Y.*, 626 F.3d 130, 132 (2d Cir. 2010); *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136 (2d Cir.1983)(requiring that all applications for attorney's fees be supported by contemporaneous records").

The Supreme Court explained, "The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the court may reduce the award accordingly." *Hensley v. Echerhart*, 461 US 424, 433 (1983).

Without a clear description of what Class Counsel did, Class Members cannot determine whether the work was duplicative. "[A]mple authority supports reduction in the lodestar figure for ... forms of duplicative or inefficient work." *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 226, 237 (2d Cir. 1987). Reductions on this basis of duplicative work are common. *See, e.g., id.* (ten percent reduction for duplication); *N.Y. State Ass'n for Retarded Child., Inc. v. Carey*, 711 F.2d 1136, 1142 (2d Cir. 1983) (accepting five to twenty-percent reductions for "duplicative claims," among other issues); *Kahlil v. Original Old Homestead Restaurant, Inc.*, 657 F. Supp. 2d 470, 476-77 (S.D.N.Y. 2009)

(fifteen percent reduction for "inefficient billing practices").

"The court also should exclude from this initial fee calculation hours that were not 'reasonably expended.' Cases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Hensley*, 461 US at 434.

While Class Counsel provides us self-serving and colorful brochures justifying extremely expensive hourly fees, Claimants cannot ascertain precisely what they did to rack up all the hours.

## XVI. CLASS COUNSEL FAILS TO JUSTIFY INCENTIVE AWARDS AND DID NOT DISCLOSE THEIR AGREEMENTS WITH THE PLAINTIFFS.

Google used a couple dollars worth of data, but the plaintiffs are to receive a $10,000 incentive award. For what?

Class Counsel neither justifies the award nor provides details of their agreement with the named plaintiffs. Perhaps the agreement with the named plaintiffs presents a conflict of interest or a promise. *Radcliffe v. Experian Information Solutions, Inc.*, 715 F.3d 1157, 1164-1165 (9th Cir. 2013). This Court should have reviewed these agreements.

No justification has been provided for the large rewards. Exact documentation and an explanation about what these plaintiffs did to receive the award should be provided. *Shane Grp., Inc. v. Blue Cross Blue Shield of Mich.*, 825 F.3d 299 (6th Cir. 2016) (reversing and remanding class settlement; noting its concern that approved service awards might be bounties and that court could not evaluate this without documentation of hours). A way to measure the service award is to assign an hourly rate such as $50 an hour. *See Wilson v. Tesla, Inc.*, 833 Fed. Appx. 59, 62 (9th Cir. 2020)($50 to $75 an hour reasonable). Indeed, the criteria that courts should consider when determining whether to grant an incentive award and the amount of the award include: (a) the risk to the class representative in commencing a class action, both financial and otherwise; (b) the notoriety and personal difficulties encountered by the class representative; (c) the amount of time and effort spent by the class representative; (d) the duration of the litigation; and (e) the personal benefit, or lack thereof, enjoyed by the class representative as a result of the litigation. *Staton v. Boeing*, 327 F.3d 938, 977 (9th Cir. 2003); *Van Vranken v. Atlantic Richfield Co.*, 901 F.Supp. 294, 299 (N.D.Cal.1995). Here, none of these factors favor the large incentive award.

Also, to preserve the issue for Supreme Court review, incentive awards may violate precedent and are outright prohibited. *Johnson v. NPAS Sols., LLC*, 975 F.3d 1244, 1255 (11th Cir. 2020). The Eleventh Circuit opines that two cases bar such awards.. *See Trustees v. Greenough*, 105 U.S. 527, 26 L.Ed. 1157 (1881); *Cent. R.R. & Banking Co. v. Pettus*, 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885). Because of the misuse of incentive awards, such as in this case with an excessive amount, the Eleventh Circuit opinion should be followed or, at least, the objection noted for possible appellate review.

## XVII. THE SETTLEMENT DOES NOT COMPLY WITH 28 USC 1715 AND THE SETTLEMENT LACKS FAIRNESS WHERE IT APPEARS THE CLASS PAID FOR COMPLIANCE

13

In this case, Class Counsel stated that, "the settlement administrator will mail notice of the proposed Settlement and Release to the U.S. Attorney General, the State Attorneys General in all states other than California, the Attorney General of the District of Columbia, and the Attorneys General of all five major U.S. territories, within ten days of the filing of this proposed Settlement."

It is unclear why the "settlement administrator" is doing the job of the defendant and it has not been stated who is paying for this action. The Class should not pay for compliance, the Defendant should.

Furthermore, it is a conflict of interest for the Defendant to delegate this to the settlement administrator, who works for the class.

However, what is worse is that the statement of compliance is vague. There has been no proof of service filed.

28 USC §1715(b) requires much more than promising to mail letters. The defendants must send:

(b) (1) a copy of the complaint and any materials filed with the complaint and any amended complaints [...] (2)notice of any scheduled judicial hearing in the class action; (3)any proposed or final notification to class members of— (A) (i)the members' rights to request exclusion from the class action; or (ii) if no right to request exclusion exists, a statement that no such right exists; and (B) a proposed settlement of a class action; (4) any proposed or final class action settlement; (5) any settlement or other agreement contemporaneously made between class counsel and counsel for the defendants; (6) any final judgment or notice of dismissal; (7)(A) if feasible, the names of class members who reside in each State and the estimated proportionate share of the claims of such members to the entire settlement to that State's appropriate State official; or (B) if the provision of information under subsection (A) is not feasible, a reasonable estimate of the number of class members residing in each State and the estimated proportionate share of the claims of such members to the entire settlement; and (8) any written judicial opinion relating to the materials described under subparagraphs (3) through (6).

14

Recently Angeion Group has been slacking on these requirements by sending a link to the class action website or sending a compact disk.  None of these corner cutting actions comply with the statute.

In addition, Angeion Group has been sending notices that state that they do not know the number of people affected in the particular state.  This does not comply with the intent of the statute.

The second problem is that the statute does not direct notice to the state attorney generals, but rather the "appropriate state official:"

> In this section, the term "appropriate State official" means the person in the State who has the primary regulatory or supervisory responsibility with respect to the defendant, or who licenses or otherwise authorizes the defendant to conduct business in the State, if some or all of the matters alleged in the class action are subject to regulation by that person. If there is no primary regulator, supervisor, or licensing authority, or the matters alleged in the class action are not subject to regulation or supervision by that person, then the appropriate State official shall be the State attorney general.

Assuming that 28 USC §1715 was complied with at all, there is no indication that the appellees addressed their notification to the appropriate department head of the state Public Utility Commission or Public Service Commission considering it involves telecommunications services.  For federal, it should probably be served on the Federal Communications Commission for comment.

Every state has similar divisions and there needs to be something more than a promise to send a "notice" to the attorney general.  The intent of 28 USC §1715 was for the *appropriate department* or person to receive notice of the settlement along with an invitation to comment, object, or participate.

Compliance with the statute requires a bit of work, not merely promises to make a generic mass mailing of a "notice." Rather, the statute prohibits settlement approval less than ninety (90) days from the time the appropriate state official receives the 28 USC §1715(b) materials. *California v. Intelligender*, 771 F.3d 1169, 1173 (9th Cir. 2014).  There exists no evidence of compliance in this case.

Therefore, "A class member may refuse to comply with and may choose not to be bound by a settlement agreement or consent decree in a class action if the class member demonstrates that the

15

notice required under subsection (b) has not been provided." 28 USC 1715(e).  In this case, full and complete compliance did not occur.

### XVIII.  UNCASHED CHECKS NEED TO BE TRANSFERRED TO STATE UNCLAIMED PROPERTY AGENCIES; MOREOVER, THERE IS A DISPARITY IN THE TREATMENT OF CLAIMANTS WHO CHOOSE A CHECK AND A DEBIT CARD; AND, NO EXPLANATION IS GIVEN AS TO WHAT HAPPENS TO FUNDS WHERE AN UNSUCCESSFUL ELECTRONIC PAYMENT OCCURRED

This Court maintains a duty under Rule 23(e)(2)(C)(ii) to examine "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims."  In addition, under Rule 23(e)(2)(D) this Court must assure that "the proposal treats class members equitably relative to each other."

If a claimant chooses a Blackhawk virtual card and they do not receive it, the funds are eventually transferred to the unclaimed property agency for the state where the claimant's last address was.

However, if a check is issued and it is not cashed within a short period of time, Angeion Group causes the check to be cancelled.  While a normal check becomes stale in six months, Angeion Group uses an arbitrary amount of time, usually 90 days.  When this occurs, the money reverts back to the res of money with Angeion charging an unknown and probably inflated processing fee.

As to electronic payments such as Zelle, Paypal, etc., it appears unclear what happens to the money if the transfer is not successful.

As to the checks– and probably the non-received electronic payments, the cancellation of the payment and seizure of the money violates the laws of most states.  Uncashed checks are required to go to the appropriate state unclaimed property Bureau.  A court in diversity must apply state law. 28 USC 1652. Unclaimed property laws are compatible with class actions. *All Plaintiffs v. All Defendants*, 645 F.3d 329 (5th Cir. 2011).

"Every state and the District of Columbia has a set of escheat laws, under which holders of abandoned property must turn such property over to the State 'to provide for the safekeeping of abandoned property and then to reunite the abandoned property with its owner.'" Marathon Petroleum Corp. v. Sec'y of Fin. for Delaware, 876 F.3d 481, 488 (3d Cir. 2017) (quoting N.J. Retail Merchs. Ass'n v. Sidamon–Eristoff, 669 F.3d 374, 383 (3d Cir. 2012)). "The right of appropriation by the state of abandoned property has existed for centuries in the common law." Conn. Mut. Life Ins. Co. v. Moore, 333 U.S. 541, 547 (1948). In Texas v. New Jersey, 379 U.S. 674, 677 (1965), the Supreme Court first considered the question of when a state has the right and jurisdiction to escheat unclaimed intangible property. Importantly, the Supreme Court recognized that unclaimed property is the "debt" that is owed by the debtor to the creditor. Id at 680. Reasoning that a debt is the property of the creditor and not the debtor, the Supreme Court established a "primary rule" that "the right and power to escheat

16

the debt should be accorded to the State of the creditor's last known address as shown by the debtor's books and records." Id at 680-681. The Supreme Court chose this primary rule because it "involves a factual issue simple and easy to resolve, and leaves no legal issue to be decided." Id. The Supreme Court affirmed these rules in Pennsylvania v. New York, 407 US 206 (1972)(dispute between states over uncashed money orders) and Delaware v. New York, 507 US 490 (1993)(dispute over uncashed dividend checks).

Here, the uncashed checks are no different than the dispute in Delaware v. New York, and the unclaimed property laws of the claimant's last known address apply.

## XIX. THE SETTLEMENT FAILS RULE 23(e)

The Settlement does not satisfy Rule 23(e)(2) because:

- Relief is not distributed through an effective or inclusive mechanism (§4), as required by Rule 23(e)(2)(C)(ii);
- The release is overbroad and extinguishes unknown claims (§1.33; §13.2–§13.3);
- The class structure fails to distinguish between injured and uninjured members (§1.5);
- The notice program is both inadequate and funded by the class (§1.18 - §1.19; §7); and
- Undisclosed claims administration practices (§1.40)

## XX. THE OPT OUT AND OBJECTION REQUIREMENTS ARE NOT AUTHORIZED

First, there is language in the settlement at Section 9.6 that an objector "shall waive and forfeit any and all rights he or she may have to appear at the Final Approval Hearing and/or to object to this Settlement; shall be bound by all the terms of this Agreement if it is approved by the Court; and shall be forever barred from making any objection to the Settlement at the Final Approval Hearing, on appeal, by way of collateral attack, or otherwise" if they do not comply with other terms – none found in Rule 23(e)(5). While I do not intend to appear at the hearing because my objections are clear and easy to understand, it should not be a requirement that I say so.

None of this is not authorized by Rule 23 and it conflicts with the Rule. For example, 28 USC 1715 allows a challenge to the service requirements at any time, so the settlement cannot waive a collateral attack. The jurisdiction of the appellate court is decided by that forum, not the settlement agreement. Finally, persons that do not receive their email from Angeion because it went to the SPAM folder or due to the closure of an email should not be barred from collateral attack.

As to opt out, it similarly requires a wet ink signature. *See* Section 8.2. There is no basis for this other than to discourage opt outs. The Electronic Signatures in Global and National Commerce Act, 15 USC 7001, et seq., (E-Sign Act), signed into law June 30, 2000, provides a general rule of validity for electronic records and signatures for transactions in or affecting interstate or foreign commerce. Class Counsel cannot overrule this law simply because they do not want people opting out from their absurd settlement.

## XXI. CLASS COUNSEL CANNOT DISCOURAGE OBJECTIONS BY DISALLOWING ATTORNEY FEES TO OBJECTING COUNSEL

Section 9.3 states that Class Members "shall be solely responsible for his or her attorneys' fees and costs." This is not the law on the subject. On the contrary, a Class Member who hires an attorney

may receive attorney fees from the common fund if their objection benefits the class.  This section of the agreement is meant to discourage objections when Class Counsel should be encouraging objections to make the settlement better after they modify and correct all of the aforementioned problems.

## XXII. CONCLUSION

For these reasons, Objector respectfully requests that the Court:

1. Deny final approval of the Settlement; or
2. In the alternative, require modifications including:
   - Implementation of an open and accessible claims process;
   - Adoption of reliable, multi-channel notice procedures;
   - Removal of the settlement administrator or appointment of a special master to assure data commingling did not occur into their Angeion 2.0 consumer reporting agency;
   - Disclosure of all transfers of data to third parties by Angeion Group
   - Require itemization of the hourly work of Class Counsel, notice to the class of the attorney fee motion, and a firm and clear deadline to object.
   - Narrowing of the release to claims actually litigated; and
   - Structural safeguards to ensure that compensation is directed to injured class members and that claims administration is transparent and free from conflicts.
   - Compliance with 28 USC 1715

Dated:  May 28, 2026.


DECLARATION


   I, Michael Sussman, declare and state that the facts stated above are true and correct to the best of my knowledge.  THIS OBJECTION APPLIES TO THE ENTIRE CLASS for the most part.   28 USC 1746.



Respectfully submitted,

Michael Sussman